IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

                Plaintiff,

      v.

Civil Action No.
9:10-CV-1431 (MAD/DEP)

BRIAN FISCHER; ROBERT SCHATTINGER;
RABBI ALEC H. FRIEDMANN; DALE ARTUS;
THOMAS LaVALLEY; MAX PATNODE;
DAVID LUCIA; V. JOHNSON; KEVIN HICKS;
R. TRUDEAU; and IMAM ASSALLAMI FADL,

            Defendants.

---

APPEARANCES:

FOR PLAINTIFF:                OF COUNSEL:

TYRONE WALKER, *Pro Se*
94-A-5258
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    MEGAN M. BROWN, ESQ.
Office of the Attorney General      Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT, RECOMMENDATION AND ORDER

*Pro se* plaintiff Tyrone Walker, a New York State prison inmate, has

commenced this action pursuant to 42 U.S.C. § 1983 against a broad

array of corrections employees, alleging deprivation of his civil rights.  In

his complaint plaintiff sets forth several loosely related claims based upon

occurrences at the facility in which he was confined at the relevant times,

alleging violation of his rights under the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-

1(a), as well as the First, Eighth, and Fourteenth Amendments to the

United States Constitution.

In response to plaintiff's complaint defendants seek dismissal of

several of his claims on a variety of grounds, including lack of personal

involvement and failure to state a cause of action upon which relief may

be granted.  The plaintiff, in turn, has cross-moved for permission to

amend his complaint and join additional parties.  Having carefully

reviewed plaintiff's complaint and supporting exhibits in light of

defendants' arguments and Walker's opposition, I recommend that

defendants' motion be granted, in part, and that certain of plaintiff's claims

be dismissed, with leave to replead.  In addition, in light of my

recommendation regarding the merits of plaintiff's claims and his failure to

include a proposed, fully integrated amended complaint with his motion, I

will deny the plaintiff's pending motion for leave to amend his complaint

and join additional parties, subject to plaintiff's right of amendment as set

forth below.

I.   BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the

New York State Department of Corrections and Community Supervision

("DOCCS"); at the times relevant to his claims he was confined in a

special housing unit ("SHU") cell within the Clinton Correctional Facility

("Clinton"), located in Dannemora, New York.[2]  *See* Complaint (Dkt. No. 1)

¶ 4.  Plaintiff is a Muslim by faith, and suffers from a gastrointestinal

condition that causes him to experience chronic constipation and severe

_____

[1]      In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion, as well as the attached exhibits.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

[2]      Prisoners may be placed in SHU cells for a variety of reasons, in addition to for disciplinary purposes.  *Lee v. Coughlin*, 26 F. Supp. 2d 615, 618 (S.D.N.Y. 1998) (quoting, *inter alia*, 7 N.Y.C.R.R. § 301.6); 7 N.Y.C.R.R. § 301.7.  Inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one of hour of outdoor exercise per day, and are entitled to unlimited legal visits and one non-legal visit per week.  *Id.*  SHU inmates have access to counselors and sick call, and additionally can participate in cell study programs and can receive books from the library.  *Id.*

internal hemorrhoids.  *See id.* at ¶ 18 and Exh. 5.  For those conditions plaintiff receives hemorrhoidal cream periodically, is provided with Metamucil, and has been placed on a Controlled "A" High Fiber Diet.  *Id.* at ¶ 18 and Exh. 1.

Plaintiff's complaint in this action centers, in significant part, upon the alleged failure of prison officials to meet his health and religious dietary needs.  Believing that the prescribed High Fiber Diet did not provide him with adequate fiber, plaintiff filed Grievance No. CL-57436-08 on July 14, 2008, requesting a Kosher Diet, or a Muslim Halal Diet, which, he maintains, would satisfy both his medical needs and religious beliefs.  Complaint (Dkt. No. 1) ¶ 19.  In response, plaintiff was advised that the High Fiber Diet was created by the DOCCS Division of Nutritional Services in accordance with DOCCS policies and complies with all state-wide mandates, and his grievance was therefore denied.  *Id.* at ¶ 19 and Exh. 2.  Plaintiff's appeals of that grievance denial were rejected at both the facility superintendent level and by the DOCCS Central Office Review Committee ("CORC").  *Id.* at ¶ 19.

On July 29, 2008, plaintiff received a communication from Brian LeCuyer, a Nurse Administrator at Clinton, advising that if he was not satisfied with his existing diet he should complete a refusal form

requesting that he be removed from the diet and could speak with the appropriate religious official regarding his desire for a Kosher Diet or Muslim Halal Diet.  *Id.* at ¶ 20 and Exh. 3.

Plaintiff wrote to the Assistant Director of Nutritional Services on July 30, 2008, reiterating his challenge to the adequacy of the High Fiber Diet as set forth in Grievance No. CL-57436-08.  *Id.* at ¶ 25 and Exh. 4. Plaintiff did not receive a response to that communication.  *Id.* at ¶ 25.

On August 1, 2008, plaintiff made a written request to Rabbi Alec H. Friedmann, the Jewish Chaplain at Clinton, requesting that he be placed on a Cold Alternative Diet, or Kosher Diet, to address his health issues, explaining that the diet would be consistent with his religious beliefs. Complaint (Dkt. No. 1) ¶ 22 and Exh. 5.  Rabbi Friedmann wrote back to the plaintiff on August 6, 2008, denying his request and recommending that he instead accept a Religious Alternative Meal ("RAM").  *See id.*  In that communication Rabbi Friedmann informed Walker that the RAM would meet all of the biblical requirements of his chosen religion as a Muslim.  *See id.* at Exh. 5.

After complaining to several prison officials concerning the diet denial, including Clinton Superintendent Dale Artus, Clinton Superintendent of Programs Max Patnode, and DOCCS Commissioner

Brian Fischer, plaintiff voluntarily removed himself from the Controlled "A" High Fiber Diet in September of 2009.  Complaint (Dkt. No. 1) ¶¶ 23-30 and Exh. 12.

A second aspect of plaintiff's complaint concerns a request that he be permitted to observe weekly religious Jumuah sermons, also referred to as Khutbah, by closed circuit television from his SHU cell.  Complaint (Dkt. No. 1) ¶¶ 35-42.  In effort to obtain access to those weekly religious sermons plaintiff filed grievances on October 21, 2008, July 1, 2010, and September 21, 2010; sent a complaint letter on July 28, 2008 to Clinton Superintendent Artus; forwarded a written complaint to DOCCS Commissioner Brian Fischer on August 25, 2008; sent three letters, dated February 10, 2009, February 23, 2009, and March 2, 2009, to Muslim Imam Assallami Fadl; and lodged a complaint, dated September 21, 2010, with Clinton Superintendent Thomas LaValley.  *Id.*; *see also* Complaint (Dkt. No. 1) Exhs. 16-22.

As a third element, plaintiff's complaint asserts a claim of retaliation, alleging that after complaining regarding the failure of prison officials to provide him with the requested diet and access to Jumuah sermons he was moved from his cell location to another where he experienced significantly more unpleasant conditions and was subjected to excessively

6

frequent cell searches.[3]  Complaint (Dkt. No. 1) ¶¶ 43-50.  Plaintiff also claims that his due process rights were violated in connection with that transfer.  *See generally id.*

The fourth and final subject addressed in plaintiff's complaint concerns the denial of his request for a sweet breakfast as part of his religious observance on October 2, 2010 and the fact that the food provided to him in celebration of Ramadan Feast differed from that offered to Muslim inmates in the general prison population.[4]  Complaint (Dkt. No. 1) ¶¶ 68-70.  In anticipation of the 2010 religious feast, and after having been denied his sweet breakfast in 2009, plaintiff wrote to Superintendent Thomas LaValley on September 22, 2010 concerning the matter, hoping to preemptively avoid a similar denial for that year.  *Id.* at ¶ 68 and Exh. 47.  Walker sent a similar letter to the Food Administrator at Clinton on September 28, 2010.  *Id.* at 69 and Exh. 48.  After not receiving his sweet

---

[3]     Apparently the cell searches, characterized by Walker as excessive, revealed the presence of contraband on August 14, 18, 27, and 28, 2008, September 4, and 19, 2008, and November 18, 2008, as evidenced by the issuance of contraband receipts to the plaintiff.  Complaint (Dkt. No. 1) ¶ 59.

[4]     According to the plaintiff the religious feast provided to him in SHU consisted of rice, fish, mess hall cabbage, and mess hall vegetable bean, and did not include other foods, like lamb, bean pie, and chicken, which was provided to Muslims in general population in celebration of the Ramadan Feast.  The sweet breakfast referred to by the plaintiff generally consists of a banana, a donut, coffee cake, and soda and other beverages.  Complaint (Dkt. No. 1) ¶ 70.

7

breakfast, as requested, plaintiff filed a grievance and on October 3, 2010

sent letters to defendants Fischer and LaValley, complaining of the failure

to provide him with the requested sweet breakfast.  *Id.* at ¶ 70 and Exh.

49.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on November 29, 2010.  Dkt. No. 1.

As defendants, plaintiff's complaint names Brian Fischer, the DOCCS

Commissioner; Robert Schattinger, the agency's Director of Nutritional

Services; Dale Artus, the former Superintendent at Clinton; Thomas

LaValley, a former Deputy Superintendent and presently the

Superintendent at the facility; Max Patnode, a Deputy Superintendent at

Clinton; Rabbi Alec H. Friedmann, a Jewish Chaplain at the prison; David

Lucia, a Corrections Lieutenant at Clinton; V. Johnson, the Health

Services Director at Clinton; Kevin Hicks, a Corrections Sergeant; R.

Trudeau, a Corrections Officer; and Imam Assallami Fadl, another

Chaplain at Clinton.  *Id.* Complaint (Dkt. No. 1) ¶¶ 5-15.  Each of the

defendants is named both individually and in his official capacity.  *See id.*

at ¶¶ 5-15.  In his complaint, plaintiff asserts that his religious freedom

rights under the RLUIPA and First Amendment were infringed based upon

defendants' interference with his ability to practice his chosen religion,

8

including through denial of a sweet breakfast and proper feast, the opportunity to observe Jumuah sermons, and the denial of a Kosher Diet, and further that he was unlawfully retaliated against for voicing complaints and subjected to cruel and unusual punishment.[5]  *See generally* Complaint (Dkt. No. 1).

On April 4, 2011, in lieu of answering, defendants moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff's complaint for a variety of reasons.  Dkt. No. 28.  Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 33, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to Rule 28 U.S.C. §636b(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

---

[5]     Despite a claim in his sworn complaint that no previous suits have been filed relating to any matter included as a basis for this action, *see* Complaint (Dkt. No. 1) ¶ 16, there appears to be a considerable overlap between the claims now raised and those asserted in a prior suit filed by Walker with this court.  *See Walker v. Fischer*, No. 9:08-CV-1078 (TJM/AJB).  In that action various claims including, *inter alia*, plaintiff's Eighth Amendment cause of action alleging that the diet provided to him by prison officials has been ineffective to address his constipation and hemorrhoids and that the Cold Alternative Diet, or Kosher Diet, would better treat his digestive condition, were dismissed on motion for summary judgment.  *See* Dkt. No. 9:08-CV-1078, Report and Recommendation dated 7/25/11 (Dkt. No. 116) p. 7 and Decision and Order (Dkt. No. 20) p. 3.  In his complaint in that matter plaintiff accused Rabbi Alec H. Friedmann, a defendant in this action but who was not named in plaintiff's complaint in that suit, of denying his request for a Kosher Diet based upon a status as a Muslim.  *See id.*

Subsequent to the filing of defendants' dismissal motion, plaintiff moved for leave to amend and/or supplement his complaint and to add two defendants.  Dkt. No. 36.  Defendants have opposed plaintiff's motion, arguing both that it fails to comply with the court's requirement that a fully integrated pleading be submitted together with such a motion and that various of the claims he seeks to add are futile.  Dkt. No. 37.  With the submission of a reply on behalf of the plaintiff, which fails to cure these deficiencies, *see* Dkt. No. 38, plaintiff's motion for leave to amend and/or supplement and to join additional parties is similarly ripe for determination.[6]

III.   DISCUSSION

A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in

---

[6]   Plaintiff's motion for leave to amend and to join additional parties falls within the scope of my jurisdiction under 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508-09 and nn. 208 and 209 (N.D.N.Y. 2009).

order to withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. 129, ___, 129 S.

Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,

555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil

Procedure requires that a complaint contain "a short and plain statement

of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

8(a)(2).  *Id.*  While modest in its requirements, that rule commands that a

complaint contain more than mere legal conclusions; "[w]hile legal

conclusions can provide the framework of a complaint, they must be

supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

In deciding a Rule 12(b)(6) dismissal motion, the court must accept

the material facts alleged in the complaint as true and draw all inferences

in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84

S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d

292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003);

*Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).

However, the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.  *Iqbal*, 129 S.

Ct. at 1949.  To withstand a motion to dismiss, a complaint must plead

sufficient facts which, when accepted as true, state a claim which is

plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d

Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the

Second Circuit has observed, "[w]hile *Twombly* does not require

heightened fact pleading of specifics, it does require enough facts to

'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In*

*re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting

*Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

　　　When assessing the sufficiency of a complaint against this

backdrop, particular deference should be afforded to a *pro se* litigant,

whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson*, 127

S. Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by

lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285,

292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346,

350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp.

2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

　　　B.　　Personal Involvement of Supervisory Defendants

　　　In their motion, defendants first seek dismissal of plaintiff's claims

against defendant Fischer, the DOCCS Commissioner, as well as Clinton

Superintendents Artus and LaValley, asserting as a basis their lack of

12

involvement in the conduct giving rise to his claims.  In response, plaintiff

does not appear to seriously question defendants' argument that

Commissioner Fischer was not involved in the relevant conduct to the

degree necessary to establish his liability, but claims that his complaint

sufficiently implicates defendants Artus and LaValley in the constitutional

violations alleged.  *See* Plaintiff's Memorandum (Dkt. No. 33) pp. 23-24.

Plaintiff's claims against those two supervisory defendants surround their

involvement in addressing grievances and complaints lodged by Walker

concerning the conditions forming the basis for his claims.  *See id.*

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)).  In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show some tangible connection

between the constitutional violation alleged and that particular defendant.

*See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Defendants Fischer, Artus, and LaValley are high ranking

supervisory employees within the DOCCS.  As supervisory employees

they cannot be liable for damages under section 1983 solely by virtue of their positions; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. The liability of such a supervisory official for the civil rights violations in issue can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.[7]

---

[7]       Thought the issue of supervisory liability for civil rights violation was addressed by the Supreme Court relatively recently in its decision in *Iqbal*, the Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*. Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States*, 674 F. Supp. 2d 531, 542-544 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth
(continued...)

Defendants' arguments regarding personal involvement on the part of Commissioner Fischer are well taken.  In his complaint, plaintiff alleges that he wrote to Commissioner Fischer in September 2008 raising various issues, including a request for a Kosher Diet.  Complaint (Dkt. No. 1) ¶ 24 and Exh. 7.   While plaintiff goes on to aver that the Commissioner responded to his complaint, the relevant exhibit referenced in and attached to his complaint plainly reveals that the plaintiff's letter was referred by Commissioner Fischer to Deputy Commissioner LeClaire, who responded on behalf of the Commissioner.  *See id.*  Plaintiff also alleges that he wrote to Commissioner Fischer on October 3, 2010 regarding the failure of prison officials to provide him with a sweet breakfast.  *Id.* at ¶ 70 and Exh. 49.  There is no indication in plaintiff's complaint that Commissioner Fischer ever acknowledged or responded to that letter. Without more these allegations, even if true, are insufficient to establish

---

[7](...continued)

in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

the requisite personal involvement on the part of Commissioner Fischer in the constitutional violations alleged.  *Johnson v. Fischer*, No. 9:11-CV-386, 2011 WL 6739520, at \*2 (N.D.N.Y. Dec. 22, 2011) (Sharpe, C.J.) (citations omitted); *see also Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F. Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where the only allegation against him was that he ignored the inmate's request for an investigation)).[8]

Plaintiff's claims against Superintendents Artus and LaValley stand on different footing.  Under *Iqbal* and *Colon* a supervisory employee who becomes aware of an ongoing violation, including for example by way of a report, grievance, or appeal, but fails nonetheless to remedy the wrong, can be held personally accountable for a civil rights violation under section 1983.  *See Iqbal*, 556 U.S. at ___, 129 S. Ct. at 1948-49; *Colon*, 58 F.3d at 873; *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A]

---

[8]      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it.").  Plaintiff's complaint and supporting attachments reveal that he voiced concerns to defendants Artus and LaValley, and show their potential awareness of plaintiff's claims regarding alleged ongoing constitutional deprivations.

Defendant LaValley's awareness of plaintiff's claims of ongoing deprivations is demonstrated by his denial of a grievance filed by the plaintiff regarding the refusal to provide him with a High Fiber Diet, a recurring complaint of the plaintiff.  *See* Complaint (Dkt. No. 1) Exh. 2.  In addition, plaintiff claims to have spoken to defendant LaValley concerning viewing Jumuah sermons via closed circuit television, and an appeal of a grievance concerning that matter to Superintendent Artus was delegated to defendant LaValley, who verbally informed Walker that it would be denied although he never formally answered the grievance.  *See* Complaint (Dkt. No. 1) Exh. 16; *see also* Plaintiff's Memorandum (Dkt. No. 33) p. 23.  Deputy Superintendent LaValley also heard and disposed of an appeal by Walker of the denial of a grievance concerning staff harassment.  *See* Complaint (Dkt. No. 1) Exh. 41.  Based upon these indications that he was or should have been aware of plaintiff's complaints

17

regarding persistent deprivations, and drawing all inferences favorably to the plaintiff, I am unable to conclude that he has not stated a plausible claim of personal involvement on the part of defendant LaValley.

Plaintiff's claims against Superintendent Artus are somewhat scant. Walker alleges that Superintendent Artus was aware of his various complaints, including his request for a Kosher Diet, through verbal discussions and written complaints, but nonetheless failed to take appropriate measures to rectify those ongoing violations. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 23. These allegations, if proven, could potentially establish Superintendent Artus' responsibility for the constitutional and statutory deprivations claimed in plaintiff's complaint. *See Braxton v. Nichols*, No. 08 Civ. 08568(PGG), 2010 WL 1010001, at *9 and n.10 (S.D.N.Y. Mar. 18, 2010).

In sum, at this early procedural juncture I recommend dismissal of plaintiff's claims against Commissioner Fischer based upon lack of personal involvement, but against a finding that plaintiff has not stated a basis for holding Superintendents Artus and LaValley personally liable for the acts complained of in his complaint.

C.    Plaintiff's High Fiber Diet Claims

Defendants next challenge the sufficiency of plaintiff's allegations

concerning the failure of prison officials to provide him with a Cold Alternative (Kosher) Diet.  While this remains somewhat unclear, it appears that plaintiff's claims related to his diet are asserted under both the Eighth Amendment and the free exercise clause of the First Amendment, as well as the RLUIPA.  Defendants maintain that plaintiff's allegations fail to state a plausible cause of action under any of those provisions.

## 1.    First Amendment Free Exercise/RLUIPA

Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents.  *Word v. Croce,* 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001).  This requirement, however, is augmented by RLUIPA and the First Amendment's free exercise clause, which afford protection extending beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, an inmate's diet and participation in religious meals.[9]  *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir. 2004);

---

[9]      The general principles associated with protections under the First Amendment and the RLUIPA are discussed more fully further on in this report.  *See* (continued...)

*Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir. 2003).  The mandate of those provisions is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford*, 352 F.3d at 597; *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992).  "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."  *McEachin,* 357 F.3d at 203.

Plaintiff's complaint nonetheless fails to state a plausible First Amendment and RLUIPA deprivation claim associated with the refusal of prison officials to provide him with a Kosher Diet in lieu of the prescribed Controlled "A" High Fiber Diet.  Plaintiff does not appear to contend that his Controlled "A" Diet does not comport with his religious beliefs as a Muslim.  Instead, he argues that the Cold Alternative (Kosher) Diet would also be consistent with his religious beliefs, and should be made available to him for health reasons.  *See* Complaint (Dkt. No. 1) ¶¶ 22.  The mere fact that the desired Kosher Diet would also have fulfilled his religious dietary needs, as apparently did his High Fiber Diet, does not establish a

―――――――――――――――

[9](...continued)
pp. 28-36, *post*.

20

burden upon his free exercise rights under the First Amendment and the

RLUIPA.  *See Dove v. Broome County Corr. Facility*, No. 9:10–CV–0002,

2011 WL 1118452, at \*9 (N.D.N.Y. Feb. 17, 2011) (Peebles, M.J.), *report*

*and recommendation adopted*, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011)

(Hurd, J.).  I therefore recommend dismissal of any First Amendment and

RLUIPA claims associated with plaintiff's Kosher Diet deprivation.

## 2.    Eighth Amendment

Plaintiff's meal claims are also asserted under the Eighth

Amendment, which prohibits cruel and unusual punishments that involve

the "unnecessary and wanton infliction of pain" and are incompatible with

"the evolving standards of decency that mark the progress of a maturing

society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290,

291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct.

1076, 1084 (1986) (citing, *inter alia, Estelle*).  As was previously noted, the

Eighth Amendment applies to the provision of prison meals, requiring that

inmates be provided with nutritionally adequate meals.  *Word,* 169 F.

Supp. 2d at 226.

I do not understand the plaintiff to be claiming that the meals that

were served to him in accordance with his High Fiber Diet were

nutritionally inadequate.  Rather, it appears that Walker is asserting a

21

medical need for a diet containing an even higher fiber content than the Controlled "A" High Fiber Diet and that his claim should therefore be analyzed as alleging deliberate indifference to a serious medical need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291. To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation that is sufficiently serious by objective terms, "in the sense that a condition of

22

urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### a.    Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care. . .", and centers upon whether prison officials acted reasonably in treating the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at 280.  Where there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).

Objectively, plaintiff's complaint fails to plausibly allege deprivation

of adequate medical care and treatment for a serious medical need.

While Walker's complaint alleges that he suffers from constipation and

internal hemorrhoids, and attaches medical records to confirm those

conditions, *see* Complaint (Dkt. No. 1) ¶ 18 and Exh. 1, it also

demonstrates that he has, in fact, received medical attention for those

conditions.  Moreover, plaintiff's complaint does not allege facts from

which one could conclude that those conditions are sufficiently serious to

meet the objective requirements of the Eighth Amendment.  *Lowman v.*

*Perlman*, No. 9:06-CV-0422, 2008 WL 4104554, at *5 (N.D.N.Y. Aug. 29,

2008) (Kahn, D.J. and Treece, M.J.); *Cabassa v. Gummerson*, No. 01-CV-

1039,  2006 WL 1559215, at *9-10 (N.D.N.Y. Mar. 30, 2006) (Lowe, M.J.),

*report and recommendation adopted* 2006 WL 1555656 (N.D.N.Y. Jun. 1,

2006) (Hurd, D.J.); *Kendall v. Kittles*, 2004 WL 1752818, at *6

("Hemorrhoids, albeit, uncomfortable, are a minor issue, far removed from

the category of medical conditions that have been deemed 'sufficiently

serious' by other courts.").

> b.    Subjective Requirement

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

In addition to failing to state a sufficiently serious medical condition, plaintiff has failed to allege facts showing a plausible claim that any of the defendants were subjectively indifferent to his serious medical needs. Nowhere in his complaint or in the supporting exhibits is it shown that any of the defendants knew of and disregarded an excessive risk to plaintiff's

health or safety by denying him the requested diet.[10]  In his complaint

plaintiff acknowledges that he receives Metamucil and hemorrhoidal

cream to address his medical conditions.  *See* Complaint (Dkt. No. 1) ¶

18.  While plaintiff complains that the Controlled "A" High Fiber Diet does

not meet his needs because of the lack of peanut butter and the reduction

of bread from twelve slices to eight, as well as the lack of desserts,

plaintiff does not point to any adverse impact upon his health other than to

allege, in conclusory terms, that his condition requires that he be provided

with food with a higher fiber content than perceived under the Controlled

"A" High Fiber Diet.  Moreover, plaintiff's claim that the denial of meals

with higher fiber content represents indifference to his medical condition is

undermined by his voluntary discontinuance of the High Fiber Diet in

September 2009.

Because plaintiff has failed to allege facts plausibly demonstrating

his ability to meet both the objective and subjective requirements of the

prevailing Eighth Amendment medical indifference test, I recommend

dismissal of plaintiff's cruel and unusual punishment claim related to his

---

[10]        According to the plaintiff the Cold Alterative, or Kosher, Diet is not only consistent with his religious beliefs, but in his view satisfies his health needs for fiber. *See* Complaint (Dkt. No. 1) ¶ 32.

prison diet.

D.    Plaintiff's Remaining Free Exercise Claims

In addition to challenging his diet, plaintiff asserts that defendants unlawfully interfered with his right to exercise his chosen religion by denying him his "sweet breakfast" upon completion of fasting for the month of Ramadan, depriving him of the full panoply of foods provided to Muslims in the general population for the Ramadan Feast, and failing to provide him with the ability to view weekly Jumuah sermons from his SHU cell.  Complaint (Dkt. No. 1) ¶¶ 35-42 and 68-70.

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to

27

participate in congregate religious services.") (citing cases).  The task of

defining the contours of that right in a prison setting requires the striking of

a delicate balance of the rights of prison inmates against the legitimate

interests of prison officials tasked with maintaining prison security.

*O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S. Ct. 2400, 2404

(1987); *Ford*, 352 F.3d at 588; *Salahuddin,* 993 F.2d at 308.  When

determining whether a refusal by prison officials to permit an inmate's

attendance at a religious service or event impinges upon that individual's

First Amendment free exercise right, the inquiry is "one of

reasonableness, taking into account whether the particular [act] affecting

[the] right. . . is 'reasonably related to legitimate penological interests.'"

*Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S.

951, 111 S. Ct. 372 (1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107

S. Ct. 2254, 2261 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,*

850 F.2d 917, 925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at

348, 107 S. Ct. at 2404).

Courts must analyze free exercise claims by evaluating "1) whether

the practice asserted is religious in the person's scheme of beliefs, and

whether the belief is sincerely held; 2) whether the challenged practice of

28

the prison officials infringes upon the religious belief;[11] and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid*, 850 F.2d at 926 (citations omitted). Examination of plaintiff's free exercise claim within this framework entails application of a three-part, burden shifting analysis. *Id.* at 926. A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes upon his or her sincerely held religious beliefs. *Salahuddin,* 467 F.3d at 274-75; *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). Importantly, in evaluating this factor the court must be wary of "question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigant's interpretations of those creeds[,]" *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S. Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief that is religious in nature. *Ford,* 352

---

[11]    "In *Salahuddin*, the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been 'substantially burdened.'" *Pilgrim v. Artus*, No. 9:07-CV-1001, 2010 WL 3724883, at * 13 n.10 (N.D.N.Y. 2010) (Treece, M.J.) (citing *Salahuddin*, 467 F.3d at 274-75 n. 5 and *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question)), *report and recommendation adopted*, 2010 WL 3724881 (N.D.N.Y. Sep 17, 2010) (Sharpe, J.).

F.3d at 590; *King,* 2007 WL 1017102, at *4.  Once a plaintiff has made this showing, the burden shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny.[12]  *Salahuddin*, 467 F.3d at 474-75; *Livingston v. Griffen*, No. 04-CV-00607, 2007 WL 1500382, at *15 (W.D.N.Y. May 21, 2007).  In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner*.  *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir. 1995); *Livingston,* 2007 WL 1500382, at *15.

As was previously noted, plaintiff has also asserted a claim under the RLUIPA, which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Claims under the RLUIPA are analyzed utilizing

---

[12]     While this protocol is particularly well-suited for analysis of an agency-wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate.  *Salahuddin,* 467 F. 3d at 274 n.4.

principles similar to those which inform the analysis of plaintiff's free exercise claim, although there are subtle distinctions between the two provisions and their application in a prison setting.  *See Salahuddin v. Goord*, 467 F.3d at 274.  The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Harnett v. Barr*, 538 F. Supp. 2d 511, 520 (N.D.N.Y. 2008) (quoting 42 U.S.C. § 2000cc-5(7)(A)).  Under the RLUIPA, as in First Amendment cases, courts apply a burden-shifting analysis.  *See id.* at 520.  The plaintiff bears the initial obligation of showing that his or her religious exercise has been burdened and that the burden is substantial.  *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b)).  The focus then shifts to the government to show that the burden furthers a compelling governmental interest and that it represents the least restrictive means of achieving that interest.  *Hartnett*, 538 F. Supp. 2d at 520*.*

Plaintiff complains of not being provided with a proper Ramadan meal in September 2010 despite having written to Deputy Superintendent LaValley on September 22, 2010 pointing out a similar denial in 2009.[13]

---

[13]     Although not referenced in his complaint, plaintiff apparently wrote to defendant Imam Assallami Fadl in September 2008 complaining that due to actions of
(continued...)

Complaint (Dkt. No. 1) ¶¶ 68-69 and Exh. 49.   Plaintiff alleges that after

sending the letter he learned the sweet breakfast had already been held,

and it was incumbent upon the facility Imam to make arrangements for

preparing and serving the sweet breakfast.  Complaint (Dkt. No. 1) ¶¶ 69-

70 and Exhs. 47, 48, and 49.

Plaintiff's allegations regarding the denial of religious meals on two

isolated occasions are insufficient to meet his burden of establishing

defendants' conduct infringes on his sincerely held religious beliefs under

either the First Amendment or the RLIUPA.  *See DeBlasio v. Rock*, No.

9:09–CV–1077, 2011 WL 4478515, at *18 (N.D.N.Y. 2011) (McAvoy, S.J.)

(finding prisoner's allegation that he was given one meal that did not

comport with his religious beliefs insufficient to establish and Eighth

Amendment claim) (citing *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129

(N.D.N.Y.2003); *Shakur v. Selsky*, 391 F.3d 106 (2d Cir. 2004)); *see also*

*Tafari v. Annets*, No. 06-CV-11360, 2008 WL 4449372, at *1 (S.D.N.Y.

Oct.2, 2008) (adopting magistrate judge's report and recommendation that

denial of kosher meals on two occasions "constitute[d] a *de minimis*, not a

substantial, interference" with the prisoner's free exercise of religion), *aff'd*

---

[13](...continued)
prison officials he was required to break his fast that year with only water.  *See*
Complaint (Dkt. No. 1) Exh. 34.

363 F. App'x 80 (2010); *Dove*, 2011 WL 1118452, at *9 (finding no reasonable factfinder could conclude that by depriving him of his kosher diet for a period of thirty days plaintiff's sincerely held religious beliefs were unlawfully impinged and that legitimate penological concerns did not justify the defendants' actions).  Similarly, his contention that his Ramadan Feast menu, which he does not argue was inconsistent with his religious beliefs, was not identical to the menu offered to non-SHU inmates is insufficient to trigger the protection of the RLUIPA and the First Amendment.  *See Dove*, 2011 WL 1118452, at *9.  Absent a pattern more clearly reflecting a calculated, deliberate infringement by prison officials on the plaintiff's sincerely held religious beliefs by depriving him or her of religious accommodations on more than an isolated, *de minimis* basis, a claim of constitutional significance under the First Amendment and under the RLUIPA is not stated.  *See Thaxton v. Simmons*, No. 9:10–CV–1318 2012 WL 360104, at * 6 (N.D.N.Y. Jan. 5, 2012) (Treece, M.J.), *report and recommendation adopted*, 2012 WL 360141 (N.D.N.Y. Feb. 02, 2012) (D'Agostino, J.); *Alster v. Goord*, 745 F. Supp. 2d 317, 342 (S.D.N.Y. 2010).

The portion of plaintiff's religious exercise claim growing out of the alleged ongoing refusal of prison officials to broadcast Jumuah sermons

to his SHU cell by contrast could be regarded as a sufficiently serious deprivation to state a plausible free exercise claim.  *See Hudson v. Dennehy*, 538 F.  Supp. 2d 400, 414 (D. Mass. 2008) *aff'd sub nom.*, *Crawford v. Clarke,* 578 F.3d 39 (1st Cir. 2009).  Defendants nonetheless assert that plaintiff fails to allege any authority on the part of Imam Fadl, a named defendant, to arrange for a change in DOCCS policy to permit closed circuit television broadcast to SHU cells.  Imam Fadl is identified in plaintiff's complaint as the Chaplain at Clinton.  Complaint (Dkt. No. 1) ¶ 15.  It appears to the court from plaintiff's complaint and supporting exhibits that as Chaplain defendant Fadl has at least some measure of control and autonomy over religious concerns within Clinton.  At this juncture, I am unable to conclude with complete certainty that plaintiff's complaint does not assert a plausible First Amendment and RLUIPA free exercise claim against defendants Fadl, Artus and LaValley related to access to Jumuah sermons, and therefore recommend denial of that portion of defendants' motion seeking his dismissal from the suit.[14]

_____

[14]    In his complaint, plaintiff alleges that he wrote to Imam Fadl on three occasions in February and March 2009, requesting closed circuit television broadcast of Jumuah sermons.  Complaint (Dkt. No. 1) ¶ 39 and Exh. 20.  Plaintiff further indicates that while Imam Fadl did not respond in writing, he verbally advised Walker that he thought it was a good idea "but that he wasn't going to the administration about it; Plaintiff would have to address it on his own with them".  *Id.*  Drawing all inferences and resolving ambiguities in plaintiff's favor, this intimates at least some degree of

(continued...)

34

E.    Sufficiency of Plaintiff's Harassment Claims Against
      Defendants Hicks and Trudeau

Defendants next assert that the causes of action interposed by

Walker against defendants Hicks and Trudeau amount to nothing more

than claims of harassment not cognizable under section 1983 and

therefore seek dismissal of plaintiff's complaint as against those two

defendants.

The bulk of the allegations against defendant Hicks and Trudeau

concern taunting and verbal threats.  *See* Complaint (Dkt. No. 1) ¶¶ 46,

54, 56, 58, 62, and 63.  Such allegations do not suffice to support a

cognizable claim under section 1983; that provision has not been

construed by the courts as imposing a code of professional conduct upon

prison officials.  *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y.

1996) (citations omitted); *Williams v. United States*, No. 07 Civ. 3018,

2010 WL 963474, at * 16 (S.D.N.Y. Feb. 25, 2010), *report and*

*recommendation adopted*, 2010 WL 963465 (Mar. 16, 2010); *see also*

*Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261

F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460,

474 (S.D.N.Y. 1998).  Federal courts are ill-equipped to oversee prison

---

[14](...continued)
authority on the part of Imam Fadl to address the issue.

35

operations and perform human resource functions within such settings;

rather, the function of the courts in a case such as this is to safeguard the

right of prison inmates to be free of cruel and unusual punishment running

afoul of the Eighth Amendment.  *Estelle*, 429 U.S. at 102, 97 S. Ct. at 291.

Mere allegations of verbal abuse do not rise to the level of a constitutional

violation, and are not cognizable under 42 U.S.C. § 1983.  *See Moncrieffe*

*v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29,

2000) (Mordue, J.) (allegations that corrections officer laughed at inmate

not actionable under section 1983) (citation omitted); *Carpio v. Walker*,

No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)

(Pooler, J. & DiBianco, M.J. ) ("verbal harassment alone, unaccompanied

by any injury, no matter how inappropriate, unprofessional, or

reprehensible it might seem, does not rise to the level of an Eighth

Amendment violation").  Nor do threats against inmates amount to a

constitutional violation.  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y.

1995).

Plaintiff has also alleged that defendant Trudeau accused the

plaintiff of attempting to bribe him, issuing a misbehavior report asserting

three charges that included bribery and extortion.  Complaint (Dkt. No. 1)

¶ 47 and Exh. 26.  Although plaintiff's complaint does not expressly so

state, the intimation is that the charge was false.  Standing alone,

however, the mere allegation that a false misbehavior report has been

issued to an inmate similarly does not implicate unconstitutional conduct.[15]

*Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v.*

*Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982,

108 S. Ct. 1273 (1988)).

Because plaintiff's claims against defendants Hicks and Trudeau are

limited to conduct that does not rise to a level sufficient to support a claim

under section 1983, I recommend the dismissal of all claims against those

defendants.

F.    Sufficiency of Plaintiff's Procedural Due Process Claim Against
       Lieutenant Lucia

In his complaint, plaintiff asserts that Corrections Lieutenant Lucia

served as a hearing officer to address defendant Trudeau's misbehavior

report and that during the hearing "[t]he Hearing Officer refused to

consider all the facts that preceded the Misbehavior Report."  Complaint

(Dkt. No. 1) ¶ 47.  Interpreting his claim as asserting a due process cause

---

[15]    The further assertion that a false misbehavior report has been prompted
by retaliatory animus and relates to an inmate having engaged in protected activity, in
contrast, can suffice to state a claim for retaliation.  *Franco v. Kelly*, 854 F.2d 584, 589
(2d Cir. 1988).  No such allegation is contained within plaintiff's complaint.

of action against defendant Lucia, in their motion defendants seek dismissal of that potential claim.

In his complaint Walker asserts that following the disciplinary hearing Corrections Lieutenant Lucia found him guilty of the charges set forth and imposed a penalty which included, *inter alia*, one year of disciplinary SHU confinement.  Complaint (Dkt No. 1) ¶ 47.   In the next paragraph, however, he avers that the disciplinary penalty imposed by defendant "is not an issue because the whole year has been rescinded in the way of modification and time-cuts."  *Id.* at ¶ 48.

In order to establish a procedural due process violation the plaintiff must first show that he was deprived of a cognizable liberty interest. *Tellier v. Fields,* 280 F.2d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  Because it appears that in the end no such deprivation occurred as a result of defendant Lucia's action, that defendant is entitled to dismissal of plaintiff's procedural due process claim against him.  *Ocasio v. Deluke*, No. 08-CV-51 (GLS/DRH) 2010 WL 6001595, at * 7 (N.D.N.Y. Sep. 3, 2010) (Homer, M.J.), *report and recommendation adopted*, 2011 WL 864898 (N.D.N.Y. Mar. 08, 2011) (Sharpe, J.).

G.    Denial of Equal Protection

38

Among the claims contained within plaintiff's complaint is one in which he asserts that his right to equal protection under the Fourteenth Amendment was denied, based upon defendants' refusal to provide him with the requested Kosher Diet.  Complaint (Dkt. No. 1) ¶ 75.  In their motion, defendants do not address this cause of action.  Nonetheless, in light of the procedural posture of the case and the fact that plaintiff is proceeding *in forma pauperis*, the court is empowered to evaluate the sufficiency of that claim *sua sponte*.  *Fitzgerald v. First East Seventh Street Tenants Corp*., 221 F.3d 362 (2d Cir. 2000).

The equal protection clause directs state actors to treat similarly situated people alike.  *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985).  To prove a violation of the equal protection clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class.  *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)).  The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not

39

reasonably related to [any] legitimate penological interests."  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

In this instance, plaintiff's complaint lacks any factual allegations suggesting that the failure to provide Walker with the requested Kosher Diet was based upon intentional or purposeful discrimination directed at an identifiable suspect class.  Under the circumstances, I therefore recommend dismissal of plaintiff's equal protection cause of action as not plausibly stated in his complaint.

H.    Qualified Immunity

The last portion of defendants' motion seeks a finding of qualified immunity with respect to all defendants in connection with plaintiff's claims.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that

40

[his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims."  *Pearson*, 555 U.S. at 232, 129 S.Ct. at 815-16.  The first step requires the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[16] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[17]  Expressly recognizing that the

---

[16]     In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

[17]     In *Okin*, the Second Circuit clarified that the "'objectively reasonable'
(continued...)

41

purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . .  prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[18]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at 818, 821.  In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do

---

[17](...continued)
inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

[18]      Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

The rights implicated in plaintiff's complaint are and were at the relevant times well-established.  The assessment of whether, against that backdrop, defendants acted reasonably in the belief that their actions did not run afoul of rights guaranteed to the plaintiff under the Constitution is a matter which cannot be addressed at this early procedural juncture. I therefore recommend denial of defendants' motion for qualified immunity, without prejudice to the right to renew the argument based upon a more fully developed record. *Phipps v. Gillani*,  9:10–CV–1588, 2012 WL 265727, at *6 (N.D.N.Y. Jan. 5, 2012) (Peebles, M.J.), *report and recommendation adopted*,  2012 WL 264414 (N.D.N.Y. Jan 30, 2012)

(McAvoy, S.J.).

      I.    <u>Whether to Permit Amendment</u>

In this report I am recommending that certain of plaintiff's claims be dismissed as legally deficient.  Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).

In this case, being unable to state definitively that if given the opportunity to amend plaintiff could not cure all or at least some of the deficiencies noted, I recommend that he be given leave to amend, if desired, with respect to the claims for which dismissal is recommended. When amending, plaintiff should consider that any amended pleading will replace the existing complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court.  *See Harris v.*

*City of N.Y.*, 186 F.3d 243, 249 (2d Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); Fed. R. Civ. P. 10(a). Additionally, any amended complaint should allege facts specifically indicating the involvement of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations.  *See Bass,* 790 F.2d 260, 263.

> J.      Plaintiff's Motion For Leave to Amend/Join Parties

Following the filing of defendants' dismissal motion, plaintiff moved for leave to amend his complaint and join two additional parties.  Dkt. No. 36.  In his motion, plaintiff seeks to add Corrections Captain Facteau and Sergeant Delutis as new defendants, and to assert additional claims, including retaliation, based upon events not recounted in his initial complaint, and several of which, he claims, have occurred since the commencement of this action.  *Id.*  Defendants oppose plaintiff's motion in light of the pending dismissal motion, on the basis of plaintiff's failure to satisfy the requirements of this court associated with such motions, and on the ground of futility.

The rules of this court require that a party seeking leave to amend or supplement a pleading submit an unsigned copy of a proposed amended and/or supplemental pleading, as part of the motion, adding that "the

45

proposed amended pleading must be a complete pleading, which shall supersede the original pleading in all respects."  N.D.N.Y.L.R. 7.1(a)(4). Significantly, the rule provides that "[a] party shall not incorporate any portion of its prior pleading into the proposed amended pleading by reference."  *Id.*

Plaintiff's motion for leave to amend and to join additional parties fails to meet this requirement.  Instead, plaintiff has submitted a proposed pleading which adds to, but does not replace, his amended complaint.  In addition, various of the allegations set forth in the proposed amended complaint purport to alter factual allegations contained within plaintiff's initial complaint.  *See, e.g.,* Plaintiff's Proposed Amended and Supplemental Complaint (Dkt. No. 36-2) ¶ 82, 83, and 84.

The requirement of the court's local rules that a fully integrated pleading be submitted for substitution for the pleading to be replaced in connection with a motion for leave to amend and to supplement, with the understanding that if the motion is granted the new pleading will become the operative pleading requiring a response by the defendants, serves an important function, helping to crystalize the claims and defenses in the case and to frame the issues.  To impose upon the court and the defendants the burden of combining two documents into a single pleading,

46

particularly when the second purports to alter the body of the first, is unreasonable and undermines this objective.  It is for this reason the court's local rules require the submission of a new fully integrated pleading in connection with such a motion.  *See Gantt v. Lape*, No. 9:10-CV-0083, 2011 WL 673783, at * 4 (N.D.N.Y. Jan. 18, 2011) (Lowe, M.J.), *report and recommendation adopted*, 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011) (Sharpe, J.).

In light of the court's decision on defendants' dismissal motion and plaintiff's failure to comply with this meaningful requirement of the local rules, I recommend that his motion for leave to amend and/or supplement his complaint, and to join additional parties, be denied, without prejudice to renewal in conformity with the court's local rules.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff's complaint, which sets forth an assortment of claims based upon conduct on the part of the named defendants, states plausible causes of action under the First Amendment and the RLUIPA based upon the failure of prison officials to permit him to observe Jumuah sermons, but fails to set forth cognizable claims for the deprivation of procedural due process or equal protection, or for the denial of plaintiff's rights based upon the failure to provide him with a Kosher Diet and sweet breakfast,

47

and additionally fails to state claims against defendants Fischer, Hicks, Trudeau, and Lucia.  It is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 28) be GRANTED, in part, and that all claims against defendants Fischer, Hicks, Trudeau, Schattinger, Johnson, Patnode and Lucia, and all First Amendment, Eighth Amendment Fourteenth Amendment and RLUIPA claims associated with the denial of a Kosher Diet, a proper Ramadan feast similar to that enjoyed by Muslim inmates in general population, and of a sweet breakfast, be DISMISSED with leave to replead, but that the motion otherwise be DENIED; and it is further

ORDERED, that plaintiff's motion for leave to amend and supplement his complaint, and to join additional parties in the action, (Dkt. Nos. 36 and 38) is DENIED, without prejudice to renewal in compliance with the court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 27, 2012
           Syracuse, NY



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

> FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined.   *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

### C. Eighth Amendment Conditions of Confinement

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

### D. Due Process

### 1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "*could*

cause a great effect" and "*could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D.
Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards;
and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the
Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. Introduction

*1 Plaintiff Jesse L. Stewart, an inmate at Forest State
Correctional Institution, Forest County, Pennsylvania,
brings this action under 42 U.S.C. § 1983, alleging that
defendants Tioga County Jail employees violated his
Eighth and Fourteenth Amendment rights during his
incarceration at Tioga County Jail. (See Compl., Dkt. No.
1.) Defendants moved for summary judgment and for
dismissal based on, among other things, Stewart's refusal
to cooperate at his deposition. (Dkt. No. 30.) On April 26,
2010, Magistrate Judge George H. Lowe issued a Report
and Recommendation Order (R & R) recommending that
defendants' motion for dismissal as a discovery sanction
be denied but that defendants' motion for summary
judgment be granted. (Dkt. No. 38.) Pending are Stewart's
objections to the R & R. (Dkt. No. 39.) For the reasons
that follow, the court adopts the R & R in its entirety.

#### II. Standard of Review

Before entering final judgment, this court routinely
reviews all report-recommendations in cases it has
referred to a magistrate judge. If a party has objected to
specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. See Almonte v. N.Y. State Div.
of Parole, No. 04–cv–484, 2006 WL 149049, at *6–7
(N.D.N.Y. Jan.18, 2006). In those cases where no party
has filed an objection, or only a vague or general objection
has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. See
id.

Summary judgment shall be granted "if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV.
P. 56(c)); see also Globecon Group, LLC v. Hartford Fire
Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). In considering
a motion for summary judgment, the court must "view the
evidence in the light most favorable to the non-moving
party and draw all reasonable inferences in its favor ...."
Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation
omitted). The initial burden is on the moving party to
inform the court of the basis for its motion, and identify
those portions of the pleadings, affidavits, and discovery
and disclosure materials on file that it believes
"demonstrate the absence of a genuine issue of material
fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also SEC v. Kern,
425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute
over a material fact only arises if the evidence would
allow a reasonable jury to return a verdict for the
nonmoving party." Dister v. Cont'l Group, Inc., 859 F.2d
1108, 1114 (2d Cir.1988) (citation omitted). And while
the court remains obliged to read a pro se movant's
supporting papers liberally and "interpret them to raise the
strongest arguments that they suggest," Burgos v. Hopkins,
14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations,
conjecture, and speculation ... are insufficient to create a
genuine issue of fact," Kerzer v. Kingly Mfg., 156 F.3d
396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. Discussion

**\*2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

#### A. Failure to Exhaust Administrative Remedies

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly that administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

#### B. Eighth Amendment Conditions of Confinement Claims

**\*3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed .[FN1]

FN1. Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified "medical life threatening ailments" which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C. *Due Process***

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged

deprivation and that the deprivation imposed " 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection." *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D. *Access to the Courts***

**\*4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute "evidence" sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> [FN2]. The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** &#9902;&#9902; 1358

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

**Prisons 310** &#9902;&#9902; 203

310 Prisons

310II Prisoners and Inmates

310II(D) Health and Medical Care

310k203 k. Reproductive issues. Most Cited
Cases

**Sentencing and Punishment 350H** &#9902;&#9902; 1546

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1546 k. Medical care and treatment. Most
Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

**\*1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1] violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND**[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

**A. Facts**

**1. Parties**

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

**2. Bellamy's Surgery**

In August 2004, while in DOCS custody at Sing Sing

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm."[FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See Bellamy I, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See Bellamy I, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

### 3. Bellamy's Letters to Wright

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility.[FN14] Bellamy's third letter to Wright concerned several matters.[FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

> **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> **FN18.** *See id.*

> **FN19.** *See id.* ¶ 13.

> **FN20.** *See id.* ¶ 14.

> **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> **FN22.** *See id.* ¶ 15.

> **FN23.** *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment . [FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> **FN47.** *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> **FN48.** *Burgos,* 14 F.3d at 790.

> **FN49.** *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> **FN50.** *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> **FN51.** *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

> **FN52.** *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> **FN53.** *Id.*

> **FN54.** *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> **FN55.** *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

> FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

> FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. [FN63]

> FN59. U.S. Const. amend. XI.

> FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

> FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

*6 This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain–indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

[1] Civil Rights 78 🗝 1358

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Constitutional Law 92 🗝 4825

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents Thereof

92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310**         **234**

310 Prisons

    310II Prisoners and Inmates

        310II(E) Place or Mode of Confinement

           310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H**         **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

           350Hk1537 k. Protection from Violence. Most Cited Cases

    Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78**         **1335**

78 Civil Rights

    78III Federal Remedies in General

        78k1334 Persons Liable in General

           78k1335 k. In General. Most Cited Cases

    Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78**         **1355**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

    Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H**         **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ⬅⬅ 1533**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ⬅⬅ 1376(7)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

            78k1376 Government Agencies and Officers

                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⬅⬅ 1376(2)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

            78k1376 Government Agencies and Officers

                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

OPINION & ORDER

SIDNEY H. STEIN, District Judge.

*1 Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.");* *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
Brian FISCHER, Lucien LeClaire, Jr., Teresa
Knapp–David and Trudy Lynn–Caron, Defendants.
No. 9:11–cv–386 (GLS/DRH).

Dec. 22, 2011.
Johnathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, The Capitol, Adrienne J. Kerwin, Assistant
Attorney General, of Counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Johnathan Johnson commenced
this action against Brian Fischer, Commissioner of the
New York Department of Corrections and Community
Supervision ("DOCCS"), Lucien LeClair, Deputy DOCCS
Commissioner, Teresa Knapp–David, DOCCS
Classification and Movement staff member, and Trudy
Lynn–Caron, an Upstate Correctional Facility ("Upstate")
counselor, alleging deliberate indifference to his safety
and cruel and unusual punishment in violation of his
Eighth Amendment rights. (Compl., Dkt. No. 1.)
Defendants moved to dismiss Johnson's claims for lack of
**personal involvement** or, in the alternative, for violation
of the "three strike" provision of 28 U.S.C. § 1915(g).
(Dkt. No. 10, Attach.1.) In a Report–Recommendation (R
& R) dated November 28, 2011, Magistrate Judge David
R. Homer recommended that defendants' motion to
dismiss be granted as to Fischer, LeClaire and
Knapp–David and denied as to Lynn–Caron. (Dkt. No. 15
at 10.) Pending are Johnson's objections to that R & R.

(Dkt. No. 16.) For the reasons that follow, the R & R is
adopted in its entirety.

### II. *Standard of Review*

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations *de novo. See Almonte v. N.Y. State Div.
of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7
(N.D.N.Y. Jan.18, 2006). In those cases where no party
has filed an objection, or only a vague or general objection
has been filed, this court reviews the findings and
recommendations of the magistrate judge for clear error.
*See id.*

### III. *Discussion*

Johnson objects only to Judge Homer's
recommendation that the claims against Fischer, LeClaire
and Knapp–David be dismissed. (Dkt. No. 16.) Judge
Homer's conclusion that Johnson satisfied the "imminent
danger" exception to 28 U.S.C. § 1915(g)'s "three strikes"
provision and his recommendation that Johnson's claims
against Lynn–Caron survive are, therefore, reviewed for
clear error. *Almonte,* 2006 WL 149049 at \*6–7.

In his objections, Johnson largely reiterates the same
factual and legal assertions contained in his initial claim.
(Dkt. No. 16.) Treating these factual rehashings as specific
objections, the court reviews them *de novo.* The crux of
Johnson's objections is that inaction on behalf of Fischer,
LeClaire and Knapp–David constituted **personal
involvement** in the alleged violation of his constitutional
rights. (Dkt. No. 16.)

Damages in a **section 1983** claim are only appropriate
if the defendant was personally involved in the alleged
constitutional violation. *See Farrell v. Burke,* 449 F.3d
470, 484 (2d Cir.2006) (citations omitted). Ordinarily, the
plaintiff must demonstrate that there is a "tangible
connection between the alleged unlawful conduct and the
defendant." *Balkum v. Sawyer,* No. 6:06–cv–1467, 2011
WL 5041206, at \*4 (N.D.N.Y. Oct.21, 2011) (citing *Bass*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

v. Jackson, 790 F.2d 260, 263 (2d Cir.1986)). Where, as here, defendants are supervisory officials, a link, under the doctrine of respondeat superior, is inadequate to establish the requisite **personal involvement**. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Thus, to prevail against a supervisory defendant, the plaintiff must show that the supervisor:

**\*2** (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

Iqbal v. Hasty, 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).[FN1]

FN1. The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) upon the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d 531,543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, the court, until instructed to the

contrary, continues to apply the five factor *Colon* test.

Johnson alleges that he notified Fischer, LeClaire and Knapp–David that he and his family had been threatened by enemy gang members incarcerated at Upstate, but that no action was taken. (Compl., Dkt. No. 1 at 6.) This failure to act, Johnson contends, constituted deliberate indifference. (Dkt. No. 16 at 4.) Mere notification of a present or pending constitutional violation, however, is insufficient to establish **personal involvement** on behalf of a **supervisory** official. *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000); *see also Excel v. Woods,* No. 9:07–CV–0305, 2009 WL 3124424, at *21 (N.D.N.Y. Sept.29, 2009); *Walker v. Pataro,* No. 99CIV.4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr.23, 2002) (holding that "where a **supervisory** official like the Commissioner of Corrections ... receives **letters** or similar complaints from an **inmate** and does not personally **respond**, the **supervisor** is not personally involved and hence not **liable.**"). While this rule may not hold true where the defendant is a local prison official, that is not the case here as neither Fischer, LeClaire nor Knapp–David are employed at Upstate. *Haywood v. Woods,* No. 9:01–CV–00225, 2007 WL 1834641, at *10 (.D.N.Y. June 25, 2007) (noting that the general **supervisor** notification standard does "not translate well ... where the letters alerting prison officials of an **inmate's** plight are directed to local prison officials who plainly are ... positioned to take steps to protect the prison **inmate.**"); (Dkt. No. 10, Attach. 1 at 4 .) Even affording Johnson the special solicitude to which he is entitled, his claims against Fischer, LeClaire and Knapp–David fail to allege **personal involvement**, and therefore must be dismissed. Accordingly, Judge Homer's recommendation that defendants' motion to dismiss be granted as to Fischer, LeClaire and Knapp–Davis is adopted.

The remainder of Judge Homer's R & R is devoid of clear error, and as such, is adopted in its entirety.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Homer's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

November 28, 2011 Report–Recommendation (Dkt. No. 15) is **ADOPTED** in its entirety; and it is further

   **ORDERED** that defendants' motion to dismiss (Dkt. No. 10) is **DENIED** in part as to Trudy Lynn–Caron; and it is further

   **ORDERED** that defendant's motion to dismiss (Dkt. No. 10) is **GRANTED** in part as to Brian Fischer, Lucien LeClair, and Teresa Knapp–David and that all claims against them are **DISMISSED;** and it is further **ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties by mail and certified mail.

   **\*3 IT IS SO ORDERED.**

N.D.N.Y.,2011.

Johnson v. Fischer
Slip Copy, 2011 WL 6739520 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.) [FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name. [FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Compl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63).

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

*DISCUSSION*

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

> As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

**I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations***

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority" is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into the existence of a conspiracy); (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

*5 As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

*6 It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, *Correction Law § 851 et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 et seq., contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 et seq. In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

### III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Benjamin **BRAXTON**, Plaintiff,
v.
James **NICHOLS**, John Nuttall, Licien J. Leclaire, Jr.,
Gayle Haponik, Anthony J. Annucci and Lester Wright,
Defendants.
No. 08 Civ. 08568(PGG).

March 18, 2010.

*MEMORANDUM OPINION AND ORDER*

PAUL G. GARDEPHE, District Judge.

**\*1** *Pro se* Plaintiff Benjamin Braxton alleges that his rights under the Eighth Amendment to the United States Constitution were violated by his exposure to a dangerous level of environmental tobacco smoke ("ETS"), commonly known as secondhand smoke, caused by the Defendants' deliberate indifference. The Complaint seeks compensatory and punitive damages. (Cmplt. at 16) Defendants have moved to dismiss Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion (Docket No. 9) will be granted as to Count II but otherwise denied.

**DISCUSSION**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To meet this standard, a complaint's factual allegations must permit the Court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct." *Id.* at 1950. "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007)

(citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 87 (2d Cir.2002)), and must "draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006)).

Because Plaintiff is proceeding *pro se,* the Court construes the complaint liberally, *Harris v. Mills,* 22 A.D. 379, 572 F.3d 66, 72 (2d Cir.2009), "interpret[ing] it to raise the strongest arguments that it suggests." *Harris v. Westchester County Department of Corrections,* No. 06 Civ.2011(RJS), 2008 WL 953616, at \*2 (S.D.N.Y. Apr.3, 2008) (internal quotation omitted). Moreover, allegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss. *See Coakley v. 42nd PCT. Case 458,* No. 08 Civ. 6202(JSR), 2009 WL 3095529, at \*3 (S.D.N.Y. Sept.28, 2009); *Donahue v. U.S. Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990).[FN1] As in any other case, however, the Court accepts as true only factual allegations, and does not accept as true allegations stating only legal conclusions. *Harris,* 572 F.3d at 72 ("[T]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." (quoting *Iqbal,* 129 S.Ct. at 1949)).

FN1. *See also Oliver v. Haddock,* No. 08 Civ. 4608(DAB)(GWG), 2009 WL 4281446, at \*2 (S.D.N.Y. Dec. 1, 2009) (citing *Woods v. Goord,* No. 01 Civ.. 3255(SAS), 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering pro se prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* No. 98 Civ.2077(SAS), 1999 WL 33458, at \*1 n. 1 (S.D.N.Y. Jan.26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' " (quoting *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at \*1 n. 2 (S.D.N.Y. Nov.17, 1997)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

(citations omitted))).

I. *FACTS*

For purposes of deciding Defendants' motion to dismiss, the Court assumes that the following factual allegations in the Complaint, and in documents that the Complaint incorporates by reference,[FN2] are true: On July 31, 1996, Braxton was convicted in state court, and on September 6, 1996, he was incarcerated at Gowanda Correctional Facility, where he was housed with a substantial number of frequent or chain smokers.[FN3] (*Id.* ¶ 14) On February 7, 2000, Plaintiff was transferred to Fishkill Correctional Facility, where he was again housed with numerous frequent or chain smokers. (*Id.* ¶ 15) On November 8, 2000, Defendant Annucci, Deputy Commissioner and Counsel, and Defendant Leclaire, Jr., Deputy Commissioner for Correctional Services, forwarded a memorandum to all facility superintendents announcing the Department of Correctional Services' ("DOCS") indoor smoking ban. (*Id.* ¶ 16)

> FN2. The Court may consider documents incorporated by reference in the Complaint without converting Defendants' motion to dismiss to a motion for summary judgment. *See Kamholtz v. Yates County,* No. 09-0026-cv, 2009 WL 3463481 (2d Cir. Oct 29, 2009); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

> FN3. While Plaintiff also complains about being exposed to secondhand smoke as a pretrial detainee at Rikers Island (Cmplt.¶ 13), such a claim is not cognizable under the Eighth Amendment. Accordingly, in ruling on Defendants' motion to dismiss, the Court considers only the events occurring after Plaintiff's state court conviction. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (because prisoner was a pre-trial detainee, she had no Eighth Amendment claim).

**\*2** Plaintiff was transferred on March 12, 2001, to Mid-Orange Correctional Facility, where he was once more housed with inmates who were frequent or chain smokers. (*Id.* ¶ 17) Between April 2, 2001, and October

12, 2003, Plaintiff served as a porter in the bathrooms, laundry rooms, shower areas and single rooms of the D1-Block where he was housed. In performing his porter duties, Plaintiff "was constantly bombarded with Secondhand smoke which compromised Plaintiff's health and safety." (*Id.* ¶ 19) After serving time in the Segregated Housing Unit as the result of a disciplinary infraction, Plaintiff was moved to the D2-Block at Mid-Orange on September 10, 2004, where he continued working as a porter. (*Id.* ¶ 21) During his porter duties in the D2-Block, Plaintiff was again exposed to regular smoking by inmates in the bathroom stalls, shower areas, dayrooms, and single rooms throughout the day. (*Id.* ¶ 22)

On April 25, 2007, former Mid-Orange Superintendent D.L. Van Buren forwarded a memorandum to prison personnel about the facility's new "Indoor Smoke Free Policy," (*Id.* ¶ 23) On October 15, 2007, Plaintiff submitted his first grievance that relates to this action. Plaintiff complained that secondhand smoke was causing irritation to his lungs.[FN4] (Cmplt. ¶ 24; Schulman Dec. Ex. A) The facility inmate grievance committee reviewed Plaintiff's grievance and determined that his medical concerns should be addressed through "sick call." (Schulman Dec. E. A at 3) Plaintiff appealed to the Superintendent on November 6, 2007, and on November 13, 2007, the Superintendent issued a decision advising Plaintiff "to address his medical concerns through sick call." (*Id.* at 2) Plaintiff met with a doctor on November 21, 2007, but claims that his concerns about lung irritation from secondhand smoke were not addressed. (Cmplt.¶ 27) Prior to this doctor's visit, Plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC") on November 17, 2007, on the basis that his "medical concerns were not being addressed." (*Id.* ¶ 26; Schulman Dec. Ex. A at 2) CORC sustained the Superintendent's decision on December 17, 2007, noting that Plaintiff had already been seen by a doctor and that he could address any additional medical concerns through the regular sick call procedures. (Cmplt. ¶ 28; Schulman Dec. Ex A at 1)

> FN4. Plaintiff also wrote to the Department of Health on October 29, 2007, complaining about the facility's inadequate ventilation, (Cmplt.¶ 24)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

Plaintiff's complaints about secondhand smoke continued. On December 15, 2007, he wrote to Defendant Nichols, then Mid-Orange Superintendent, to report that inmates were smoking in the upper and lower gymnasiums and in other common areas. (Cmplt. ¶ 30; Pltf. Ex. 16) Plaintiff stated that he was experiencing headaches, nausea, congestion, and respiratory complications because of exposure to the secondhand smoke. (*Id.*) Acting Superintendent Jacobsen responded to Plaintiffs letter. Plaintiff does not describe the contents of this response. (*Id.* ¶ 31) Plaintiff wrote two additional letters to Superintendent Nichols on January 19 and 22, 2008, complaining about the failure to enforce the facility's indoor smoking ban and alleging that correctional officers were smoking inside the facility. Plaintiff does not indicate who received these letters or whether he received any response. (*Id.* ¶ 37-38; Pltf. Exs. 18-19)

**\*3** On March 13, 2008, Plaintiff filed a second inmate grievance, requesting the creation of a "non-smoking dormitory" to house non-smoker inmates. (Schulman Dec. Ex. B at 19-20) Plaintiff provided a lengthy discussion of the dangers associated with exposure to secondhand smoke. (*Id.* at 20-22, 27-32) Although Plaintiff did not explicitly request that the existing non-smoking policy be enforced, he stated that his "health has been compromised and ... [that his] health and safety is in jeopardy." (*Id.* at 28, 29; Cmplt. ¶ 43) On March 27, 2008, the facility grievance committee instructed Plaintiff to resubmit his grievance in the form of a project proposal and to submit it to the Deputy Superintendent of Programs. (Cmplt. ¶ 44; Schulman Dec. Ex. B at 18) Plaintiff instead appealed to Superintendent Nichols, who issued a decision on March 28, 2008, noting that indoor smoking was already prohibited by DOCS policy and advising Plaintiff to submit his proposal to the facility executive team. (Schulman Dec. Ex. B at 17)

Plaintiff chose instead to appeal Defendant Nichols' decision to CORC. His appeal states: "Grievant request[s] the facility to provide a smoke-free dorm and conduct a logistical survey to determine the practicality of implementation of grievant's request." (*Id.*) On May 7, 2008, CORC denied Plaintiff's proposal for a non-smoking dormitory, noting that there was no evidence suggesting malfeasance by staff members and that Plaintiff should

address complaints about indoor smoking to security staff. (*Id.*) The Complaint does not allege that Plaintiff ever made such a complaint.

## II.  *PLAINTIFF SUFFICIENTLY ALLEGES DELIBERATE INDIFFERENCE*

To prevail on his claim against the individual defendants under 42 U.S.C. § 1983, Plaintiff must show: (1) that the defendants "were acting under color of state law;" and (2) that "their actions deprived the plaintiff of a right guaranteed by the constitution or laws of the United States." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Here, Plaintiff attempts to establish the second element of his Section 1983 claim by alleging that the individual defendants violated the Eighth Amendment of the United States Constitution. (Cmplt.¶¶ 16-17)

Alleged Eighth Amendment violations by prison officials are governed by a two-part test: (1) whether the conditions of confinement objectively posed "a substantial risk of serious harm" to the inmate; and (2) whether the prison official, as a subjective matter, was "deliberate[ly] indifferent" to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal citations and quotation marks omitted). An objective risk of substantial harm may exist even if an inmate experiences no current symptoms. A risk of serious future harm is sufficient, *Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (noting that "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and ... actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation."), but the inmate must show that the risk of future harm is "so grave that it violates contemporary standards of decency." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

**\*4** A plaintiff must also demonstrate that the defendants were deliberately indifferent in that "the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing [plaintiff's] health in danger.... In other words ... defendants knew of the health dangers and yet refused to remedy the situation." *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998). This subjective element "entails something more than mere negligence ... but something less than acts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 835). This means that "a prison official must know of and disregard an excessive risk to inmate health or safety; the official must ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... draw the inference and fail to take reasonable measures to abate it." *Trammell v. Kean,* 338 F.3d 155, 164 (2d Cir.2003) (citing *Farmer,* 511 U.S. at 837, 847). "Plaintiff need not show actual knowledge of the risk of harm, but rather can present[ ] evidence showing that a substantial risk ... was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. at 842.

Applying these principles to Braxton's claims, he must demonstrate that he was subjected to a substantial risk of harm, current or future, from exposure to ETS and that this substantial risk was caused by the deliberate refusal of Defendants to remedy the situation when they could have. The Second Circuit has ruled that "a plaintiff [may state] a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health.' " *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002) (quoting *Helling,* 509 U.S. at 35). Defendants argue, however, that Braxton has failed to allege any substantial injury resulting from ETS exposure, either in the Complaint or in his grievances. Even if he had alleged substantial injury, Defendants argue that Braxton has failed to plead facts demonstrating that Defendants were deliberately indifferent to his health or welfare. (Def.Br.8-10)

In the Complaint, Braxton refers to "irritation" he experienced due to secondhand smoke (Cmplt.¶ 26), and alleges that "exposure to unreasonable levels of Secondhand smoke posed a risk of serious damage to Plaintiff's current and future health ... [and that he] continues to suffer from nausea, headaches, and congestion as a proximate result of Defendants deliberate indifference." (Cmplt.¶ 49) In his opposition brief,

Plaintiff attaches medical records demonstrating that he has repeatedly complained to physicians over a period of years about lung and nasal congestion due to secondhand smoke. (Opp.Exs.1-2, 35-41) Plaintiff also alleges in his brief that he "suffered blackouts due to secondhand smoke, and was admitted to the emergency room with respect to blackouts." (Opp. at 2 n. 1) In support of this allegation, Braxton submits an emergency room record from Bellevue Hospital dated May 10, 2009, in which the doctor states: "Please arrange for the patient to be in non-smoking quarters." (*Id.* Ex. 2)

**\*5** While these documents do not establish that Plaintiff has suffered a serious injury or faces a risk of future harm, they suggest with sufficient plausibility that Plaintiff may be able to demonstrate through discovery that a serious present injury or a future risk of serious injury exists. *See Davis v. New York,* 316 F.3d 93, 100-01 (2d Cir.2002) (finding plaintiff's allegations "that the smoke caused him to suffer dizziness, difficulty breathing, blackouts, and respiratory problems .... are not mere conclusory allegations, but may be sufficient to create an issue of fact as to the level of smoke to which [ plaintiff] was exposed and, thus, whether his Eighth Amendment rights were violated"). Affidavits from the medical personnel who treated Plaintiff, for example, might describe his ETS-triggered congestion as chronic and severe, or otherwise shed light on the status of Plaintiff's health. Affidavits from fellow inmates, similarly, could establish that indoor smoking in Plaintiff's vicinity was excessive, commonplace, and ignored by prison officials. *See Enigwe v. Zenk,* No. 03 Civ. 854(CBA), 2007 WL 2713849, at \*4 (E.D.N.Y. Sept.14, 2007). Accordingly, dismissal for failure to allege substantial injury is inappropriate.[FN5]

> FN5. The cases cited by Defendants are inapposite, as the plaintiffs in those cases either submitted no medical records or failed to allege that they suffered from serious medical conditions caused by prison conditions. In *Enigwe v. Zenk,* 2007 WL 2713849, at ----2-6 (E.D.N.Y. Sept.14, 2007), for example, the court granted defendant's motion for summary judgment in part because Enigwe had not presented evidence that ETS had damaged his

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

health. Discovery had revealed that Enigwe had never sought medical treatment for any of the health problems alleged in his complaint and had not previously reported severe health effects. Moreover, no physician had ever suggested that Enigwe was suffering health problems due to ETS exposure. *Id.* at ----3-4. Enigwe had also failed to offer evidence to support the claim that he was exposed to unreasonably high levels of ETS-such as affidavits from other inmates and his deposition testimony contradicted these allegations. *Id.* at *4. Here, in contrast, Braxton has supplied numerous medical records demonstrating that he complained of medical conditions caused by ETS exposure, and that a physician had requested that Braxton be moved to a non-smoking dormitory. In sum, neither *Enigwe* nor any other case cited by Defendants suggests that dismissal would be appropriate here.

Defendants also argue that even if Braxton could satisfy "the objective prong of the deliberate indifference test, he fails to adequately allege ... subjective deliberate indifference," because "liability cannot be established simply by alleging that a problem existed unabated on a defendant's watch." (Def. Br. at 9-10) Defendants further contend that "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference." *Enigwe, 2007 WL 2713849, at *6* (citing *Helling, 509 U.S. at 36*).

To state a valid claim, Plaintiff must allege and later adduce evidence demonstrating a risk of harm from ETS exposure that was unreasonably high and dangerous to his future health, *Warren v. Keane, 196 F.3d 330, 332-33 (2d Cir.1999)*, and that prison officials "knew of the health dangers and yet refused to remedy [them]." *LaBounty v. Coughlin, 137 F.3d 68, 72-73 (2d Cir.1998). See also Shepherd v. Hogan, 181 Fed. Appx. 93, 95 (2d Cir.2006)* ( "In order to be entitled to a jury trial, [plaintiff] must proffer evidence from which a reasonable juror could infer that (1) [defendant] was subjectively aware of the seriousness of [plaintiff's] situation, and (2) [defendant] had the ability to take some action that would have significantly alleviated [plaintiff's] ETS exposure,"). The

pleadings and incorporated documents sufficiently allege unreasonable exposure to ETS due to deliberate indifference.

While "imperfect enforcement of [a non-smoking policy] alone may not support a finding of deliberate indifference," *id.* at *18 (citing *Scott*, 139 F.3d at 944), courts making such a finding have done so at summary judgment, after full discovery. *See, e.g., Id.* at *19. Here, there has been no discovery and it is not clear whether the indoor smoking ban was enforced consistently, if at all. In any event, Braxton has alleged more than imperfect enforcement of the indoor smoking ban.

**\*6** Plaintiff has offered evidence that-through letters and grievances-he put prison officials, including Superintendent Nichols, on notice that inmates were smoking regularly in common spaces and that this was causing Plaintiff to experience "headaches as well as sinuses and nausea." (Pltf.Exs.16, 18, 19) Indeed, Plaintiff's correspondence and grievances, and the allegations in his complaint, cite nearly constant exposure to ETS on a daily basis. (Cmplt. ¶¶ 19, 22, 24, 30, 37-38, 43; Schulman Dec. Exs. A, B; Pltf. Exs. 16, 18, 19)

In his grievances, Plaintiff discusses the secondhand smoke issue in detail. For example, in a March 2008 grievance, Plaintiff states:

Irrespective to the Non Indoor Smoking Policy, inmates continue to smoke in the school administration's bathroom, cottage bathrooms, toilet stalls, shower rooms, dayrooms, and single rooms. Grievant asserts that because of the underenforcement, grievant is at risk to respiratory complications.

...

Grievant asserts that he is susceptibility [sic] to develop respiratory diseases because he is currently in a Block with 37 inmates whereas half of them are frequent or chain smokers. In 15-20 minute intervals they enter the Block bathrooms, dayrooms, bathrooms, bathroom stalls, shower rooms, and single rooms to smoke. Furthermore, grievant stats [sic] that he must hold his breath as he goes by and/or enter these rooms these

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

rooms [sic], and raise his saliva dampened T-shirt to cover his nose and mouth while he is in these rooms. Grievant also states that he must raise his collar of his dampened T-shirt to cover his nose and mouth to avoid inhalation while he is in his room, when their smoking ritual begins. The ventilation is inadequate; therefore, your immediate assistance is appreciated. I also feel my health has been compromised, and my health and safety is in jeopardy. I request also the ventilation to be checked out because the smoke from the constant cigarette smoking takes quite a while to decrease the "level" of residual gases from the cigarettes smoke after they have left.

(Pltf. Ex. 34 at 9-10) *Cf. Enigwe,* 2007 WL 2713849, at *6 (granting summary judgment where plaintiff did not assert that "he informed prison officials that the non-smoking policy was being violated ... [and] does not claim that he specifically told .... any prison official [ ] that there was smoking in his cell or in other areas of the housing unit where smoking was forbidden")

The Second Circuit has held that an "an official [may] exhibit [ ] deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 255 (2d Cir.2001). Braxton has offered three letters to the Superintendent as well as a grievance demonstrating that he complained about the routine violation of the indoor smoking ban and the deleterious effects of the secondhand smoke on his health. This is sufficient to demonstrate on a motion to dismiss that prison officials were on notice of the unreasonable exposure.[FN6]

FN6. As the Court in *Warren v. Keane,* 196 F.3d at 332-33, stated in denying summary judgment:

"plaintiffs' allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, *inter alia,* under-enforcement of inadequate smoking rules, overcrowding of inmates and poor ventilation." *Warren v. Keane,* 937 F.Supp. 301, 305 (S.D.N.Y.1996). Until the facts are determined, we are unable to say that

any prison official reasonably could have believed that the alleged severe exposure to ETS did not violate the plaintiffs' Eighth Amendment rights.

## III. *PLAINTIFF ALLEGES SUFFICIENT PERSONAL INVOLVEMENT OF DEFENDANTS*

**\*7** Defendants also argue that Plaintiff has inadequately pled their personal involvement in the alleged constitutional violations (Def. Br. at 12), which is a "prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Personal involvement may be shown in one of five ways: [that] (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Jean-Laurent v. Wilkinson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006).

As an initial matter, supervisory officials are not liable under the doctrine of *respondeat superior. See, e.g., Iqbal,* 129 S.Ct. at 1948 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Accordingly, Count II of Plaintiff's Complaint, entitled "Respondeat Superior Liability," must be dismissed.[FN7]

FN7. To the extent the Complaint could be read as asserting Section 1983 claims against the Defendants in their official capacities, those claims are barred by the Eleventh Amendment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

See *Hater v. Melo,* 502 U.S. 21, 25-27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Ying Jing Can v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993).

As for Plaintiff's deliberate indifference claims, the Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief'" *Iqbal,* 129 S.Ct. at 1949 (citing Fed.R.Civ.P. 8(a) (2)). As noted above, because Plaintiff is proceeding *pro se,* the Court will consider facts alleged in and documents attached to Plaintiff's opposition papers. Based on the Complaint and the supplementary facts set forth in Plaintiff's opposition papers, the Court will not dismiss the Complaint on the ground that Plaintiff has failed to adequately plead the Defendants' personal involvement in the alleged constitutional violation.

### A. *Defendant James Nichols*

Plaintiff sent Defendant Nichols three letters informing him of frequent indoor smoking by inmates and guards, as well as the symptoms Plaintiff experienced as a result. It is also undisputed that Defendant Nichols reviewed Plaintiff's second grievance requesting the creation of a smoke-free dormitory. (*See* Def. Br. at 14) This grievance contained a detailed discussion of Plaintiff's exposure to ETS and the medical consequences he suffered. (*See supra* pp. 11-13) Defendants' argument that Superintendent Nichols "did not understand plaintiff to be complaining about underenforcement of the indoor smoking ban" (Def. Reply Br. at 6) is conclusory and is not a fair inference from the evidence currently before the Court.

**\*8** Defendants also argue that Nichols may not have been aware of the letters addressed to him, given that Acting Superintendent Jacobson answered Braxton's first letter and that Nichols was not the superintendant as of April 2007. (Def. Br. at 14) This argument presents a question of fact that must be addressed through discovery,

and cannot be resolved on a motion to dismiss. For purposes of Defendants' motion to dismiss, Plaintiff has demonstrated that it is plausible that Nichols was personally involved in the alleged failure to address Braxton's complaints.

### B. *Defendants John Nuttall, Lucien J. Leclair, Jr., Gayle Haponik, Anthony J. Annucci, and Lester Wright*

The Complaint fails to state a claim against the remaining Defendants. For example, while the Complaint asserts that Defendants Annucci and Leclaire disseminated DOCS' no-smoking policy on November 8, 2000, it does not allege that they had any involvement with Plaintiff or his complaints and grievances. [FN8] (Cmplt.¶ 16) Defendants Wright and Nutall are not mentioned at all in the Complaint's factual allegations. Defendant Haponik is mentioned only insofar as he directed Plaintiff to submit his request for a non-smoking dormitory through the prison's grievance process, (Cmplt.¶¶ 46-47)

> FN8. In any event, any claim based on November 2000 conduct would be barred by Section 1983's three-year statute of limitations. See *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *Taylor v. City of New York Dept. of Hous., Preserv. & Dev.,* No. 08 Civ. 150(JSR)(GWG), 2008 WL 2485410, at *3 (S.D.N.Y. Jun. 19, 2008).

In his opposition memorandum of law, however, Plaintiff alleges that Defendants Nuttal, Leclair, Haponik, Annucci and Wright were CORC panel members and were present at and responsible for the "appellate administrative review and decision" concerning Plaintiff's March 13, 2008 grievance. (Opp. at 12-13, 17) If these allegations are true, Plaintiff's grievance, quoted above, arguably could have put each of these defendants on notice of Plaintiff's claimed constitutional violations.

It is not clear in this Circuit whether mere membership on a grievance panel is sufficient to demonstrate "personal involvement" for Section 1983 purposes. In *McKenna v. Wright,* 386 F.3d 432 (2d Cir.2004), plaintiff alleged an ongoing constitutional violation related to his serious liver disease, and argued that a deputy superintendent was liable because he had "denied treatment for McKenna by rejecting McKenna's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

grievance." *McKenna,* 386 F.3d at 437. The Circuit stated, in *dicta,* that "it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of,"[FN9] citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002), in which the court dismissed a claim against a superintendent based on his denial of the plaintiff's grievance regarding alleged inadequate medical care. In discussing this issue, however, the Circuit did not address earlier decisions which found personal involvement where a constitutional violation was brought to a supervisor's attention and the supervisor did not remedy the violation. *See, e.g., Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1991) (finding personal involvement where defendant superintendent was notified of alleged due process violation through plaintiff's petition for a writ of habeas corpus but failed to provide a remedy); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where defendant superintendent denied plaintiff's appeal of an administrative hearing where plaintiff was deprived of his due process right to call witnesses).

> FN9. The Court found personal involvement because the deputy superintendent was responsible for the prison's medical program: "When allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." *McKenna,* 386 F.3d at 438.

**\*9** Courts in this district are split as to whether review and denial of a grievance constitutes personal involvement in the underlying allegedly unconstitutional conduct.[FN10] *See Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (citing cases and noting disagreement). Some courts have dismissed claims founded on the denial of a grievance (*see supra* note 10); some courts have found personal involvement where a grievance adjudicator investigated the prisoner's complaint, *see Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007); others have made a distinction between a *pro forma* denial and a detailed response to a grievance, *see Brooks v. Chappius,*

450 F.Supp.2d 220, 226 (W.D.N.Y.2006); and still others have decided that personal involvement may be found where the grievance alleges an "ongoing" constitutional violation such that the " 'supervisory official who reviews the grievance can remedy [it] directly.' " *See Burton v. Lynch,* 664 F.Supp.2d at 360 (quoting *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)); *see also Hall v. Leclaire,* No. 06 Civ. 0946(GBD)(JCF), 2007 WL 1470532, at *10 (S.D.N.Y. May 22, 2007), *adopted in relevant part,* 2007 WL 2815624 (S.D.N.Y., Sept.24, 2007). The "ongoing" constitutional violation analysis, of course, does not address the Circuit's *dicta* in *McKenna,* which involved an alleged ongoing constitutional violation that the defendant deputy superintendent could have remedied.

> FN10. *Compare Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (holding that personal involvement can be found where the grievance alleges an "ongoing" constitutional violation such that the " 'supervisory official who reviews the grievance can remedy [it] directly' ") (quoting *Vega v. Arms,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009); *Atkinson v. Selsky,* No. 03 Civ. 7759(LAK), 2004 WL 2319186, at *1 (S.D.N.Y. Oct.15, 2004) (stating that " *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986), made it sufficiently clear that a prison official's denial of a grievance or grievance appeal is sufficient personal involvement to render that official liable under Section 1983"); *Moore v. Scully,* No. 90 Civ. 3817, 1993 WL 22129, at *3 (S.D.N.Y. Jan.26, 1993) (denying summary judgment where plaintiff alleged that a disciplinary hearing violated due process and defendant superintendent affirmed result); *Smith v. Tucker,* No. 88 Civ. 2798, 1991 WL 211209, at *7 (S.D.N.Y. Oct.4, 1991) (same) *with Manley v. Mazzuca,* No. 01 Civ. 5178, 2007 WL 162476, at *10 (S.D.N.Y. Jan.19, 2007) (dismissing claims where defendant superintendent denied plaintiff's grievance alleging improper medical treatment); *Foreman v. Goord,* No. 02 Civ. 7089, 2004 WL 1886928, at *7 (S.D.N.Y. Aug.23, 2004) (dismissing claims against superintendent for lack of personal involvement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

where plaintiff complained of excessive use of force and superintendent denied grievance on appeal); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (dismissing claims against defendant superintendent who, on appeal, denied plaintiff's grievance for deliberate indifference to medical needs); *Scott v. Scully,* No. 93 Civ. 8777, 1997 WL 539951, at *4 (S.D.N.Y. Aug.28, 1997) (same), *abrogated on other grounds, Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999).

Given the uncertainty in the law and the lack of any discovery in this case, this Court will not dismiss Plaintiff's claims against the members of the CORC panel at this time. Discovery will reveal, *inter alia,* whether the members of the panel were in a position to remedy the alleged ongoing constitutional violation Plaintiff complains of.[FN11]

> FN11. Defendants also argue that the CORC panel members are not personally involved because they suggested to Plaintiff that his complaints about indoor ETS should be referred to security personnel. (Def. Reply Br. at 7). The CORC panel, however, did not make a formal referral of Plaintiffs' complaint to other prison personnel. Accordingly, the cases Defendants cite are not on point and this argument is unavailing.

**IV. *THE COMPLAINT WILL NOT BE DISMISSED ON QUALIFIED IMMUNITY GROUNDS***

Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits," *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The defense shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818.

The Second Circuit has held that "a traditional

qualified immunity defense may [ ] be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint." *McKenna,* 386 F.3d at 436. Defendants are entitled to dismissal on qualified immunity grounds where the rights allegedly violated were not clearly established at the time of any alleged deliberate indifference, *Islam v. Fischer,* No. 07 Civ. 3225(PKC), 2008 WL 110244, at *6 (S.D.N.Y. Jan.9, 2008), or there is no plausible factual dispute as to " 'whether ... a reasonable police officer should have known he acted unlawfully....' " *Id.* (quoting *Lennon,* 66 F.3d at 421). Where a complaint's allegations are such that "reasonable officials in defendants' positions could disagree as to whether defendants' ... actions against plaintiff were unlawful," judgment as a matter of law on the issue of qualified immunity is appropriate on a motion to dismiss. *Id.* (citing *Lennon,* 66 F.3d at 421).

**\*10** Here, the rights at issue are clearly established.[FN12] The Supreme Court has acknowledged that exposure to secondhand tobacco smoke may satisfy the objective prong of an Eighth Amendment claim, *Helling,* 509 U.S. at 31-35, and the Second Circuit has held that the right not to be exposed to unreasonably high levels of ETS is "clearly established." *Warren v. Keane,* 196 F.3d at 333 ("We hold that after *Helling,* it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."); *see also Islam v. Fischer,* 2008 WL 110244, at *6.

> FN12. Rights are "clearly established" when supporting Supreme Court or Second Circuit precedent existed at the time of the alleged unconstitutional conduct. *See Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1994).

Moreover, Plaintiff's Complaint does not demonstrate that reasonable officials in Defendants' positions would not have known that they were acting unlawfully. "The plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna,* 386 F.3d at 436 (holding pre-*Iqbal* that "not only must the facts supporting the defense appear on the face of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief" (internal citation omitted)).

Plaintiff has alleged sufficient facts to make plausible his claims that Defendants were deliberately indifferent to the violation of his constitutional rights. As the district court in *Warren* found, "plaintiffs' allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, *inter alia,* underenforcement of inadequate smoking rules, overcrowding of inmates and poor ventilation." *Warren v. Keane,* 937 F.Supp. 301, 305 (S.D.N.Y.1996); *accord, Warren,* 196 F.3d at 332-33 ("Until the facts are determined, we are unable to say that any prison official reasonably could have believed that the alleged severe exposure to ETS did not violate the plaintiffs' Eighth Amendment rights.") Absent further evidence, this Court cannot find that "[g]iven the known dangers of ETS, [ ] a reasonable person [in Defendants' position] would [not] have understood that exposing an inmate to high levels of ETS could violate the Eighth Amendment." *Id.* Accordingly, the Complaint will not be dismissed on qualified immunity grounds.

## V. *THE COMPLAINT WILL NOT BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

Defendants argue that the Complaint should be dismissed because Braxton failed to exhaust his administrative remedies, "Where it appears from the face of the complaint that a plaintiff concedes lack of exhaustion, or non-exhaustion is otherwise apparent, a court may decide the exhaustion issue on a Rule 12(b)(6) motion," *Verley v. Goord,* No. 02 Civ. 1182(PKC)(DF), 2004 WL 526740, at *27 (S.D.N.Y. Jan. 23, 2004) (citing *Rivera v. Pataki,* No. 01 Civ. 5179(MBM), 2003 WL 21511939, at *4 (S.D.N.Y. My 1, 2003); *McCoy v. Goord,* 255 F.Supp.2d 233, 250-52 (S.D.N.Y.2003)). Because failure to exhaust is an affirmative defense, however, exhaustion need not be pleaded in a complaint. *See Jones v. Bock,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). From the pleadings in this action, it is not evident that Braxton failed to exhaust his administrative remedies.

**\*11** The Prison Litigation Reform Act ("PLRA") requires that "no action [ ] be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a) (1996). Under the PLRA, a plaintiff complaining about prison conditions must fully utilize the prison facility's internal grievance procedures before filing suit. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (holding the exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes"). A plaintiff, in other words, must fully comply with the prison facility's grievance rules and procedures and must appeal any issue raised through the highest level of administrative review. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo,* 548 U.S. 81, 93, 95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *Booth v. Churner,* 532 U.S. 731, 735, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). These rules apply even where the relief sought in an action for example, money damages is unavailable at the administrative stage. *See Grey v. Sparhawk,* No. 99 Civ. 9871(HB), 2000 WL 815916, at *2 n. 2 (S.D.N.Y. June 23, 2000). Where it is clear that a inmate did not exhaust his administrative remedies, the court must dismiss the action. *See Booth,* 532 U.S. at 735; *Neal v. Goord,* 267 F.3d 116, 117-18 (2d Cir.2001); *Harris v. Bowden,* No. 03 civ. 1617(LAD), 2006 WL 738110, at *2 (S.D.N.Y. Mar. 23, 2006) ("Statutory exhaustion requirements are mandatory; courts may not dispense with them freely ." (citing *Bastek v. Federal Crop Ins. Corp.,* 145 F.3d 90, 94 (2d Cir.1998)).

Three circumstances, however, may excuse a plaintiff from the PLRA's exhaustion requirements: (1) when administrative remedies are not available; (2) when defendants have either waived this defense or acted so as to estop them from raising the defense; or (3) when special circumstances, such as a reasonable misunderstanding of the grievance procedures, otherwise justify the prisoner's failure to comply with the exhaustion requirement. *Ruggiero v. County of Orange,* 467 F.3d 170, 175-76 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

The "applicable procedural rules" are "defined not by the PLRA, but the [local] prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). New York DOCS' Inmate Grievance Program ("IGP") procedures provide for a three-tiered process for adjudicating inmate complaints: First, a prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC") at each facility; second, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility; and finally, a prisoner may appeal an adverse decision by the superintendent to CORC. N.Y. COMP.CODES R. & REGS., tit. 7, § 701.7 (1999). An "expedited" process is also available for harassment grievances, *id.* § 701.11, which pertain to "[e]mployee conduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.11(a). *See also Hemphill,* 380 F.3d at 682-83. Harassment grievances are sent directly to the superintendent, *id.* § 701.11(b)(2), and the superintendent must initiate an investigation and render a decision. COMP.CODES R. & REGS., tit. 7, § 701.11(b)(3-5). A prisoner may then appeal to CORC. *Id.* § 701.11(b)(7).

**\*12** The relevant DOCS regulations state that "the grievance must contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." *Id.* § 701.7(a)(1)(i). The complaint form provides a space for the inmate to include a "[d]escription of [the][p]roblem," and directs the inmate to be "as brief as possible" but to include a statement of the "[a]ction requested." *Id.* While New York IGP regulations do not require a prisoner's grievance to state the names of the alleged responsible parties, *Espinal,* 554 F.3d at 224, the inmate "must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[A]grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Id.* at 697 (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)).

Defendants argue that neither of Braxton's grievances

"fairly raises the issue of underenforcement of DOCS's indoor smoking ban." (Def.Br.20) As discussed above, however, Braxton's second grievance clearly communicates that indoor smoking is pervasive and is compromising his respiratory functions. (Pltf. Ex. 34 at 9-10) The fact that the CORC panel reviewing the grievance suggested that Braxton take up the issue with security staff demonstrates that the panel understood that Braxton was alleging a widespread violation of the indoor smoking ban. (Pltf.Ex. 8) Moreover, Braxton's first grievance makes clear that he is suffering lung irritation as the result of exposure to secondhand smoke. (Ex. A at 6)

Because the pleadings here do not demonstrate that Plaintiff failed to exhaust his administrative remedies, dismissal for failure to exhaust is not appropriate.

### *CONCLUSION*

For the reasons stated above, Count II of the Complaint is DISMISSED. Defendants' motion to dismiss (Docket No. 9) is otherwise DENIED. The Clerk of the Court is directed to terminate the motion.

SO ORDERED.

S.D.N.Y.,2010.

Braxton v. Nichols
Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald Mack DOVE, Plaintiff,
v.
BROOME COUNTY CORRECTIONAL FACILITY,
[FN1] K. Moore, Captain; Timothy Hill, Lieutenant; Daniel Snyder, Correction Officer; and C. Mogenson, Chaplain, Defendants.

> FN1. The Broome County Correctional Facility is listed as a defendant in both the caption of plaintiff's complaint, and on the court's records. The facility is not, however, identified as a defendant in the body of the complaint. *See* Complaint (Dkt. No. 1) section 3. In any event, as defendants have argued, the Broome County Correctional Facility is not a separate entity with its own legal identity and amenable to suit. *See* Legett–Edwards v. City of Syracuse, No. 5:06–CV–892, 2007 WL 2891774, at *2 (N.D.N.Y. Sept. 28, 2007) (Mordue, C.J.) (citing Loria v. Town of Irondequot, 775 F.Supp. 599, 606 (W.D.N.Y.1990)). Accordingly, if this case survives the pending motion the Broome County Correctional Facility should be removed as a defendant in the action.

Civil Action No. 9:10–CV–0002 (DNH/DEP).

Feb. 17, 2011.
Donald Mack Dove, Albany, NY, pro se.

Broome County Attorney's Office, Aaron J. Marcus, Esq., of Counsel, Binghamton, NY, for Broome County Defendants.

Lynch Schwab, PLLC, Louis U. Gasparini, Esq., of Counsel, White Plains, NY, for Defendant C. Mogenson.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Donald Mack Dove, a New York State prison inmate who at the relevant times was confined locally at the Broome County Correctional Facility ("Broome CCF"), has commenced this action pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights during the period of his incarceration at the facility. In his complaint, plaintiff maintains that while in the Broome CCF he was unlawfully denied kosher food for a period of thirty days after having been observed eating a non-kosher meal, and that the denial constituted 1) an unlawful interference with his right to freely exercise his chosen religion, as guaranteed under the First Amendment; 2) a deprivation of due process and equal protection, in violation of the Fourteenth Amendment; 3) cruel and unusual punishment, as prohibited by the Eighth Amendment; and 4) a violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*[FN2] As relief, plaintiff seeks an injunction directing that he be provided with kosher meals as well as a monetary award.[FN3]

> FN2. The RFRA was invalidated by the Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157 (1997). In deference to his *pro se* status, I have chosen to analyze plaintiff's statutory religious claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, which was in enacted by Congress to rectify the perceived constitutional infirmity of the RFRA. *See* Pugh v. Goord, 571 F.Supp.2d 477, 504 n. 11 (S.D.N.Y.2008).

> FN3. Since it appears that plaintiff is no longer confined in the Broome CCF, his request for injunctive relief is subject to denial as moot. Prins v. Coughlin, 76 F.3d 504, 506 (2nd Cir.1996) (citing Young v. Coughlin, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989), and Beyah v. Coughlin, 789 F.2d 986, 988 (2d Cir.1986)); Candelaria v. Greifinger, No. 96–CV–0017, 1998 WL 312375,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

Currently pending before the court in connection with the action are two motions. In the first one of the named defendants, C. Mogenson, who is identified in plaintiff's complaint as a prison chaplain, requests dismissal of Dove's claims against him on a variety of grounds including, *inter alia,* lack of personal involvement and lack of personal jurisdiction, as well as on the merits.[FN4] The second motion is brought on behalf of the remaining defendants in the action seeking the entry of summary judgment dismissing plaintiff's claims, arguing that the record now before the court fails to disclose the existence of evidence upon which a reasonable factfinder could conclude that any of the constitutional or statutory rights referenced in plaintiff's complaint were violated. For the reasons set forth below, I recommend that both motions be granted, and that plaintiff's complaint be dismissed in its entirety.

> FN4. In his motion, defendant Mogenson initially also sought dismissal of plaintiff's claims based upon his alleged failure to exhaust available administrative remedies before commencing suit. Dkt. No. 16. After having reviewed plaintiff's submissions in opposition, *see* Dkt. No. 27, however, defendant Mogenson has now withdrawn that portion of his motion. *See* Defendant's Reply Memorandum (Dkt. No. 25–1) at p. 3.

## I. *BACKGROUND*[FN5]

> FN5. When addressing defendant Mogenson's motion I have considered the contents of plaintiff's complaint and deemed the material allegations of that complaint to be true. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). I have also considered and incorporated into the background description facts derived from the exhibits attached to the plaintiff's complaint, which may also be properly considered in connection with the dismissal

motion. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993). For purposes of the remaining defendants' summary judgment motion the following recitation is derived from the record now before the court. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). In both instances, all reasonable inferences have been drawn in favor of the plaintiff and any conflicts and ambiguities have been resolved in his favor. *Papelino v. Albany College of Pharmacy of Union University,* ——F.3d ——, 2011 WL 199124, *12 n. 1 (2d Cir. Jan. 24, 2011) (citing *Pena v. DePrisco,* 432 F.3d 98, 107 (2d Cir.2005)).

The circumstances giving rise to plaintiff's claims in this action are neither complex nor controversial. Plaintiff, a follower of the Kashrut of Judaism religious tenets, was confined in the Broome CCF at the times relevant to his claims. *See generally* Complaint (Dkt. No. 1) § 6 and Exhs. at p. 12 of 13. While there, plaintiff requested and was provided kosher meals in accordance with his religious beliefs. *Id.*

On September 30, 2009, it was discovered that plaintiff's dinner time kosher meal was missing from the prison meal cart. Snyder Aff. (Dkt. No. 28–14) ¶ 4. Defendant Daniel J. Snyder, a corrections officer at the facility, reported the missing meal to the facility's kitchen staff, and was informed that plaintiff's meal would be delivered shortly to the pod in which he was confined at the time. *Id.*

While awaiting delivery of the missing kosher meal plaintiff consumed a non-kosher meal, advising Corrections Officer Snyder that he had "bought" the meal and needed to eat it, adding in substance that when he works hard he can eat more, and while it is his right to receive kosher meals he is also entitled to eat more when he needs to. *Id.* at ¶¶ 5–7. Plaintiff's scheduled kosher meal was ultimately delivered and also consumed by the plaintiff. *Id.* at ¶ 8.

**\*2** Corrections Officer Snyder reported the fact of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

plaintiff's consumption of a non-kosher meal to medical and kitchen personnel at the facility, as well as to the jail chaplain. Snyder Aff. (Dkt. No. 28–14) ¶ 9. After reviewing Corrections Officer Snyder's report of the incident, prison officials at the Broome CCF ordered the discontinuance of plaintiff's kosher diet for a period of thirty days, and plaintiff was informed that he could reapply for kosher meals at the end of the thirty-day period. Complaint (Dkt. No. 1) § 6 and Exhs. p. 12 of 13; Hill Aff. (Dkt. No. 28–15) ¶ 6. Although the discontinuance was not effectuated pursuant to a formal written policy, it followed the practice of the New York State Department of Correctional Services ("DOCS") and is consistent with a prior suspension of kosher meals to another inmate at the Broome CCF under similar circumstances. Hill Aff. (Dkt. No. 28–15) ¶¶ 6–7; Moore Aff. (Dkt. No. 28–16) ¶¶ 4–6.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on January 4, 2010. Dkt. No. 1. In his complaint Dove has named the Broome CCF, Corrections Captain K. Moore, Corrections Lieutenant Timothy Hill, Corrections Officer Daniel Snyder, and Chaplain C. Mogenson as defendants, and claims interference with his right of free religious exercise under both the First Amendment and the RFRA, cruel and unusual punishment, deprivation of equal protection, and the denial of procedural due process.[FN6] Id.

> FN6. As was previously noted, plaintiff's complaint is equivocal as to whether the Broome CCF was intended to be a defendant in the action. See p. 1, n. 1, ante.

In response to plaintiff's complaint, while defendants Hill, Moore, and Snyder have answered, generally denying plaintiff's allegations and additionally interposing a series of affirmative defenses, Dkt. No. 17, defendant C. Mogenson, who is separately represented, instead has moved seeking its dismissal pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 16. In his motion defendant Mogenson argues that 1) the complaint does not sufficiently allege his personal involvement in the conduct giving rise to plaintiff's constitutional claims; 2) the complaint fails to establish that plaintiff's religious beliefs are sincerely held,

warranting dismissal of his free religious exercise claims; 3) plaintiff's equal protection and cruel and unusual punishment claims are without merit; and 4) the court lacks personal jurisdiction over him based upon the fact that he has not been properly served in the action. Id. In response to defendant Mogenson's motion, plaintiff has submitted an opposition which is comprised wholly of a series of exhibits, many of which were attached to his original complaint. Dkt. No. 27. Defendant Mogenson has since replied in response to that opposition and in further support of his dismissal motion. Dkt. Nos. 25, 26.

On January 21, 2011, defendants Broome County CCF, K. Moore, Timothy Hill, and Daniel Snyder moved for entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 28. In their motion those defendants argue that 1) plaintiff's claims against the Broome CCF should be dismissed since it is not a separate entity amenable to suit; 2) plaintiff's request for injunctive relief is moot based upon his transfer out of the facility; 3) plaintiff's religious freedom statutory claim, which should be analyzed under the RLUIPA, and First Amendment free exercise claim are deficient based upon the insincerity of plaintiff's beliefs in subscribing to an exclusively kosher diet and the claim that in any event the penological interests giving rise to the temporary suspension of plaintiff's kosher meals outweigh the burden to plaintiff's religious beliefs resulting from the thirty-day suspension; 4) plaintiff's equal protection, due process and Eighth Amendment claims are deficient as a matter of law; and 5) in any event they are entitled to qualified immunity based upon their good faith reliance upon a standard DOCS practice. Despite the fact that his response to defendants' summary judgment motion was due on February 8, 2011, the plaintiff has not opposed the motion.

**\*3** Both motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See also Fed.R.Civ.P. 72(b).

## III. DISCUSSION

A. Personal Jurisdiction Over Defendant Mogenson

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

A review of the court's records in this matter reflects that on April 6, 2010 the summons issued by the clerk was returned unexecuted as to various of the named defendants, including Chaplain Mogenson. Dkt. No. 11. While there is subsequent acknowledgment of service forms on file with regard to the various other defendants, *see* Dkt. Nos. 18–21, there is no record of defendant Mogenson having been served or waived service in the action. He therefore asserts that the court lacks personal jurisdiction over him and should dismiss plaintiff's claims against him on this basis.

There is no proof in the record now before the court that Mogenson has been served in the action or has acknowledged or waived service, nor has plaintiff supplied any evidence regarding the issue in opposing defendant's motion. This court therefore lacks jurisdiction over defendant Mogenson.[FN7] *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350, 119 S.Ct. 1322, 1327 (1999) (citation omitted). The question remains whether this fact entitles defendant Mogenson to dismissal at this juncture, or instead whether more time should be allotted in order to allow for further efforts to obtain jurisdiction over him.

> FN7. By appearing in the action for the limited purpose of making the instant motion defendant has not submitted to the court's jurisdiction for all purposes and waived the requirement of service. *Louring v. Kuwait Boulder Shipping Co.,* 455 F.Supp. 630, 634 (D.Conn.1977) (citing *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871 (3d Cir.1944), *cert. denied sub nom., Orange Theatre Corp. v. Brandt,* 322 U.S. 740, 64 S.Ct. 1057 (1944)).

The summons in this case was issued on January 6, 2010. *See* Dkt. No. 5. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons be made within 120 days of its issuance, absent a court order extending that period.[FN8] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or

direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the prescribed period for service, a district court is afforded broad discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See* *Zapata,* 502 F.3d at 197.

> FN8. That rule provides that
>
> > [i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period....
>
> Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A *pro se* litigant such as the plaintiff is entitled to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* as is the case in this instance, the court is obligated to forward the plaintiff's process to the United States Marshal's Service, which must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshal's Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin,* 304 F.Supp.2d

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

934, 938–43 (E.D.Mich.2004). In such circumstances it is incumbent upon the plaintiff to develop, through pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshal's Service. *See* *VanDiver*, 304 F.Supp.2d at 942.

**\*4** In this case I recommend that if the court finds all or some of plaintiff's claims should survive the pending motions, in its discretion it should also reject the suggestion that plaintiff's complaint be dismissed as against Chaplain Mogenson, without prejudice, as neither serving the interest of justice nor promoting judicial economy, and instead order that the United States Marshal for the Northern District of New York personally serve Chaplain Mogenson with the summons and complaint in this matter.[FN9]

> FN9. In the event plaintiff's claims survive and this action goes forward, defendant Mogenson and his counsel could ultimately decide that it is more expeditious to accept service in this matter and avoid the necessity and embarrassment of having the United States Marshal's Service effectuate personal service upon him.

B. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

C. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

*York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. See *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Plaintiff's Failure To Oppose Defendants' Summary Judgment Motion*

**\*6** Although he has properly and timely opposed defendant Mogenson's dismissal motion, the plaintiff has not responded to the summary judgment motion

subsequently filed by the remaining defendants.[FN10] Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose the pending summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

> FN10. The notice of defendants' summary judgment motion was accompanied by a notification to the plaintiff of the consequences of failing to oppose the motion, as required pursuant to the court's local rules. *See* N.D.N.Y.L.R. 56.2.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp.106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.).[FN11] Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

FN11. Copies of all unreported decisions cited in

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

this document have been appended for the convenience of the *pro se* plaintiff.

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[FN12] *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a) (3)).[FN13]

> **FN12.** Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* *See* N.D.N.Y .L.R. 7.1(a)(3) (emphasis in original).

> **FN13.** Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

E. *Personal Involvement*

**\*7** At the heart of defendant Mogenson's motion is his claim that plaintiff's complaint fails to disclose a sufficient degree of involvement in the constitutional deprivations alleged to support a finding of liability against him.

It is well-established that personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages against that party

under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A defendant may only be held accountable for his or her role in a constitutional deprivation, and not for the actions of others on the basis on *respondeat superior* or otherwise. *Iqbal,* 129 S.Ct. at 1952.

Here, plaintiff's complaint and supporting exhibits, interpreted in a light most favorable to him, state a plausible claim of personal involvement in the constitutional deprivations alleged on defendant Mogenson's part. In the body of his complaint plaintiff asserts that defendant Mogenson was in the direct chain of communication between corrections officials and prison kitchen personnel concerning the report of plaintiff having consumed non-kosher food, directing that his kosher meals be discontinued for a period of thirty days. *See* Complaint (Dkt. No. 1) § 6. Chaplain Mogenson's role in the suspension of kosher meals is also disclosed in a memorandum dated October 15, 2009, which he wrote to the plaintiff and copied to Corrections Lieutenant Hill, Corrections Captain Moore, and the prison kitchen, explaining to Dove why his kosher meals were being temporarily discontinued. Complaint (Dkt. No. 1) Exhs. at p. 12 of 13. That Chaplain Mogenson appears to have played an integral role in the decision-making process is further confirmed by plaintiff's statement describing the relief sought in his inmate grievance concerning the matter, in which he requested the opportunity "to see Reverend Mogenson concerning this matter ASAP ...". *Id.* Exhibits at p. 10, 13.

Drawing all inferences and resolving all ambiguities in plaintiff's favor, I conclude that his complaint adequately states a plausible claim of personal involvement on the part of defendant Mogenson in the conduct giving rise to plaintiff's claims, and therefore recommend denial of the portion of that defendant's motion challenging the sufficiency of plaintiff's allegations

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

regarding that defendant's personal involvement.

F. *Merits of Plaintiff's Claims*

In their motions defendants challenge the sufficiency of plaintiff's religious exercise claims under the First Amendment and the RLUIPA, arguing that plaintiff's professed religious beliefs are not genuinely held, and that in any event the burden upon his religious beliefs resulting from defendants' actions is far outweighed by the legitimate penological interests at stake. Defendants additionally argue that plaintiff's equal protection, due process, and Eighth Amendment claims lack merit.

1. *First Amendment*

**\*8** Plaintiff asserts that the defendants unlawfully interfered with the exercise of his religious beliefs by denying him kosher meals for a period of thirty days. The First Amendment to the United States Constitution guarantees the right to free exercise of religion.[FN14] U.S. CONST. AMEND. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

> FN14. That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether

the refusal to permit attendance at a religious service, for example, has abridged an inmate's constitutional rights hinges upon the balancing of the inmate's First Amendment free exercise right against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services to other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204–05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily, the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is on occasion narrowed by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203.

**\*9** Pivotal to his First Amendment claim is a showing that plaintiff's religious beliefs, leading to the need for an exclusively kosher diet, are sincerely held. *Salahuddin,* 467 F.3d at 274–75. In their motions defendants challenge the genuineness of plaintiff's stated religious beliefs and invite the court to dismiss plaintiff's free religious exercise claims on this basis. The Second Circuit has had occasion to address this element—the bonafides of a plaintiff's sincerely held religious beliefs—in the context of a religious dietary restriction request made by an inmate in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

*Ford,* 352 F.3d 582. Noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

In the end, analysis of plaintiff's First Amendment claim requires a balancing of the legitimate penological interests advanced by prison officials for taking the challenged action against the resulting burden upon plaintiff's religious beliefs. In this instance, defendants note that the average daily cost of feeding an inmate is $2.69, while the cost of feeding an inmate participating in a religious meal plan can range from $7.82 to $9.91 per day. Moore Aff. (Dkt. No. 28–16) ¶ 8 and Exh. H. Accordingly, the financial burden of providing plaintiff with a kosher meal as opposed to making available food ordinarily provided to other inmates is not inconsequential. Turning to the burden, it appears that by plaintiff's own actions and admissions he has signaled that while he may hold sincere beliefs in the Kashrut of Judaism tenets, his beliefs do not extend to requiring him *exclusively* to eat kosher food. Under these circumstances no reasonable factfinder could conclude that by depriving him of his kosher diet for a period of thirty days plaintiff's sincerely held religious beliefs were unlawfully impinged and that legitimate penological concerns did not justify the defendants' actions. *See Tapp v. Stanley,* No. 04–CV–6400, 2008 WL 4934592, at *7–9 (W.D.N.Y. Nov. 17, 2008). Accordingly, I recommend dismissal of plaintiff's First Amendment claim.

**2. *RLUIPA***

The RLUIPA provides, in pertinent part, that [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person—1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). The familiar principles which inform the analysis of plaintiff's free exercise claim are similar to those applicable to the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). Like the First Amendment's free exercise clause, the RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy.[FN15]

FN15. The RLUIPA, enacted by Congress under authority of the Spending Clauses of the Constitution, applies only to programs and for activities receiving federal financial assistance. *Pugh v. Goord,* 571 F.Supp.2d 477, 504 n. 11 (S.D.N.Y.2008) (citing *Marria v. Broaddus,* No. 97 Civ. 8297(NRB), 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003); *Fluellen v. Goord,* No. 06 Civ. 602E (HKS), 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007)). While defendants assert that the Broome CCF does not in general receive federal funding they do not acknowledge that it has received federal funds to the extent of being reimbursed for housing federal prison inmates. In light of my determination on the merits, I find it unnecessary to address this issue.

It should also be noted, as defendants have argued, that although there is not uniformity on this issue, the weight of authority appears to be that under the RLUIPA does not allow for recovery of damages against defendants, either individually or in their official capacities. *Singh v. Goord,* No. 05–Civ. 9680(SCR)(LMS), 2010 WL 1875653, at *6 (S.D.N.Y. March 9, 2010); *Sweeper v. Taylor,* No. 906–CV–379, 2009 WL 815911, at *9 (N.D.N.Y. Mar. 27, 2009) (Mordue, C.J.); *Pugh,* 571 F.Supp.2d at 503; *but see Hankins v. New York State Dep't of Corr.,* No. 07 CV 408, 2008 WL 2019655, at *6 (N.D.N.Y. March 10, 2008) (Lowe, M.J.) (concluding in *dicta,* that by accepting federal funds New York effectively has waived its sovereign

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

immunity thereby allowing for damages against defendants in their official capacities). In light of my determination on the merits I also find it

**\*10** To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially burdened his or her religious exercise through actions not found to promote a compelling governmental interest advanced through the least restrictive means. *Pilgrim v. Artus,* No. 9:07–CV–1001 (GLS/RFT), 2010 WL 3724883, at \*10 (N.D.N.Y. March 18, 2010) (Treece, M.J.). The RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is "reasonably related to legitimate penological interests". *Id.*

Despite these differences, I conclude the record in this case fails to disclose evidence from which a reasonable factfinder could find that plaintiff's religious beliefs were substantially burdened by defendants' actions and that those actions were not prompted by a compelling governmental interest advanced through the least restrictive means. Once again, plaintiff has demonstrated by his own conduct that his religious beliefs do not require him to exclusively consume kosher meals. Accordingly, by their actions the defendants did not unreasonably burden plaintiff's religious beliefs by denying him access to kosher meals for a period of thirty days based upon a determination that his religious beliefs allegedly requiring the kosher meals are not sincerely held and in light of the substantial increase in cost in providing kosher meals as compared to those given to other inmates. I therefore recommend dismissal of plaintiff's RLIUPA claims on the merits.

### 3. *Eighth Amendment*

In his complaint plaintiff alleges that by their failure to provide him with a kosher diet defendants have caused him to suffer stomach pain and discomfort in violation of his right under the Eighth Amendment to be free of cruel and unusual punishment.[FN16] Defendants argue that this claim, which is distinct from plaintiff's free exercise causes of action, lacks merit.

    FN16. It is unclear from the record now before

the court whether, while confined at the Broome CCF, plaintiff was a convicted and sentenced prisoner, or instead in pretrial confinement. If at the relevant time plaintiff had yet to be convicted and sentenced, then his food deprivation claim would be more appropriately analyzed under the Fourteenth Amendment since he would not be subject to the Eighth Amendment's prohibition against cruel and unusual punishments. *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003). In addressing that claim I have nonetheless applied an Eighth Amendment analysis since there does not appear to be a material difference in the legal principles governing the provision of food to prison inmates under either provision. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321.[FN17] Deliberate indifference exists if an official "knows of and disregards an excessive risk to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing Farmer); *Waldo,* 1998 WL 713809, at *2 (same).

> FN17. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. unnecessary to stake out a position regarding this complex issue.

**\*11** To establish an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07–346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Couglin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *Brown v. Eagen,* No. 9:08–CV–0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass,* No. 9:03–CV1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted). In this instance, plaintiff has failed to allege that the food at the Broome CCF was prepared and served in a manner that endangered his health. While plaintiff may claim that he did not eat the non-kosher meals provided to him such a claim, while perhaps cognizable under the First Amendment or the RLUIPA, does not also implicate cruel and unusual punishment in violation of the Eighth

Amendment, particularly since it appears plaintiff did not hesitate to consume a non-kosher meal on September 30, 2009 even knowing his replacement kosher meal would be provided, and thus the deprivation of kosher meals cannot reasonably be expected to result in plaintiff not eating. *Modlenaar v. Liberatore,* No. 07–CV–6012 CJS, 2009 WL 2179661, at * 5 (W.D.N.Y. July 22, 2009). Indeed, the plaintiff " 'has not [and cannot] provide[ ] any authority for the proposition that denial of [kosher] food in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment.' " *Perez v. Westchester Cnty. Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at * 5 (S .D.N.Y. Apr. 30, 2007) (quoting *Wesley v. Kalos,* No. 97 CIV 1598, 1997 WL 767557, at *4 (S.D.N.Y. Dec. 11, 1997)); *see also Modlenaar v. Liberatore,* No. 07–CV–6012, 2009 WL 2179661, at * 5 (W.D.N.Y.2009). I therefore recommend dismissal of plaintiff's Eighth Amendment cruel and unusual punishment claim.

### 4. *Equal Protection*

Without any specificity concerning the classifications drawn by the defendants, plaintiff asserts in his second cause of action that the suspension of his daily kosher meals represented a deprivation of equal protection. In their motions defendants seek dismissal of that claim.

**\*12** The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, inter alia, *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

Plaintiff's complaint fails to allege facts demonstrating a plausible claim of denial of equal protection. Plaintiff does not identify the classifications drawn by the defendants, nor does he assert that he was treated differently than other similarly situated inmates as a result of intentional or purposeful discrimination. Accordingly, I recommend dismissal of plaintiff's equal protection claim.

5. *Procedural Due Process*

In his complaint, plaintiff also purports to assert a procedural due process claim based upon the thirty-day deprivation of kosher meals. In their motion defendants similarly challenge the legal sufficiency of this claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 901, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

As a threshold matter, a party asserting such a claim must demonstrate the deprivation of a cognizable liberty interest. *Tellier,* 280 F.3d at 80. While the provision of a kosher diet may implicate free exercise concerns under the First Amendment and the RLUIPA, it does not rise to the level of a cognizable liberty interest giving rise to the procedural safeguards guaranteed under the Fourteenth Amendment. *George v. Conway,* No. 05–CV–510A, 2009 WL 1449046, at *16 (W.D.N.Y. May 21, 2009). I therefore recommend dismissal of plaintiff's due process claim on this basis.

6. *Retaliation*

Finally, in the margin of his complaint, though not in the body of that claim, plaintiff's second cause of action also refers to "retaliation". Such a claim, if indeed it was intended to be set forth, is facially lacking in merit. **\*13** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a

right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 346–47 (N.D.N.Y.2010). In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001).

In this case, plaintiff does not allege that the suspension of his kosher meals was in response to his having engaged in activity protected under the First Amendment. Accordingly, to the extent that his complaint could be construed as asserting a retaliation claim, that claim should be dismissed.

E. *Whether to Grant Leave to Amend*

If the recommendations contained in this report are adopted all of plaintiff's claims will be dismissed. The next issue to be addressed, then, is whether plaintiff should be afforded an opportunity to amend his complaint to assert additional facts demonstrating the existence of plausible constitutional claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). This hold true regardless of whether dismissal comes pursuant to a Rule 12(b) dismissal motion, or instead by way of the entry of summary judgment. *See*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1118452 (N.D.N.Y.)

(Cite as: 2011 WL 1118452 (N.D.N.Y.))

*Kilgore v. Kaufman,* 374 Fed. App'x 89, 91 (2d Cir.2010) (cited in accordance with Fed. R.App. Proc. 32.1). The court must therefore determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

In this instance, having reviewed the entire record associated with the pending summary judgment motion, I conclude that plaintiff cannot assert a plausible constitutional claim under the facts disclosed in that record. Accordingly, I recommend that plaintiff not be afforded an opportunity to amend his complaint in this action. *Clarke v. Max Advisors, LLC,* 235 F.Supp.2d 130, 151 (N.D.N.Y.2002) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962)).

IV. *SUMMARY AND RECOMMENDATION*

**\*14** Plaintiff's complaint, though succinct and addressed to a finite and modest set of facts, alleges in general terms a variety of constitutional claims against the moving defendants. Because plaintiff's complaint is bereft of facts demonstrating the existence of plausible cruel and unusual punishment, equal protection, procedural due process, and retaliation claims, I recommend dismissal of those causes of action, without leave to amend. I further recommend dismissal of plaintiff's First Amendment and RLUIPA free religious exercise claims based upon a finding that no reasonable factfinder could conclude that plaintiff's sincerely held beliefs were substantially impinged by defendants' failure to provide a kosher diet for thirty days, and that the penological interests associated with that deprivation were neither compelling nor substantially outweighed by the *de minimis* interference with plaintiff's religious exercise stemming from that deprivation. Accordingly, it is hereby respectfully

RECOMMENDED that the motion of defendant Mogenson to dismiss plaintiff's complaint (Dkt. No. 16) be GRANTED, and further that the motion of the remaining defendants for summary judgment dismissing plaintiff's complaint (Dkt. No. 28) also be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

ORDERED the clerk is also serve a copy of the Report and Recommendation upon the parties in accordance with this court's local

N.D.N.Y.,2011.

Dove v. Broome County Correctional Facility
Slip Copy, 2011 WL 1118452 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 867072 (N.D.N.Y.)

(Cite as: 2011 WL 867072 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald Mack DOVE, Plaintiff,
v.
BROOME COUNTY CORRECTIONAL FACILITY;
K. Moore, Captain; Timothy Hill, Lt.; Daniel Snyder,
Correction Officer; and C. Mogenson, Defendants.
No. 9:10-CV-02.

March 10, 2011.
Donald Mack Dove, Attica, NY.

Broome County Attorney's Office, Aaron J. Marcus, Esq.,
of Counsel, Binghamton, NY, for Defendants Broome
County CF, Moore, Hill, and Snyder.

Lynch, Schwab, PLLC, Louis U. Gasparini, Esq., of
Counsel, White Plains, NY, for Defendant Mogenson.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

    **\*1** Plaintiff, Donald Mack Dove, commenced this
civil rights action in January 2010, pursuant to 42 U.S.C.
§ 1983. By Report-Recommendation dated February 17,
2011, the Honorable David E. Peebles, United States
Magistrate Judge, recommended that defendant
Mogenson's motion to dismiss plaintiff's complaint (Dkt.
No. 16) be granted; that the remaining defendants' motion
for summary judgment dismissing plaintiff's complaint
(Dkt. No. 28) also be granted; and that plaintiff's
complaint be dismissed in its entirety, without leave to
replead. The plaintiff has filed objections to the
report-recommendation.

    Based upon a de novo review of the entire file,
including the portions of the Report-Recommendation to
which plaintiff has objected, and the recommendations of
Magistrate Judge Peebles, the Report-Recommendation is
accepted and adopted in all respects. *See* 28 U.S.C.

636(b)(1).

    Accordingly, it is

    ORDERED that

    1. Defendant C. Mogenson's motion to dismiss
plaintiff's complaint (Dkt. No. 16) is GRANTED;

    2. The remaining defendants' motion for summary
judgment dismissing plaintiff's complaint (Dkt. No. 28) is
GRANTED; and

    3. Plaintiff's complaint is DISMISSED in its entirety,
without leave to replead.

    4. The Clerk is directed to enter judgment accordingly
and close the file.

    IT IS SO ORDERED.

N.D.N.Y.,2011.

Dove v. Broome County Correctional Facility
Slip Copy, 2011 WL 867072 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:

(1) there was no evidence that administrative remedy was available to inmate;

(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;

(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;

(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;

(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A**    **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A**    **25**

170A Federal Civil Procedure
   170AI In General
      170AI(B) Rules of Court in General
         170AI(B)1 In General
            170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A**    **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ⬤ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ⬤ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ⬤ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ⬤ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ⬤ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ⬤ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ⬤ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 ☞ 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 ☞ 192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** &#128273;    1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** &#128273;    192

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** &#128273;    1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** &#128273;    1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** &#128273;    192

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** &#128273;    1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** &#128273;    2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ⌐🔑    1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ⌐🔑    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 ⌐🔑    1355

78 Civil Rights
    78III Federal Remedies in General
      78k1353 Liability of Public Officials
        78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 ⌐🔑    1358

78 Civil Rights
    78III Federal Remedies in General
      78k1353 Liability of Public Officials
        78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A ⌐🔑    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ☞ 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
**\*347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **\*351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **\*352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reisock v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post-Woodford. However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also_ _Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also_ _Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also* *Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

### 2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

#### a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359** of medication for plaintiff's renal disease.

#### i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See* *Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See* *Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> **FN13.** Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> **FN14.** Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> **FN15.** In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> **FN16.** Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s *364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, he "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366** Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437*)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Vincent LOWMAN, Plaintiff,
v.
Kenneth PERLMAN, Superintendent of Mid-state Correctional Facility, Glenn Goord, Commissioner of New York State Department of Correctional Services, Dr. Ramineni,[FN1] Director of Administrator Health Services, Defendants.

> FN1. The Complaint and Docket misspell this Defendant's name as "Dr. Remeinena." We will refer to the correct spelling used in the caption.

No. 9:06-CV-0422 (LEK/RFT).

Aug. 29, 2008.
Vincent Lowman, Marcy, N.Y., pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Stephen H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, N.Y., for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.
**\*1** This matter comes before the Court following a Report-Recommendation filed on August 4, 2008 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 54). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Vincent Lowman, which were filed on August 8, 2008. Objections (Dkt. No. 55).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 54) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.
*Pro se* Plaintiff Vincent Lowman brings this civil rights action, pursuant to 42 U.S.C. § 1983, asserting that the Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. Dkt. No. 1, Compl. Specifically, Plaintiff claims that the treatment and medication he was receiving at Woodbourne Correctional Facility ("Woodbourne") for his back, knee, high blood pressure, and asthma were wrongly discontinued after his transfer to Mid-State Correctional Facility ("Mid-State"). *Id.* at p. 3. Defendants now move for Summary Judgment pursuant to Fed.R.Civ.P. 56, (Dkt. No. 42), which Plaintiff opposes (Dkt. No. 48). For the reasons that follow, it is recommended that the Defendants' Motion be **granted** and the Complaint **dismissed.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

## I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

**\*2** Plaintiff was transferred from Woodbourne to Mid-State on June 28, 2005, where Defendant Dr. Ramineni was employed. Dkt. No. 42, Defs.' Mot. for Summ. J., Defs.' 7.1 Statement, at ¶ 1. During Plaintiff's first visit with Dr. Ramineni on August 18, 2005, he complained of pain in his lower back and right knee, although an examination revealed no swelling, discoloration, or any other signs of injury to his back or knee. *Id.* at ¶ 8. Dr. Ramineni prescribed Naprosyn, an anti-inflammatory drug. *Id.* On September 14, 2005, Plaintiff again complained of back and knee pain. Again, Dr. Ramineni found no inflammation nor swelling. *Id.* at ¶ 10. Plaintiff requested a magnetic resonance imaging (MRI) and a transcutaneous electrical nerve stimulator (TENS) unit, but Dr. Ramineni denied those requests as medically unnecessary. *Id.* at ¶ 11. Plaintiff's final meeting with Dr. Ramineni was on November 14, 2005. Plaintiff complained of pain in his left knee for which he was prescribed Motrin. *Id.* at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), accord, *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

See *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has not made any specific allegations against Defendants Perlman and Goord, nor has he advanced a theory of supervisory liability against them. *See generally* Compl. Because his Complaint is completely devoid of any mention of Defendants Perlman and Goord beyond listing them as Defendants, it is recommended that the Complaint be **dismissed** as to these Defendants.[FN2]

FN2. In addition, it appears that Plaintiff may not

have intended to file this action against Defendants Perlman and Goord. In his Statement of Undisputed Material Facts, included in his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff states "[t]he plaintiff's [sic] only file [sic] a civil action against the defendant Dr. Ramineni." *See* Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., at p. 1.

### C. Eighth Amendment Claim

**\*4** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is "'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d at 66). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

### 1. *Serious Medical Need*

Plaintiff alleges that prior to his arrival at Mid-State, he sustained injuries to his lower back and knee and suffered from asthma and high blood pressure, and that because the treatment he received at Woodbourne was discontinued upon his arrival at Mid-State, he suffered "swelling of the knee, continued lost [sic] of sleep, joint swelling and discoloration in the lower back area, and knee." Compl. at Statement of Facts, ¶¶ 2-4. Plaintiff also alleges that while at Mid-State he had problems going to the bathroom and may have had hemorrhoids. Compl. at [unnumbered] p. 4.

**\*5** Plaintiff's Ambulatory Health Record (AHR) reflects that he made several complaints of pain in his knee and back, but provides no additional evidence of any concrete injury beyond a pulled groin muscle he suffered while playing basketball and Dr. Ramineni's diagnosis of a sprained left knee. *See* Defs.' 7.1 Statement, Ex. A, AHR. Plaintiff has failed to allege any specific injury, serious or otherwise, with respect to his back. Plaintiff's indication that he had trouble going to the bathroom and suffered from hemorrhoids is supported by one entry in his AHR noting that he was constipated and possibly had hemorrhoids. AHR, entry dated Oct. 24, 2005. However, these conditions, without any other evidence or allegation as to their severity, are not sufficiently serious to establish

an Eighth Amendment claim. *See, e.g., Cabassa v. Gummerson,* 2006 WL 1559215, at \*9-10 (N.D.N.Y. Mar. 30, 2006) (evidence that plaintiff may have suffered from hemorrhoids, without more, did not establish a viable Eighth Amendment claim); *see also Kendall v. Kittles,* 2004 WL 1752818, at \*6 (S.D.N.Y. Aug. 4, 2004) (stating hemorrhoids "are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.")).

With respect to Plaintiff's knee, two referral orders indicate that a MRI from August 2004 "showed possible small partial tear of [Plaintiff's] ACL [anterior cruciate ligament]," and that after a consultation with orthopedics on December 6, 2005, Plaintiff was scheduled to have arthoscopic surgery on his left knee [FN3] and possibly ACL reconstruction. Defs.' 7.1 Statement, Ex. C, Referrals, dated Nov. 28, Dec. 6, 2005, & Jan. 10, Feb. 23, 2006 & CORC Response, dated Mar. 1, 2006 (stating "CORC also notes that on 2/27/06 the greivant was referred for arthroscopic [sic] knee surgery, which is pending approval.").[FN4]

> **FN3.** We note that it is not altogether clear which knee Plaintiff asserts was not properly treated. In his Complaint, Plaintiff refers nonspecifically to his knee, while his AHR entries make references to problems in both the left and right knees. *See* AHR, entries dated Aug. 18, Nov. 7, & Nov. 14, 2005. In any event, our analysis is the same.

> **FN4.** There is no record of Plaintiff's surgery in the AHR or in any other submissions to the Court, however, Plaintiff indicated in his Opposition to the Defendants' Motion for Summary Judgment that "[i]t took [him] two or three grievances to see another doctor and have the knee surgery done." Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., Pl.'s Decl., at ¶¶ 10 & 18. Thus, it appears that at some point after February 23, 2006, Plaintiff underwent arthoscopic knee surgery.

However, even assuming that Plaintiff suffered from a small tear in his ACL, generally speaking, "knee injuries have been [held] insufficient to trigger Eighth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

protection and support a deliberate indifference claim." *Guarneri v. Bates,* 2008 WL 686809, at *7 (N.D.N.Y. Mar. 10, 2008) (internal quotation marks and citations omitted). Furthermore, in this case, Plaintiff was able to walk and apparently play basketball until he pulled a groin muscle on July 8, 2005. AHR, entries dated July 8, 2005 (noting Plaintiff pulled his groin playing basketball) & Sept. 9, 2005 (noting Plaintiff's ability to walk without any pain). In addition, Dr. Ramineni noted that there was no inflammation nor restricted movement in Plaintiff's left knee. *Id.* at entry dated Nov. 14, 2005. Thus, Plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *See Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y. July 11, 2006) (partially torn ACL in conjunction with other knee problems did not establish Eighth Amendment claim); *see also Moody v. Pickles,* 2006 WL 2645124, at *6-7 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion," which did not render plaintiff immobile, was not a serious medical need).

### 2. *Deliberate Indifference*

**\*6** Even assuming, *arguendo,* that Plaintiff met his burden on the first prong, he has failed to establish that Dr. Ramineni was deliberately indifferent to his medical needs. Plaintiff claims that upon being transferred from Woodbourne to Mid-State, the treatment he had been receiving for his back and left knee was arbitrarily discontinued. Plaintiff first visited with Dr. Ramineni on August 18, 2005, complaining of pain in his lower back and right knee.[FN5] AHR, at entry dated Aug. 18, 2005. Dr. Ramineni observed no inflammation nor swelling in his knee and prescribed Naprosyn, an anti-inflammatory drug. *Id.;* Defs.' Mot. for Summ. J., Subbarao Ramineni, M.D., Decl., dated Dec. 20, 2007, at ¶ 5. Plaintiff saw Dr. Ramineni on September 14, 2005, again complaining of back and knee pain and requesting a MRI, a referral to orthopedics, a TENS unit, and physical therapy. AHR, at entry dated Sept. 14, 2005. Dr. Ramineni noted Plaintiff was able to walk without any pain and showed no objective signs of swelling nor inflammation, and denied Plaintiff's requests for a MRI and TENS unit because they were "not medically indicated." *Id.* With respect to Plaintiff's request for physical therapy, Dr. Ramineni noted he had received such treatment in the past but it did not

help. *Id.;* Ramineni Decl. at ¶ 8.

FN5. Plaintiff's AHR indicates that he was a "no show" for an appointment with Dr. Ramineni scheduled for July 21, 2005. AHR, entry dated July 21, 2005.

November 14, 2005, was the date of Plaintiff's last meeting with Dr. Ramineni. Ramineni Decl. at ¶ 10. Plaintiff complained of pain in his left knee, although Dr. Ramineni observed no inflammation nor restricted movement. AHR, at entry dated Nov. 14, 2005. Dr. Ramineni diagnosed Plaintiff with a sprained knee and prescribed Motrin. *Id.*

Considering this record, there is no indication that Dr. Ramineni displayed anything close to the criminal recklessness required under the Eighth Amendment subjective prong. In order to establish deliberate indifference, an individual must " 'know of and disregard an excessive risk to inmate health or safety.' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) (quoting *Chance v. Armstrong,* 143 F.3d at 702 & *Farmer v. Brennan,* 511 U.S. at 837). Although Dr. Ramineni denied Plaintiff's requests for physical therapy, a MRI, and x-ray, those denials were based on his opinion that they were not medically necessary as Plaintiff showed no objective signs of serious injury such as swelling, inflammation, nor inhibited ambulation. Furthermore, Dr. Ramineni did not disregard Plaintiff's medical needs, but rather, prescribed him Naprosyn and Motrin for the pain he complained of in his knee.

Thus, Plaintiff has failed to establish that Dr. Ramineni displayed a deliberate indifference towards his medical needs. For the reasons stated above, this claim should be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Plaintiff's Complaint (Dkt. No. 1) be **dismissed** in its entirety and Defendants' Motion for Summary Judgment **granted;** and it is further

**\*7 ORDERED,** that in the event the District Judge adopts this recommendation, Plaintiff's Motion to Compel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

(Dkt. No. 44) is **denied** as moot; and it is further

   **ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.

Lowman v. Perlman
Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner, Director of Special
Housing/Disciplinary Program; Anthony Graceffo,
Chief Medical Officer, Auburn Correctional Facility;
Glenn S. Goord; Hans Walker; Gary Hodges; D.W.
Seitz; Terry Halcott; Christine Coyne Nancy O'Connor;
Ann Driscoll; John McClellen; John Rourke, Captain,
Security Services at Auburn Correctional Facility;
Koors, Head Pharmacist at Auburn Correctional
Facility; Robrt Mitchell, Correctional Counselor at
Auburn Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.
No. 9:01-CV-1039.

Sept. 24, 2008.
Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Fruchter, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

*1 Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated June 30, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' second motion for summary
judgment (Docket No. 81) be granted in part and denied
in part. Objections to the Report Recommendation have
been filed by the parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have

objected, the Report-Recommendation is accepted and
adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in
part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in
its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to
the extent that it asserts:

(a) Any Fourteenth Amendment procedural due process
claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against
defendant Hans Walker;

2. Defendants' second motion for summary judgment
is otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim
against defendants D.W. Seitz and Craig Gummerson
asserted in the Fourth Amended Complaint's Fifth Cause
of Action; and

(b) Plaintiffs First Amendment retaliation claim against
defendants D.W. Seitz and Craig Gummerson also
asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) FN1 For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN2 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. FN3

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].");  *see also Matsushita Elec.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[FN9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN11] Finally, even though an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

FN7. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS

21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint" [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.FN13 In one of those actions, he was awarded $1,000 following a jury trial.FN14 (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.FN15

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials; *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

**\*4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second,

Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

> FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

> FN18. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing-violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential

informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

*5 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) FN20 Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [FN21]

> FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held

prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf .* Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

**\*6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

> [FN22.] I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false. [FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983. [FN24] The reason that I set these facts aside is that I can find no record evidence that there was any

connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

> [FN23.] *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

> [FN24.] A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) [FN25]

> FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

**\*7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [FN26]

> FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential

informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue.[FN27]

FN27. See *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for action, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

**\*8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004)* [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6[23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful

actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl.].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin*, 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant

hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

**FN32.** *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

**FN33.** *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.)[FN34]

> **FN34.** *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.[FN35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

*12 As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and

his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [FN37]

> **FN36.** I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

> **FN37.** For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

**\*13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered an "independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-did plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal

books and correspondence[ ] and family pictures," *see* Dkt. No. 4, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

## 2. Claims Under the First Amendment

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

### a. Access-to-Courts Claim

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. [FN39]

FN39. *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts

claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy"

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

FN40. I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

*16 For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of

Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act. [FN45]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds,* Lewis v. Casey, 518 U.S. 343, 350 (1996); *see also* Bourdon v. Loughren, 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [v. Connor, 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also* Acre v. Miles, 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46. *Cf.* Woods v. Interstate Realty Co., 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin [v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints*

*or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at \*6, 1997 U.S. Dist. LEXIS 11025, at \*19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at \*9, 1991 U.S. Dist. LEXIS 8763, at \*26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at \*4, n. 4, 2003 U.S. Dist. LEXIS 19567, \*12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. FN48 The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

> FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

**\*19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at

criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).FN49 In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

> FN49. *Cf. Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

> FN50. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff's] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

> FN51. See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998).[FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52. *See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state

court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6[13]" through "6[15]" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

> FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the

case for complaints filed by plaintiffs who are *not* proceeding *pro se. See* Albert v. Carovano, 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord,* Wynder v. McMahon, 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), Northrup v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997).

> FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Phillips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at \*14 (2d Cir. Feb. 1, 2008) ("*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See* Williams v. Manternach, 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

> FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

> FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to

Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

> FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's

First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

> FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground .[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord*, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord*, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted]. As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.

(Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be **GRANTED** in part and **DENIED** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be **DISMISSED** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be **DISMISSED** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment accessto-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise DENIED** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24   ANY   OBJECTIONS   to   this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN65]

FN65. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default

argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)

(Cite as: 2006 WL 1555656 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner/Director of Special Housing/Disciplinary
Program; Anthony Graceffo, Chief Medical Doctor,
Auburn Correctional Facility; Glenn S. Goord; Hans
Walker; Gary Hodges; D.W. Seitz; Terry A. Halcott;
Christine Coyne; Nancy O'Connor; Ann Driscoll; John
McClellen; John Rourke, Captain Security Services at
Auburn Correctional Facility; Koors, Head Pharmacist
at Auburn Correctional Facility; Robert Mitchell,
Correctional Counselor at Auburn Correctional Facility;
and Androsko, Registered Nurse, Auburn Correctional
Facility, Defendants.
No. 9:01-CV-1039.

June 1, 2006.
Samuel Cabassa, Wallkill, NY, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, David Fruchter, Esq., Asst. Attorney General, of
counsel, Albany, NY, for Defendant Department of Law,
the Capitol.

### ORDER

DAVID N. HURD, United States District Judge.
  **\*1** Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated March 30, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be denied to the extent it seeks dismissal of (1)
claims asserted against defendants Walker and Seitz in
the Fourth Cause of Action of plaintiff's Fourth Amended
Complaint; and (2) the claims asserted against defendants

Walker, Gummerson, and Seitz in the Fifth Cause of
Action of Plaintiff's Fourth Amended Complaint, but that
defendants' motion be granted in all other respects.
Objections to the Report Recommendation have been filed
by all parties.
  Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have
objected, the remainder of the Report-Recommendation is
accepted and adopted. See 28 U.S.C. 636(b)(1).

  Accordingly, it is

  ORDERED that

  1. The objections to the Report Recommendation are
REJECTED;

  2. The defendants' motion for summary judgment is
DENIED to the extent it seeks dismissal of:

  a. The claims asserted against defendants Walker and
Seitz in the Fourth Cause of Action of plaintiff's Fourth
Amended Complaint; and

  b. The claims asserted against defendants Walker,
Gummerson, and Seitz in the Fifth Cause of Action of
Plaintiff's Fourth Amended Complaint;

  3. The defendants' motion is GRANTED in all other
respects; and

  4. The remaining claims in plaintiff's Fourth Amended
Complaint are DISMISSED.

  IT IS SO ORDERED.

N.D.N.Y.,2006.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2006 WL 1555656
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)

(Cite as: 2006 WL 1555656 (N.D.N.Y.))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Cyril KENDALL, Plaintiff,
v.
C.O. KITTLES, Shield No. 15396; C.O. Charles, Shield
No. 10739; C.O. Johnson; C.O. Cunningham; Frank
Squillante; William J. Fraser; New York City Dept. of
Correction; Rikers Island Correctional Facility,
Defendants.
No. C0 Civ. 628(GEL).

Aug. 4, 2004.

Cyril Kendall, plaintiff pro se.

Michael A. Cardozo, Corporation Counsel for the City of
New York, New York, N.Y. (Hillary A. Frommer) for
defendants Kittles, Charles, Squillante and Fraser, of
counsel.

OPINION AND ORDER

LYNCH, J.

*1 This action concerns allegations by plaintiff Cyril
Kendall that he was denied certain medical
accommodations and housing conditions while he was a
pre-trial detainee at Rikers Island Correctional Facility
("Rikers"), and that these denials infringed his
constitutional right to be free from cruel and unusual
punishment. Defendants Kittles and Charles are
corrections officers at Rikers, defendant Squillante is the
Warden of the North Infirmary Command unit where
Kendall was housed at Rikers, and defendant Fraser is the
former Commissioner of the New York City Department
of Correction. All four defendants now move for summary
judgment and, for the reasons that follow, the motion will
be granted.

BACKGROUND

Kendall was arrested on March 13, 2002, and was

held as a pre-trial detainee at the North Infirmary
Command ("NIC") unit at Rikers. (Frommer Decl., Ex.
D.) Kendall filed his Complaint in this action on January
28, 2003, asserting that during his time at Rikers he was
denied medically-indicated accommodations for his
asthma and for his hemorrhoid condition.[FN1]

FN1. Kendall conducted no discovery in this
action, and the only discovery taken by
defendants was to subpoena Kendall's medical
records. Although Kendall complains in his
opposition brief that he was unable to take
discovery due to his incarceration, he was
provided ample opportunity for discovery by the
Court and neither complained to the Court about
his inability to take discovery during this period
nor sought any assistance in doing so. Indeed,
even now Kendall does not ask for any further
discovery or suggest what discovery might be
relevant or helpful. Accordingly, the Court will
view the record as closed for purposes of
summary judgment, and the factual discussion
below will be drawn from the documentary
evidence attached to Kendall's Complaint or
submitted as exhibits to the Declaration of
Assistant Corporation Counsel Hillary Frommer.

*Asthma* and Non–Smoking Housing

Kendall's medical records indicate that on August 26,
2002, Dr. Adriana Vives of the NIC medical clinic
requested that Kendall be housed in a non-smoking area
"for medical reasons." (Frommer Decl., Ex. A) The same
request was made again by Dr. Vives, again without
further explanation, on September 24, 2002. (*Id.*) Neither
request mentioned Kendall's alleged asthma. When
Kendall visited the medical clinic at NIC on September
30, 2002, the treating physician noted that Kendall had
previously complained of swelling in his neck, hands and
lips, but that none of these conditions had been observed
during any of Kendall's previous visits to the clinic. (*Id.,*
Ex. J.) Apparently Kendall himself reported to the treating
physician during this visit that his
previously-complained-of swelling had resolved and that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

he had "no breathing difficulty." (*Id.*) The doctor noted that the physical exam revealed neither swelling, nor signs of recent swelling, in the face, eyes, lips, tongue, or neck. (*Id.*)

On January 4, 2003, Kendall apparently fell from his bed and was discovered unconscious on the floor of his cell around ten p.m. (*Id., Ex. K.*) He was attended by emergency medical technicians at Rikers and transferred by ambulance to Elmhurst General Hospital within thirty minutes. (*Id.*) Kendall returned to Rikers on January 6, after refusing a transfer to Bellevue Hospital for further evaluation. (*Id.*) Kendall avers that he "passed out" due to secondhand smoke inhalation. (P. Mem. & Aff. ¶ 15.) It is undisputed that Kendall remained in a smoking-permitted housing unit throughout his time at Rikers.

*Hemorrhoids*

Kendall was treated at the Bellevue Hospital Rectal Clinic for swollen hemorrhoids on September 9, 2002. (Frommer Decl., Ex. J.) On October 4, 2002, Dr. Vives requested that Kendall be allowed to keep bottled water and some additional food in his cell "for medical reasons." (*Id., Ex. A.*) Kendall avers that he was not provided with bottled water and was denied access to a water fountain, and so had to drink water from the sink in his cell. (P. Mem. & Aff. ¶¶ 7–8.) On the same day, Dr. Vives prescribed a "donut" pillow for Kendall to sit on, as well as stool softeners and suppositories, all to relieve his discomfort from the hemorrhoid condition. (Frommer Decl., Ex. J.) On October 10, 2002, Kendall again visited the Bellevue Rectal Clinic; the treatment notes from the second visit state that Kendall was "doing well" following a rubber band ligation procedure to address a prolapsed hemorrhoid. (*Id.*) Kendall received follow-up care at the NIC clinic on October 11 and 15, 2002. (*Id.*) On November 11, 2002, Physician's Assistant Allen Walker requested that Kendall be allowed an extra sheet to use for privacy while using the toilet, and that he be allowed to hold material to change his surgical dressings in his cell. (*Id., Ex. A.*) Kendall avers that the defendants denied him these recommended supplies. (P. Mem. & Aff. ¶¶ 14–15.) On November 13, 2002, Dr. Vives filed a consultation request for Kendall to be seen again at the Bellevue Rectal Clinic for additional treatment. (Frommer Decl., Ex. J.) Kendall was seen at Bellevue the following day and received an additional rubber band ligation on another prolapsed hemorrhoid; the treating physician noted that a "small amount of bleeding is normal" and requested a follow-up visit in five weeks. (*Id.*) On December 12, 2002, Kendall refused to attend his next scheduled visit to the Bellevue Rectal Clinic, despite having the medical consequences of such refusal explained to him. (*Id.*)

**\*2** Throughout the fall of 2002, Kendall was repeatedly seen and treated in the NIC medical clinic for a series of other medical complaints—flu-like symptoms, podiatry complaints, pain in his shoulder, difficulty digesting prison food, etc. (*Id.*)

*Exhaustion of Administrative Remedies*

On September 26, 2002, Kendall's counsel in his criminal case wrote to Warden Squillante, alerting him to the medical staff's recommendations of surgery for Kendall's hemorrhoid condition and transfer to a non-smoking housing unit on account of Kendall's asthma. (Frommer Decl., Ex. A.) Kendall asserts, both in the Complaint and in the sworn Affidavit submitted in opposition to the defendants' summary judgment motion, that he attempted to file a formal grievance with Mohammed Akinlolu, the Grievance Coordinator at NIC, but was told by Akinlolu that his complaints did not qualify as a grievance. (*Id., P. Mem. & Aff. ¶ 11.*) According to Kendall, Akinlolu refused even to document these conversations. (*Id.*) Kendall also states that he requested and was denied an interview with the Grievance Resolution Committee at Rikers, and that he was unable to make any further efforts to comply with the Rikers grievance procedures because he was housed in protective custody, without access to the grievance form kept in another part of the prison, and because various corrections officers refused his requests to supply him with grievance forms. (*Id.* ¶¶ 11–12.)

Unsurprisingly, defendants dispute Kendall's version of his pursuit of administrative remedies for his complaints. Grievance Coordinator Akinlolu declares in a sworn affidavit that Kendall had free and unimpeded access to grievance forms. (Frommer Decl., Ex. B. ¶ 3.) Akinlolu recalls discussing with Kendall his complaints regarding non-smoking housing and the desire to keep food and water in his cell, but Akinlolu avers that he merely told Kendall that, in order to grieve medical

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

concerns, he would need written physician authorization for each request. (*Id.* ¶¶ 4–5.) Defendants have also submitted sworn affidavits from Arthur Harris, the director of the Inmate Grievance Resolution Program for the New York City Department of Corrections, and from Tonya Glover, intake secretary for the Board of Correction, both asserting that a diligent search of the relevant records reveals no grievance or other correspondence from Kendall regarding his desire to be placed in non-smoking housing or the alleged denial of medical accommodations. (*Id.,* Exs. F & H.) Defendant Squillante testified by affidavit that he never received any correspondence from Kendall. (*Id.,* Ex. G.) Finally, defendants Charles and Kittles likewise testified by affidavit that neither of them (i) were aware of any medical condition suffered by Kendall, (ii) were ever shown or given any medical authorizations regarding Kendall, (iii) ever denied Kendall access to a water fountain, or (iv) ever prohibited or prevented Kendall from keeping bottled water or food in his cell. (*Id.,* Exs. L & M.)

**\*3** Defendants previously moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6). In an Opinion and Order dated September 15, 2003, this Court granted the motion as to defendants Johnson and Cunningham for lack of service, and as to defendants New York City Department of Corrections and Rikers Island Correctional Facility on the ground that they are non-suable agencies of the City of New York under the New York City Charter. The motion was denied as to all other defendants. Those remaining defendants filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on April 9, 2004.

DISCUSSION

I. *Standard on Summary Judgment*

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). On a motion for summary judgment, the evidence

must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (quoting *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 289 (1968)).

II. *Exhaustion of Administrative Remedies*

On their motion for summary judgment, defendants renew the argument made in their motion to dismiss that plaintiff's claims cannot succeed because he has failed to exhaust the available administrative remedies before bringing this action. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

An action for deliberate medical indifference is an action "with respect to prison conditions," and is thus subject to the PLRA's exhaustion requirements. *See, e.g., Harris v. N.Y.C. Dept. of Corrections,* 00 Civ. 7164(NRB), 2001 WL 845448, at \*2 (S.D.N.Y. July 25, 2001). Where exhaustion of administrative remedies is required, failure to do so must result in dismissal of the claims. *Neal v. Goord,* 267 F.3d 116, 117 (2d Cir.2001). As a number of courts in this district have detailed, and as defendants outline in their motion for summary judgment, prisoners in the custody of the New York City Department of Corrections must complete a three-step inmate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

grievance procedure, including two levels of appeals, to exhaust their administrative remedies. *See, e.g., McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003).

**\*4** However, where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust. *See Feliciano v. Goord,* 97 Civ. 263(DLC), 1998 WL 436358 (S.D.N.Y. July 27, 1998) (denying dismissal on failure to exhaust grounds where corrections officers refused to provide inmate with grievance forms); *Burns v. Moore,* 99 Civ. 977(LMM), 2002 WL 91607, at * 5 (S.D.N.Y. Jan. 24, 2002) ("if an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he ... had any available administrative remedies"). The plain language of the statute requires only "available" administrative remedies to be exhausted. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from utilizing is not an "available" remedy under § 1997e(a)") (internal quotations omitted). Common sense and fundamental fairness support this reading. A custodian cannot prevent an inmate's access to a grievance procedure, thereby frustrating the inmate's attempt to resolve his complaints administratively, and then defend against the inmate's subsequent lawsuit by faulting the inmate for failure to exhaust the administrative process. Congress could not have intended the PLRA's administrative exhaustion requirement to produce such a Kafkaesque result. On similar reasoning, a custodian may be estopped from arguing that an inmate failed to exhaust administrative remedies where the custodian previously informed the inmate that the complaints are "non-grievable." *See Feliciano,* 1998 WL 436358, at *2; *Davis v. Frasier,* 98 Civ. 2658(HB), 1999 WL 395414, at *4 (S.D.N.Y. June 15, 1999).

The parties present in the instant motion the same factual dispute that was presented on the motion to dismiss. As noted above, plaintiff claims that he did not fail to exhaust "available" administrative remedies because the actions of various corrections officials prevented him from availing himself of the inmate grievance procedure, both by denying him access to the proper forms and by informing him that his complaints were not grievable. (P. Mem. & Aff. ¶¶ 10–13.) Defendants claim that plaintiff's allegations are not true

and that he had numerous opportunities to comply with the available grievance procedures but simply chose not to. (D. Mem. 3–5, 12–14; Frommer Decl., Exs. F–H, L–M.) The only difference between the presentation of this dispute in the two motions is that plaintiff has now submitted a sworn affidavit, and defendants have supplemented their factual presentation with additional sworn affidavits. However, the core factual dispute as to whether Kendall did or did not have access to grievance forms during the relevant period, and was or was not told by corrections officials that his complaints were nongrievable, remains. Whatever the relative persuasiveness of defendants' affidavit testimony versus plaintiff's affidavit testimony, such credibility determinations are properly for a jury, not for this Court on a motion for summary judgment.

**\*5** Viewing all evidence and making all reasonable inferences in the plaintiff's favor, as the Court must on summary judgment, the defendants have failed to establish that there is no material factual dispute as to the availability of administrative remedies, or that no reasonable fact-finder could find for the plaintiff on this issue. Defendants' argument that they are entitled to summary judgment because plaintiff has submitted "no evidence" is unavailing; Kelly's own sworn affidavit, relating his version of the conversation with Akinlolu and his experience trying to secure grievance forms, does constitute evidence creating a factual dispute, whatever defendants' views on its credibility. Accordingly, the motion for summary judgment on the ground of failure to comply with the requirements of the PLRA is denied.

III. *Section 1983 and the Eighth Amendment*

However, as to the substance of Kendall's claims—that the denial of requests for non-smoking housing and to be allowed to keep food, bottled water, and extra sheets and surgical dressing in his cell violated his Constitutional rights, the defendants' motion for summary judgment will be granted because, even accepting Kendall's version of disputed facts, his claims do not rise to the level of a Constitutional violation.

Kendall predicates his section 1983 claim on the Eighth Amendment, which protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

wanton infliction of pain" at the hands of prison officials. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976). To establish an Eighth Amendment violation in the context of denial of medical care or accommodation, an inmate must show that prison officials acted with "deliberate indifference" to the inmate's serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32 (1993); *Estelle v. Gamble,* 429 U.S. at 104–05; *Fulmore v. Mamis,* 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001); *Carbonell v. Goord,* 2000 WL 760751 at *6 (S.D.N.Y. Jun. 13, 2000). The requirement has two prongs—an objective inquiry as to whether the deprivation of medical attention is "sufficiently serious," and a subjective inquiry as to whether the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (*Hathaway II* ).

As to the first prong, it is well established that more than discomfort or minor injury is required in order for a plaintiff to demonstrate a serious medical need. *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (serious medical need may be demonstrated if "unnecessary and wanton infliction of pain" results, or if the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss of function); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*Hathaway I* ) (the standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain.") *Compare Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* 98 Civ. 5011(WHP) 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, rose to the level of sufficiently serious condition); *Hathaway I,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and produced extreme pain that led to registered complaints on almost seventy occasions); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days was sufficiently serious).

**\*6** Kendall's complaints, even viewing the evidence in the light most favorable to him, simply do not rise to the level of Constitutional seriousness. Although placement in non-smoking housing would undoubtedly be preferable, from a health perspective, to exposure to secondhand smoke from other prisoners, there is no evidence that Kendall suffered any serious health consequences from this housing. The medical consultation forms that recommend he be transferred to non-smoking housing do not specify any medical condition, nor do they suggest that any serious consequences will result if the transfer does not occur. (Frommer Decl., Ex. A.) Kendall's medical records indicate that he was examined for his complaints of swelling due to secondhand smoke exposure, and that those complaints were not substantiated. (*Id.,* Ex. J.) Kendall himself told medical personnel that his previously-complained-of swelling had subsided and that he had no further breathing difficulties. (*Id.*) The one serious incident was the apparent fall that rendered Kendall unconscious. However, the medical records clearly indicate that Kendall received prompt and appropriate treatment, including hospitalization at a non-prison facility, and that Kendall refused further evaluation or treatment, even though he was advised of the possible medical consequences. (*Id.,* Ex. K.) No reasonable factfinder could, on this record, conclude that the failure to transfer Kendall to a non-smoking housing unit was "sufficiently serious" as to constitute a deprivation of Eighth Amendment rights.

The record similarly does not support a finding of a Constitutional violation with regard to Kendall's hemorrhoid condition. Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed "sufficiently serious" by other courts. Moreover, Kendall's medical records indicate that he received frequent and appropriate medical treatment for this condition, and that the only time he was without medical care for his hemorrhoids was when Kendall refused to attend a scheduled visit to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

Bellevue Rectal Clinic for a follow-up exam. (*Id.,* Ex. J.) The medical recommendation that Kendall be allowed to keep bottled water and extra food in his cell is not, on its face, even connected to his hemorrhoid condition (it appears connected to Kendall's complaints to NIC clinic staff about his difficulty adjusting to prison food). (*Id.,* Exs. A & J.) However, even assuming that the recommendation was related to the hemorrhoids, there is no evidence that the alleged failure to follow this recommendation caused any health consequences whatsoever for Kendall, much less consequences that are "sufficiently serious" to constitute an Eighth Amendment violation.

Finally, Kendall's allegations in his Complaint about the alleged failure of corrections officers to allow him an extra sheet or extra surgical dressing in his cell are not, at bottom, complaints about medical care, but rather amount to an argument that Kendall suffered embarrassment due to the difficulty of hiding the physical consequences of his hemorrhoid condition. (*Id.,* Ex. A.) While the Court sympathizes with Kendall's embarrassment, some loss of privacy and attendant loss of dignity is an inevitable consequence of incarceration, and, so long as no serious medical consequences result, these allegations likewise do not amount to a Constitutional deprivation.

*7 As to the second prong of the inquiry, an official will be found to act with "deliberate indifference" to a prisoner's needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Mere negligence, even that which is tantamount to medical malpractice, does not amount to an Eighth Amendment violation. *Estelle v. Gamble,* 429 U.S. at 106; *Hathaway I,* 37 F.3d at 66 (2d Cir.1994) ("[d]eliberate indifference requires more than mere negligence, but less than conduct undertaken for the very purpose of causing harm"). On the present record, no reasonable factfinder could conclude that Kendall has satisfied this standard—chiefly because, as noted above, the recommendations that were allegedly disregarded (request for non-smoking housing, request to keep bottled water and extra food in cell, request for "personal care"

items such as an extra sheet for privacy and extra surgical dressing) did not constitute "an excessive risk to inmate health or safety." Thus, even accepting Kendall's testimony that defendants Kittles, Charles, and Squillante were all aware of the medical recommendations and aware of Kendall's complaints and requests, their alleged disregard of these recommendations does not give rise to a Constitutional violation.

All of the medical evidence in this case indicates that, while in the custody of the New York City Department of Corrections, Kendall received frequent, prompt, and appropriate medical treatment for his hemorrhoid condition, as well as for a variety of other complaints, both substantiated and unsubstantiated. (Frommer Decl., Exs. A, J, K .) Even though Kendall was denied requested transfers to non-smoking housing, and may have been denied permission to keep bottled water and extra food in his cell, there is no evidence that any of the medical personnel that examined or treated Kendall on a nearly weekly basis observed or noted any serious consequences from these circumstances. In short, the record of Kendall's time at Rikers does not remotely demonstrate the kind of callous disregard of the inmate's needs that is "repugnant to the conscience of mankind" and incompatible with "evolving standards of decency" that would constitute cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. at 105–06. Accordingly, the defendants' motion for summary judgment on Kendall's section 1983 and Eighth Amendment claims is granted.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on the grounds that plaintiff has failed to establish an Eighth Amendment violation.

SO ORDERED:

S.D.N.Y.,2004.

Kendall v. Kittles
Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

*1 This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Prince PILGRIM, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional
Facility, Defendants.

Civ. No. 9:07-CV-1001 (GLS/RFT).

March 18, 2010.

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant.

**REPORT-RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Prince Pilgrim has filed this civil
rights action, pursuant to 42 U.S.C. § 1983 and the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq., alleging that
Defendant Dale Artus, Superintendent of Clinton
Correctional Facility, violated his constitutional and
statutory rights to freely exercise his religious beliefs. Dkt.
No. 1, Compl. The crux of Plaintiff's religious expression
claim is that he was repeatedly punished for exercising his
sincerely held religious beliefs, which require him to wear
dreadlocks, because he is a member of the Nation of Islam
("NOI") and Department of Correctional Services'
("DOCS") policy allows only those of the Rastafarian faith
to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to
protect him from unconstitutional retaliation, his due
process rights were violated during the course of several
disciplinary hearings, and the penalties imposed as a result
of his disciplinary convictions constituted "cruel and
unusual punishment" in violation of the Eighth
Amendment. *Id.*

Presently before the Court for a
Report-Recommendation is Defendant's Motion for
Summary Judgment. Dkt. No. 36. Since the filing of
Defendant's Motion, the Court has granted Plaintiff four
separate extensions of time to file a response in opposition
to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20,
2009, at p. 1 (cataloguing prior extensions). The final
extension granted Plaintiff until September 4, 2009, to file
a response, and warned Plaintiff that *"failure to oppose
Defendant's Motion will result in this Court accepting
the facts set forth by Defendant as true." Id.* at p. 3
(emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)).
Despite this Court's leniency and warnings, Plaintiff's
Response [FN1] was not received until September 10, 2009,
six days after the deadline passed. Dkt. No. 47, Pl.'s Resp.
in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure
to meet the extended deadline, because he is proceeding
*pro se,* we will nonetheless consider his Response and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

FN1. Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

## I. FACTS NOT IN DISPUTE

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

**\*2** Plaintiff was received into DOCS' custody on or about November 4, 1992. Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1. At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [FN2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

FN2. DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2) (b).

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[FN3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40-41. However, Plaintiff was allowed to call other witnesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

> FN3. Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co,* 2009 WL 211371, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition. *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

**\*3** Also on February 20, 2007, Plaintiff filed a

grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

*4 Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party

bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any, " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Personal Involvement

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

**\*5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Artus.[FN4] *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

FN4. Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus"* (emphasis added)).

**\*6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d 511, 524-25 (N.D.N.Y.2008)); *cf. Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official *receives and acts on* a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v.*

*Wurzberger,* 2006 WL 1285627, at *2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[FN5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July 5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

FN5. Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

**\*7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[FN6] be **dismissed** for lack of personal involvement. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also Brown v. Goord,* 2007 WL 607396, at \* 10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards,* 1985 WL 467, at \*4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

> FN6. We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with

the notable exception of his First Amendment religious expression claim) to be without merit.

a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008)* (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008)* (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

### b. *Retaliation*

**\*8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)

(citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

**\*9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a

valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

### c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[FN7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See Parker v. Peek-Co,* 2009 WL 211371, at \*4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

be **dismissed** as a matter of law.

> FN7. Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See* *Lewis v. Casey,* 518 U.S. 343, 353 (1996).

**C. RLUIPA and First Amendment Claims**

    *1. Merits of Plaintiff's Claims*

**\*10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion." FN8 *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

> FN8. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at \*5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:

> A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

> B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No.

36-3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

**\*11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [FN9] *see also Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

> [FN9]. The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See Cutter v. Wilkinson,* 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III)(B)(2)(e), which states that

**\*12** [a]n inmate may be subjected to a hair search when

there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

   *Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. *Id.* at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See* Amaker v. Goord et al., 2007 WL 4560595.

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." Farid v. Smith, 850 F.2d 917, 926 (2d Cir.1988) (citations omitted).

**\*13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOC S' policy substantially burdens his religious beliefs. *See* Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir.2006).[FN10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. at 89. Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. Id. at 89-91 (citations omitted).

FN10. In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." Salahuddin v. Goord, 467 F.3d 263, 274-75 n. 5 (2d Cir.2006). *See also* Pugh v. Goord, 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See* Benjamin v. Coughlin, 905 F.2d 571, 576-77 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990) (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y.1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord,* 2007 WL 4560595.

### 2. *Personal Involvement*

**\*14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[FN11] *See Joseph v. Fischer,* 2009 WL 3321011, at \*18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at \*9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at \*2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at \*3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at \*3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law,"

42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

FN11. The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[FN12] *See Zuk v. Gonzalez,* 2007 WL 2163186, at \*2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at \*7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999)* (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

FN12. Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

3. *Monetary Damages under RLUIPA*

**\*15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506-08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.[FN13] Looking to the Eleventh Amendment's protection of the states' sovereign immunity,

courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258-63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.[FN14] *See Pugh v. Goord,* 571 F.Supp.2d at 506-07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009)* (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506-07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidance[FN15] in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**FN13.** Research has not revealed any district court in this Circuit that has concluded otherwise.

**FN14.** Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

**FN15.** "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

**\*16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

**D. Qualified Immunity**

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**\*17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

**\*18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **_FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW._** _Roldan v. Racette,_ 984 F.2d 85, 89 (2d Cir.1993) (citing _Small v. Sec'y of Health and Human Servs .,_ 892 F.2d 15 (2d Cir.1989)); _see also_ 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.

Pilgrim v. Artus

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3724881 (N.D.N.Y.)

(Cite as: 2010 WL 3724881 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Prince PILGRIM, Plaintiff,
v.
Dale ARTUS, Superintendent, Clinton Correctional Facility, Defendant.
No. 9:07-cv-1001 (GLS/GHL).

Sept. 17, 2010.
Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, Aaron M. Baldwin, David L. Cochran, Assistant Attorneys General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, District Judge.

*1 Pro se plaintiff Prince Pilgrim brings this action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA),[FN1] alleging that while he was an inmate at Clinton Correctional Facility, defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated his constitutional and statutory rights, including the right to freely exercise his religious beliefs. (*See* Compl., Dkt. No. 1.)

FN1. 42 U.S.C. § 2000cc-1, *et seq.*

On April 30, 2009, Artus moved for summary judgment. (Dkt. No. 36.) In a ReportRecommendation and Order (R & R) filed March 17, 2010, Magistrate Judge Randolph F. Treece recommended that all Pilgrim's claims except his religious expression claims be dismissed, that Artus be dismissed from the action, and that the New York State Department of Correctional Services (DOCS) and

DOCS Commissioner Brian Fischer be substituted sua sponte as proper defendants.[FN2] (R & R at 18-27, Dkt. No. 50.) Pending are Artus and Pilgrim's objections to the R & R. (Dkt.Nos.55, 56.) For the reasons that follow, the R & R is adopted in its entirety.

FN2. The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04-cv-484, 2006 WL 149049, at *6-7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

Here, both parties have filed specific objections to certain of Judge Treece's findings and conclusions. Having reviewed those findings and conclusions de novo and the remainder of the R & R for clear error, the court finds no error, concurs with Judge Treece, and adopts the R & R in its entirety. As to the substitution of parties specifically, the court recognizes the difficulties that the addition of new defendants at this late stage may cause. However, having carefully reviewed Judge Treece's findings, and in line with the reasoning and authority set forth in the R & R, the court does not agree with defendant that permitting the substitution would be an abuse of discretion. *See* FED. R. CIV. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Randolph F. Treece's Report-Recommendation and Order (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724881 (N.D.N.Y.)

(Cite as: 2010 WL 3724881 (N.D.N.Y.))

50) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Dale Artus is **DISMISSED** from this action; and it is further

**ORDERED** that the New York State Department of Correctional Services (DOCS) and DOCS Commissioner Brian Fischer be substituted as defendants; and it is further

***2 ORDERED** that the Clerk comply with Judge Treece's directives as to updating the docket, issuing and forwarding summonses with copies of the complaint, and scheduling a status conference between the new defendants and Judge Treece; and it is further

**ORDERED** that, pursuant to the R & R, DOCS and Brian Fischer are to file a response to Pilgrim's complaint as provided in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Pilgrim v. Artus
Slip Copy, 2010 WL 3724881 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

(Cite as: 2007 WL 1017102 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Bobby KING and James Ford, Plaintiffs,
v.
Floyd BENNETT, John Hayes, John Laconte and Glenn
Goord, Defendants.
No. 02-CV-349Sr.

March 30, 2007.

Bobby King, Wallkill, NY, pro se.

James Ford, Gainesport, NY, pro se.

Michael J. Russo, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

   **\*1** In accordance with 28 U.S.C. § 636(c), the parties
have consented to have the undersigned conduct all further
proceedings in this case, including entry of final judgment.
Dkt. # 23.

   Currently before the Court is defendants' motion for
summary judgment dismissing plaintiffs' complaint of
denial of the right to free exercise of religion by virtue of
DOCS' policy of holding joint Friday prayer services for
both Shiʻa and Sunni Muslims. Dkt. # 33. For the
following reasons, defendants' motion is granted.

### BACKGROUND

   In *Cancel v. Goord,* a Shiʻa Muslim incarcerated at
the Fishkill Correctional Facility filed a grievance
"requesting that Shiʻa Muslims be allowed to have
religious study meetings, classes or study group specific to
their religious beliefs and that they be allowed access to
outside Shiʻa clergy persons." 181 Misc.2d 363, 364

(Sup.Ct. Dutchess County 1999), *aff'd as modified,* 278
A.D.2d 321 (2d Dep't 2000), *leave to appeal denied,* 96
N.Y.2d 707 (2001). The Department of Correctional
Services ("DOCS"), denied the grievance, prompting the
inmate to commence an article 78 proceeding challenging
DOCS' determination as arbitrary and capricious. *Id.* The
trial court concluded that DOCS' determination that the
spiritual needs of the inmates of the Shiʻa Muslim faith
could be met in religious services led by chaplains of the
Sunni Muslim faith was arbitrary and capricious. *Id.* at
365. Accordingly, the trial court granted the petition and
annulled DOCS' resolution of the grievance. *Id.* at 365-66.
The trial court also ordered that DOCS permit Shiʻa
inmates "to have contact with a volunteer Shiʻa scholar"
or, if no such volunteer was available, to permit Shiʻa
inmates "to participate in a religious education class or
study group up to once per week with an approved inmate
acting as facilitator and with security staff present...." *Id.*
at 366.

   The Appellate Division affirmed the trial court's order
insofar as it granted the petition and annulled DOCS'
resolution of the grievance, but vacated that portion of the
trial court's decision "which directed the manner in which
[DOCS] was to permit the petitioner and his fellow
adherents of the Shiʻa sect of Islam to practice their faith,
and remit[ted] the matter to ... DOCS to conduct
administrative proceedings, with Shiʻa participation, to
determine the manner in which to best afford Shiʻa
inmates sepearate religious services, under appropriate
Shiʻa religious leadership, in a time and place that
comport with legitimate penological concerns." 278
A.D.2d at 323.

   In accordance with that decision, DOCS implemented
an official policy entitled "Protocol for Shiʻite Muslim
Programs and Practices" ("Protocol"). Dkt. # 36, ¶ 5. The
Protocol requires DOCS to: (1) refrain from disparaging
the doctrines of any religious faith; (2) endeavor to consult
with ecclesiastical authorities on Shiʻite Islam in the
community at large to obtain advice and guidance
regarding accommodation of the religious needs of Shiʻite
inmates; (3) afford Shiʻite inmates the right to attend
Shiʻite religious education and study classes; (4) afford

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

(Cite as: 2007 WL 1017102 (W.D.N.Y.))

Shi'ite inmates full and equal opportunity to participate in, without discrimination, the weekly Friday Jumah [FN1] services and ensure that the Muslim Council has at least one Shi'ite member; and (5) revise it's religious observance calendar to include observances unique to Shi'ite Muslims. Dkt. # 36, ¶ 5.

> FN1. Jumah is a weekly congregational service commanded by the Quran which must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 344 (1987).

**\*2** Following implementation of the Protocol, *Cancel* moved for civil contempt, arguing that DOCS "disobeyed the express mandate of the Court to afford Shi'a inmates separate religious services under appropriate Shi'a leadership." Dkt. # 36, Exh. D, p. 4. Despite the language used by the Appellate Division, the Hon. Mark C. Dillon, J.S.C., determined that

The Order of the Appellate Division remitting this matter to ... DOCS does not mandate separate religious services for the Shi'a inmates. If it had, there would have been no need of a remittal. The Order only mandates that ... DOCS determine the manner in which the Shi'a inmates can practice their faith, apart [from] Sunni prisoners.

Dkt. # 36, Exh. D, p. 5.

On January 24, 2002, plaintiffs filed grievances at the Elmira Correctional Facility ("Elmira"), claiming that the Protocol did not conform to *Cancel v. Goord* and violated their right to attend separate Shi'a prayer services. Dkt. # 5, Exh. 2. DOCS denied the grievances, stating:

Jumah services are held on Friday afternoon with Shi'ite and Sunni Muslims in the mosque. Worship classes for Sunni and Shi'ite are held separately each week. Therefore, the facility is in accordance with the state directive and the *Cancel v. Goord* decision.

Dkt. # 5, Exh. 2.

Plaintiffs commenced this action by filing a complaint

in the Northern District of New York on April 12, 2002, which was transferred to this district for proper venue. Dkt. # 5. Although plaintiffs' complaint acknowledges that the Islamic Chaplin at Elmira had authorized a Shi'a study group one night per week to enable Shi'ite Muslim inmates to learn and study the Shi'ite Muslim Sect of Islam, plaintiffs allege that Shi'ite inmates have not been afforded a meaningful or reasonable opportunity to freely participate and practice the Shi'a faith in a separate religious service as set forth in *Cancel v. Goord* and as required by the First Amendment to the United States Constitution. Dkt. # 5, ¶ 4. Plaintiffs demand Jumah services separate and apart from Sunni Muslims and seek monetary damages to compensate for their mental anguish and to punish DOCS' refusal to comply with *Cancel v. Goord* . Dkt. # 5, ¶ 11 & p. 6.

In support of their motion for summary judgment, defendants submit the affidavit of Richard Cerio, Deputy Superintendent for Programs at Elmira. Dkt. # 36. Deputy Superintendent Cerio declares that Elmira

is in accordance with the Protocol, as Elmira has one general Muslim service on Fridays, Shi'a Muslims participate in these services, and at least one Shi'a is on the Muslim Majlis. When Elmira occasionally has inmate facilitators assist in the prayer service, the responsibility is shared by both Sunni and Shi'a Muslims. Shi'a inmates also have the right to attend Shi'a Muslim religious education and study classes apart from Sunni Muslims (as Elmira has a weekly study class that is held on Thursdays from approximately 6:30 to 9:00 pm). Shi'a Muslim inmates can also participate in Arabic language classes and Islamic studies classes, which are conducted by an Imam. Finally, Elmira's Religious Observance Calendar for 2003 is being revised to include the Day of Ghadi (March 3), which is a day of prayer and reflection for Shi'a Muslims, and to include Ashura (March 24), a further day of prayer and reflection for Shi'a Muslims.

**\*3** Dkt. # 36, ¶ 8.

Defendants also rely upon the October 3, 2001 affidavit of John LoConte, Director of Ministerial and Family Services for DOCS, which was submitted to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

(Cite as: 2007 WL 1017102 (W.D.N.Y.))

district court with respect to a motion for preliminary injunction by a Shi'a inmate at the Fishkill Correctional Facility seeking religious services separate from Shi'ite inmates. *Pugh v. Goord,* 184 F.Supp.2d 326 (S.D.N.Y.2002), vacated, 345 F.3d 121 (2d Cir.2003). Director LoConte affirms that although "plaintiffs may be viewed as simply asking that DOCS accommodate their request for a separate prayer area and religious services for a single religious sub-group-Shi'ite Muslims-in reality, establishing a separate organization and program for such inmates would increase pressure on DOCS to make such distinctions for other groups, or subgroups, now and in the future." Dkt. # 37, ¶ 27. For example, Director LoConte notes that there are over 200 protestant denominations encompassed within the Protestant program and three major denominations within the Jewish program. Dkt. # 37, ¶ 42. Director LoConte also avers that "[s]eparate programs would raise security concerns and are fiscally prohibitive because each such program would have to be overseen by prison staff." Dkt. # 37, ¶ 28. In addition, DOCS lacks sufficient space for separate worship areas. Dkt. # 37, ¶ 32. Furthermore, Director LoConte affirms that

> dividing DOCS' Islamic program into separate programs for each sect represented in the prison system would encourage rivalries among the different sects by promoting power struggles and competition for new members or converts. By way of example, in the late 1970's and into the 1980's there had been two major Islamic programs in the state's prison system: a generic Islamic Program and the American Muslim Mission. The inmates in each of the two programs competed for new members and converts from the other. On many occasions this competition turned violent. Recognizing the divisiveness of having the two programs, the religious leadership agreed to a unification and a singular Islamic program, since which the various Muslim sects have coexisted peacefully within DOCS' Islamic program.

Dkt. # 37, ¶ 29. As a result, DOCS has structured the current Muslim program "to accommodate beliefs and practices common to all Muslims." Dkt. # 37, ¶ 17.

In opposition to the motion for summary judgment,

plaintiff King [FN2] argues that the Protocol does not provide for separate religious services under appropriate Shi'a leadership as required by *Cancel v. Goord* and the free exercise clause of the First Amendment. Dkt. # 40. To support the sincerity of his belief in the necessity of separate Jumah, plaintiff King avers that "the Practical Laws of Islam" by Imam Khomenini, requires that "one who conducts congregational prayer must," *inter alia,* be a believer in "the twelve Imam Shia." Dkt. # 60, p. 2. Plaintiff King also avers that

> FN2. Plaintiff Ford has not participated in this action since his release to parole on June 10, 2002.

**\*4** Sunni Muslim adherents perform certain religious functions that invalidate prayer for Shi'a adherents, i.e., the folding of the hands in prayer on the chest, stomach, turning of the head in prayer and the recitation of the words AMIN after the recitation of the Fatiah chapter of the Quran, all of which invalidate prayers for any Shi'a adherents ... which ultimately means that it's an invalidation of the central tenant [sic] of worship....

Dkt. # 60, pp. 2-3.

### DISCUSSION AND ANALYSIS

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials chaged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), cert. denied, 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), citing *O'Lone,* 482 U.S. at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

(Cite as: 2007 WL 1017102 (W.D.N.Y.))

349 and *Turner v. Safley,* 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs. *Salahuddin,* 467 F.3d at 274-75. In assessing the sincerity of an inmate's religious belief, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford,* 352 F.3d at 593. Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590. A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996).

Assuming, without deciding, the sincerity of plaintiff King's belief that engaging in Jumah with Sunni Muslims invalidates his prayers and substantially burdens the exercise of his religious faith, DOCS' refusal to afford Shi'a separate Jumah will still be permissible if it is reasonably related to some legitimate penological interests. "Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."   *Salahuddin,* 467 F.3d at 274, *citing Turner,* 482 U.S. at 90-91; *Ford,* 352 F.3d at 595. Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns are irrational. *Ford,* 352 F.3d at 595.

**\*5** In the instant case, DOCS has articulated a rational basis for their refusal to afford Shi'a inmates an opportunity to attend Jumah separate from Sunni inmates. Director LoConte expresses concern that permitting separate Jumah for Sunni and Shi'a inmates would pressure DOCS to afford separate services for numerous subgroups within the Protestant and Jewish faiths which would increase fiscal and administrative burdens and encourage rivalries among different groups by promoting power struggles and competition for new members and converts. Dkt. # 37, ¶¶ 29, 42. As justification for his security concerns, Director LoConte recounts that DOCS previously recognized two major Islamic programs but unified them because of violent competition between the groups. Dkt. # 37, ¶ 17. Director LoConte also affirms that DOCS lacks sufficient resources, staff and space to accommodate separate Jumah services, a consideration under both the first and third factors. Dkt. # 37, ¶¶ 28, 32.

With respect to the second and fourth considerations, Director LoConte affirms that DOCS has structured the general Muslim program "to accommodate beliefs and practices common to all Muslims" and has endeavored to equalize participation by Sunni and Shi'a with respect to Jumah by sharing responsibility between Shi'a and Sunni inmate facilitators when such facilitators are utilized and by including at least one Shi'ite member on the Muslim Council. Dkt. # 36, ¶¶ 8 & 17. In addition, DOCS has afforded Shi'a inmates, including plaintiff King, the opportunity to attend weekly Shi'a religious education and study classes and has added holy days unique to Shi'a Muslims to Elmira's Religious Observance Calendar. Dkt. # 36, ¶ 8.

As a result, it is the decision of this Court that DOCS' Protocol, as currently implemented at Elmira, strikes a reasonable balance between the accommodation of plaintiff King's religious beliefs and DOCS' legitimate penological interests and does not, therefore, violate plaintiff King's constitutional right to free exercise of religion. *See, e.g., Orafan v. Goord,* 411 F.Supp.2d 153 (N.D.N.Y.2006) (DOCS did not deny Shi'a inmates statutory rights under Religious Land Use and Institutionalized Person Act or First Amendment free exercise rights by refusing to provide Jumah service separate from Sunni inmates); *Muhammad v. City of N.Y. Dep't of Corrs,* 904 F.Supp. 161, 197 (S.D.N.Y.1995) (First Amendment did not require accommodation of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

(Cite as: 2007 WL 1017102 (W.D.N.Y.))

Nation of Islam inmate's request for separate services), *appeal dismissed,* 126 F .3d 119 (1997); *Matiyan v. Commissioner Dep't of Corrs.,* 726 F.Supp. 42, 44 (W.D.N.Y.1989) (DOCS' refusal to honor Sunni inmate's request for Jumah separate from Shi'a inmates did not offend the Free Exercise Clause of the First Amendment).

### CONCLUSION

Based on the foregoing, defendants' motion (Dkt.# 33), for summary judgment dismissing plaintiff's complaint is **GRANTED.**

The Clerk of the Court is directed to enter judgment in favor of the defendants.

**\*6** The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2007.

King v. Bennett
Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Detroy LIVINGSTON, Plaintiff,
v.
P. GRIFFIN, Correction Captain, State of New York
Correctional Services (DOCS); Donald Selsky, Director
of Special Housing for DOCS; R. Lee, Correction
Officer (C.O.); S. Hurteau, C.O.; S. Gawlicky C.O.;
LeFrance, Sergeant of DOCS; M. Foster, C.O.; D.
Abair, C.O.; S. Salls, Sergeant of DOCS; J. Bouyea,
C.O., Defendants.
No. 9:04-cv-00607-JKS.

May 21, 2007.
Detroy Livingston, Elmira, NY, pro se.

Bridget Erin Holohan, New York State Attorney General,
the Capitol Albany, NY, for Defendants.

MEMORANDUM DECISION and ORDER

JAMES K. SINGLETON, JR., United States District
Judge.

I. MOTION PRESENTED

**\*1** At Docket No. 56 defendants P. Griffin, Donald
Selsky, R. Lee, Scott Hurteau, S. Gawlicky, G.
LeFrance,[FN1] M. Foster, D. Abair, S. Salls and J. Bouyea
have moved for summary judgment in their favor under
FED.R.CIV.P. 56. At Docket No. 62 Plaintiff Detroy
Livingston has opposed the motion to which Defendants
replied at Docket No. 66. After reviewing the moving and
opposing papers the Court has determined that the issues
are fully briefed and oral argument would not assist the
Court in ruling on the motion. The matter is decided on
the moving and opposing papers.

FN1. In various documents filed with the Court,
"LeFrance" is spelled "LaFrance." For purposes
of consistency the Court will use the LeFrance
spelling in this memorandum decision and order.

II. BACKGROUND/JURISDICTION

Plaintiff Detroy Livingston ("Livingston") is an
inmate in the custody of the New York Department of
Correctional Services ("DOCS") incarcerated at the
Coxsackie Correctional Facility, Coxsackie, New York.
Defendants P. Griffin ("Griffin"), Donald Selsky
("Selsky"), R. Lee ("Lee"), Scott Hurteau ("Hurteau"), S.
Gawlicky ("Gawlicky"), G. LeFrance ("LeFrance"), M.
Foster ("Foster"), D. Abair ("Abair"), S. Salls ("Salls")
and J. Bouyea ("Bouyea") are all employees of DOCS in
various capacities. Livingston, appearing *pro se,* has sued
all the defendants in their individual capacities under 42
U.S.C. § 1983 alleging various violations of his civil
rights under the Constitution and laws of the United States
in 17 causes of action. These causes of action are divided
into seven separate claims at three separate correctional
facilities.

In his first count, Livingston sets forth his first four
causes of action alleging that Griffin denied him due
process of law under the Sixth and Fourteenth
Amendments arising out of a disciplinary hearing.
Livingston's fifth cause of action, contained in his second
count, alleges that Selsky in reviewing and modifying the
disposition of the disciplinary action also violated his due
process rights under the Sixth and Fourteenth
Amendments. The third count contains the sixth and
seventh causes of action alleging that Lee inflicted cruel
and unusual punishment on him in violation of the Eighth
and Fourteenth Amendments as well as violated New York
law by feeding him foods mixed with unknown drugs.
Livingston's fourth count contains Livingston's eighth and
ninth causes of action alleging that Hurteau inflicted cruel
and unusual punishment on him in violation of the Eighth
and Fourteenth Amendments as well as violated New York
law by feeding him foods mixed with unknown drugs. In
his fifth count Livingston sets forth his tenth, eleventh, and
twelfth causes of action alleging that Gawlicky fabricated
a misbehavior report subjecting him to cruel and unusual
punishment in violation of Fifth, Eighth and Fourteenth
Amendments and provided false testimony that resulted in
a violation of the Sixth and Fourteenth Amendments. In

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

the sixth count, Livingston's thirteenth cause of action alleges that LeFrance tried to force him to be chained to a transsexual/homosexual contrary to Livingston's religious beliefs in violation of First and Fourteenth Amendments and the fourteenth cause of action alleges that Foster fabricated a misbehavior report arising out of his refusal to be transported while chained to a transsexual/homosexual in violation of his First and Fourteenth Amendments. Livingston's seventh count contain Livingston's fifteenth, sixteenth, and seventeenth causes of action alleging that Abair, Salls, and Bouyea, respectively, denied him religious meals in violation of the First, Eighth, and Fourteenth amendments.

**\*2** This Court has jurisdiction over the federal constitutional claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

### III. ISSUES PRESENTED

Defendants' Motion raises essentially two issues: (1) that there is insufficient evidence to support any of the claims made and (2) defendants Griffin, Selsky, Foster, LeFrance, Salls, Abair, and Bouyea are entitled to qualified immunity.

The claims under Count One and the Second Count raise the issue of the due process requirements in prisoner disciplinary actions to (1) compulsory production of witness; (2) the extent to which documentary evidence used by the hearing officer in making his decision must be provided to the prisoner; and (3) whether a recording of the proceedings is constitutionally mandated.

The claims under the Third and Fourth Counts raise the issues of (1) whether expert testimony is required to establish a claim that food fed to an inmate was drugged and (2) whether a private cause of action exists for a violation of the New York penal Code.

The Fifth Count deals with the issue of whether temporal proximity between the filing of a complaint against a correctional officer and an adverse action (issuance of a misbehavior report), standing alone, is sufficient evidence to survive a summary judgment motion on a retaliation claim.

The Sixth Count presents the issue of whether a sincerely held religious belief that homosexuality is an abomination justifies a refusal to be shackled to or be compelled to sit next to a transsexual/homosexual individual.

The Seventh Count presents an issue of whether a prisoner's dietary restrictions must be central to his religious beliefs.

### IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law. FED.R.CIV.P. 56(c); *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.2000). Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence. FED.R.CIV.P. 56(e). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. CIV. (3rd) § 1339 (noting that a verified pleading may serve as an affidavit only if it contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity).

In response to a properly supported motion for summary judgment, the opposing party must come forth with evidence that would be sufficient to support a jury verdict in his favor at trial. *Colon v. Coughlin, supra; Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).[FN2] The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. In order to show that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.,* at 255. All reasonable inferences are drawn in favor of the non-moving party and the moving party bears the burden of both production and persuasion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Additionally, *pro se* litigants should generally be afforded "special solicitude" regarding motions for summary judgment. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir .1988).[FN3]

> FN2. The Court notes that in their motion Defendants offer DOCS records that although authenticated by counsel are not properly authenticated by the custodian of records. However, Plaintiff has not objected to their use and their admissibility at trial is not subject to dispute. Consequently, the Court will consider the records. *See H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991).

> FN3. The Court need not, however, accept conclusory statements or allegations. *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2004).

### V. DISCUSSION

A. **Denial of Due Process Claims (Count One-Griffin; Second Count-Selsky).**

**\*3** The basic facts underlying these claims is not disputed. On November 27, 2001, Livingston was issued a misbehavior report charging him with violating prison rules 100.11 (assault on staff) and 106.10 (direct order). Griffin conducted a disciplinary hearing on November 30, December 5, and December 8, 2001. Livingston's defense was that the C.O. assaulted him by pushing him down the

stairs.[FN4] Eight witnesses testified at the hearing, one inmate witness refused to testify, and Griffin denied Livingston's request to call the facility doctor as a witness. Livingston was provided a copy of the denial of witness form. Livingston was furnished and submitted a redacted copy of the unusual incident report and the officers' "To/From" forms, which comprise the report. Following the hearing, Livingston was found guilty and sentenced to 36 months in the special housing unit ("SHU"). Livingston appealed the guilty disposition and sentence to Selsky, Director of Special Housing/Inmate Disciplinary Program. Selsky affirmed the guilty disposition, but modified the sentence imposed to 12 months in the SHU.

> FN4. The C.O. who filed the complaint against Livingston, T. Notobartolo, is not a party to this lawsuit.

Livingston alleges that Griffin violated his Sixth and Fourteenth due process rights by: (1) failing to call witnesses; (2) taking testimony off the record; (3) denying Livingston documentary evidence; (4) failing to personally ascertain whether an inmate witness in fact refused to testify and failing to provide him with the refusal to testify form; and (5) knowingly used a defective tape recorder. With respect to Selsky, Livingston alleges that, notwithstanding the reduction in the sentence to the SHU, in affirming the finding of guilt notwithstanding the due process violations, Selsky also violated Livingston's Sixth and Fourteenth Amendment due process rights.

In his complaint Livingston alleges:

20. On November 30, 2001 Plaintiff informed defendant P. Griffin that he wanted to call all the c.o.'s as witnesses that responded to the incident because he did not know their names.

21. Defendant P. Griffin failed to call but four of the c.o.'s that responded to the incident.

22. There was over ten c.o's that responded to the November 26, 2001 incident.

23. C.O. Keller witnessed part of the incident and he gave defendant P. Griffin the name of another C.O. that responded to the incident during a off-the-record

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

testimony which Plaintiff over heard.

24. When Plaintiff requested the C.O. whose name c.o. Keller gave to defendant P. Griffin to be call as a witness he refused to call him or disclose the name.

25. Defendant P. Griffin's off-the-record testimony violated Title 7 NYCRR § 254.6(b).

26. Defendant P. Griffin denied Plaintiff the injury report of C .O. T. Notobartolo concerning the November 26, 2001 incident.

27. Defendant P. Griffin denied Plaintiff the institution doctor as a witness at the hearing.

28. Defendant P. Griffin did not personally ascertain whether inmate Shabazz in fact refused to testify at the hearing, and place his findings on the record.

**\*4** 29. Defendant P. Griffin did not furnish Plaintiff with any of the forms to explain the refusal of witnesses, refusal to testify, nor denial of documentary evidence.

30. Defendant P. Griffin refused Plaintiff the Unusual incident report, and accident reports even though he promised that he will.

31. Defendant P. Griffin knowingly [*sic* ] used a defective tape recorder which did not clearly record Plaintiff's objections and conclusions.

The minimum due process requirements for prison disciplinary proceedings were laid down by the United States Supreme Court more than 30 years ago in *Wolff v. McDonnell,* 418 U.S. 539, 563-71 (1974). Summarized, these include: (1) written notice of the charges; (2) sufficient time to marshal the facts and prepare a defense; (3) a limited or restricted right to call witnesses and present documentary evidence; and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. Prison officials have the discretion to keep to keep a disciplinary hearing within limits and refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as limit the access to other inmates to collect statements or compile

documentary evidence. Although not prescribed, it is useful for the reason for refusal to call a witness to be stated. Confrontation and cross-examination are not constitutionally required. Nor does the inmate have a right to counsel; however, where an illiterate inmate is involved or the complexity of the issues render it unlikely the that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence that supports the decision to impose discipline on the inmate. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454-55 (1985).

The ordinary disciplinary procedures of the New York prison system comport with the appropriate due process standards outlined in *Wolff. See Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). In a § 1983 civil rights action, the only relevant inquiry is whether the constitutional minimal requirement for imposing disciplinary punishment was met, not whether state procedures were followed. *Shakur v. Selsky,* 391 F.3d 106, 118-19 (2d Cir.2004). The record in this case clearly establishes that Plaintiff's constitutional due process rights were satisfied. Of the rights recognized in *Wolff* only the right of right to call witnesses and present documentary evidence is implicated in this case.

**\*5** The Court notes initially that, with respect to the disciplinary charge, only Plaintiff and C.O. T. Notobartolo were present during the altercation on the stairs. At the disciplinary hearing the two gave diametrically opposed versions of what occurred. According to the testimony of Notobartolo while he was escorting Livingston down the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

stairs Livingston turned and punched him in the side of the face. Notobartolo then grabbed Livingston in a bear hug in an upper body hold and the two tumbled down the stairs. After scrapping for a while, Notobartolo gained control of Livingston, rolled him over face forward, put his knee on Livingston's buttocks and held him while two other officers applied mechanical restraints. Livingston testified that Notobartolo pushed him down the stairs and that, while holding him down, Notobartolo mouthed to an unidentified officers to hit him (Notobartolo) in the face, which the unidentified officer did.

The two inmate witnesses testified as to what they observed prior to the time Notobartolo and Livingston entered the stairwell but did not observe what occurred in the stairwell. None of the other four correctional officers who testified, all of whom arrived on the scene after Notobartolo had regained control of Livingston in the stairwell, corroborated Livingston's testimony concerning the officer who allegedly was requested to and did hit Notobartolo.

Turning first to the unidentified C.O. who was not called (¶¶ 23 and 24). A review of the transcript and Livingston's statement of facts simply do not support the speculative and conclusory allegation that Griffin Keller identified the C.O. Livingston believes was present. Livingston was permitted to call every C.O. identified either by testimony or in a report submitted. Keller testified that he, Sgt. Shanley, C.O. Kukla, and an unidentified C.O. responded to the scene. C.O. Kukla testified that he, C.O. Keller, and C.O. Notobartolo were present and that C.O. Hemeon came later. Sgt. Shanley testified that he came on the scene after Livingston was under control. Griffin explained that he was unable to learn the identity of the C.O., which is clearly a valid reason for not calling the witness. Livingston's position in this case would go further and require Griffin to prove that he was unable to learn the identity. This, the Court may not do. *See Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) citing *Ponte v. Real,* 471 U.S. 491, 497 (1985). Moreover, while due process requires that an inmate be permitted to call witnesses in his defense, there is no authority for the proposition that due process requires the hearing officer to identify and locate witnesses for the inmate.

With respect to the recording allegations (¶¶ 25 and 31) due process does not require that the proceedings be recorded. Accordingly, while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process.

**\*6** As the hearing officer (Griffin) explained in denying access to C.O. Notobartolo's injury report (¶ 26), those records are confidential. Their relevance to the disputed issues is, at best, tangential. The extent of the injuries Notobartolo may have suffered was not at issue. Livingston does not cite and the Court's independent research does not reveal any authority for the proposition that, in the context of the disputed issues involved in this case, Livingston was entitled to see that report. Griffin also adequately and properly explained his denial of Livingston's request to call the institution doctor (¶ 27), *i.e.,* that testimony of the doctor, who was not at the scene and did not witness the incident, was irrelevant. All the institutional doctor could have testified to was the extent of Livingston's injuries, not how he incurred them. The Court notes that the injuries Livingston suffered were, by his own admission, as a result of falling down the stairs. Whether he was pushed, as Livingston alleges, or was grabbed and fell in the grasp of Notobartolo as Notobartolo alleges, is not a matter to which the doctor could competently testify. Since the refusal to call the doctor was based upon irrelevance, that refusal was justified and did not violate constitutional due process. *Kingsley v. Bureau of Prisons,* 962 F.2d 145, 146-47 (2d Cir.1992).

With respect to the testimony of Shabazz (¶ 28), the hearing transcript shows that Griffin received the refusal form signed by Shabazz that he would not testify and heard the testimony of the C.O. who obtained and witnessed the signed refusal to testify form. Due process does not require, as Livingston suggests, that the hearing officer personally ascertain that a witness refuses to testify.

Finally, turning to Griffin's refusal to furnish the forms and denial of documentary evidence,[FN8] the unusual

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

incident, and accident reports (¶¶ 29 and 30).[FN6] Livingston complains he was not furnished the refusal to testify form signed by Shabazz and an unredacted copy of the unusual incident report. The material redacted from the unusual incident report was a portion of a sentence that described the injuries received by Notobartolo. That was properly withheld from Livingston for the same reason as was the injury report. As for the refusal to testify form is concerned, as noted above, the hearing officer received the form and heard testimony concerning how it was obtained and signed. Even assuming that not giving it to Livingston (the transcript does not indicate that he requested a copy or to examine it) constituted a denial of due process, it was harmless. Livingston merely complains that he was not provided a copy of the refusal form but does not contend that Shabazz did not refuse or even make any offer as to what the testimony of Shabazz might be or what disputed issue of fact to which it might related.

> FN5. Livingston does not identify what other documentary evidence he was denied.

> FN6. The accident report is the injury report referred to in ¶ 26 and disposed of above.

Livingston's constitutional due process rights were not violated by either the Tier III hearing by Griffin or its review by Selsky. Moreover, with respect to Selsky, Livingston has failed to provide facts that even hint at, let alone establish, Selsky had a personal involvement in the alleged denial of his constitutional due process rights. See *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Although he alleges that the complaint by the C.O. was "fabricated," the record contains ample evidence to support the finding that Livingston was guilty of the infractions of which he was charged. Griffin is entitled to judgment in his favor on Count One (First, Second, Third, and Fourth Causes of Action) and Selsky is entitled to judgment in his favor on the Second Count (Fifth Cause of Action).

**B. Cruel and Unusual Punishment-Food Drugging (Third Count-Lee; Fourth Count-Hurteau).**

**\*7** Livingston contends that on various dates in July 2002 Lee and Hurteau knowingly, intentionally, and deliberately served him food trays laced with unknown drugs. As a result each time Livingston ate the food he became dizzy, light headed, disoriented, sleepy and rendered unconscious. Livingston also contends that he had to file a felony complaint before the poisoning of his food ceased. In his Affidavit, Livingston states:

14. Defendant R. Lee knowingly gave Plaintiff food trays with some kind of drugs mixed into the food. Plaintiff was poisoned by defendant Lee on July 15, 16, 17, 21 and 29, 2002. Each time Plaintiff ate the food defendant Lee gave him the drug made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious. That is how Plaintiff realized that defendant Lee was poisoning him through the food tray.

15. The poisoning of Plaintiffs food started after he wrote some complaints and grievances on defendant Lee. The first grievance Plaintiff wrote on defendant Lee was that he refused to pick up his mail, and the next was in regard to him not giving Plaintiff his law library request. Plaintiff did not have any problem with defendant Lee before these instances. Nor was Plaintiffs food poisoned until after he wrote the grievances and complaints against defendant Lee. The poisoning of Plaintiffs was done in retaliation for writing grievances and complaints against defendant Lee.

16. When defendant Lee gave Plaintiff his food tray he would make sarcastic remarks about the food like, "don't forget to eat your vegetables, it's good for you", and "I put something good for you in there." Plaintiff did not really know what defendant Lee meant by these remarks until after he ate the food, and felt the effects of the poison.

17. Plaintiff complaint numerous times about defendant Lee poisoning his food. Plaintiff went as far as filing a felony complaint against defendant Lee in an attempt to stop him from poisoning his food.

18. Plaintiff also tried to get medical tests performed to figure out what was causing the dizziness, disorientation and unconsciousness after he ate the food. Nurse Gomez did not have any medical tests done when Plaintiff requested them, and complained about the effects of the poisoned food to him.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

19. Defendant S. Hurteau also knowingly and deliberately gave Plaintiff poisoned food. On July 23, and September 4, 2002 defendant Hurteau deliberately gave Plaintiff food trays in which unknown drugs were mixed into the food. Each time Plaintiff ate the food defendant Hurteau gave him the drugs made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious.

20. Plaintiff was being poisoned by defendant Hurteau, because of the grievances he wrote on him. Plaintiff had written a couple of grievances on defendant Hurteau for breaking the cell headphones and then writing him a misbehavior report for breaking the headphones.

21. At no time did Plaintiff consent to have drugs planted in his food by defendant Hurteau, or anyone else. Nor did a medical doctor authorize drugs to be put in Plaintiff's food by defendant Hurteau, or anyone else. Plaintiff was taking medication for a chronic illness at the time that his food was being poisoned by defendant Hurteau, but the medication did not cause any vertigo, unconsciousness, or dizziness. It was the unknown drugs that were in the food that cause these effects in Plaintiff.

**8 22. Plaintiff had to resort to filing a felony complaint on defendant Hurteau for poisoning his food for the violation to stop.

23. Plaintiff told the other prisoners in his area that sometimes when he ate the food he felt the effects of being drugged. Some of these prisoners also told Plaintiff that they also felt drugged up after eating the food.

24. Plaintiff loss 50 pounds because defendants Lee and Hurteau were poisoning his food and he was in fear of eating the food.

In his deposition with respect to Lee, Livingston testified:

Q How do you know Defendant Lee put drugs in your food?

A Because sometime he will say something to the effect of eat-don't forget to eat your vegetables, and it's good for you, and I put something good for you in there and stuff like that.

Q Did he tell you he put drugs in your food?

A Not, not like that. He didn't come outright and say there's drugs in your food poisoning you. He would say some sarcastic things like I put something good in there, and don't forget to eat your vegetables and stuff like that.

Q What made you think that those comments reflected that Defendant Lee put drugs in your food?

A At first I didn't-when he said it, I didn't 24 think-you know, he was just talking. But after eating it, then I feel the effect of the drugs, then I knew what he's doing-what he meant by what he said.

Q And what effects are you referring to?

A I would get lethargic, sleepy, dizzy, and I 4 would sometimes fall out-go to sleep.

Q Why would Defendant Lee put drugs in your food?

A Retaliation.

Q For what?

A For writing him up.

Q When did you write him up?

A While I was there. I don't remember the dates, but I wrote him up about not. giving me my law library and stuff like that.

Q Are you referring to formal grievances that you wrote?

A Formal grievances and complaints that the Superintendent was provided.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

With respect to Hurteau, Livingston testified:

Q And how do you know Defendant Hurteau put drugs in your food?

A Because he was the one that was giving me that food, that specific tray right there, and he had an ax to grind or something to retaliate against me for writing him up and ...

Q And how do you know those two trays had drugs in it?

A After eating it, I felt the effects of the poison.

Lee and Hurteau do not contradict the facts asserted by Livingston. Instead they rely on the perceived weaknesses in his case. Contrary to the arguments of Lee and Hurteau, Livingston's medical records for July 24, 2002, reflect: "When I been eating food in the last month I've been feeling dizzy, light headiness, sleep, I want to take [illegible writing] see why this is happening" and the notation under "Plan" " : Thinks it the food-Discuss [medical symbol for with] PA." Although Livingston's medical records show several visits with medical personnel in the month following his initial complaint, the record does indicate any further investigation of Livingston's complaints was undertaken. Lee and Hurteau also argue that because Livingston has no expert medical testimony to establish a causal connection between his alleged health ailments and the alleged drugs in his food and the cause of the injury is not within common knowledge of a layperson, his claim must fail, citing *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 46 (2d Cir.2004) and *Barnes v. Anderson,* 202 F.3d 150, 159 (2d Cir.1999).

**\*9** Neither *Wills* nor *Barnes* is apposite to this case. In *Wills* the issue presented was the causal connection between squamous cell carcinoma and exposure to benzene or PAHs. *Barnes* presented the issue of the causal connection between a miscarriage and an incident that was alleged to have caused substantial emotional stress. This case, on the other hand, involves a situation in which it is uncontested that Livingston ingested food provided him by Lee and Hurteau and after ingesting the food became dizzy, lightheaded, disorientated, sleepy and rendered unconscious. No medical or laboratory tests were run on Livingston. Under these circumstances it is impossible to determine from direct objective evidence what, if any, foreign substance adulterated the food he ingested. Without this critical information it would not be possible for a medical expert to testify with any reasonable degree of medical certainty the cause of the symptoms exhibited by Livingston. At best, a medical expert could only provide the trier of fact with a list of those substances that, when added to food, (1) would not necessarily be readily detectable while it was being eaten and (2) would cause similar symptoms to occur. The facts in this case are more akin to an ordinary food poisoning case. It is within common knowledge that when one eats contaminated food and suffers food poisoning one becomes ill. The severity of the illness may be dependent upon the exact nature of the contaminant but irrespective of the contaminant the person who ingests contaminated food suffers to some degree from food poisoning. In this case, if the jury accepts Livingston's claim that Lee and Hurteau drugged or poisoned the food he was served, the causality nexus between that and the ensuing symptoms may be logically inferred from temporal proximity.

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d at 262 (quoting *Wilson v. Seiter,* 501 U.S. 294, 299 (1991)); *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30 & n. 2 (2d Cir.1994).

Administering a harmful foreign substance through food causes bodily injury just as does the use of excessive force. In an excessive-force case, whether conduct was "wanton" turns on whether force was applied in a good-faith effort to further a legitimate penal objective, or maliciously and sadistically to cause harm. *Hudson,* 503 U.S. at 7; *see also Blyden v. Mancusi,* 186 F.3d at 262-63. Applying that principle to the uncontested facts of this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

case, the deliberate adulteration of food without any connection whatsoever to a legitimate penological objective, a rational jury could reasonably find that the actions of Lee and Hurteau were wanton.

**\*10** The objective component of a cruel-and-unusual-punishment claim focuses on the harm done; but the amount of harm that must be shown depends on the nature of the claim. *See, e.g., Hudson,* 503 U.S. at 8. This objective component is "contextual and responsive to contemporary standards of decency," *id.* (internal quotation marks omitted), and there are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. No showing of extreme injury is required when the claim is that prison officials used excessive force:

In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.

*Hudson,* 503 U.S. at 9. Applying that principle to the facts in the case before the Court, a rational jury could reasonably find that the deliberate inclusion of a harmful substance in food and serving it to a prisoner was done maliciously and sadistically intending to cause harm, thereby violating contemporary standards of decency. In that case, irrespective of whether Lee and Hurteau, or either of them, intended to cause Livingston serious bodily harm or death and only to make him ill, they subjected him to cruel and unusual punishment.

Based on the undisputed facts in the record before it the Court can not say that a rational jury could not reasonably find in favor of Plaintiff. The Court agrees that there is no direct objective evidence corroborating Livingston and the circumstantial evidence is weak.[FN7] Nonetheless, a jury could find, based upon the uncontradicted testimony of Livingston that he ingested food and became ill shortly thereafter, in the absence of any other plausible cause, more likely than not he became ill because of some harm substance added to the food. The jury could also find that Lee and Hurteau had both the

opportunity (as the persons who delivered the food) and the motive (retaliation) to place a harmful substance in the food.[FN8]

FN7. In the context of a summary judgment motion, not only must the Court accept as true the factual assertions of the non-moving party, but in this case neither Lee nor Hurteau have denied under oath Livingston's factual statements that they served him drugged, poisoned, or otherwise contaminated or adulterated food.

FN8. To the extent that Livingston asserts a retaliatory animus claim based on temporal proximity to previously filed grievances against Lee and Hurteau, strength of temporal proximity weighs greater than that of the claim against Gawlicky discussed below. The issuance of an inmate misbehavior report is a normal function of a correctional officer entitled to a presumption of regularity. On the other hand, spiking an inmate's food with drugs, poison, or another harmful substance is most decidedly not. Moreover, unlike the claim against Gawlicky, Lee and Hurteau have as yet presented no evidence to counter its weight.

In his Seventh and Ninth Causes of Action Livingston alleges that the acts of Lee and Hurteau violated N.Y. PEN. LAW § 120.05(5) (Assault in the second degree). Defendants argue that Livingston lacks standing to bring the claim citing *Leeke v. Timmerman,* 454 U.S. 83, 91 (1981). While the Court agrees that Livingston lacks standing to bring a criminal action, that is not the issue. The issue, as it relates to N.Y. PEN. LAW 120.05(5), is whether it gives rise to a private cause of action under New York law. Defendants have not cited any case that no private cause of action lies for a violation of that provision and independent research by the Court has not found any such authority. It is clear that New York recognizes the existence of a private cause of action for violations of its Penal Law. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 451 N.E.2d 459, 463 (N.Y.1983). Under New York law, as applied by the New York Court of Appeals, unless the legislature specifically provides that the provisions of the penal law are exclusive and private

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

litigants are not intended to have a cause of action for its violation, it is for the courts to determine, in light of statutory provisions, particularly those relating to sanctions and enforcement, and their legislative history, and of existing common-law and statutory remedies, whether legislature intended private litigants to have cause of action for violation of provisions. *Id.* Whether a private cause of action was intended under a penal statute turns in the first instance on whether Livingston is one of the class for whose especial benefit statute was enacted. However, inquiry does not end there, rather, factors include what indications there are in statute or its legislative history of intent to create or deny such remedy and, most importantly, consistency of doing so with purposes of underlying legislative scheme. *Id.* Although they have the burden of establishing entitlement to judgment as a matter of law, Lee and Hurteau have not briefed this critical issue.

**\*11** Additionally, it appears that New York would recognize a civil tort cause of action under the facts of this case. *Cf. McCrory v. State,* 721 N.Y.S.2d 712, 713 (N.Y.A.D.2001) (dismissing food poisoning claim for failure to prosecute); *Hakeem v. Wong,* 636 N .Y.S.2d 440, 441 (N.Y.A.D.1996) (dismissing a prisoner's claim that prison officials deliberately poisoned foods purchased from a vending machine for failure to exhaust administrative remedies). In addition, the Second Circuit has indicated that a civil battery claim lies under N.Y. PEN. LAW § 35.30. *See Nimely v. City of New York,* 414 F.3d 381, 391 (2d Cir.2005). This Court perceives no principled reason to assume that a civil battery claim may not be asserted under § 120.05(5).

Having failed to establish that they are entitled to judgment in their favor as a matter of law, Lee and Hurteau are not entitled to judgment on Count Six (Sixth, Seventh, Eighth, and Ninth Causes of Action).

## C. False Misbehavior Report (Fifth Count-Gawlicky)

The basic facts of the events and sequence in this case are undisputed. Livingston lodged complaints with the Superintendent against Gawlicky on March 17 and April 6, 2003. On April 11, 2003, Gawlicky issued a misbehavior report against Livingston charging him with

making threats against her and disobeying a direct order. Following a hearing, Livingston was found guilty of making of the threat charge and not guilty of violating a direct order and sentenced to four months punitive confinement, with loss of privileges.

Livingston contends that the report was false and Gawlicky fabricated it in retaliation for Livingston having filed the complaints against her and that she falsely testified that she feared Livingston might reach through the cell bars to assault her so that he would be placed in a plexiglass cell.

Because they involve questions of intent and are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must approach prisoner claims of retaliatory action with skepticism and care. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To sustain a First Amendment retaliation claim Plaintiff must show that: (1) the speech or conduct at issue was protected; (2) the defendant took an action adverse to him; and (3) a causal connection between the protected speech or activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes v. Walker,* 239 F.3d at 492. Defendant concedes that the complaints filed by Livingston constituted a protected activity and it appears beyond cavil that the filing of a misbehavior report that results in disciplinary action is adverse. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). This leaves as the only open issue the causal connection between the two.

The only evidence that Livingston offers for his retaliation claim is the temporal proximity between his complaints against Gawlicky and the filing of the disciplinary charges against him. This is circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002); *Colon v. Coughlin, supra,* 58 F.3d at 872. The question becomes whether this, standing alone, is sufficient to defeat summary judgment. In *Colon* the Second Circuit suggested that if this were the sum and total of plaintiff's case, it might be inclined to affirm the grant of summary judgment to the defendants based upon the weakness of plaintiff's case. 58 F.3d at 873. In this case, unlike *Colon,* Livingston offers no direct evidence of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

a retaliatory motive. Other circumstantial evidence that might lend support to his case, *e.g.,* his disciplinary record and the nature of the more recent disciplinary violations, *see* Flaherty v. Coughlin, 713 F.2d 10, 14 (2d Cir.1983), in reality undercut Livingston's claim. The record shows that between December 1989 and April 2003 Livingston was the subject of more than 100 disciplinary actions, several of which involved assaults on or threats made to staff. In *Gayle,* unlike this case, the misbehavior report was not only temporally close but arose from statements made in a protected activity (discussion of a grievance) and the conviction was reversed on appeal.

**\*12** The Court, balancing the principles of the special solicitude to be given to *pro se* plaintiffs and the general rule against weighing the evidence against the skepticism with which it must view retaliation claims, is of the opinion that, based on the evidence in this case, no rational trier of fact could reasonably find in favor of Livingston. Gawlicky is entitled to summary judgment in her favor on the Count Five (Tenth, Eleventh, and Twelfth Causes of Action).

**D. Interference with Religious Beliefs (Count Six-LeFrance and Foster; Count Seven-Abair, Salls, and Bouyea).**

Both Count Six and Count Seven appear to be predicated upon an alleged infringement of Plaintiff's religious beliefs as a Rastafarian. In his complaint, Livingston alleges that LeFrance tried to force him to be handcuffed or sit next to a person who was clearly a transsexual/homosexual and that because of this Foster fabricated a misbehavior report that Livingston disobeyed a direct order. He further alleges that Abair, Salls and Bouyea refused to serve him alternative religious meals, *i.e.,* substitute meals when red meat was served. Livingston's claim of religious belief is clouded by certain undisputed facts. Livingston admits to having been raised as a Seventh Day Adventist. In approximately 1984 he became a Muslim. At some subsequent date that does not appear in the record, Livingston converted to Rastafarianism. However, irrespective of the date of his conversion, Livingston did not inform prison officials of this conversion until on or after August 21, 2004, after the dates that the events of which Livingston complains occurred.

1. *LeFrance and Foster.*

In his affidavit, Livingston testified:
38. On July 21, 2003 when Plaintiff was being transferred out of Upstate C.F. SHU, defendant LaFrance tried to force him to be shackled with an inmate that was clearly a transsexual/homosexual. Due to Plaintiffs religious belief he refused to be shackled with the transsexual/homosexual inmate.

39. When Plaintiff was called to the pen gate to be shackled, and he saw the inmate whom was to be shackled with him Plaintiff calmly asked defendant LaFrance, "is this person going to be handcuffed to me". Defendant LaFrance answered "yes". That is when Plaintiff clearly, calmly and respectfully told defendants LaFrance, M. Foster, and the other c.o.'s in the area that it's against his religion to be in such a close proximity with a transsexual/homosexual person, and could he be shackled to somebody else. The defendants said "no". Plaintiff then sat beck [*sic* ] down.

40. Plaintiff was again asked to be shackled to the transsexual/homosexual inmate. Plaintiff again refused to be shackled to that inmate, and again stating his religious concerns.

41. Defendant LaFrance then got on the telephone and spoke to someone about Plaintiff and the situation. While on the telephone defendant LaFrance suggested an alternative solution to the situation. The alternative was that Plaintiff would not be shackled to this person, but he still had to be seated next to the same person, Plaintiff agreed to not being shackled to this person, but questioned the logic of being forced to being seated next to this person still. Defendant LaFrance then told the person on the telephone that Plaintiff still refused to get on the bus. If Plaintiff were not shackled to this person it would be no need for him to be seated next to this person for the long bus ride. Sitting next to the transsexual/homosexual person was the same as being shackled to him.

**\*13** 42. Plaintiff would have been force to be seated next to the transsexual/homosexual person for six to eight uncomfortable hours. Plaintiff did not want to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

violate his religious belief, and be stressed out for not adhering to his religious dogma.

43. Plaintiffs religious belief comes from the Holy Bible, and the way his mother raised him. In the book of Leviticus chapter 18 verse 22 through 26states that, "you shall not lie with a male as with a woman; it is an abomination ..." There are many other verses in the Bible such as this one that forbid homosexual acts and association. Jamaican parents who were strict with the teachings of the Bible raised plaintiff. Also, the Jamaican people when Plaintiff was growing up took anti-homosexual stance very serious, because of what the Holy Bible states regarding any homosexual activities. God did destroy Sodom and Gomorrah, because of the abundance of homosexual abomination that was occurring in these two cities.

44. Plaintiff stated his religious concerns to both defendants LaFrance and Foster, but they were hell bent on violating Plaintiffs religious beliefs.

45. Plaintiff was escorted back to SHU, and the next day, July 22, 2003 was issued a bogus fabricated misbehavior report written by defendant M. Foster.

46. Defendant Foster fabricated that Plaintiff stated that he "wasn't gonna be shackled to any Homo". And also said, "You guys might be Homo's, but I'm not and you ain't putting me with that Homo". Plaintiff never said any of these alleged quotes. At all time during the incident Plaintiff calmly, clearly and respectfully expressed his religious position to defendants LaFrance and Foster regarding his religious belief and the reason why he did not want to be shackled to the transsexual/homosexual person. At no time did Plaintiff verbally harass or abuse anyone. These defendants asked Plaintiff to be shackled to get on the bus; they did not give a direct order. Either way Plaintiff would have still stand on his religious rights and beliefs to not be shackled to the transsexual/homosexual person.

47. There were other inmates that were associating with the transsexual/homosexual while in the pen that would have been willing to be shackled to this person.

48. Plaintiff was found guilty at the disciplinary hearing by the H.O., and sentenced to four (4) months SHU with loss of all privileges, and sixty (60) days was suspended and deferred.

49. Plaintiff submitted an administrative appeal. The hearing disposition was reversed and expunged on administrative appeal after Plaintiff completed his SHU sentence. In all Plaintiff did sixty-one (61) days in SHU due to the fabricated misbehavior report written by defendant Foster and endorsed by defendant LaFrance.

In his Deposition, Livingston testified:

Q Okay. I'm going to turn now to the events that you've included in this Complaint that occurred on the date of July 21 st, 2003, at Upstate Correctional Facility.

**\*14** Could you please describe what. happened on July 21 st, 2003?

A Well, I got-I was escorted to the receiving room to be processed to be released from S.H.U. Upstate, and at one point I saw that the Sergeant wanted me to be handcuffed to this inmate that was, say-he was a transsexual. Like-I don't know. He had-he had fake breasts or whatever you want to call it, and he made himself up to look like a girl-female or whatever. And I told the Sergeant I don't want to be handcuffed to this dude right here, and I told him the reason why, and he tried to force me to still. I told him, no, I'm not going to. And he-after going back and forth, I still told him I refused, and he got on the phone. He spoke to somebody. And he came with an alternative way to be-to be placed on the bus, but it was still something to do with being handcuffed to the dude. And I told him no. So he said well, you know, you get put back in your cell. I said: If that's how it's going to be, that's how it was going to be. It's my religious right not to be forced to be handcuffed to this person. That's what I told him. So they put my back in my cell and wrote me a force ticket saying this and that happened, when none of that happened in the ticket. And I went to a hearing. They found me guilty. And I appealed it, and they found in my favor.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

Q So the ticket was ultimately reversed?

A Yes.

Q Who first gave you the order to be handcuffed to this transsexual inmate?

A. I think it was LeFrance 'cause I turned to him after I saw what was-what was taking place, I turned to him and said: I'm not gonna be handcuffed to this person right here.

Q And what did LeFrance do?

A He said if you want-he said-he said something like if you want to get on the bus you are. And I said I'm not, and we went back and forth with it. And I told him the reason why, and he still didn't care. And I told him, well, I refused. And he made a phone call to somebody.

Q Did LeFrance give you a direct order to be handcuffed to the transsexual inmate?

A You could probably say it was an order, but I still wasn't going to.

Q And you refused the direct order?

A If it was an order, I refused it.

Q And you refused to obey the direct order on religious grounds

A Yes.

Q And what are those religious grounds

A Not to be in close proximity and interactive with persons of that persuasion.

Q And is that part of your Rastafarian beliefs?

A It's my belief. It comes out of the Bible. I think I sited [sic] the place in the Bible where it states Leviticon-Leviticus.

Q In Paragraph 71 of your Complaint you correctly note that you cite Leviticus 18[:]22 through verse 26. Do you know what that verse states?

A Not verbatim.

Q Could you summarize it for me?

A Basically what I just said about, yon know, being associated, proximity, interaction, you know, with persons like that person was.

Q And did you cite this verse to Sergeant LeFrance?

*15 A No. But I told him that's my religious belief not to be handcuffed to this person like that.

Q Were you actually ever handcuffed to this other inmate?

A No.

Q So the only injury suffered as a result of the events of July 21 st, 2003, is the ticket that was issued to you?

A I had to do 61 days, and my religious belief was compromised.

Q How was your religious belief compromised?

A Because they wanted me-to handcuff me to the person-this person knowing that. And since I refused, they gave me 61 days because of my religious belief.

Q So the injuries suffered was the 61 days in S.H.U.?

A And my religious beliefs.

Q In Paragraph 74 of your Complaint you say: Defendant M. Foster fabricated a misbehavior report stating that Plaintiff disobeyed a direct order, verbal harassment, and staff direction for movement.

    Why was the ticket fabricated?

A Because in the description of the incident, none of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

that happened. He said I start-I don't remember what he wrote, but he's saying that I start yelling, screaming, and causing a scene and all kinds of stuff. But I never did that. All I stated was my religious belief and my reason for refusing to be handcuffed to this person. But he just made up lies, fabrication, and said all kind of stuff happened beside, you know, that really happened.

Q A hearing was conducted on this incident?

A Yes.

Q What was your defense at the hearing?

A That because of my religious belief I didn't want to be handcuffed to this person and none of the description of the incident was true.

Q Did Defendant Foster give you a direct order?

A Not that I remember. All I kept speaking to was the Sergeant because he was the one in charge. So all my verbal comments were directed to him.

A little later he further testified.

Q Were you ever given an order to get onto the bus? A I guess so if-'cause that's what they was trying to do. It might not have been an order-order, but it was, you know, they wanted me to get on the bus.

Q And did you refuse because of your religious beliefs?

A Yes

Four facts emerge from Livingston's testimony. First, he refused to be shackled or, alternatively, sit unshackled next to a person he described as being a transsexual or homosexual for transport between two prison facilities. Second, his refusal was based upon his professed religious beliefs. Third, his refusal to be shackled resulted in his not being transported and was, at the very least, the functional equivalent of refusing to obey a direct order. Fourth, Livingston was subjected to disciplinary action for his failure to obey the order.

Livingston has the threshold burden of establishing that the action of which he complains substantially burdened his sincerely held religious belief. *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006). Once Livingston has met this burden, the burden shifts to the Defendants to identify the legitimate penological purpose justifying impingement upon that right and that the burden is reasonable. *Id.* In making the reasonableness determination, this Court must evaluate four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether Plaintiff had an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating Plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.,* citing *Turner v. Safley,* 482 U.S. 78, 90-91 (1987).

**\*16** The question is twofold: what was believed and how was it burdened? Livingston's belief in this case is that homosexuality is an abomination and that he should "not be in close proximity and interactive with persons of that persuasion." [FN9] By his own admission Livingston was not handcuffed nor was he forced to ride seated next to the homosexual/transsexual. The burden he alleges imposed was that Foster issued him a fabricated misbehavior report and he was subjected to disciplinary action for refusing to be handcuffed to a homosexual/transsexual.

FN9. In addressing Plaintiff's threshold burden, this Court starts with the assumption that Plaintiff's religious belief is sincerely held. *See Ford v. McGinnis,* 352 F.3d 582, 590 n. 8 (2d Cir.2003).

The fatal infirmity in Livingston's case against LeFrance is that there is no factual support for a finding that LeFrance infringed upon any religious belief. He admits that he does not know and is only guessing that LeFrance ordered Foster to issue the ticket. Other than to order him to be handcuffed to the homosexual/transsexual person and board a transport bus, which order Livingston admittedly refused to obey, LeFrance had no further direct or personal involvement in the incident. While perhaps

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

showing that LeFrance *attempted* to burden Livingston's religious beliefs, Livingston falls far short of establishing that LeFrance burdened them. Moreover, even assuming LeFrance ordered the misbehavior report be issued, as discussed further below, it does not establish his liability. LeFrance is entitled to judgment in his favor on the Thirteenth Cause of Action.

Livingston's action against Foster suffers from several infirmities. The misbehavior report charged Livingston with disobeying a direct order, verbal harassment, and staff direction for movement. Livingston claims the misbehavior report was fabricated. The fabrication claimed by Livingston was in the description of his behavior, *e.g.,* "yelling, screaming, and causing a scene and all kinds of stuff." What Livingston fails to contend is that he did not disobey an order or staff direction for movement. Quite to the contrary, Livingston admits he refused to be handcuffed or sit next to the transsexual/homosexual for movement and as a consequence missed the movement. Even accepting as true Livingston's conclusory allegation that the description was false, having admitted he refused to be handcuffed and board the bus, Livingston's conclusory assertion that the infraction of the rules with which he was charged was fabricated lacks factual foundation.[FN10]

FN10. The Court is not unmindful of the fact that Defendant's conviction of this charge was later reversed on appeal. Not only is no reason shown for the reversal, but the fact that Livingston may have been exonerated on appeal does not render the misbehavior report "bogus" or "fabricated" in a case where he admits the facts that underlie the charges in the misbehavior report to be true.

Plaintiff's only defense to the misbehavior report was the exercise of his religious beliefs was being infringed. The question becomes whether being handcuffed or, alternatively, forced to sit next to a homosexual/transsexual on a bus would substantially burden Plaintiff's religious beliefs. It would not. According to Plaintiff, being forced to sit next to a homosexual/transsexual for six to eight hours would have been uncomfortable and he would have been stressed out for not adhering to his religious dogma. This case does not

rise to level of those cases in which a substantial burden on religious tenets was found to exist. Plaintiff was not denied the right to participate in congregate services ( *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); right to participate in a religious ceremony of his choice (separate Shia and Sunni services during Ramadan) (*Salahuddin v. Goord, supra*); denied a religious meal ( *Ford v. McGinnis,* 352 F.3d 582, 594 (2d Cir.2003)); or forced to swear on a bible in church ( *Doe v. Phillips,* 81 F.3d 1204, 1211-12 (2d Cir.1996)). Plaintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination. This fits within those cases in which it can comfortably be said that is so peripheral to Plaintiff's religion that the burden is constitutionally *de minimis. See Ford v. McGinnis, supra,* 352 F.3d at 593. Moreover, nowhere has it been clearly established that no matter how strongly or sincerely held his religious beliefs may be, a prison inmate has the right to be free from being in the proximity of or interactive with another person because of that person's sexual orientation. Indeed, such a rule, just as one founded upon color, creed, religious beliefs, gender, or national origin, would be repugnant to the strong public policy of this country and this Court declines to adopt such a rule.

**\*17** Defendants argue that, assuming that the misbehavior report constituted an impermissible burden on his religious beliefs, Livingston is not entitled to recover because LeFrance and Foster have qualified immunity. Under the doctrine of qualified immunity, *i.e.,* freedom from being sued, the court follows a two-step process: first was there a violation of a constitutional right and second was the right clearly established at the time of the violation. *Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir.2006) citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The relevant dispositive in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct is unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202. If the facts establish a violation, the inquiry becomes whether the evidence, when viewed in the light most favorable to plaintiff and all permissible inferences drawn in his favor, is such that no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not violate a clearly established right. *Salahuddin v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

*Goord,* 467 F.3d at 273.

While a general right of a prisoner to freely exercise his religious beliefs, although subject to some restriction, was clearly established in 2003, the question is whether that right extended to Livingston's conduct. *See, e.g., Shabazz v. Coughlin,* 852 F.2d 697, 700-701 (2d Cir.1988) (holding that while the right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not). As noted above, no such right as that claimed by Livingston in this case has been clearly established and defendants are entitled to qualified immunity.

LeFrance and Foster are entitled to judgment in their favor on the Sixth Count (Thirteenth and Fourteenth Causes of Action).

2. *Abair, Salls, and Bouyea.*

In his affidavit Livingston testified:
50. On August 5, 2003 defendant D. Abair started denying Plaintiff his alternative/religious meals while in Upstate C.F. Plaintiff notified sergeant Trim, but nothing was done about this problem. Plaintiff had to go hungry for the last two chows (lunch & dinner). Plaintiff told defendant Abair that he have been getting the religious/alternative since he arrived in Upstate C.F. on May 2, 2003. Defendant Abair still refused to give Plaintiff his meal.

51. On August 6, 2003 again Plaintiff did not get his religious/alternative meals. Plaintiff spoke to defendant S. Salls on the 7 to 3 shift about the problem. Plaintiff had to go hungry because his meal was not given to him, and he did not eat meat for religious reasons. When the 3 to 11 shift came on Plaintiff spoke to Sgt. Bass about the problem, but nothing changed Plaintiff still had to go hungry.

52. On August 7, 2003 during the 7 to 3 shift Plaintiff again spoke to defendant Salls twice. Defendant Salls told Plaintiff he wouldn't be getting the religious/alternative meal until September 1,2003.

*18 53. Plaintiff even spoke to the Muslim Iman [*sic* ]

Dr. Ali on August 7, 2003 about him being denied his religious/alternative meal. Dr. Ali said he would tell somebody about the problem. Plaintiff still did not get his meals.

54. On August 11, 2003 defendant J. Bouyea came back to work on A-gallery in 8-Building, for which he was the steady C.O. Plaintiff spoke to defendant Bouyea about the problem of him not getting his religious/alternative meal. Defendant Bouyea wrote the sign back on the door indicating that Plaintiff was to get a religious/alternative meal. Defendant Bouyea told Plaintiff that he must have "pissed off somebody for them to change his alternative meal to regular." Plaintiff started getting his religious/alternative meal then.

55. On August 13, 2003 defendant Salls came to Plaintiff cell during feed-up time and made defendant Bouyea change the religious/alternative meal tag on the cell door to regular meal. Defendant Salls told Plaintiff he "will make sure you don't get your religious meal." Plaintiff did not get his meal and he went hungry again.

56. On August 14,2003 defendant Salls came to Plaintiff on the pretense of investigating him not get his allotted cell property. Defendant Salls tried to make a mockery of Plaintiff situation. At one point defendant Salls told Plaintiff "you just don't understand you are not getting anything."

57. On August 14, 2003 defendant Bouyea refused to give Plaintiff his religious/alternative meal during the lunch feed-up. Defendant Bouyea told Plaintiff that defendant Salls said, "you not alternative, so you not getting it." It was reported to the console that Plaintiff refused chow. Plaintiff still was not getting his meals.

58. On August 17, 2003 Plaintiff was not feed [*sic* ] at all because there was no religious/alternative meals on the food cart for him. This was not reported to the console to be recorded in the logbook.

59. On August 20,2003 Plaintiff spoke to Correction Lieutenant D. Phelix about his meal being changed from religious/alternative to regular without him requesting the change. He said he would check into the situation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

Plaintiff did this when he was moved from 8-B-2cell to 8-A17cell.

60. On August 22, 2003 Plaintiff spoke to Correction Captain Bezio regarding him not getting his religious/alternative meal. He told Plaintiff that defendant Salls investigated the matter. Defendant Salls never investigated Plaintiff about the food after August 7,2003. In fact, it was defendant Salls whom had Plaintiff [*sic*] meal changed without consent or a request after the problem was corrected on August 13, 2003 Plaintiff told this to Capt. Bezio.

61. On August 28, 2003 Plaintiff told Correction Captain Racette about the problem he was having regarding not getting his religious/alternative meals, and it being changed to regular meals without his request. Capt. Racette saw for himself that the alternative meal sign on the cell door was scratched off with a black marker and regular was written on the place card.

**\*19** 62. All of the discrepancies about Plaintiff's religious/alternative meals started after he refused to be shackled to the transsexual/homosexual inmate on July 21, 2003. Which was a deliberate attempt to violate Plaintiff's religious beliefs.

63. The denial of Plaintiff [*sic*] religious/alternative meals was once again an attempt to violate his religious beliefs. Because of Plaintiff's religious beliefs he do not eat red meat, pork, crustaceans or fishes without scales. Plaintiff went hungry when red meat was served.

In his Deposition Livingston testified in part:

Q What are your religious dietary restrictions under Rastafarianism?

A I don't eat any red meat and stuff like that.

Q You're going to need to elaborate on what "stuff like that" is?

A Just red meat and you know ...

Q Do you eat other forms of meat?

A. Yes.

Q Chicken?

A Yes, I eat chicken.

Q Fish?

A Fish.

Q So it's basically just no red meat like-

A Yes.

Q -beef?

A Yes. And I don't eat shrimps, crabs, oysters, and those things without scales and stuff like that.

Q So no seafood?

A No. I eat seafood but certain seafood like unscaled seafood. Like, you know, certain-it's basically what the Bible said not to eat. The Bible said not to eat unscaled fish and basically that's what I-I don't eat shrimps, crabs and lobsters.

Q I can't imagine that the Department of Correctional Services serves lobster too often.

A They never do. But you can buy it, though.

Q Really?

A Yeah.

Q Hmm. And the dietary restriction of red meat and no unscaled seafood, is that a basic tenant of Rastafarianism?

A That's how I grew up from my mother. My mother never cooked pork and stuff like that. That's one other thing. Unscaled fish, she never cooked those.

Q And is your mother a Rastafarian?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

A. No, she's Seven [*sic* ] Day Adventist. But she followed-she just followed the Bible strict, like, you know, as far as dietary things.

Q So even though you converted to Rastafarianism, you kept the dietary restriction of a Seven [*sic* ] Day Adventist?

A Basically. It's basically the same thing, but they just follow the Old Testament, you know, Torah and all that other stuff.

Q Now, it was my understanding that Rastifarians are complete vegetarians; is that true?

A Some. Some.

Q Why have you chosen not to be a complete vegetarian?

A Because I think I need some-some of that, you know, protein and things.

Q Now, in August of 2003, were you serving a S.H.U. sentence?

A Yes, I think so. I think-yeah, 2003.

Q When you came into DOCS custody, did you inform them of your no red meat dietary restriction?

A At one point.

Q When?

A Every time that I went to the box or S.H.U. I informed them that, you know, I'd like the alternative meal-the religious meal.

Q Now, how do you go about telling them that you want the alternative meal?

**\*20** A You know, each facility prison, you know, verify how they want to be told. Some make you sign a paper-documents that all you want is the alternative

meal, and others they just ask you when you come in what kind of food you want and you tell them.

Q How does Upstate do it?

A When I first went there in '01, I think it was I went there-or '02 I told-I signed a piece of paper before. But when I returned the most-last one-recent one-the most recent one I just told them. They just put it up on the door of the cell that, you know, he eats alternative.

Q And how about in '03, what was the process at Upstate?

A '03, that's the most recent one. I think I told-that's why I told them. I told them-the first time I went there, I had to sign a document saying I wanted the religious meal. The last time I went there, they just put it on the door after I told them I only eat alternative meal.

Q. And how do they put it on the door?

A. They write it on a piece of paper and they have some magnets like, you know, you might use on your refrigerator to stick it up there on the metal door.

Q And what's the difference between the regular meal and the religious alternative meal?

A They don't serve meat. Soy beans and-

Q So the religious alternative meal is completely vegetarian?

A Yes. And fish.

Q It includes fish, though?

A Yes.

Q And when you were in S.H.U., your meals are delivered to you?

A Yes.

Q And how many times a day are meals delivered to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

S.H.U. inmates?

A Three times.

Q And generally what would be in your breakfast?

A Everybody get the same breakfast generally. I can't-it varies everyday; toast and hot cereal, cold cereal, coffee cake and jelly, milk, coffee if you drink coffee, juice.

Q Is there ever any meat products in the breakfast?

A If you consider eggs or they have some, I think, turkey sausages/links.

Q And do you eat eggs under your religious dietary restriction?

A Yes, I eat eggs.

Q And do you eat turkey sausage as part of your religious-

A I eat turkey.

Q So any breakfast that was delivered to you would have complied with your religious dietary needs?

A. Yes.

Q What generally is in a lunch that was delivered to you in S.H.U.?

A Non-meat. Alternative-on the alternative meal it's non-meat, that's all. But it varies from meal to meal.

Q What about in the general-the non-alternative meal, what would be included in that?

A It varies too, but they have meat in theirs, most likely.

Q Would there be non-meat products included in the lunch?

A Like potatoes, and rice, and stuff like that?

Q Yeah.

A Mm-hmm. Vegetables. But the main course would be something with meat, most likely. They also get chicken and fish, turkey.

Q And for dinner on the non-alternative meal, what was generally served?

A Basically the same thing; meat biproducts [sic] and carbohydrates, bread.

*21 Q So the main entree would have either chicken, fish or beef-

A Right.

Q -and then there would be two sides-

A Two sides.

Q-like a serving of vegetables?

A Yeah.

Q And then maybe a serving of potatoes and rice?

A Yeah, dessert. Mm-hmm.

Q And bread?

A Yes.

Q You allege in your Complaint that from August 5th to August 11th, 2003, you had to go hungry when red meat was served. How many times was red meat served to you in S.H.U. from August 5th to August 11th, 2003?

A I didn't count but basically every day red meat is served. Sometime it be mixed into it where you can't even, you know, separate and eat what's not red meat like potatoes or rice.

Q What do you mean "every day red meat was served"?

A Some kind of red meat was served-I wouldn't say

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

every day, but most days it would be red meat. You know, beef, chopped beef, Salisbury steak, stuff like that.

Q And which meal of the day, breakfast, lunch or dinner, could you not eat because it had red meat?

A Probably the last two lunch and dinner.

Q So you were always able to eat your breakfast?

A Yes.

Q And were there days when both lunch and dinner on the same day included red meat?

A Yes.

Q How many days was that?

A I didn't count them, so I couldn't really give you a specific answer on that.

Q Were there ever consecutive days in which both lunch and dinner included red meat?

A Yes.

Q How many?

A I couldn't say.

Q When you arrived at Upstate, who did you tell about your dietary restriction?

A Officer on the gallery.

Q Do you remember his name?

A No.

Q And when did you first arrive in S.H.U. at Upstate in 2003?

A I think I got there May.

Q And from May to August of 2003, you had no problems receiving your alternative meal?

A No. I think it was from May to July 'cause I was gonna get out in July on the 21 st. And then when I told them I didn't want to be handcuffed to that other inmate and they put me back into the cell, that's when all the problems started about my meal.

* * * *

Q But your only complaint was when the meal contained read meat?
A My complaint is them not wanting to comply with my request for religious meal because that's what I was getting and they knew it. And they just outright refused me because, I think, in retaliation of what they-what I did when I said I didn't want to be handcuffed to that-to that person.

* * * *

Q Did you ever complain to Officer Abair that he was denying you your religious meal?
A Yes, I did.

Q. When did you have this conversation?

A At the time he denied it.

Q And what did he say to you?

A What did he say? Basically you're not getting it. You're not getting an alternative meal. We went back and forth. I told him: I been getting it. He said: You're not getting it now. I said: Why not? He didn't give me no reason.

Q What are your claims again Defendant Bouyea?

*22 A Yeah. He started not giving me my alternative meal, also.

Q When?

A Shortly after that incident. Shortly after Abair started

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

that and he knew. 'Cause when Abair started that, not giving me my alternative meal, he wasn't on. He was the steady officer. And when he came back, he knew I was there for a while on that gallery, and he put the alternative tag back on my cell. Because he knew, you know, since I been there I was getting the alternative meal. And then about a week or so after, Sergeant Salls, S-A-L-L-S-

Q Mmhmm.

A-Salls told him to take it off right in front of me. Take it off. Take that off the door, he's not getting it. So he start not giving me my alternative meal.

Q So who's the officer who is in charge of the gallery at Upstate S.H.U. that you were housed at in August and September 2003?

A August? That's when they moved me from one side to the other. So I don't really know who was the officer that was in charge. But on the gallery, on B Gallery where I was before where this-where it started, he-that other officer who you said his name, he was the steady officer and he knew my dietary requirements.

Q So in July of 2003, where were you housed?

A In 8 Building, B Block, in Two Cell.

Q And when you were going to be transferred out of Upstate in July of 2003, you had an incident with Officer LeFrance and Officer Foster, so you were not transferred out of Upstate; correct?

A Yeah, I was-yep, they sent me back to my cell. That cell right there.

Q So they sent you to the 8 Building, B Block?

A No. They sent me right back to the same cell, 8 Building, B Block, Two Cell.

Q And was this the cell you were in from August 5th to August 11th, 2003?

A August 5th to August 11th, 2003. I might have the dates mixed up, but at one point they had moved me from A Building, B Gallery, Two Cell to A Block-A Building, A Block-A Gallery, 19 cell or something, if I'm not mistaken.

Q And this is where you were denied your religious meals?

A Most of the time. But it was happening on the other gallery, too, before I got moved.

Q And was it Officer Bouyea who was in charge of 8 Building,

A Block-A B Block.

Q B Block?

A No, B Gallery. It's 8 Building, B Gallery and the cell. Yeah, he was the officer-he was the main officer that was on. Him and another officer.

Q And just so I'm getting this straight, he was the officer in charge of the 8 Building or the A Building?

A Eight. Eight. The number eight.

Q Who was in charge of A Building?

A I don't know.

Q Did you see Officer Bouyea from August 5th, 2003, to August 11th, 2003?

A Did I see him? Occasionally, yeah. Mm-hmm.

Q And did you complain to him that you weren't getting your religious meals?

A He knew I wasn't getting my religious meals after that Sergeant told him to take the religious alternative meal that was posted on my door down. That's when I stopped getting it again.

**23** Q Right. And that's on August 13th, 2003. But prior

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

to that, from August 5th to August 11th, 2003, did you complain to Officer Bouyea that you weren't getting your religious meals?

A Yeah. Because when he came back to work. 'Cause before that-before that, he wasn't on. But when he came back to work I was like-I was telling him they stopped giving my religious meal, and I told him: You knew I 1was getting that before. And he said: Yeah. And then he put it back up. He post it back on the door, and I start getting it again. And then that's when Salls-a Sergeant Salls told him to take it down and not to give me no more-give me the trays of the alternative meal anymore.

Q How do you know Sergeant Salls told Officer Bouyea to take the sign off of your door?

A Did it right in front of me.

Q What did Sergeant Salls say?

A He told him to take it down and don't give him no more alternative meal.

Q Why did Sergeant Salls tell him to do that?

A I don't know.

Q So what are your claims again Officer Bouyea?

A That he took-he stopped giving me my alternative meal when he know that I was supposed to be getting it.

Q Why do you think Sergeant Salls stopped giving you your alternative meals?

A I think it came out of that incident that happened when I was getting transferred. 'Cause after that happened then, that's when all the things about my food started. Before that incident, it was no problem getting my trays-my food tray-alternative food trays. But after that incident, just all kinds of problems about that.

* * * *

Q Now, after the sign was taken off of your door on

August 13th, 2003, how long did you go without your alternative meals?

A From then on I never got it until sometime in September.

Q What happened in September?

A After complaining to everybody that walked past, even writing complaints to the Superintendent and others, and they came up with an idea that I had to sign a request form for that kind of a meal, which I did, and they started giving me my meal-the alternative meal again.

Q Now, from August 13th to September 1 st, 2003, the breakfast that was served always complied with your religious dietary restrictions?

A I was able to eat, yeah.

Q From August 13th to September 1 st, 2003, how many lunches could you not eat because it had red meat?

A I didn't count it.

Q More than one?

A Yes.

Q More than five?

A Probably.

Q More than ten?

A Probably.

Q. More than 15?

A Probably.

Q More than 20?

A Probably.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

Q Sir, how many lunches were severed to you from August 13th to September 1st?

A I don't know. I didn't count.

Q You get one lunch a day; correct?

A Yep. I still didn't count them.

Q How many dinners were served to you from August 13th to September 1st, 2003?

A I don't know. I didn't count them.

Q Well, you get one dinner a day; correct?

A Right. If you want to do math, probably could figure it out.

**\*24** Q And how many dinners had red meat?

A I don't know. Probably the majority of them had red meat, though. Sometimes there was fish and turkey, depending on the meal or the menu.

Defendants' argument is essentially twofold. First, Defendants argue that Livingston's dietary restrictions are not central to his Rastafarian religion but are based upon his having been raised as a Seventh Day Adventist. Therefore, Defendants argue his religious beliefs are not sincere. Second, that Livingston did not inform the DOCS officials of his conversion to Rastafarianism until approximately one year after the incidents forming the basis for his claims. For the reasons that follow, the Court rejects those arguments.

Defendants' first argument is contrary to controlling authority. In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical, but whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious; a claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). In the very case

cited by Defendants in support of their argument, *Ford v. McGinnis, supra,* the Second Circuit rejected a narrow reading of *Jackson.* Instead, following *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 832-33 (1989) (free exercise of religious beliefs does not turn on a membership in a particular sect or a particular tenet of the sect involved), *Ford* rejected any objective test in determining the sincerity of religious beliefs. 352 F.3d at 588-91; *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir .1984) ("differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud"). At best, Defendants' argument raises a triable issue of fact as to Livingston's sincerity.

Defendants' second argument rings hollow. First, there is no indication in the record that Livingston was denied alternative religious meals because of his failure to formally advise DOCS of his conversion to Rastafarianism until approximately a year later. Second, the testimony of Livingston that he advised the Defendants of his religious preferences is uncontradicted and there is no evidence that Defendants made any investigation into his claim. Third, and perhaps more importantly, the uncontradicted testimony of Livingston that, notwithstanding the lack of formal notification of conversion to Rastafarianism, he had received alternative religious meals prior to August 2003 eviscerates any suggestion that such formal notification was required. Moreover, even by his official stated religious belief as a Muslim, Livingston was entitled to receive alternative religious meal.

**\*25** Abair, Salls, and Bouyea contend that they are entitled to qualified immunity. The Court disagrees. Not only have they failed to adequately develop that issue but they lose on the merits as well. As noted above, qualified immunity does not exist where there is a clearly established right and no reasonable officer could not be aware that his conduct violated that right. It was clearly established law in 2003 that prison inmates have a right to a diet consistent with the prisoner's religious scruples. *See Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975).

Defendants have not advanced any legitimate penological justification for denying Livingston alternative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

(Cite as: 2007 WL 1500382 (N.D.N.Y.))

religious meals and none appears from the record before this Court. Consequently, this Court rejects the qualified immunity argument of Abair, Salls, and Bouyea for the same reason as did the Second Circuit in *Ford,* 352 F.3d at 597 ("prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying [Plaintiff a meal consistent with his religious tenets] was unlawful."). *See also Salahuddin v. Goord,* 467 F.3d at 275.[FN11]

> **FN11.** Put another way, if the actions of Abair, Salls, and Bouyea did not infringe on Livingston's First Amendment free exercise right, there is no liability in any event and the Court need not reach the issue of qualified immunity. On the other hand, if those actions did, in fact, constitute violation of a clearly established First Amendment free exercise right, in the absence of a legitimate penological justification Abair, Salls, and Bouyea are not entitled to qualified immunity.

Abair, Salls, and Bouyea are not entitled to judgment as a matter of law on the Seventh Count.[FN12]

> **FN12.** The Court notes that, as it appears he was following the orders of a superior, the liability of Bouyea is questionable. However, that argument has not been presented to the Court for consideration.

## VI. CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment at Docket No. 56 is GRANTED in part and DENIED in part.

IT IS ORDERED THAT the First, Second, Third, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action are hereby DISMISSED, with prejudice.

IT IS FURTHER ORDERED THAT this action is DISMISSED, with prejudice in its entirety, as against Defendants P. Griffin, Donald Selsky, S. Gawlicky, G. LeFrance, and M. Foster.

N.D.N.Y.,2007.

Livingston v. Griffin
Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.
No. 9:09–CV–1077 (TJM/GHL).

Sept. 26, 2011.
Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adele M. Taylor–Scott, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM DECISION AND ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that twenty-three employees of the New York Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights by denying him adequate medical care, interfering with his right to exercise his religion, subjecting him to excessive force, and subjecting him to unconstitutional conditions of confinement. (Dkt. No. 1.) Currently pending is Defendants' motion for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion, despite having been advised of the consequences of failing to do so and having been granted four extensions of the deadline by which to do so. (Dkt. No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011, Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text Order.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff, an inmate currently in DOCCS custody at Five Points Correctional Facility, complains in this action

of a series of events that occurred at Great Meadow Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

**A. Incidents in 2006**

In his verified complaint, Plaintiff alleges that on December 28, 2006, Defendant Physician Assistant Fisher Nesmith stopped at his cell during sick-call rounds. (Dkt. No. 1 at 11.) Plaintiff told Defendant Nesmith that he needed to see the doctor for his chronic back pain and herniated discs. *Id.* Defendant Nesmith would not allow Plaintiff to see the doctor. *Id.* at 12. This happened "several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant Correction Officer Kevin Holden was assigned to pack Plaintiff's personal belongings because Plaintiff was moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages were missing from each of Plaintiff's three copies of the Koran. *Id.* One of the three Korans had to be destroyed because it was missing so many pages. *Id.* Plaintiff alleges that Defendant Holden is "defin[i]tely responsible" for the missing pages because he "was the only person to pack [P]laintiff's property ..." *Id.*

**B. Incident with Extraction Team**

Plaintiff alleges that one night in early August 2009 [FN1], he complained of sharp pains in his left ribcage area and blood in his urine.[FN2] (Dkt. No. 1 at 12.) Defendant Correction Officer Kelsey Lenney told Plaintiff he would call a nurse.[FN3] *Id.* After speaking with Defendant Nurse Della Howley, Defendant Lenney returned twenty minutes later and asked Plaintiff if he had requested a sick call. *Id.* at 12–13. Plaintiff was enraged and started banging the gate and asking to see a sergeant. *Id.* at 13. When Defendant Sergeant John Busse responded to the scene, Plaintiff explained the situation and Defendant Busse said he would take care of it. *Id.* Two hours after Plaintiff had first complained of the pain, Defendant Howley arrived at his cell "with a very negative attitude." *Id.* Plaintiff "was so mad she wouldn't help him [that] he threw water at her and hit [Defendant] Lt. Richard Juckett as well." *Id.*

FN1. Plaintiff's allegations about the precise dates on which the incidents in the complaint

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

occurred are contradictory. Early in the complaint, he alleges that he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

FN2. Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

FN3. Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

*2 After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS FN4 one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id*. Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id*. Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id*. In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id*. At his deposition, Plaintiff testified that the members of

the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

FN4. The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

"discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

**C. Incident at Conference Room**

**\*3** The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu [FN5] and Defendant Social Worker Sarah Wetherell.[FN6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

> FN5. The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

> FN6. The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there

to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

**\*4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his

deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

**\*5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**D. Conditions of Confinement**

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id.* Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Plaintiff to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

### 2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

### 3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

### 4. *Food*

**\*6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [FN7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

[FN7.] It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

### 6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

### 7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009.[FN8] (Dkt. No. 55–6 at 28.)

[FN8.] Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

**E. Restrictions on Religious Practice**

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id* . Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

**F. Procedural History**

**\*7** Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material FN9 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN9. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that

Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans.[FN10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

> FN10. Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court

should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

> FN11. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers[FN12] failed to provide him with adequate medical care. (Dkt. No. 1at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

> FN12. Defendants characterize the complaint as asserting Eighth Amendment medical care claims

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

1. *Defendants Lenney, Busse, and Howley*

Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is

no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

**\*11** Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

**\*12** Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13).

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

**C. Excessive Force Claim Against the Extraction Team**

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests "that [P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16 and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

**\*13** Here, Plaintiff's verified complaint alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would

credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys.* There, the plaintiff, who alleged that a group of police officers beat him and threw him out a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases).[FN13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**D. Claims Against Defendants Battu and Wetherell**

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

**\*14** Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

**E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp**

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**\*15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

**F. Conditions of Confinement Claims**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [FN14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement.[FN15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

   FN14. Defendants do not address the claim against Defendant Tedford.

   FN15. Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

1. *Handcuff Incident with Defendant Segovis*

   Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

   The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment

imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

   *16 To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

   To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

   Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

   Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

the cuffs, and [P]laintiff refused to put his hand or wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001) [FN16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

FN16. As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No.

55–23 at 19.)

**2. *Hot Water***

**\*17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

**3. *Drinking Water***

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

### 4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

**\*18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law. [FN17]

> [FN17]. Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.) Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

### 6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law.[FN18]

> FN18. Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

**\*19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

### 7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

### 8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

### G. Religion Claims

**\*20** Plaintiff alleges that Defendants Rock and Bellamy[FN19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

> FN19. Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN20]

> FN20. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required.

*Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation that denies a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted)).

**\*21** To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN21] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

belief that is religious in nature [FN22]. *Ford,* 352 F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires him to demonstratively pray several times each day.

FN21. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain their free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

FN22. However, in some cases "an asserted belief might be so bizarre, so clearly nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of Employment Security,* 489 U.S. 829, 834 n. 2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially burdened" where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was

forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely held religious beliefs because Plaintiff "has also admitted that prayer times do not always coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55–23 at 26, citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

An inmate housed at Great Meadow who wishes to pray during his recreation period has alternatives to demonstrative prayer in the yard. First, the inmate can make silent, non-demonstrative prayers while in Great Meadow's recreation yard. In addition, an inmate may choose to remain in his cell during the recreation period and, while in his cell, the inmate may pray demonstratively as he wishes. An inmate may choose to go back to his cell during a designated "go back," whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. "Go Back" periods, however, are limited, and may not coincide with the exact point in time that an inmate wishes to perform the Salaah, inasmuch as inmates must be escorted while they are transported from the recreation yard to their cells, and vice versa, and [ ] only a finite number of correction officers work at Great Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660, 2010 WL 3910086 (N.D.N.Y. Sept.30, 2010). [FN23] There, Judge Mordue found that:

FN23. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

**\*22** *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*36–37, 2010 WL 3910086, at \*12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale violent incidents. During the confusion caused by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively

impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

**\*23** I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of discretion, no favors, no favoritism, and no room for inmates in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at *14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock is irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

**\*24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are

assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *42–26, 2010 WL 3910086, at *14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *47–48, 2010 WL 3910086, at *16.

**\*25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *48–53, 2010 WL 3910086, at *16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *53–54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *54–56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *57–58, 2010 WL 3910086, at *19.

Thus, in *Smith,* Judge Mordue found that there was a

triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a " 'reasonable specificity' requirement for defining the contours of a constitutional right for qualified immunity purposes." *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

**\*26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*88, 2010 WL 3910086, at \*29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

FN24. An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State"

and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*58–62, 2010 WL 3910086, at \*19–20. However, he found that the defendants were entitled to qualified immunity. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*89, 2010 WL 3910086, at \*29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ––––U.S. ––––, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

3. *Access to Personal Razor*

**\*27** Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**H. Claim Against Defendant Karandy**

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11–12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is ***GRANTED IN PART AND DENIED IN PART.*** All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

N.D.N.Y.,2011.

DeBlasio v. Rock
Slip Copy, 2011 WL 4478515 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4449372 (S.D.N.Y.)

(Cite as: 2008 WL 4449372 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Injah TAFARI, Plaintiff,
v.
Paul W. ANNETS, et al., Defendants.
No. 06-cv-11360 (GBD)(AJP).

Oct. 2, 2008.
*ORDER*

GEORGE B. DANIELS, District Judge.

**\*1** *Pro se* plaintiff, Injah Tafari, is an inmate in the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff filed his amended complaint alleging, pursuant to 42 U.S .C. § 1983 and the First, Eighth and Fourteenth Amendments of the Constitution, that defendants violated his right to the free exercise of religion, inflicted cruel and unusual punishment, and engaged in racial discrimination. Petitioner alleges: (1) that he was denied Kosher meals while in transit between facilities on January 16 and 20, 2004, June 20 and 24, 2005, July 26, 2005, and September 26, 2005; and (2) that defendant Rabbi Mitchell Chill who oversees the Pilot Hot Kosher Meal Program at the Green Haven Correctional Facility ("Green Haven") denied plaintiff's request for a transfer to that facility because of racial animus. Defendants Paul W. Annets, Catherine Jacobsen, Joseph Lurenz, C.O. Kern and Mitchell Chill moved for summary judgment on January 28, 2008.

The matter was referred to Magistrate Judge Andrew J. Peck for a Report and Recommendation ("Report"). Magistrate Judge Peck found that Rabbi Chill was not in a position to authorize plaintiff's transfer to Green Haven, nor did he have any personal involvement in the determination of plaintiff s request. (Report at 24-5.) The magistrate judge found that plaintiff was denied Kosher meals on January 16 and 20, 2004 "because Tafari failed to notify the appropriate staff members before he left the facility that he required Kosher meals while traveling

between facilities." (Report at 37). The magistrate judge rightly held that summary judgment was appropriate with respect to plaintiff's claims related to failure to receive Kosher meals on June 20 and 24, 2005 since the moving defendants were not personally involved in the underlying events at the Washington Correctional Facility where plaintiff's meals were arranged. (Report at 38). Magistrate Judge Peck also properly concluded that plaintiff's failure to receive Kosher meals on July 26, 2005 and September 26, 2005 "constitute[s] a *de minimis,* not a substantial, interference with Tafari's free exercise of religion." (Report at 41) (emphasis in original). Moreover, Magistrate Judge Peck noted that plaintiff does not allege that he suffered any physical injuries as a result of his failure to receive the requested Kosher meals. (Report at 12, 14, 16).

In his Report, Magistrate Judge Peck informed the parties of their right to submit objections and advised them that failure to file timely objections to the Report may constitute a waiver of those objections. Plaintiff filed timely objections. Since plaintiff is proceeding *pro se,* his pleadings, including his objections, are liberally construed and interpreted to raise the strongest argument they suggest. *See Wheeler v. Butler,* 209 Fed. Appx. 14, 15 (2d Cir.2006); *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 139-40 (2d Cir.2000).

**\*2** The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within a report. 28 U.S.C. § 636(b)(1) (2006); *Cullen v. U.S.,* 194 F.3d 401, 405 (2d Cir.1999). When the parties submit objections to a report, the Court must make a *de novo* determination of those portions of the report to which objections are raised. 28 U.S.C. § 636(b)(1)(C); *U.S. v. Raddatz,* 447 U.S. 667, 672 (1980). However, it is not necessary for the Court to conduct a *de novo* hearing on the matter. *Id.* at 676. The Court may, in its discretion, receive additional evidence or recommit the matter to the magistrate judge with further instructions. *See* Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(c) (2006).

Upon *de novo* review of the instant matter, this Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4449372 (S.D.N.Y.)

(Cite as: 2008 WL 4449372 (S.D.N.Y.))

determined that the magistrate judge's findings are amply supported by the both the evidentiary record and the law. This Court also finds that plaintiff's objections, which merely restate his claims, do not "set forth specific facts showing that there is a genuine issue for trial" (Fed.R.Civ.P. 56(e)) and thus, are insufficient to defeat summary judgment.

This Court adopts the Report in its entirety. The motion for summary judgment is GRANTED.

SO ORDERED:

S.D.N.Y.,2008.

Tafari v. Annets
Not Reported in F.Supp.2d, 2008 WL 4449372 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronnie THAXTON, Plaintiff,
v.
A. SIMMONS, Corrections Officer, Upstate
Correctional Facility; Gary, Corrections Officer, Upstate
Correctional Facility; Bush, Corrections Officer,
Upstate Correctional Facility; John Doe, Corrections
Officer, Upstate Correctional Facility; K. Garneau,
Nurse, Upstate Correctional Facility; Lombard,[FN1]
Upstate Correctional Facility, Defendants.

FN1. Upon information and belief, Plaintiff has
misspelled this Defendant's name. We will refer
to this Defendant by the correct spelling:
Lumbard. *See* Dkt. No. 20–1, Defs.' Mem. of
Law, at p. 3 n. 2.

Civ. No. 9:10–CV–1318 (MAD/RFT).

Jan. 5, 2012.
Ronnie Thaxton, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Ronnie Thaxton brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that
the Defendants violated his constitutional rights while he
was incarcerated at Upstate Correctional Facility. Dkt. No.
1, Compl. Currently pending before the Court is
Defendants' Motion to Dismiss, Dkt. No. 20, which
Plaintiff opposes, Dkt. No. 26. For the reasons that follow,
it is hereby recommended that Defendants' Motion be

granted in part and denied in part.

**I. ALLEGATIONS IN THE COMPLAINT**

In accordance with the applicable standard of review,
discussed below, the following facts are derived from the
Complaint and are taken as true.[FN2] This factual recitation
includes only those facts relevant to the remaining
Defendants.[FN3]

FN2. References to the Complaint are to the page
numbers automatically assigned by the Court's
Case Management Electronic Case Files System.

FN3. On March 29, 2011, the Honorable Gary L.
Sharpe, Chief United States District Judge,
performed an initial review of Plaintiff's
Complaint, pursuant to 28 U.S.C. § 1915(e), and
dismissed several Defendants and corresponding
claims included in the Complaint. Dkt. No. 6.
More specifically, Chief Judge Sharpe
determined that Plaintiff failed to state a
cognizable claim against Defendants Bellnier,
Duvall, and Bellamy, and thus dismissed them
from this action. *Id.* Any allegation of fact
relating solely to these dismissed claims and
Defendants will not be discussed.

At all times relevant to the matters at issue in the
Complaint, Plaintiff was in the custody of the New York
State Department of Corrections and Community
Supervision (DOCCS) and was housed at Upstate
Correctional Facility.[FN4] On or about January 13, 2009,
Plaintiff filed an inmate grievance regarding Defendant
Simmons, whom Plaintiff claims harassed him and denied
him food at dinner. Compl. at p. 6. Approximately three
months later, on April 6, 2009, Plaintiff asked Defendants
Simmons and Gary for another food tray because there
was hair all over the one he had received. *Id.* Upon
receiving another tray, Plaintiff asked Defendant Simmons
why there always seemed to be an issue with his food each
time Defendant Simmons worked. *Id.* Defendant Simmons
replied that he didn't have time to play with Plaintiff's
food, but if he were to play with his food, Plaintiff would
know. *Id.* Defendant Gary added that he could

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

accommodate Plaintiff by putting something in his food. *Id.* Plaintiff believed that both Gary and Simmons were threatening him. The following day, on April 7, 2009, Defendant Gary made more comments to Plaintiff about his food while serving his dinner meal. Plaintiff refused to eat out of fear that his food had been tampered with. *Id.* On April 9, 2009, Plaintiff filed an inmate grievance regarding these incidents. *Id* .

> FN4. Upstate is a maximum security prison comprised exclusively of special housing unit (SHU) cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept.12, 2002).

Later that month, on April 28, 2009, Plaintiff was served a kosher dinner meal by Defendants Bush and Doe. *Id.* at p. 8. After putting his sardine sandwich together, Plaintiff took a few bites, felt a sharp pain and grinding in his mouth, and promptly spit out the food. *Id.* Plaintiff noticed he had spit out a gold colored piece of metal and that there were drops of blood on the spit-out food. He immediately called for medical attention and Defendant Bush responded by promptly notifying Defendants Sergeant Lumbard and Nurse Garneau. *Id.* Upon Lumbard's and Garneau's arrival at Plaintiff's cell, Plaintiff imparted what occurred. Defendant Garneau gave Plaintiff a medical incident form to fill out and Defendant Lumbard took possession of the metal piece and placed it in a ziplock bag to be photographed and placed on file.[FN5] *Id.* Plaintiff asked Defendant Garneau to examine him, to which she responded that there was not much damage. *Id.* Plaintiff further emphasized that he was cut and was in pain, to which Defendant Garneau walked off stating "don't be a cry baby." *Id.* at p. 9.

> FN5. Based upon responses received to several Freedom of Information Law requests, Plaintiff believes that Defendant Lumbard failed to properly make a record of the incident. Compl. at p. 15.

## II. DISCUSSION

### A. Standard of Review

**\*2** On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

**\*3** With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

**B. Eighth Amendment Claims**

*1. Failure to Protect*

Defendants assert that the only claims raised pursuant to a failure to protect theory are brought against the previously dismissed Defendants, Bellnier, Duvall, and Bellamy. Although Plaintiff attempts to reinvigorate these claims through his Opposition papers, he cannot change the fact that such claims were specifically addressed by the Honorable Gary L. Sharpe, Chief United States District Judge, when he dismissed these Defendants from the action; such rulings are binding upon this Court as law of the case. *In re PCH Assoc.,* 949 F.2d 585, 592 (2d

Cir.1991) (noting that the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). Plaintiff has not asserted any facts that would raise the inference that any remaining Defendant failed to protect him.

Furthermore, his allegations regarding veiled threats are not sufficient to raise a constitutional claim against any of the remaining Defendants. *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996), for the proposition that a claim brought under § 1983 is "not designed to rectify harassment or verbal abuse"); *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (noting that "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute a violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (internal quotation marks and citations omitted). Therefore, we agree with Defendants that any Eighth Amendment claims arising from a theory of failing to protect Plaintiff or from verbal harassment or threats should be **dismissed .**

*2. Nutritional Food*

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Wilson v. Seiter,* 501 U.S. 294, 303–04, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (noting that prisoners are guaranteed a nutritionally adequate diet). In this regard, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at \*6 (S.D.N.Y. Jan.21, 2005) (citing *Robles v. Coughlin,* 725 F.2d at 14). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment ." *Moncrieffe v. Witbeck,* 2000 WL 949457, at \*6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). Allegations of food tampering alone would not alone suffice to establish an Eighth Amendment violation; in addition, a plaintiff must allege

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

that he or she suffered "distinct and palpable injury." *M.F. v. Reish,* 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

**\*4** In the case at bar, there are two alleged incidents wherein the reasonable inference of food tampering can be drawn. The first is the April 6th incident when the food tray served to Plaintiff by Defendant Simmons had hair on it; the second is the April 28th incident when Defendants Bush and Doe served Plaintiff a food tray that contained a piece of metal in the sardines. Because Plaintiff provides no allegations of injury stemming from the April 6th incident, we find that the food tampering claim against Defendant Simmons does not rise to the level of an Eighth Amendment violation. However, the same cannot be said of the April 28th incident wherein Plaintiff ingested, but spit out, the piece of metal, which caused injuries to his tongue and cheek. These injuries developed into dental pain and numbness to the right side of his face. At this stage of the litigation, taking Plaintiff's allegations of fact as true, we find that Plaintiff has stated enough facts to plausibly show that his food was tampered with and that it caused palpable injury to him. Thus, we recommend **denying** Defendants' Motion to Dismiss as to the Eighth Amendment claim against Defendants Bush and Doe.[FN6]

> [FN6.] With this recommendation, we provide Plaintiff with his third warning that he must take steps to identify the John Doe Defendant. *See also* Dkt. No. 6 at p. 9 (informing Plaintiff that the Marshals Service cannot serve a Doe Defendant and that he must take steps to ascertain the identify should he wish to avoid dismissal); Dkt. No. 29 at p. 6 (directing Plaintiff to take reasonable steps to ascertain Doe identity). His failure to do so will result in dismissal of his claims against this Defendant. Recently, Plaintiff submitted a letter noting his efforts to identify this individual. Dkt. No. 30. Should this Court's recommendations be adopted, this case will proceed to the discovery phase wherein Plaintiff can seek information directly from the remaining Defendants that may aid him in this effort.

*3. Medical Care*

The final Eighth Amendment claim asserted in the Complaint is against Defendant Garneau for her alleged failure to provide medical care to Plaintiff. According to Plaintiff, he informed Defendant Garneau that the metal had cut the inside of his mouth and he asked her to examine him, to which she replied, without examination, that he was fine and to not be such a cry baby.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). When complaining of the denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*5** At this stage, we find that Plaintiff has adequately pled a claim for deliberate indifference. First, we disagree with Defendants' categorization of the Plaintiff's medical condition as not serious and that Defendant Garneau's reaction to his request for medical care further shows the lack of seriousness of such condition. Plaintiff asserts that the inside of his mouth had been cut by a metal object and that he was bleeding. Such condition is one that is worthy of medical care and, if left untreated, could lead to more serious medical problems. *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Guiterrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997), for the proposition that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"). In fact, Plaintiff avers that he suffered further complications from the denial of treatment, such as numbness and difficulty eating. While upon further review of the record, it may be clearer that Plaintiff received treatment, or that his medical condition was not so serious, at this stage, taking all facts alleged by Plaintiff as true, we find that he has stated enough facts to plausibly allow his claim of deliberate indifference to go forward. Therefore, we recommend **denying** Defendants' Motion to Dismiss with regard to the Eighth Amendment claims stated against Defendant Garneau.

### C. First Amendment Claims

Plaintiff asserts that his First Amendment rights were violated in several ways. First, he states that the threats of food tampering, combined with actual food tampering, impeded his right to exercise his religion by eating a kosher diet. Next, he claims that the Defendants violated his First Amendment rights when they retaliated against him, through threats and food tampering, because he exercised his First Amendment right to file grievances. We consider each of these claims *seriatim.*

#### 1. Interference with Religion

Prisoners maintain some measure of constitutional protection afforded by the Free Exercise Clause of the First Amendment. *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Among those protected rights is the right to receive a kosher diet. *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (citing *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975), for the proposition that it is clearly established "that a prisoner has a right to a diet consistent with his or her religious scruples"). Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990); *see also Pell v. Procunier,* 417 U.S. at 822. Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see also Ford v. McGinnis,* 352 F.3d at 588. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison official furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d at 926 (citations omitted).

**\*6** Plaintiff asserts that because his food tray was contaminated on two occasions, only the latter of which he specifies as a kosher meal, his right to exercise his religion and receive kosher meals has been infringed. First, it is not clear what religion Plaintiff professes to adhere to. Because he makes passing reference to a "jewish diet," we will presume, for our purposes here, that he practices Judaism. However, it is not enough for Plaintiff to merely reference his religion. He must also allege that he possesses sincerely held religious beliefs. "[S]crutiny of

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

the prisoner's sincerity is often essential in differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Ford v. McGinnis,* 352 F.3d at 588 (internal quotation marks and citations omitted). No where in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein. Mere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs. *Id.* (citing *Jackson v. Mann,* 196 F.3d 316, 317–21 (2d Cir.1999)).

But the real question is whether the contamination of two meals constitutes a substantial burden on Plaintiff's free exercise claims. We submit that it does not. In making this assessment, we note that in both instances, after Plaintiff brought the problem to the respective Defendant's attention, Plaintiff was provided with a different tray. Thus, Plaintiff was not denied the ability to express his allegedly sincerely held belief of maintaining a religious diet. Notwithstanding Plaintiff's protestations and impressions that the Defendants have all conspired against him, the minor disruption of two kosher meals during a four-month period can hardly be called a substantial burden. At best, these incidents present a *de minimis,* or insubstantial, burden on Plaintiff's ability to freely exercise his religion. *See, e.g., Graham v. Mahmood,* 2008 WL 1849167, at * 10 (S.D.N.Y. Apr.22, 2008) (citing, *inter alia, Hanton v. Mathiau,* 29 F. App'x 772, 773 (2d Cir.2002), for the proposition that preventing a prisoner who was a member of the Nation of Islam from making one round of bean pie deliveries had a *de minimis* and insubstantial burden on the prisoner's free exercise rights); *Tafari v. Annets,* 2008 WL 4449372, at *1 (S.D.N.Y. Oct.2, 2008) (Daniels, D.J.) (adopting magistrate judge's report and recommendation that denial of kosher meals on two occasions "constitute[d] a *de minimis,* not a substantial, interference" with the prisoner's free exercise of religion), *aff'd* 363 F. App'x 80 (2010). Therefore, we recommend **granting** Defendants' Motion to Dismiss as to Plaintiff's First Amendment religious exercise claims.

*2. Retaliation and Conspiracy*

Plaintiff's final First Amendment claim is that the Defendants conspired together to retaliate against him for

exercising his right to file grievances, and possibly for exercising his religious beliefs.

**\*7** To support a conspiracy claim under § 1983, a plaintiff must demonstrate or allege (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002).

Here, we have no facts, beyond Plaintiff's conclusory statements, that the Defendants have acted in concert. Thus, Plaintiff has failed to plausibly state that the Defendants acted in concert to violate his constitutional rights and such claims should be **dismissed.**

Turning to the specific retaliation allegations, the Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

Plaintiff asserts that the grievance he filed against Defendant Simmons on January 13, 2009, was an exercise of his First Amendment right and was the impetus for all subsequent retaliatory conduct. We can easily find that Plaintiff satisfies the first prong of a retaliation claim when he filed a grievance against Defendant Simmons. Plaintiff also claims that this same Defendant contaminated his food tray with hair. While Simmons promptly provided Plaintiff with another food tray, the close proximity of the filed grievances against him, coupled with the discussion that ensued on April 6th is enough for Plaintiff to eke out a retaliation claim at this stage.[FN7] Thus, we recommend **denying** Defendant Simmons's request to have the retaliation claim against him dismissed.

> FN7. It is the Court's view that Plaintiff has barely nudged across the line from conceivable to plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950–51, 173 L.Ed.2d 868 (2009). Nevertheless, because we are bound to give the Plaintiff the benefit of every reasonable inference to be drawn from the allegations in the Complaint, we recommend allowing this claim to proceed. *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

**\*8** However, Plaintiff's claims of retaliation against Defendants Bush and Doe are nothing more than conclusory and, in light of the factual allegations, implausible. Plaintiff believes that Defendants Bush and Doe contaminated his kosher food tray on April 28th as retaliation for the grievances he filed against Defendant Simmons on January 13th and April 9th. But he provides the Court with no plausible connection between the protected activity and the allegedly adverse conduct nor any plausible connection between Defendants Bush and

Doe and Simmons. In satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353). Here, Plaintiff has failed to connect the allegedly adverse conduct to his protected speech, thus, we recommend **granting** Defendants' Motion to Dismiss as to the retaliation claims against Defendants Bush and Doe.

### III. CONCLUSION

For the reasons stated herein, it is hereby **RECOMMENDED,** that Defendants' Motion to Dismiss be **granted in part and denied in part** as follows:

**1) GRANTED,** as to Eighth Amendment failure to protect claims against Defendants Bellnier, Duvall, and Bellamy, who were each previously dismissed from this action;

**2) GRANTED,** as to claims of verbal harassment and threats against all Defendants;

**3) GRANTED,** as to Eighth Amendment nutrition claims against Defendants Simmons and Gary;

**4) DENIED,** as to Eighth Amendment nutrition claims against Defendants Bush and Doe;

**5) DENIED,** as to Eighth Amendment deliberate medical indifference claims against Defendant Garneau;

**6) GRANTED,** as to First Amendment interference with religion claims against all Defendants;

**7) GRANTED,** as to conspiracy claims against all Defendants;

**8) DENIED,** as to First Amendment retaliation claim against Defendant Simmons;

**9) GRANTED,** as to First Amendment retaliation claims against Defendants Bush and Doe; and it is further

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360104 (N.D.N.Y.)

(Cite as: 2012 WL 360104 (N.D.N.Y.))

**RECOMMENDED,** that if the above recommendations are adopted, then Defendants Gary and Lumbard should be **dismissed** from this action as there are no claims plausibly stated against them; and it is further

**RECOMMENDED,** that if the above recommendations are adopted, then Defendants Simmons, Bush, Doe, and Garneau should be ordered to file an answer in response to the Complaint and this matter should proceed to the discovery phase on the remaining claims; and it is further

**ORDERED,** that Plaintiff continue to take steps to ascertain the identity of the John Doe Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. ,,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2012.

Thaxton v. Simmons
Slip Copy, 2012 WL 360104 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

Feb. 25, 2010.
**REPORT AND RECOMMENDATION**

[THEODORE H. KATZ](), United States Magistrate Judge.
 **\*1 TO: HON. RICHARD J. SULLIVAN, UNITED
STATES DISTRICT JUDGE FROM: THEODORE H.
KATZ, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Larry Williams ("Plaintiff"), proceeding *pro
se,* brings this action against Defendants the United States
of America, the United States Marshal's Service
("USMS"), Detention Officers Luis Figueroa, Donny
LaRosa, Thomas Ventiere, A.J. Krause, and unnamed
detention officers John Does Nos. 4, 6, 7, and 8
(collectively, "Defendants"), alleging that they violated his
rights under the First, Fifth, Sixth, and Eighth
Amendments to the United States Constitution. Plaintiff
asserts his claims against Defendants Figueroa, LaRosa,
Ventiere, Krause, and John Does Nos. 4, 6, 7, and 8
(collectively, the "Individual Defendants") in their official
as well as individual capacities.

Defendants have moved to dismiss the action pursuant
to [Rules 12(b)(1), (5), and (6) of the Federal Rules of
Civil Procedure](). Defendants contend that the Court lacks
subject matter jurisdiction, Plaintiff fails to state a claim
upon which relief can be granted, and Plaintiff has failed
to serve Defendants within 120 days of the filing of the
Amended Complaint. The case was referred to this Court
for a Report and Recommendation on Defendants' motion.
For the reasons that follow, this Court recommends that
Defendants' motion be granted.

**BACKGROUND**

The events at issue in this action took place while
Plaintiff was involved in criminal proceedings in the
Southern District of New York ("S.D.N.Y."). Plaintiff
alleges that the Individual Defendants, employees of the
USMS assigned to the S.D.N.Y., violated his
constitutional rights by mistreating him when they
transported him to and from the S.D.N.Y. courthouse, and
while he was in the courthouse's holding cells during the
course of his criminal trial. Unless otherwise noted, the
following facts are taken from Plaintiff's Amended
Complaint, and assumed to be true for purposes of
Defendants' motion to dismiss. (*See* Amended Complaint,
dated Jan. 7, 2009 ("Am.Compl.").)

**I. The Incidents of 2004 through 2006**

On February 8, 2004, Defendant Figueroa transported
Plaintiff and other inmates from the Metropolitan
Detention Center ("MDC"), where Plaintiff was
incarcerated during his criminal trial, to the S .D.N.Y.
courthouse. (*See* Am. Compl. ¶ 4.) During the trip,
Defendant Figueroa began to discuss another inmate's
case, who was in protective custody with one of Plaintiff's
co-defendants in his criminal case. (*See id.* ¶ 5.) Plaintiff
told Defendant Figueroa that "such discussions should not
take place in the presence of inmates." (*See id.* ¶ 6.) In
response, Defendant Figueroa called Plaintiff a "rat,"
which, according to Plaintiff, put his "life in jeopardy."
(*See id.* ¶ 7.) Defendant Figueroa then told Plaintiff that he
would be placed in the "Zebra Tank"-a
solitary-confinement cell at the courthouse that was
typically reserved for inmates who were cooperating with
the government. (*See id.* ¶ 8.) Upon arrival at t he
courthouse, Plaintiff was placed in the Zebra Tank. (*See
id.*)

**\*2** On March 1, 2004, during another trip to the
S.D.N.Y. courthouse, Defendant Figueroa told another
inmate on the bus-one of Plaintiff's co-defendants in his
criminal proceeding-that Plaintiff would be placed in the
Zebra Tank every time he went to the courthouse. (*See id.*
¶¶ 9-10.) He told Plaintiff, "You don't know who you are
messing with. I'm from the street too." (*Id.* ¶ 11.)

When they arrived at the courthouse, Defendant
LaRosa escorted the inmates inside the building and
toward the holding cells, while Defendant Figueroa

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

walked side-by-side with Plaintiff. (*See id.* 12.)

All of the prisoners were restrained with leg shackles, as well as handcuffs connected by chains to waist restraints. (*See id.* ¶ 13.) When the group reached an area of the building outside of the U.S. Marshal's office, Defendant Figueroa encountered Defendant Ventiere, and told him to make sure that Plaintiff was sent to the Zebra Tank. (*See id.* ¶ 14.) Defendant Ventiere instructed Plaintiff to step out of the line and stand by the wall opposite the other inmates. (*See id.* ¶ 15.) Plaintiff complied, but informed Defendant Ventiere that he would like to speak to a supervisor whenever possible. (*See id.* ¶ 16.)

At that point, Defendant Figueroa grabbed Plaintiff and "slammed him back into the wall." (*Id.* ¶ 17.) Defendant Ventiere joined Defendant Figueroa, and together they began "manhandling, choking, wrestling, and otherwise using excessive force" on Plaintiff as they moved him down the hall and into the Zebra Tank. (*Id.* ¶ 18.) When they arrived, they "smashed" Plaintiff into the metal cell door and the iron cell bars, and finally "slammed" Plaintiff into the metal bench. (*See id.* ¶ 19.) They punched Plaintiff in the head and back, leaving him in a state of semiconsciousness. (*See id.* ¶¶ 21-22.) Plaintiff remained in restraints during this incident and was unable to physically defend himself. (*See id.* ¶ 20.)

After Defendants Figueroa and Ventiere left, Plaintiff "managed to use the toilet in the Zebra Tank and then fell to the floor." (*See id.* ¶ 23.) Defendants Krause and John Doe No. 4, who were standing nearby, told Plaintiff to get up, because "it did not look good for the camera." (*Id.* ¶ 24.) Plaintiff complied, afraid that he would be subjected to further assault. (*See id.*) Plaintiff was later taken to the courtroom by Defendants Ventiere and John Doe No. 4, where his attorney "took note of the effects of the assault." (*See id.* ¶¶ 25-26.) Plaintiff was not offered medical assistance by any of the Individual Defendants. (*See id.* ¶ 27.)

After Plaintiff's court appearance that day, Defendant Figueroa replaced Plaintiff's restraints for the trip back to the MDC. (*See id.* ¶ 28.) According to Plaintiff, Defendant Figueroa applied the restraints "unduly tight," inflicting

"considerable additional pain." (*Id.*) When he arrived at the MDC, Plaintiff requested treatment by a physician's assistant for his injuries. (*See id.* ¶ 29.) A physician's assistant refused to examine Plaintiff's injuries, but prescribed "two pills," and recommended that Plaintiff file a sick-call form. (*See id.* ¶ 30.)

**\*3** Plaintiff completed and filed the form the following morning, March 2, 2004. (*See id.* ¶ 31.) Several hours later, Plaintiff was taken to the Special Housing Unit ("SHU"), where he informed SHU Lieutenant Wilkens of the events of earlier in the day. (*See id.* ¶ 32.) Wilkens had Plaintiff examined by a physician's assistant, and photographed Plaintiff's bruises and injuries so that Bureau of Prisons officers would not be mistakenly blamed for the assault. (*See id.*)

The following day, March 3, 2004, Plaintiff was "spitting up blood," and was taken to a local hospital for further examination. (*See id.* ¶ 33.) The hospital prescribed pain medication and scheduled a follow-up examination for the following week. (*See id .*) Plaintiff did not receive medication until March 18, 2004. (*See id.*) MDC staff, "at the behest of the defendants," kept Plaintiff in SHU confinement until March 30, 2004. (*See id.* ¶ 34.)

As a result of Figueroa's and Ventiere's actions on March 1, 2004, Plaintiff "suffer[ed] from disorientation, and had difficulty swallowing food." (*Id.* ¶ 35.) Plaintiff had lacerations, bruising, and swelling on parts of his arms, legs and back. (*See id.* ¶ 36.) Plaintiff complained of "[d]izziness, faintness, and breathing problems." (*Id.*) In addition, Plaintiff claims that he "suffered from emotional anguish and psychological distress," and requires psychiatric treatment and medication for depression, psychosis, and anxiety. (*See id.* ¶ 37.)

On March 23, 2004, Plaintiff was again taken to the courthouse in order to attend a suppression hearing of one of his codefendants. (*See id.* ¶ 40.) He spent approximately six hours in the Zebra Tank, and was returned to the MDC several hours after his co-defendants, at the end of the day. (*See id.*) During this time, Plaintiff alleges that the Individual Defendants called him a "rat," and "humiliated [him] with jokes and teasing about the complaints made following the assault of March 1." (*See*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

*id.*) This treatment left Plaintiff so uncomfortable and mistrustful that he did not want to eat the food that the Individual Defendants gave him. (*See id.*)

Approximately one week later, on March 29, 2004, Plaintiff claims that the Individual Defendants "lost" his legal folder, which contained "valuable legal materials and strategies concerning Plaintiff's suppression hearing." (*Id.* ¶ 41.) Plaintiff does not specify which of the Individual Defendants lost these papers.

On April 23, 2004, Defendant Figueroa "continued his constant habit of taunting and teasing Plaintiff." (*Id.* ¶ 42.) On May 14, 2004, the Individual Defendants again put Plaintiff in the Zebra Tank. (*See id.* ¶ 43.) After Plaintiff complained of the cold temperature, Defendant John Doe No. 6 told Plaintiff "that's your problem." (*Id.*) Plaintiff inquired as to John Doe No. 6's name, but he did not provide it to Plaintiff. (*See id* .) Plaintiff was later placed in a regular holding cell. (*See id.*)

**\*4** While in the regular holding cell, Defendant Figueroa approached Plaintiff and asked "What's wrong?" while laughing. (*See id.* ¶ 44.) Although Plaintiff had arrived at the courthouse at 8:00 a.m. that morning, Plaintiff was not returned to MDC custody until approximately 8:30 p.m. (*See id.*) Plaintiff alleges that a similar delay occurred several months later, on August 16, 2004. (*See id.* ¶ 45.)

In September and October 2004, during Plaintiff's criminal trial, the Individual Defendants subjected Plaintiff to "constant taunting and harassment" that he alleges "negatively effected [his] due process and right to a fair trial." (*Id.* ¶ 46.) During this time period, Defendant John Doe No. 7 told Plaintiff, "I don't know why you are going to trial, you will never win," and on one occasion, pushed Plaintiff while he was walking from the courtroom. (*Id.* ¶¶ 47, 49.) Defendant John Doe No. 8 called Plaintiff a "crybaby" after he cried at his criminal trial. (*See id.* ¶ 50.) Plaintiff also alleges that one of the Individual Defendants-unspecified by Plaintiff-told Plaintiff that if he "pissed them off[, Plaintiff would] suffer a worse fate than before ." (*Id.* ¶ 48.) At the conclusion of Plaintiff's trial, on October 27, 2004, Defendant John Doe No. 7 told Plaintiff, "You're going to Leavenworth," and "You'll get

what you deserve." (*Id.* ¶ 51.) Plaintiff alleges that, in December 2005, at another criminal hearing, he complained about the Individual Defendants' "constant and continued mistreatment of Plaintiff." (*Id.* ¶ 52.)

Finally, on May 5, 2006, Plaintiff claims that Defendant Ventiere "popped from out of a door of a room with a large one-way mirror" as Plaintiff was being escorted to a holding cell by a USMS officer. (*Id.* ¶ 53.) Plaintiff had been telling the officer about the previous incidents with the Individual Defendants when Defendant Ventiere said, "I heard that, and I'll teach you a lesson." (*Id* . ¶ 53.) Plaintiff was returned to a holding cell, where he sat in "utter fear, not knowing if something would happen." (*Id.*) Defendant Ventiere took no further action against Plaintiff, but Plaintiff was kept in the holding cell until the last bus back to the correctional facility. (*See id.*)

## II. The Filing and Service of the Complaint

Plaintiff filed this action on February 28, 2007.[FN1] In his initial Complaint, he named only "John Does 1-11, sued in their individual capacities" as Defendants. (*See* Complaint, dated Feb. 28, 2007 ("Compl."), at 1.) Plaintiff's Complaint was stamped "received" by the Court's Pro Se Office on March 9, 2007, but was not docketed until April 14, 2007. On August 10, 2007, Plaintiff mailed a service package to the USMS. The paperwork was returned to Plaintiff on August 27, 2007, indicating that the Complaint could not be served without the names and addresses of Defendants. Plaintiff then wrote to the Court on September 5, 2007, requesting additional time to serve Defendants and assistance in obtaining the identity of the then-John Doe Defendants. (*See* Pl .'s Ltr., dated Sept. 5, 2007.) After Plaintiff's request went unanswered, he submitted a second letter to the Court on October 10, 2007. (*See* Pl.'s Ltr., dated Oct. 10, 2007.)

FN1. It is well-settled that, as a *pro se* prisoner, Plaintiff's papers are deemed filed on the date that he hands them over to prison officials to be mailed. *See Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 2382 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying *Houston* to constitutional tort suits). Absent evidence to the contrary, the Court assumes that Plaintiff gave his Complaint to prison officials to mail on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the date he signed it, February 28, 2007. *See, e.g.* *Frith v. Hill,* No. 07 Civ. 5899(JSR), 2009 WL 3073716, at \*8 n. 4 (S.D.N.Y. Sept. 23, 2009); *Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

**\*5** On October 30, 2007, District Judge Richard J. Sullivan ordered the United States Attorney's Office ("USAO") to identify the officers described in the Complaint, if possible, and to provide each officer's name and last known address to Plaintiff and the Court within 45 days. (*See* Order, dated Oct. 30, 2007, at 2.) Plaintiff was ordered to file an amended complaint identifying Defendants by their proper names no later than 30 days after receiving the names, and to serve the amended complaint via the Court's Pro Se Office. (*See id.*) Plaintiff was cautioned that *"[f]ailure to comply with this deadline may result in the dismissal of the plaintiff's complaint."* (*Id.* at 3.)

By letter dated December 17, 2007, the USAO identified Defendant Figueroa as John Doe No. 1, and Defendant Ventiere as John Doe No. 3, based on the allegations in the Complaint. (*See* Defs.' Ltr., dated Dec. 17, 2007.) The USAO was unable to identify the remaining John Does. The USAO noted that the Complaint contained no allegations against John Does Nos. 9-11. Finally, the USAO wrote that "no less than forty different officers and/or independent contractors hired by the USMS may have come into contact with Plaintiff while he was being transported from prison to Court, and to the Courthouse cellblock while attending Court conferences, hearings, or his trial," and without more specific information, the USMS was unable to determine which of those officers might have been the John Does described in the Complaint. (*Id.*)

On January 6, 2008, Plaintiff requested that the Court order the USAO to produce the names and pictures of all forty of the officers and independent contractors. (*See* Pl.'s Ltr., dated Jan. 6, 2008.) On January 17, 2008, Judge Sullivan denied this request as premature, ordered Plaintiff to submit additional details about the remaining John Doe Defendants by February 17, 2008, and ordered the USAO to make reasonable efforts to identify the remaining Defendants within 45 days of receiving the new details

from Plaintiff. (*See* Order, dated Jan. 17, 2008.) Plaintiff was also ordered to either amend the Complaint within 30 days of receiving the names of the John Doe Defendants, or renew his request for photographs of all forty individuals, should identification by the USAO prove unsuccessful. (*See id.*)

By letter dated February 17, 2008, Plaintiff provided physical descriptions of four of the remaining John Doe Defendants, and an additional factual allegation against a fifth John Doe Defendant.[FN2] (*See* Pl.'s Ltr., dated Feb. 17, 2008.) After 45 days passed and the USAO did not submit a response, Plaintiff wrote to the Court to request a status update. By letter dated June 30, 2008, the USAO indicated that it never received Plaintiff's February 17, 2008 letter. [FN3] (*See* Defs.' Ltr., dated June 30, 2008.) By Order dated July 3, 2008, Judge Sullivan ordered the USAO to respond to Plaintiff's letter within 20 days, and ordered Plaintiff to file an amended complaint within 30 days of receipt, or renew his request for the photographs. (*See* Order, dated July 3, 2008.)

> FN2. After the USAO identified John Does Nos. 1 and 3, six John Does remained unidentified, not including John Does Nos. 9-11.

> FN3. Plaintiff's February 17, 2008 letter indicated that the USAO was copied on the letter. (*See* Pl.'s Ltr., dated Feb. 17, 2008.)

**\*6** On August 15, 2008, the USAO informed the Court that they had been unable to conclusively identify any more of the unnamed Defendants based on the information that Plaintiff provided.[FN4] (*See* Defs.' Ltr., dated Aug. 15, 2008.) The USAO indicated that they believed that one of the John Doe Defendants was "most likely" A.J. Krause, but Plaintiff's descriptions were simply too vague to further identify the unnamed Defendants with reasonable certainty. (*See id.*)

> FN4. The Court granted the USAO additional time, beyond the 20 days originally provided, to submit its response.

On September 17, 2008, Plaintiff renewed his request for the names and photographs of all 40 officers, claiming

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

that he needed the information in order to set forth his claims of a "civil conspiracy." FN5 (*See* Pl.'s Ltr., dated Sept. 17, 2008.) Judge Sullivan denied Plaintiff's request, finding that Plaintiff's "conclusory allegations" did not warrant such an order. (*See* Order, dated Sept. 30, 2008.) Instead, Plaintiff was granted leave to amend the Complaint to add parties as appropriate, and to include any new information that had been developed after the action was commenced. (*See id.*) Judge Sullivan instructed Plaintiff to "add as much identifying detail as possible in order to satisfy the requirements of a valid pleading," and informed him that, to the extent that the amended pleading stated claims against employees of the USMS, he could use the pre-trial discovery process and possibly Court assistance to identify the remaining unnamed Defendants. (*See id.*) Finally, Judge Sullivan reminded Plaintiff of the three-year statute of limitations that governed his claims, and warned him that "[A]n amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants are not named originally because the plaintiff did not know their identities." (*See id.* (quoting *Barrow v. Wethersfield, 66 F.3d 466, 470 (2d Cir.1995)*).)

> FN5. Neither Plaintiff's Complaint nor his Amended Complaint alleges claims for civil conspiracy.

Plaintiff filed the Amended Complaint on January 2, 2009. He named as Defendants the United States of America, the USMS, Luis Figueroa (formerly John Doe No. 1), Donny LaRosa (whom Plaintiff refers to as "Donny LNU," and was formerly John Doe No. 2),FN6 Thomas Ventiere (formerly John Doe No. 3), and A.J. Krause (formerly John Doe No. 5). Plaintiff also maintained his action against John Does Nos. 4, 6, 7, and 8, although John Doe No. 8 is not included in the caption of the Amended Complaint. Plaintiff sued the Individual Defendants in their official as well as individual capacities.

> FN6. Plaintiff identified John Doe No. 2 as "Donny LNU," (presumably, "last name unknown"), without assistance from Defendants. Defendants have identified this individual as Donny LaRosa.

Judge Sullivan ordered Plaintiff to serve the Amended Complaint by April 1, 2009. (*See* Order, dated Mar. 2, 2009.) Due to a change of address, Plaintiff did not receive this Order, and, on April 9, 2009, Plaintiff requested an extension of time to serve Defendants. Judge Sullivan granted Plaintiff's request, and ordered Plaintiff to serve the Amended Complaint by May 15, 2009, and to submit a status letter to the Court by May 29, 2009, describing his efforts to serve Defendants. (*See* Order, dated Apr. 14, 2009.)

**\*7** Having received no updates or certificates of service from Plaintiff by June 5, 2009, Judge Sullivan ordered the action dismissed pursuant to Federal Rule of Civil Procedure 41(b). (*See* Order, dated June 5, 2009.)

On June 17, 2009, Plaintiff requested reconsideration of the Order of Dismissal, on the grounds that he had served Defendants, but had been awaiting the process receipts, which he did not receive until June 10, 2009. (*See* Pl.'s Ltr., dated June 17, 2009.) Plaintiff claimed that he had been under the impression that if he served Defendants, he did not need to submit a status letter by May 29, 2009. The Court reopened the case on June 23, 2009. (*See* Order, dated June 23, 2009.) Plaintiff thereafter submitted the process receipts, which indicated that Plaintiff mailed service packages to the USMS on May 12, 2009; the forms were acknowledged as received on May 27, 2009; and process was effectuated on June 2 and 4, 2009.

**DISCUSSION**

Defendants contend that (1) the claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity, and should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; (2) the claims against the Individual Defendants in their personal capacities are time-barred and/or fail to state claims upon which relief can be granted, and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (3) Plaintiff failed to effectuate service on the Individual Defendants within 120 days of the filing of the Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

Complaint, and those claims should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. (*See* Defs.' Memorandum of Law, dated Aug. 21, 2009 ("Defs.' Mem."), at 8-19.)

In response, Plaintiff primarily addresses Defendants' argument that the Amended Complaint fails to state a claim upon which relief can be granted, based on Plaintiff's alleged failure to comply with the applicable statute of limitations. Plaintiff argues that the initial Complaint was timely filed, and the Amended Complaint "relates back" to the date of the original filing. (*See* Pl.'s Memorandum of Law, dated Aug. 31, 2009 ("Pl.'s Mem."), at 1-3.) Plaintiff does not address Defendants' arguments regarding sovereign immunity and insufficiency of service of process.

**I. Subject Matter Jurisdiction Under Rule 12(b)(1)**

A. *Legal Standard*

On a Rule 12(b)(1) motion, "the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Dong v. Ridge,* No. 02 Civ. 7178(HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005) (quoting *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004)); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Marshall v. Nat'l Ass'n of Letter Carriers,* Nos. 01 Civ. 3167(LTS), 01 Civ. 3086(LTS), 2003 WL 223563, at *6 (S.D.N.Y. Feb. 3, 2003).

**\*8** It is "axiomatic" that, under the principle of sovereign immunity, "the United States may not be sued without its consent, and the existence of consent is a prerequisite for jurisdiction." *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2003). "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941) (citations omitted); *see also Lehman v. Nakshian,* 453 U.S. 156, 160-61, 101 S.Ct. 2698, 2701-02 (1981); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953-54 (1976); *Dotson v. Griesa,* 398 F.3d 156, 177 (2d Cir.2005) ("a finding of sovereign immunity ... deprive[s][a] court of subject matter jurisdiction"). In other words, the United States must unequivocally express

its consent to be sued by specifically waiving sovereign immunity in a statutory text. *See Lane v. Peña,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096 (1996); *see also United States v. Nordic Village, Inc.,* 503 U.S. 30, 33-44, 112 S.Ct. 1011, 1014-15 (1992); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980). Further, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman,* 453 U.S. at 161, 101 S.Ct. at 2702 (quoting *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273 (1957) (quotation marks omitted)); *see also Lane,* 518 U.S. at 192, 116 S.Ct. at 2096 ("a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

The United States need not be an expressly named defendant for an action to be considered as one against the sovereign. "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act ." *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 723 (2d Cir.1983) (internal quotation marks and citations omitted) (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, (1963); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012 (1947); and *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468 (1949)). It follows that a suit against a federal agency or its officers, acting in their official capacities, constitutes a lawsuit against the federal government. *See Dotson,* 398 F.3d at 177 (federal agencies and officers acting in official capacities protected by sovereign immunity); *see also FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit"); *Kemer v. Johnson,* 900 F.Supp. 677, 681 (S.D.N.Y.1995) (citing *B.K. Instrument,* 715 F.2d at 723) (federal officers acting in official capacities protected by sovereign immunity)).

B. *Application*

**\*9** In the instant case, Plaintiff has named the United States and the USMS as Defendants, and asserted claims against the Individual Defendants in their official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

capacities, as well as their personal capacities. Because the USMS is a federal agency, and the Individual Defendants, in their official capacities, are officers of that agency, claims asserted against them are in fact asserted against the United States. Thus, absent an "unequivocally expressed" statutory waiver of sovereign immunity for claims of this type, these claims will be barred by sovereign immunity. *See Lane,* 518 U.S. at 192, 116 S.Ct. at 2096.

Here, as Plaintiff alleges that Defendants used excessive force and harassed him, in violation of the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution, he is asserting constitutional torts, and there is no waiver of sovereign immunity. *See Castro v. United States,* 34 F.3d 106, 110 (2d Cir.1994) ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts."); *see also Robinson v. Overseas Military Serv. Corp.,* 21 F.3d 502, 510 (2d Cir.1994); *Doe v. Torres,* No. 05 Civ. 3388(JSR)(GWG), 2006 WL 290480, at *4 (S.D.N.Y. Feb. 8, 2006); *James v. United States.* No. 99 Civ. 4238(BSJ)(HBP), 2003 WL 22149524 at *4 (S.D.N.Y. Sept. 17, 2003). Because sovereign immunity has not been waived, the Court lacks subject matter jurisdiction over Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities. Accordingly, those claims must be dismissed.

Defendants also contend that, to the extent that the Amended Complaint is construed to assert common law tort claims, they are also barred for lack of subject matter jurisdiction. (*See* Defs.' Mem. at 10-11.) As an initial matter, the United States is the only proper Defendant in a claim brought under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2679(b)(1). And, although the United States has waived sovereign immunity for a limited subset of tort claims via the FTCA, *See id.* § 1346(b), Plaintiff must first exhaust all administrative remedies prior to commencing a federal action. *See id.* § 2675(a). This requirement is jurisdictional, and cannot be waived. *Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.1983). Plaintiff does not dispute that he has not presented his claims to the USMS, and so they remain unexhausted. (*See* Declaration of Gerald M. Auerbach, USMS General Counsel, dated Aug. 20, 2009.)

Accordingly, any common law tort claims must also be dismissed for lack of subject matter jurisdiction.

## II. Failure to State a Claim Under Rule 12(b)(6)

Defendants contend that Plaintiff's claims against the identified Individual Defendants in their individual capacities should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[FN7] (*See* Defs.' Mem. at 11-17.) Defendants' argument is two-fold. First, Defendants argue that Plaintiff's claims arising out of conduct more than three years prior to the filing of the Amended Complaint, where Plaintiff first identified some of the Individual Defendants, are time-barred. (*See id.* at 12-14.) Second, Defendants assert that any remaining claims do not rise to the level of a constitutional violation. (*See id.* at 14-17.)

> FN7. Defendants do not address the claims against the remaining John Doe Defendants. Because those Defendants have not been named, and thus have not been served, this Court lacks personal jurisdiction over them. Accordingly, those claims should also be dismissed. *See Williams v. Winfield,* No. 94 Civ. 6384(TPG), 2002 WL 91619, at *2 (S.D.N.Y. Jan. 24, 2002) (dismissing claims against unidentified correctional officer for lack of personal jurisdiction, after counsel for defendants could not identify him despite good faith efforts to do so).

*10 In response, Plaintiff contends that the claims of the Amended Complaint "relate back" to the date of the original Complaint, February 28, 2007, and are therefore timely.[FN8] (*See* Pl.'s Mem. at 3.) This would include any claims arising out of conduct occurring on or after February 28, 2004.

> FN8. Plaintiff also argues that 28 U.S.C. § 2401(a) provides for a six-year statute of limitations for *Bivens* claims. (*See* Pl.'s Mem. at 3-4.) The Second Circuit Court of Appeals has made clear that *Bivens* claims are governed by a three-year statute of limitations. *See Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

After the parties fully briefed the motion to dismiss, the Court requested additional submissions on two questions: (1) which, if any, of Plaintiff's *Bivens* claims would be timely pursuant to Federal Rule of Civil Procedure 15(c)(1)(A), which permits the Court to look to New York State's more forgiving body of statute of limitations law?; and (2) to the extent Plaintiff's claims "relate back" under this framework, do the surviving claims rise to the level of constitutional violations? (*See* Order, dated Dec. 29, 2009.) The Court also requested Plaintiff to provide details regarding his efforts to determine the identities of the John Doe Defendants, both before and after filing the Complaint. (*See id.*)

In response to the Court's inquiry, Defendants contend that Rule 15(c)(1)(A) is wholly inapplicable to *Bivens* claims, but even if it were to apply, Plaintiff's surviving claims do not rise to the level of constitutional violations. (*See* Defendants' Supplemental Memorandum of Law, dated Jan. 15, 2010 ("Defs.' Supp. Mem.").)

Plaintiff, on the other hand, responded to the Court's request by merely stating that he acted diligently and to the best of his abilities at all times given his *pro se* status and limited resources as a prisoner. (*See* Plaintiff's Supplemental Memorandum of Law, dated Jan. 26, 2010 ("Pl.'s Supp. Mem."), at 2.) Plaintiff further contends that New York law permits tolling of the statute of limitations when a plaintiff is unable to identify a defendant, provided he acts diligently in his attempts to do so. (*See id.* at 2-3 (citing *Mabry v. N.Y.C. Dep't of Corr.*, No. 05 Civ. 8133(JSR) (JCF), 2008 WL 6190003 (S.D.N.Y. Mar. 7, 2008)).)

A. *Statute of Limitations*

1. *Legal Standard*

"A *Bivens* action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights." *See Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir.2007); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994). Federal courts sitting in New York apply a three-year statute of limitations period to *Bivens* claims. *See*

*Kronisch*, 150 F.3d at 123; *see also Tapia-Ortiz v. Doe*, 171 F.3d 150, 151 (2d Cir.1999). Therefore, a plaintiff filing a constitutional claim against federal officers in their individual capacities must institute his suit no more than three years after the cause of action first accrued. If it is determined that the relevant date for statute of limitations purposes in this case is the date of Plaintiff's original Complaint, the majority of his claims are timely (i.e., those accruing on or after February 28, 2004). On the other hand, if the date of the Amended Complaint (January 2, 2009) is the relevant date, Plaintiff is left with only those claims accruing on or after January 2, 2006.

**\*11** The Second Circuit has stated that "[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party [in an amended pleading] in effect constitutes a change in the party sued." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.1993). Therefore, "[s]uch an amendment may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met." *Id.; see also Barrow v. Wethersfield*, 66 F.3d 466, 468 (2d Cir.1995). If the requirements of Rule 15(c) are met, an amended pleading will be said to "relate back" to the date of the original complaint. *See* Fed.R.Civ.P. 15(c).

Pursuant to Rule 15(c), an amended pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

... or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if [the amendment arose out of the same conduct in the original pleading] and if ... the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

concerning the proper party's identity.

Fed.R.Civ.P. 15(c)(1). Because "state law supplies the statute of limitations period" for a *Bivens* claim, *see Kronisch,* 150 F.3d at 122, the Court has the option of applying state law to determine if the amended pleading relates back.

In deciding whether to apply state or federal relation back law, the Court must determine which law "affords a more forgiving principle of relating back." *See Wilson v. The City of N.Y.,* No. 03 Civ. 2495(RLC), 2006 WL 2528468, at *2 (S.D.N.Y. Aug. 31, 2006) (citation omitted). In comparing the two, the Advisory Committee's Notes to Rule 15(c) direct the Court to look at " 'controlling bod[ies] of limitations law,' which in this case includes all the tolling provisions in the New York Civil Practice Law and Rules ("CPLR") and the interpretations of these statutes found in New York case law." *Id.* (citing Fed.R.Civ.P. 15(c) (1) Advisory Committee's Note (1991); *see also Mabry,* 2008 WL 619003, at *6; *Murphy v. West,* 533 F.Supp.2d 312, 316 (W.D.N.Y.2008); *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *6 (S.D.N.Y. Aug. 31, 2007) (all applying New York limitations law to claims brought against "John Doe" defendants in federal court).[FN9]

> FN9. Defendants' contention that Rule 15(c)(1)(A) is inapplicable to *Bivens* claims is without merit. While such claims are purely federal in nature, the three-year statute of limitations that governs *Bivens* claims is derived from state law. *See Kronisch,* 150 F.3d at 122 (noting that "state law supplies the statute of limitations period" for *Bivens* claims).

Turning first to the federal relation-back rule (Fed.R.Civ.P. 15(c)(1)(C)), it is well-established in this Circuit that "an amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow,* 66 F.3d at 470; *see also Tapia-Ortiz,* 171 F.3d at 152. This is because "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be

characterized as a mistake." *Barrow,* 66 F.3d at 470.

**\*12** New York law, however, is more forgiving in the case of "John Doe" defendants. *See Laureano,* 2007 WL 2826649, at *6. The controlling body of New York limitations law "creates a special procedure for John Doe cases that focuses on notice to possible defendants rather than whether the failure to name the defendant was an excusable mistake." *Wilson,* 2006 WL 2528468, at *3; *see also* N.Y. CPLR 1024.

CPLR 1024 permits a plaintiff to file an action against an unknown defendant, provided that several conditions are met. *See Bumpus v. N.Y.C. Transit Auth.,* 66 A.D.3d 26, 29-30, 883 N.Y.S.2d 99, 103-04 (2d Dep't 2009). First, a plaintiff must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* The failure to act diligently to ascertain the unidentified defendant's name "subjects the complaint to dismissal as to that party." *Id.* If a plaintiff is unable to identify the defendant, he may commence the action against a "John Doe" defendant "describ[ing] [the unknown party] in such form as will fairly apprise the party that she is the intended defendant."[FN10] *Id.* (citation omitted). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and ... serve process upon them, within 120 days from filing." *Id.* at 31, 883 N.Y.S.2d at 105. The 120-day deadline imposed by CPLR 305-b may be extended "upon good cause shown or in the interest of justice."[FN11] N.Y. CPLR 305-b.

> FN10. In New York state cases applying CPLR 1024, plaintiffs commencing actions against unidentified defendants are typically required to "present an affidavit stating that a diligent inquiry has been made to determine the names of such parties." *Luckern v. Lyonsdale Energy Ltd. P'ship,* 229 A.D.2d 249, 253, 654 N.Y.S.2d 543, 546 (4th Dep't 1997) (citation omitted).

> FN11. Rule 4(m) of the Federal Rules provides a similar 120-day requirement with extensions granted upon a showing of "good cause." *See* Fed.R.Civ.P. 4(m).

To identify unknown parties after filing, a plaintiff is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

advised to serve discovery demands upon any known parties, seek disclosures pursuant to a Freedom of Information Law ("FOIL") request, or otherwise act with diligence. *Bumpus,* 66 A.D.3d at 33-34, 883 N .Y.S.2d at 107. If the unknown parties are identified prior to the deadline for service of process, the statute provides for amendment of the pleadings *nunc pro tunc. See Florence v. Krasucki,* 533 F.Supp. 1047, 1053 n. 3 (W.D.N.Y.1982) (citing N.Y. CP LR 1024). In essence, an amended pleading identifying previously unknown parties does not "relate back" to the date of the original pleading under New York's "unity of interest" test, *see, e.g., Monaardi v. BJ's Wholesale Club,* 45 A.D.3d 1149, 1150-51, 846 N.Y.S.2d 441, 442 (3d Dep't 2007), but rather, the statute of limitations is actually tolled from the date of the original filing until service. *See Wilson,* 2006 WL 2528468, at *3; *see also Luckern,* 229 A.D.2d at 255, 654 N.Y.S.2d at 546 (Under CPLR 1024, "an action commenced against unknown parties is deemed interposed, for Statute of Limitations purposes, when the 'John Doe' summons with notice is filed with the clerk of the court.").

2. *Application*

Here, it is clear that Plaintiff's failure to identify any of the Individual Defendants prior to the running of the three-year statute of limitations is fatal to his *Bivens* claims under the federal relation-back rule, because it was not the result of mistake. *See* Fed.R.Civ.P. 15(c)(1)(C); *see also Tapia-Ortiz,* 171 F.3d at 152; *Barrow,* 66 F.3d at 470. The Court must therefore decide whether Plaintiff may avail himself of New York's more forgiving statute of limitations rules. To succeed in this argument, the Court must conclude that (1) Plaintiff has acted with due diligence in identifying the Individual Defendants both before and after filing his original Complaint; (2) Plaintiff provided sufficient detail in the original Complaint such that the Individual Defendants would be on notice of the claims had they read the pleading; and (3) Plaintiff served the Amended Complaint on the Individual Defendants within 120 days of filing the Complaint.

**\*13** Plaintiff has provided no information regarding his pre-filing efforts to identify the Individual Defendants. Despite this Court's request that Plaintiff provide additional details in this regard, Plaintiff merely wrote that

he has "made his best effort to carry out the case accordingly." (*See* Pl.'s Supp. Mem. at 2.) While the Court recognizes Plaintiff's limitations, given his incarceration and *pro se* status, Plaintiff must show that he exercised some due diligence in an attempt to identify the Individual Defendants prior to filing the Complaint. The incidents in the Complaint are alleged to have occurred as early as February 2004. Yet, Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed. Between February 2004 and February 2007, Plaintiff could have filed FOIL requests or written letters to the USAO or even his criminal defense attorney. *See Laureano,* 2007 WL 2826649, at *6 (plaintiff sent letters, discovery requests, and searched public records to identify defendants); *Wilson,* 2006 WL 2528468, at *3 (plaintiff served "several unanswered discovery requests" and FOIL requests in order to identify defendants). Even if unsuccessful, this would have at least evinced some degree of diligence. And, Plaintiff certainly could have filed the original Complaint much sooner than he did-which happened to be the day before the statute of limitations was to run on his most serious claim regarding the physical assault of March 1, 2004. Had he done so, he could have then sought Court assistance with identifying the Individual Defendants.

Having failed to offer any evidence of diligence prior to filing the Complaint, on this basis alone, Plaintiff does not meet the requirements of CPLR 1024, and the Amended Complaint should be dismissed as time-barred. *See. e.g., Hall v. Rao,* 26 A.D.3d 694, 695, 809 N.Y.S.2d 661, 662 (3d Dep't 2006) (dismissing complaint, purportedly filed under CPLR 1024, when "record is utterly devoid of proof documenting what efforts, if any, plaintiffs undertook to identify [defendant] prior to the expiration of the statute of limitations").

The absence of effort by Plaintiff to identify Defendants prefiling, continued after the Complaint was filed. Upon filing the Complaint in February 2007, Plaintiff made no effort to ascertain the Individual Defendants' names until more than six months later, in September 2007. The Court's Pro Se Office sent Plaintiff the initial summons and service package on April 25, 2007, yet, the case otherwise remained dormant through August, when Plaintiff first mailed the service package to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the USMS. At that point, however, it was clear that there could be no service, since Plaintiff provided no information as to whom to serve.

It was not until September 5, 2007, after service was unable to be effectuated, that Plaintiff first wrote to the Court to request assistance in identifying the Individual Defendants, and to seek an extension of time to serve them (despite their John Doe status at that time). But by then, the statute of limitations had already run on most of the incidents alleged in the Complaint. Further, more than 120 days had elapsed since the Complaint had been filed and Plaintiff had received the service package. This too was fatal to tolling the statute of limitations under New York law, since, as discussed, a John Doe complaint must be served within 120 days of filing, unless the court has extended that period prior to its expiration.

**\*14** Nevertheless, the Court breathed life into Plaintiff's claims when it requested that the USAO attempt to identify the Individual Defendants. In December 2007, the USAO identified two of the Individual Defendants, but the vague descriptions in the Complaint prevented identification of the remaining nine John Does. Rather than amend the Complaint at this time to identify and serve the two known Defendants, in February 2008, Plaintiff provided further descriptions of five John Does. However, these were again, too vague, and resulted only in the identification of Defendant Krause, in August 2008.

Failing again to amend the Complaint, Plaintiff renewed his request for the names and photographs of every employee of the USMS that he came into contact with on the dates within the Complaint. This was denied on several occasions. (*See* Order, dated Jan. 17, 2008; Order, dated July 3, 2008; Order, dated Sept. 30, 2008.) In one Order, Judge Sullivan forewarned Plaintiff of the statute of limitations problems inherent in Plaintiff's continued delay in filing the Amended Complaint. (*See* Order, dated Sept. 30, 2008.) Three months later, nearly two years after the statute of limitations had expired, and approximately five years after most of the alleged incidents occurred, Plaintiff filed the Amended Complaint, on January 2, 2009, identifying four of the Individual Defendants. On June 2 and 4, 2009, the Amended Complaint was served on the identified Defendants. While

Plaintiff's post-filing efforts were certainly better than those prior to February 2007, more is required under CPLR 1024.

In light of the absence of any pre-filing efforts to identify the Individual Defendants, Plaintiff's failure to identify or serve any Defendants within 120 days of filing the Complaint, the deficiencies in Plaintiff's post-filing efforts to ascertain the Individual Defendants' identities, and Plaintiff's delay in filing and serving the Amended Complaint, Plaintiff may not avail himself of New York's more forgiving law regarding the statute of limitations and John Doe defendants. In those federal cases that have invoked CPLR 1024, the plaintiffs have exercised a degree of diligence not shown by Plaintiff in the instant case. *See, e.g., Mabry,* 2008 WL 619003, at \*6 (plaintiff "aggressively sought the identities of defendants" through letters and discovery requests); *Murphy,* 533 F.Supp.2d at 316 (plaintiff sought identities of John Does from identified defendants prior to the expiration of the statute of limitations); *Laureano,* 2007 WL 2826649, at \*6 (plaintiff's counsel submitted an affidavit detailing efforts undertaken to identify defendants, which included letters, discovery requests, and a search of public records); *Wilson,* 2006 WL 2528468, at \*3 (plaintiff served "several unanswered discovery requests" and FOIL requests). Accordingly, Plaintiff's claims arising out of conduct occurring more than three years prior to January 2, 2009, the date on which some of the Individual Defendants were first identified in the Amended Complaint, are time-barred.

B. *Plaintiff's Remaining Timely Claims*

**\*15** In the Amended Complaint, Plaintiff asserts a single timely claim against one Defendant. Plaintiff claims that, on May 5, 2006, as he was being escorted to a holding cell after a post-trial hearing, Defendant Ventiere "popped from out of a door of a room with a large one-way mirror and said 'I heard that and I'll teach you a lesson.' " (*See* Am. Compl. ¶ 53.) According to Plaintiff, he had been explaining his problems with the Individual Defend ants to another U.S. Marshal when this occurred. (*See id.*) Afterwards, Plaintiff alleges that he sat in a holding cell "in utter fear, not knowing if something would happen." (*See id.*) There is no allegation that anything did

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

happen.

Liberally construing Plaintiff's *pro se* Complaint, the Court views Plaintiff's claim as one of retaliation under the First Amendment. In the alternative, Plaintiff appears to allege that the verbal threat, in and of itself, constituted a constitutional violation.

### 1. *Legal Standard on a Motion to Dismiss Under* Rule 12(b) (6)

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1964-65 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *see id.* at 570, 127 S.Ct. at 1974, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *See id.* at 555, 127 S.Ct. at 1965 (citation omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570, 127 S.Ct. 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *See id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974.

### 2. *First Amendment Claim*

To state a retaliation claim under the First Amendment, the Plaintiff must allege that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the plaintiff's speech and the adverse action. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). In the prison context, the Second Circuit has defined an "adverse action" as conduct "that would deter similarly situated individuals of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Specifically, the Court of Appeals has found that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992 (2002).* In determining whether a verbal threat constitutes an adverse action, a court must consider the statement's specificity and the context in which it was given. *See Mateo v. Fischer,* No. 08 Civ. 7779(RJH)(DCF), 2010 WL 431229, at *8 (S.D.N.Y. Feb. 8, 2010).

**\*16** Here, the adverse action alleged by Plaintiff is facially insufficient to state a claim for relief. Defendant Ventiere's statement is more akin to a general threat, made in response to Plaintiff's casual conversation with another U.S. Marshal regarding his purported mistreatment.[FN12] *See Dawes,* 239 F.3d at 493 (calling plaintiff-prisoner a "rat" or "informant" insufficient to state a First Amendment claim); *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (dismissing plaintiff's First Amendment claim based on prison official's threat that "we [are] going to get you, you better drop the suit"); *Alicia v. Holwell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's statements that there were "no secrets in prison," and that plaintiff would "have to pay the consequences" for filing a grievance do not state a retaliation claim); *Cruz v. Hillman,* No. 01 Civ. 4169(DAB)(DCF), 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (Report and Recommendation) (dismissing retaliation claim based on defendant's purported "dislike" for inmates who file civil lawsuits, followed by a statement to plaintiff that "Green Haven is an open battlefield, so be careful"); *cf. Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("if you don't

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

stop writing grievances I'm going to break your fuckin' neck" was direct and specific enough to state retaliation claim). Accordingly, Plaintiff's First Amendment retaliation claim, arising out of Defendant Ventiere's conduct on May 5, 2006, should be dismissed.

> FN12. It is questionable whether Plaintiff's conversation with the U .S Marshal would constitute "protected speech." Plaintiff had not yet filed the instant suit, nor had he filed any grievances at the time. Nor was he making a request for assistance to a supervisory official.

3. *Other Constitutional Claims*

To the extent that Plaintiff claims that Defendant Ventiere's statements, standing alone, give rise to a constitutional violation, the Court recommends dismissal pursuant to Rule 12(b)(6).

It is well-established law that, without more, verbal threats and intimidation do not rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name calling insufficient to allege a constitutional violation); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006) ("verbal intimidation does not rise to the level of a constitutional violation"); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"); *see also Petty v. Goord,* No. 00 Civ. 803(JSR), 2008 WL 2604809, at *5 (S.D.N.Y. June 25, 2008) (verbal harassment related to inmate's HIV-positive status did not state a claim under the Eighth Amendment); *Davidson v. Tesla,* No. 06 Civ. 861, 2008 WL 410584, at *4 (D.Conn. Feb. 13, 2008) (no constitutional violation based on officer acting in an "angry, hostile, aggressive and belligerent manner").

Here, Plaintiff merely alleges that Defendant Ventiere threatened to "teach [him] a lesson." (Am.Compl.¶ 53.) This general threat, detached from the other untimely alleged incidents by more than two years, and not followed by any physical acts, is insufficient to state a constitutional violation. Accordingly, Plaintiff's claim based on Defendant Ventiere's verbal threat on May 5, 2006, should be dismissed.[FN13]

> FN13. Because this Court recommends dismissal of all of Plaintiff's claims pursuant to Rules 12(b)(1) and (6), discussion of Defendants' third and final ground for dismissal-insufficient service of process-is unnecessary.

**CONCLUSION**

*\*17* For the above reasons, I respectfully recommend that Defendants' motion to dismiss be granted, and all claims against Defendants be dismissed. Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity. Plaintiff's claims against the Individual Defendants in their individual capacities are time-barred and/or fail to state a claim upon which relief can be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

S.D.N.Y.,2010.

Williams v. U.S.
Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

March 16, 2010.
*ORDER ADOPTING REPORT AND
RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** On February 28, 2007, Plaintiff Larry Williams, who is incarcerated and proceeding *pro se,* initiated this suit by delivering a complaint to prison officials for them to file on his behalf. The complaint was received by the court's Pro Se Office on March 9, 2007 and docketed on April 14, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Kenneth M. Karas, District Judge, and reassigned to the docket of the undersigned on September 4, 2007. (Doc. No. 3.)

The only Defendants named in the complaint were "John Does 1-11, sued in their individual capacities," whom Plaintiff described as United States Marshals. Accordingly, on October 30, 2007, the Court ordered the United States Attorney's Office for the Southern District of New York ("the USAO") to identify the officers described in the complaint. After an extended investigation period, four Marshals were eventually identified by name: Luis Figueroa, Donny LaRosa, Thomas Ventiere, and A.J. Krause. Plaintiff then filed an amended complaint on January 2, 2009-more than twenty-two months after the original complaint was filed-adding the named defendants, in their individual and official capacities, and other parties. (Doc. No. 19.) The Court ordered Plaintiff to serve the amended complaint by April 1, 2009 (Doc. No. 20), which was later extended until May 15, 2009 at Plaintiff's request (Doc. No. 22). Plaintiff mailed service packages to the Marshals Service on May 12, 2009, and process was effectuated on June 2 and 4, 2009. On August 21, 2009, Defendants moved to dismiss the amended complaint. The motion was fully submitted on September 22, 2009, and was subsequently referred to the Honorable Theodore H. Katz, Magistrate Judge, for a Report and Recommendation.

On February 25, 2010, Judge Katz issued a Report recommending that Defendants' motion be granted in its entirety. Specifically, Judge Katz recommended (1) dismissing claims against the remaining John Doe defendants for lack of personal jurisdiction; (2) dismissing claims against the United States, the United States Marshals Service, and the individual defendants in their official capacities as barred by the doctrine of sovereign immunity; (3) dismissing as time-barred all claims against the individual defendants that are based on events that took place before January 2, 2006; and (4) dismissing the remaining timely claims for failure to state a claim on which relief can be granted. In the Report, Judge Katz advised the parties that failure to file timely objections within fourteen days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b) (1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Katz's well-reasoned and persuasive Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted. The clerk of the court is respectfully directed to terminate the motion found at Doc. No. 35 and to close this case.

**\*2** SO ORDERED.

S.D.N.Y.,2010.

Williams v. U.S.
Slip Copy, 2010 WL 963465 (S.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated

December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); Liberty Lobby at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. Polk County v. Dodson, 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections <u>FN1</u> thereto, it is

   <u>FN1.</u> I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
<u>GUSTAVE J. DI BIANCO</u>, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to <u>28
U.S.C. § 636(b)</u> and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

**DISCUSSION**

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

## 4. Due Process

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely **solely** upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was **returning** to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

## 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

## 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994)*. Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

*7 Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id* . at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Omar OCASIO, Plaintiff,
v.
F. DELUKE, C.O., Great Meadow Correctional
Facility; P. VanGuilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy, Inspector
General; D. Beebe, C.O.; S. Hamel, C.O.; T. Lespier,
Sgt.; C. Murray, Sgt.; R. Armstrong, Lt.; S. Rowe,
Captain; Julie Daniels, Inmate Grievance Coordinator;
M. Harris, Nurse; Richard A. Dunning, as Administrator
of the Estate of Elaine Dunning; Great Meadow
Correctional Facility, Medical Grievance Department;
Lucien LeClaire, Jr.; Edward Mcsweeny; and Donald
Selsky, Defendants.
No. 08-CV-51 (GLS/DRH).

Sept. 3, 2010.

Omar Ocasio, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Adam Silverman,
Esq., Assistant Attorneys General, of Counsel, Albany,
NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Omar Ocasio ("Ocasio"), formerly
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging that
defendants, fifteen DOCS employees and a facility
grievance department, violated his constitutional rights

under the First, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 129. Ocasio opposes the motion. Dkt. Nos.
135, 148. For the following reasons, it is recommended
that defendants' motion be granted.

**I. Background**

The facts are related herein in the light most favorable
to Ocasio as the non-moving party. *See* subsection II(A)
*infra.* The events in question occurred during Ocasio's
incarceration at Great Meadow Correctional Facility
("GMCF").

**A. Excessive Force**

On January 13, 2006, Ocasio was involved in an
incident with defendants Deluke, Beebe, and Maguire.
Dkt. No. 128-8 at 7. Deluke and Beebe escorted Ocasio
from the shower to his cell.[FN2] Dkt. No. 128-8 at 7; Ocasio
Dep. 1 (Dkt. No. 129-3, Ex. A) at 24.[FN3] When he entered
his cell, Ocasio was instructed to place his hands through
a slot in the cell door so that the restraints could be
removed.[FN4] Dkt. No. 128-8 at 7; Ocasio Dep. 1 at 26-27.
As Deluke was passing the retention strap [FN5] through the
feed-up slot to Beebe, Ocasio allegedly turned his body
attempting to maintain control of the restraints. Dkt. No.
128-8 at 7. Murray heard Beebe and Deluke "give Ocasio
several orders to release the feed-up port and place his
hands through the port so the restraints could be removed.
Ocasio failed to comply with their orders...." Dkt. No.
129-8 at 12; *see also* Murray Decl. (Dkt. No. 129-8 at 1-5)
¶ 14. Ocasio disputes this fact, contending that he was
completely compliant. Ocasio Dep. 1 at 28-29, 68-69
(reporting that both defendants repeatedly told him to
"Stop resisting" but that Ocasio maintains that he was
complying with the officers' requests). Beebe maintained
control of Ocasio's right hand and Deluke maintained
control of the left. Dkt. No. 129-8 at 7, 12, 14-15; Ocasio
Dep. 1 at 27-32, 71. According to Ocasio, he faced
forward upon arriving at his cellas required. Ocasio Dep.
1 at 33, 65, 71-75. Non-party Maguire ultimately removed
the restraints, Beebe and Deluke released Ocasio's hands,
Ocasio remained in his cell, and the feed-up slot was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

closed without further incident. Dkt. No. 128-8 at 7, 13-15; Dkt. No. 148 at 22. Video of the event, while poor in audio quality, indicates that the entire event transpired in approximately three and a half minutes. Video. As a result of the incident, Ocasio was issued a misbehavior report for failing to follow a direct order and exhibiting violent conduct. Dkt. No. 129-8 at 23.

> FN2. When traveling throughout the correctional facility, inmates are handcuffed behind their backs pursuant to DOCS policy. Murray Decl. (Dkt. No. 129-8 at 1-5) ¶ 6. The inmate stands in front of his cell gate within reach of a slot in the cell door. *Id.* When the slot is opened, the inmate is ordered to place his hands through the slot and the restraints are applied. *Id.* The inmate then steps forward into the cell, withdrawing his hands from the slot, and the cell gate is opened so that the inmate may back into the hallway. *Id.*

> FN3. Ocasio filed another lawsuit in the Northern District naming certain defendants named herein, concerning an excessive use of force and subsequent deliberate indifference to medical treatment regarding an altercation on January 13, 2006 with Deluke and Beebe. *See Ocasio v. Greene,* No. 08-CV-18 (TJM). The defendants' motion for summary judgment in that case was recently granted for failure to exhaust administrative remedies and a meritless Eighth Amendment claim. *Id.,* Dkt. No. 90. Citations to Ocasio's first deposition are those responses provided in connection with the *Greene* case. In the deposition, Ocasio stated that the difference between the two claims was that the present action is "a retaliatory complaint solely ... being denied [his Fourteenth] and First Amendment rights...." Ocasio Dep. 2 (Dkt. No. 129-3, Ex. B) at 9. However, the bulk of the complaint and related documentation relates to the alleged use of force, and Ocasio still contends that is an issue in the present complaint. Ocasio Dep. 2 at 10.

> FN4. The process for removing restraints once an inmate is returned to his cell is essentially the reverse of that discussed above in note 3. Murray Decl. ¶ 7.

> FN5. A retention strap is a 3' piece of nylon knotted in the center piece of the handcuffs and used to ensure that the officer maintains control of the restraints during the application and removal of the handcuffs and also prevents inmates from retaining the handcuffs and using them as weapons or tools to disable the cell gates. Murray Decl. ¶¶ 8-12. Ocasio is unsure whether he was restrained with a retention strap on the date in question; however, the video clearly displays an officer walking away from the cell after the alleged use of force with a strap in his hands.

On January 13, 2006, defendant Harris was called to Ocasio's cell at approximately 9:30 a.m. to complete a use of force medical exam. Harris Decl. (Dkt. No. 129-6 at 1-5) ¶ 8; Dkt. No. 129-6 at 12; Dkt. No. 148 at 65. Harris asserts that Ocasio refused the examination. Harris Decl. ¶ 8; Dkt. No. 129-6 at 12; Dkt. No. 129-8 at 8, 10, 12; Dkt. No. 148 at 22, 34; Ocasio Dep. 1 at 114, 116-19. Ocasio informed Harris that she was not allowed into Ocasio's cell, so Murray proposed that Ocasio "stick his] hand out the slot ...." for Harris to perform the medical evaluation...." Ocasio Dep. 2 at 94. Ocasio agreed, but when he insisted that the examination be done professionally, Murray told Harris to to continue on her rounds. *Id.* at 94-95. Non-party Officer Little attempted to take pictures of Ocasio after the incident, but Ocasio refused to comply and turned off the light in his cell. Dkt. No. 129-8 at 12.

**\*2** Ocasio denies ever receiving a medical examination and only receiving medical attention after his fiancee called the IG's office with a complaint of excessive force after visiting Ocasio on January 15. Ocasio Dep. 1 at 84, 116-19. Ocasio claims that the medical staff still did not evaluate him until weeks later. *Id.* at 85. Ocasio claims that the immediate injuries included pain and significant bleeding and that his right arm and wrist had been twisted. *Id.* at 34-37, 39-49, 77-80; Ocasio Dep. 2 at 12-13.

Later that day, defendant Dunning, a nurse, examined Ocasio and noted two complaints, a rash on his forehead and dental pain. Harris Decl. ¶ 9; Dkt. No. 129-6 at 13.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

The following day, January 14, Ocasio offered no medical complaints. Harris Decl. ¶ 10; Dkt. No. 129-6 at 13; Dkt. No. 148 at 23. On both January 15 and 16, Ocasio complained of vague pain in his forearms, but examination showed no abrasions or swelling. Harris Decl. ¶ 11; Dkt. No. 129-6 at 13-14; Dkt. No. 148 at 23, 64, 66. Ocasio asserts that on January 15, his hand was swollen two to three times its normal size but that he continued to write dozens of grievances. Ocasio Dep. 1 at 101; Ocasio Dep. 2 at 13-15. Ocasio stated that his hand remained swollen and discolored for weeks. Ocasio Dep. 2 at 15-16.

On January 17, 2006, Ocasio was examined by Nurse Lipka to whom he complained of dental pain and requested to see a dentist and was then seen by Nurse Stevens to whom he reported left arm and right hand pain.[FN6] Harris Decl. ¶ 13; Dkt. No. 129-6 at 14; Dkt. No. 148 at 64. Ocasio was escorted to Nurse Stevens by non-party Sergeant Hendry, who photographed Ocasio's injuries. Dkt. No. 129-7 at 4; Dkt. No. 148 at 22. Hendry "observed Ocasio dress himself in his cell prior to the escort. Ocasio had no problem putting on his jumpsuit, sneakers, or allowing us to place him in handcuffs and waist chain." Dkt. No. 129-7 at 4. Stevens' examination of Ocasio revealed puffiness and bruising on his right hand and two scratches on his left arm. Harris Decl. ¶ 13; Dkt. No. 129-6 at 14; Dkt. No. 129-8 at 9, 11; Dkt. No. 148 at 33. Stevens found no further injuries and that Ocasio displayed a full range of motion while dressing and undressing for the examination. Dkt. No. 129-8 at 9. Ocasio's subjective complaints included that "his hands were in terrible pain, his arm wouldn't move properly, and he couldn't make a fist with his right hand." Dkt. No. 129-7 at 4. According to Ocasio, Stevens failed both to palpate his hand during the examination, relying on her observations from afar, and record the severity of his injuries. Ocasio Dep. 1 at 110-11, 121, 126-30. According to Ocasio, despite the pain and swelling in his hand, he continued to write grievances to individuals and use his hands to eat, and he still experiences fatigue, pain, and tingling occasionally. Ocasio Dep. 1 at 131-32, 136-38.

FN6. Contrary to the noted medical entries, Ocasio contends that he knew his hand was fractured immediately and continuously asked medical staff for assistance and diagnostic testing. Ocasio Dep. 1 at 87-88.

Nurse Lipka saw Ocasio on rounds again on January 18, 19 and 20, and during that time Ocasio offered no complaints of pain in his arms or hands. Harris Decl. ¶ 14; Dkt. No. 129-6 at 15; Dkt. No. 148 at 63. On January 19, non-party Ortiz from the Inspector General's ("IG's") Office, received a complaint about the incident on January 13. Ortiz Decl. (Dkt. No. 129-9 at 1-2) ¶ 2. Ortiz conducted an investigation, which included an interview of Ocasio on February 7, 2006. *Id.* ¶ 4; *see also* Dkt. No. 148 at 20, 22 (copy of investigation request and report). Ocasio stated that the use of force constituted Deluke "putting a lot of pressure on [his] hands ..." which caused Ocasio pain, until Maguire arrived and removed his handcuffs. Dkt. No. 129-9 at 4; Dkt. No. 148 at 22. Ocasio added that there was no medical evaluation completed because if things "were not going to be [done] as per [his] request, [he] refuse[d]. [He] wanted in detail [his] medical evaluation." Dkt. No. 129-9 at 5; *see also* Dkt. No. 148 at 22, 27.

*3 On January 23 and 24, 2006, Ocasio complained to Dunning about his right hand, requested an x-ray, and she scheduled a doctor's appointment for February 17, 2006. Harris Decl. ¶ 15; Dkt. No. 129-6 at 16; Dkt. No. 148 at 23, 62; Ocasio Dep. 2 at 102-05. On January 26, 2006, Ocasio complained to Lipka of right hand pain and numbness, though she observed no swelling or decreased range of motion. Harris Decl. ¶ 16; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61. Lipka spoke with the physician's assistant about Ocasio's complaints and he agreed to see Ocasio. Harris Decl. ¶ 16; Dkt. No. 129-6 at 17. On January 27, 2006, Ocasio again saw Dunning and complained of right hand pain. Harris Decl. ¶ 17; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61. Dunning told Ocasio that he was scheduled to see a physician on February 17, 2006 and noted that he did not appear to be in any distress. Harris Decl. ¶ 17; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61.

On January 28, 2006, the physician's assistant saw Ocasio and discussed only a restricted diet. Harris Decl. ¶ 18; Dkt. No. 129-6 at 18. Ocasio inquired about x-rays the following day and on February 1. Dkt. No. 148 at 45-46. On February 14, 2006, Ocasio complained of right hand

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

pain to Nurse Nichols and requested an x-ray. Harris Decl. ¶ 19; Dkt. No. 129-6 at 22; Dkt. No. 148 at 56. On February 17, 2006, Ocasio saw a physician who ordered an x-ray of his right hand. Harris Decl. ¶ 20; Dkt. No. 129-6 at 23; Dkt. No. 148 at 55. On February 22, 2006, Ocasio requested another follow-up appointment on his right hand. Dkt. No. 129-6 at 24, Dkt. No. 148 at 54; Ocasio Dep. 2 at 102.

On February 23, 2006, an x-ray was taken and revealed a fracture in Ocasio's third metacarpal which was healing. Harris Decl. ¶ 21; Dkt. No. 1-1 at 6; Dkt. No. 129-6 at 25; Dkt. No. 148 at 53; Ocasio Dep. 1 at 110, 112. Ocasio was instructed to rest and await further instruction during his follow-up appointment in March. Dkt. No. 129-6 at 25. Ocasio was not given a brace or any other assistive device. Ocasio Dep. 2 at 105. On February 28, 2006, Ocasio again inquired as to his hand and was again told to wait until his appointment on March 14, 2006. Dkt. No. 129-6 at 25. Ocasio continued to ask for status reports, but was always reminded to wait until his follow-up in March. Dkt. No. 129-6 at 27-28; Dkt. No. 148 at 50-51, 53.

Ocasio was again seen by medical staff on March 14, 2006. Harris Decl. ¶ 22; Dkt. No. 129-6 at 32; Dkt. No. 148 at 48. The examination "revealed slight tenderness over [the] third metacarpal with no crepitus ... [and] normal range of motion and normal grip strength. The doctor concluded that the fracture was healing." Harris Decl. ¶ 22; Dkt. No. 129-6 at 32; *but see* Ocasio Dep. 1 at 97 (claiming that he never had someone "look at [his] hand specifically, see what was going, see[ ] the function of [his] hand, things like that ... never happened."). Ocasio's hand function was determined to be normal. Dkt. No. 129-6 at 32. Ocasio testified that he presently continues to experience nerve damage in his hand from the use of force. Ocasio Dep. 1 at 102. Ocasio continued to inquire about his x-ray results from medical staff, though the x-rays had already been completed and read to Ocasio and he was told that no further x-rays had been ordered or were needed. Dkt. No. 129-6 at 34, 39-40, 45, 52. Ocasio continued to see the medical department on an almost daily basis throughout 2006. Dkt. No. 129-6 at 34-71.

**\*4** A disciplinary hearing on the misbehavior report

issued to Ocasio was held in January 2006. Dkt. No. 148 at 26. On January 26, 2006, the hearing officer determined that certain of Ocasio's witnesses were unnecessary because they lacked personal knowledge of the events of the day in question. Dkt. No. 148 at 24-25. Ocasio claims he was denied a fair and impartial hearing by defendant Armstrong because he was precluded from viewing and introducing the video as evidence. Ocasio Dep. 2 at 81-86. The hearing concluded on January 31, 2006 with a finding of guilt a sentence of nine months in the Special Housing Unit (SHU),[FN7] loss of privileges, twelve months loss of good time, and seven days of restricted diet. Dkt. No. 148 at 26; Ocasio Dep. 1 at 174-75.

> FN7. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

The disciplinary finding and sentence were later reversed. Ocasio Dep. 1 at 173-74; Dkt. No. 129-3 at 306; Ocasio Dep. 2 at 126. However, Ocasio was already confined to SHU for a period of years and his SHU confinement on this charge never commenced. Ocasio Dep. 1 at 176-77. Ocasio did receive a restricted diet as a result of the hearing. *Id.* at 181. While Ocasio was receiving this diet, defendant Hamel prevented medical staff from evaluating Ocacio to ensure that he remained healthy on the restricted diet. Ocasio Dep. 2 at 74, 78-79.

**B. Grievances**

DOCS maintained an Inmate Grievance Program (IGP) for inmates to seek redress over issues of their confinement. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

"DOCS Directive # 4040 requires that grievance files and logs be maintained for at lest the current year plus the previous four calendar years ... The CORC computer database contains records of all appeals received from the facility Inmate Grievance Program Offices and which were heard and decided by CORC since 1990." Bellamy Decl. (Dkt. No. 129-5 at 1-2) ¶ 6. Ocasio was well aware of the grievance process, correctly reciting the steps required to file a grievance and any appeals thereof. Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Attached to Ocasio's complaint and filed with his response on this motion are multiple letters filed to multiple individuals both inside and outside DOCS relating to various complaints by Ocasio about his confinement prior to January 13, 2006. Dkt. No. 1-1 at 1-2, 4, 10-11, 13-14; Dkt. No. 1-2 at 1-5, 7, 17-19, 20-21; Dkt. No. 1-3 at 6-11, 13-14, 21; Dkt. 148 at 13. In a number of these letters, Ocasio was directed to follow the steps outlined in the facility grievance procedures, or his complaints were forwarded to the Superintendent of the facility in which he was housed, so that the grievance process would be initiated. Dkt. No. 1-1 at 2, 7; Dkt. No. 1-2 at 3, 5. The responses also indicated that Ocasio's grievances which were properly filed were being addressed accordingly and encouraged Ocasio to continue following facility procedures for the most efficient and optimal resolution to his complaints. Dkt. No. 1-2 at 5; Dkt. No. 1-3 at 7-8.

**\*5** In January 2006, Ocasio filed five grievances. Dkt. No. 129-10 at 5. However, of the five filed, none mentioned medical treatment or excessive force. Dkt. No. 129-10 at 5. In March 2006, Ocasio filed a grievance concerning receiving x-rays for his right hand, but did not ever file a grievance charging excessive force by officers. White Decl. (Dkt. No. 129-10 at 1-2) ¶¶ 5-6, 8; Dkt. No. 129-10 at 5; Dkt. No. 129-10 at 7 (grievance seeking x-rays to be taken), 8 (response that x-rays were taken and the results were discussed in March). In 2006, Ocasio only appealed two grievances to CORC which had been filed at GMCF. Bellamy Decl. ¶ 7. Both grievances were filed on November 1, 2006 and pertained to over the counter medications and the grievance process respectively. *Id.* ¶

7.

The only grievances approaching he matters alleged in this case were one letter to DOCS Deputy Director Nadler and another to Superintendent Greene asserting that Ocasio had been assaulted on January 13 by two officers. [FN8] Dkt. No. 1-2 at 22, 24. The letters were difficult to read. In the first, Ocasio asked Nadler to forward the letter to the forensic investigation unit, stating that there were witnesses to the assault and subsequent swnial of medical attention. *Id.* at 22. The second letter only identified Deluke as an assailant and that Deluke was being investigated by the DOCS Inspector General. *Id.* at 24. However, this letter never sought to lodge a formal complaint or initiate the grievance process. As the months passed, responses to Ocasio re-emphasized that Ocasio's compliance with the grievance system was imperative and detailed the responses to Ocasio's previously filed grievances. Dkt. No. 1-1 at 3; Dkt. No. 1 at 10, 16; Dkt. No. 148 at 30. Additionally, Ocasio continually filed letters to various departments and individuals immediately after the alleged use of force. *See* Dkt. No. 1-1 at 7-9, 12; 1-2 at 22-24 (six letters written by Ocasio in January 2006); Dkt. No. 1-1 at 5, 15; Dkt. No. 1-3 at 1-5 (four letters written by Ocasio in February 2006).

> FN8. A third letter apparently addressed to VanGuilder stated Ocasio's intent to have criminal charges filed against Deluke and Beebe for interfering with his religious meals and failing to provide him with the SHU videotape of the use of force incident on January 13. Dkt. No. 1-2 at 23. The remaining correspondence provided by Ocasio dated in 2007, solely pertains to his requests for documents, the appropriate procedure for receiving such documents, and the cost for the documents. Dkt. No. 1-3 at 12, 16-23.

Ocasio testified that he grieved the issues surrounding January 13, 2006 multiple times. Ocasio stated that he filed ten to fifteen complaints per week regarding the excessive use of force, and that he received no responses, so "[n]othing was being exhausted." Ocasio Dep. 1 at 122; *compare* Ocasio Dep. 2 at 121-22 (stating that in the six months subsequent to the alleged incident, he filed 200-25

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

grievances, averaging approximately fifty pages per week throughout these first few month). These complaints were filed with different agencies and organizations. Ocasio Dep. 1 at 123-24. Ocasio stated that he filed grievances "at least four or five times" regarding the lack of medical treatment that was afforded to him after the use of force incident. *Id.* at 120. Regarding the events of January 13th as a whole, Ocasio could not exhaust his claims "on record because [defendants] did [not] let ... specific grievance [s] ... lead to specifically an exhaustive remedy process...." *Id.* at 122-23; *see also* Ocasio Dep. 1 at 139-45, 160-62. Ocasio contended that defendants frustrated his right to participate in the grievance process, but failed to proffer any specific examples of grievances filed or the failure of DOCS to review them in the appeals process. Ocasio Dep. 1 at 125-26. During Ocasio's second deposition, he identified Murray as the individual who frustrated his attempt to file grievances by informed Ocasio that "as far as what took place on the 13th, [he] will never be able to exhaust that through the grievance officials while [Murray was t]here." Ocasio Dep. 2 at 39.

**\*6** Ocasio also stated that while his grievances were being accepted and presumably mailed, he was also sending copies to Albany to ensure that his complaints were being addressed, but he still failed to receive any responses. Ocasio Dep. 1 at 149-57. Other grievances that he filed were completely exhausted despite Murray's alleged threats. Ocasio Dep. 1 at 157-58; Ocasio Dep. 2 at 40. Ocasio also blamed the limited number of grievances actually taken to completion on defendant Daniel because there were only a portion of those grievances which "she felt ... [were] actually exhaustive through ... the grievance mechanism within the CORC office in Albany...." Ocasio Dep. 2 at 53; *see also* Ocasio Dep. 2 at 55-60.

Ocasio also contends that multiple defendants were included in the present action for failing to respond to complaints which Ocasio had sent them. This included VanGuilder's failure to respond to Ocasio's letters (Ocasio Dep. 2 at 61-66, 123); Roy's failure to respond or initiate investigations into Ocasio's complaints (*id.* at 72-73), Rowe's lack of response to Ocasio's complaints (*id.* at 88); and Leclaire, Selsky, and McSweeny's proclivity to forward the grievances and complaints Ocasio sent to them back to GMCF without conducting their own

investigation (*id.* at 107-09, 113-14, 117-19).

### C. Retaliation

Ocasio had previously complained about Deluke and Beebe, resulting in investigations against both of them. Ocasio Dep. 1 at 49-56, 62. Ocasio had Deluke investigated "at least two or three times ... prior to [him] being assaulted ... [for] harassment ... [and] physical infliction." Ocasio Dep. 2 at 19. Deluke was aware of these complaints. Ocasio Dep. 1 at 56-61; Ocasio Dep. 2 at 25-28. Deluke informed Ocasio that he knew the investigator with whom Ocasio had lodged his complaints and that Deluke had influence over him. Ocasio Dep. 1 at 59; Ocasio Dep. 2 at 26-27. This incident occurred approximately four to six months before the incident forming the basis of the present complaint. Ocasio Dep. 1 at 59-61.

Ocasio also claimed that the video cameras in SHU were not working properly, another element of the alleged retaliation. Ocasio Dep. 2 at 30, 81-82. This claim was reiterated with regard to defendant Armstrong for failing to maintain and provide such tapes to inmates during their disciplinary hearings. *Id.* at 84-85. Additionally, Ocasio claims he was placed on full restraints in retaliation for the events of January 13, 2006. *Id.* at 32-33. Beebe would place the full restraints on very tightly when he escorted Ocasio throughout the facility subsequent to January 13. *Id.* at 35. Furthermore, Ocasio claims that all of the documents produced in the course of reporting the use of force incident, including the summary provided to Armstrong by Murray, was a falsified report meant to conceal the real events that transpired that day. *Id.* at 46-51.

Ocasio also contends that his filings of grievances against Hamel and Lespier ended in retaliatory acts. Ocasio Dep. 2 at 76-80. Ocasio stated that due to the multiple investigations he requested against both defendants, they issued approximately twenty disciplinary charges which caused the amount of time Ocasio was required to remain in SHU to be extended. *Id.* at 76-80.

### III. Discussion

**\*7** Ocasio alleges that he was subject to excessive force and to deliberately indifferent medical treatment and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

that defendants retaliated against him for filing grievances. Liberally construing the complaint, it also appears that Ocasio alleges a due process violation due to a biased disciplinary hearing and disposition resulting from the misbehavior report lodged against him after the use of force. Defendants contend that (1) several defendants should be dismissed for lack of personal involvement, (2) Ocasio has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims, (3) Ocasio's claims are meritless, (4) the Eleventh Amendment bars all claims against Great Meadow, and (5) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006); see also Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a]

plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " ( citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

### B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. Porter v.. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 83 (2006). This exhaustion requirement applies to all prison condition claims. Porter, 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. Nussle, 534 U.S. at 524.

**\*8** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir.2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir.2004)). Exhaustion for an inmate in DOCS custody is generally achieved through the Inmate Grievance Program (IGP). See N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1, et seq.. However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims. A court must consider whether

(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688.

The record shows that Ocasio has failed to file any grievances, pursuant to facility policy, regarding his excessive force claims. Dkt. No. 129-15 at 5. Additionally, while Ocasio filed a grievance related to the medical care he received for his hand, he failed fully to exhaust this grievance by appealing it up through CORC. White Decl. ¶¶ 5-6; Dkt No. 129-10 at 5, 7-8; Bellamy Decl. ¶ 7. It is also undisputed that Ocasio was well informed about the grievance process, understood how it worked, and effectively utilized it on multiple occasions both prior and subsequent to the incident on January 13. *See generally* Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Ocasio contends that despite this knowledge, and despite the fact that he literally filed hundreds of complaints in the months following January 2006, the grievance process was generally unavailable to him as he was frustrated by a single threat by Murray and Daniel's selective processing of his grievances. Ocasio Dep. 1 at 120-26, 139-45, 160-62; Ocasio Dep. 2 at 121-22. These claims are belied by Ocasio's own actions. Ocasio's testimony indicates that he continued to file dozens of letters of complaint immediately following the use of force and alleged impediments created by DOCS staff. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121-22. Accordingly, even construing the facts in the light most favorable to Ocasio, administrative remedies remained available as he continued to file grievances with various individuals in spite of an alleged use of force and threats.

**\*9** This conclusion is supported by Ocasio's provision to the Court of copies of ten letters that he wrote directly after the use of force and threat. *See* Dkt. No. 1-1 at 7-9, 12; 1-2 at 22-24 (six letters written by Ocasio in January 2006); Dkt. No. 1-1 at 5, 15; Dkt. No. 1-3 at 1-5 (four letters written by Ocasio in February 2006). It is,

therefore, undisputed Ocasio continued to lodge numerous complaints, but chose not to fashion the complaints in the form of a facility grievance. Moreover, any arguments that Ocasio's injuries prevented him from filing grievances is also contradicted by his testimony. The record illustrates that, regardless of Ocasio's physical state, he was able to continue file complaints about his conditions of confinement. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121-22; Dkt. No. 1-1 at 5, 7-9, 12, 15; 1-2 at 22-24; Dkt. No. 1-3 at 1-5.

The record also establishes without contradiction that Ocasio was well aware of the grievance procedure, and remained engaged in it without pause, prior to and after January 13. Docket No. 129-10 at 4-5 (recording two grievances filed on December 8, 2005, five grievances filed on January 9, 2006, and two grievances filed on March 8, 2006, one of which was the grievance regarding Ocasio's medical care). Ocasio also pursued some grievances through CORC to completion. White Decl. ¶ 7. It appears that, in this instance, Ocasio simply failed to participate and properly utilize the mandatory administrative system. This failure is fatal to Ocasio's claim. *See generally Ruggiero v. County of Orange,* 467 F.3d 170, 177 (2d Cir.2006) (explaining that where there are administrative remedies available, the inmate is "required to exhaust them.") (citations omitted).

Accordingly, defendant's motion should be granted on this ground.^FN9

> **FN9.** While not argued by defendants, the record also shows that Ocasio failed to exhaust his administrative remedies with respect to his retaliation claims. Furthermore, liberally construing the complaint, Ocasio has also failed to exhaust any due process claims or Eighth Amendment claims regarding his placement on, or treatment during, his restricted diet. Accordingly, defendants' motion should be granted for those claims for Ocasio's failure to exhaust those claims as well.

### C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*10** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. VanGuilder and Rowe

Ocasio's principle complaints against VanGuilder and Rowe were that they failed to respond to Ocasio's multiple letters of complaint. Ocasio Dep. 2 at 61-66, 88, 123. However, such contentions are insufficient to establish personal involvement. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted).

Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). The complaint also fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that either defendant was involved with training the individuals involved in these alleged constitutional violations or that either was grossly negligent in performing his employment duties.

Accordingly, defendants' motion should be granted on this ground as to VanGuilder and Rowe.

### 2. Roy

To the extent that Ocasio claims Roy was personally involved as the DOCS Inspector General, such contentions are meritless because a position in a hierarchical chain of command, without more, is insufficient to establish personal involvement. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, Roy was not personally involved merely because Ocasio sent him multiple pieces of correspondence to which he did not reply. Similarly, there is no evidence that Roy received or responded to complaints or letters. Additionally, the record fails to support any contentions that Roy was involved with training the individuals involved in these alleged constitutional violations or that he was grossly negligent in performing his employment duties. Lastly, Ocasio has no constitutional right to an investigation and, therefore, such contentions cannot serve as the basis for § 1983 relief. *See Carrasquillo v. City of New York.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered").

Accordingly, defendants' motion should be granted on this ground as to Roy.

### 3. LeClaire, Selsky,[FN10] and McSweeny

FN10. Ocasio has included correspondence, and his testimony indicates, that one of his complaints against Selsky dealt with the general quality and reliability of the videotapes produced

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

by the SHU surveillance cameras. There is no further evidence proffered by either party about these issues though, and it is undisputed that Ocasio received the SHU videotape from January 13 for use in the instant litigation. Therefore, this matter will not be further addressed.

**\*11** To the extent that LeClaire, Selsky, or McSweeny are claimed to be personally involved because of their high ranking positions in DOCS, such contentions fail. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, defendants were not personally involved merely because Ocasio claims to have sent them multiple pieces of correspondence to which he did not reply. The complaint fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that these defendants were involved with training the individuals involved in these alleged constitutional violations or that any was grossly negligent in performing his employment duties. Furthermore, for the reasons outlined above, Ocasio has failed to state a claim when contending that these defendants failed to investigate his claims.

Lastly, to the extent Ocasio has argued that these defendants actions in referring these complaints to the appropriate correctional facility or Superintendents render them personally involved, such contentions are meritless as such delegation is appropriate. *See Bodie,* 342 F.Supp.2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Accordingly, defendants' motion should be granted on this ground as to LeClair, Selsky, and McSweeny.

#### 4. Hamel, Lapier, Armstrong, and Daniel

With respect to each of these four defendants, Ocasio has offered evidence of their direct involvement in his contended constitutional violations. Ocasio stated that

Daniel chose to selectively process his grievances, rendering the process unavailable to him. Ocasio Dep. 2 at 53, 55-60. Such contentions establish direct personal involvement in an alleged constitutional violation. Liberally construing Ocasio's complaint, he alleges that Hamel and Lapier promoted his unconstitutional conditions of confinement by prohibiting medical staff from checking on him and ensuring that his restricted diet was not physically harming him. *Id.* at 76-80. Lastly, Ocasio testified as to Armstrong's bias during the disciplinary hearing. *Id.* at 84-85.

Accordingly, defendants' motion on this ground as to Hamel, Lapier, Armstrong, and Daniel should be denied.

#### D. Retaliation

Ocasio's complaint alleges that he was subjected to retaliation by Deluke, Beebe, Armstrong, and Murray. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447-48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214-15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*12** In this case, Ocasio has failed to allege facts sufficient to support a retaliation claim. Ocasio claims that Deluke and Beebe subjected him to excessive force in retaliation for his filing grievances and having investigations commenced against them. Ocasio Dep. 1 at 49-56, 62. While filing grievances and lawsuits are actions protected by the First Amendment, Ocasio has failed to establish that the events of January 13th were precipitated by any specific grievance or investigation. Furthermore, while Ocasio states that Deluke generally attempted to intimate him by telling him that Deluke knew investigators

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

who would believe him over Ocasio, such conversations occurred four to six months prior to the alleged use of force. Ocasio presumably continued to have interactions with both officers during the time he remained, and they continued to patrol, the SHU facility. Therefore, with the passage of so many months Ocasio has failed to state how this continued to be a substantial factor which would motivate any adverse action against him. Accordingly, the requisite "temporal proximity between the [adverse action] ... and the alleged retaliation ...." does not to exist. *Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citations omitted). Moreover, the claims are generally conclusory and unsupported and, thus, must be dismissed. *Jackson,* 713 at 214.

Ocasio also contends that, after the January 13th, Beebe continually placed his restraints on him too tightly in retaliation for the use of force. Ocasio Dep. 2 at 35. Ocasio's actions in response to corrections officers directing him into his cell, whether compliant or not, are not the type of activity protected by the constitution. Thus, even regarding Ocasio's contentions as true, such allegations cannot form the basis of a retaliation claim.

Ocasio further alleges that Armstrong and Murray retaliated against him by falsifying summaries from the use of force reports and prohibiting clear SHU surveillance tapes from being available for use in the disciplinary hearing. Ocasio has failed to state what constitutionally protected activity he engaged in which formed the basis of this claim. Presumably, he alleges that his numerous complaints and grievances were the source of this alleged adverse treatment. However, such claims lack specificity and are conclusory and unsupported. Thus, they are insufficient to withstand a motion for summary judgment. *Jackson,* 713 at 214.

Accordingly, defendants' motion should be granted as to these claims.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

**\*13** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, Ocasio has failed to establish a serious medical need. A fractured metacarpal has previously been found insufficient to establish the objective prong of the Eighth Amendment analysis. *Ruiz v. Homerighouse,* No. 01-CV-266E(SR), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (citations omitted). Such a finding is also consistent with, findings that a broken finger is insufficient to state a serious medical need. *See Magee v. Childs,* No. 94-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006) (citing cases). Accordingly, Ocasio has failed to establish the objective prong of the Eighth Amendment assessment.

Moreover, even if a fractured metacarpal was a serious medical need, Harris and Dunning were not deliberately indifferent in treating it. Nurse Harris was initially called to Ocasio's cell after the use of force, but was ordered not to complete the medical examination because Ocasio failed to cooperate. Ocasio Dep. 2 at 94-95. Therefore, it was not Harris' decision to provide or deny treatment.

**\*14** Moreover, the objective medical evidence in the health records supports a conclusion that Ocasio's injury was not serious and did not require any type of care. Despite Ocasio's claims of blood and gore, none of those things were noted in the ambulatory health record, viewed on the SHU videotape, or seen in subsequent photos taken a few days later. The medical records, based upon the accounts of various medical staff indicate that Ocasio vaguely and inconsistently complained of pain and discomfort in his arms. Harris Decl. ¶¶ 10-21; Dkt. No. 129-6 at 13-23. Despite Ocasio's testimony about the pain he suffered, his later testimony indicated that he was fully satisfied with his medical treatment. Ocasio Dep. 1 at 88-89, 110-11, 121, 126-38. Furthermore, observations of Ocasio's ability to dress and undress himself days after the use of force belie claims that medical staff were aware of and deliberately indifferent to his hand. Dkt. No. 129-7 at 4; Dkt. No. 129-8 at 9.

Lastly, Dunning's interactions with Ocasio are far from evident of indifference or delay. Ocasio indicated to Dunning that he had pain in his hand and requested an x-ray. Dunning immediately scheduled Ocasio for a doctor's appointment. Harris Decl. ¶ 15; Ocasio Dep. 2 at 102-05; Dkt. No. 129-6 at 16; Dkt. No. 148 at 23, 62. A doctor's appointment was required to obtain a referral for diagnostic testing and, thus, Dunning immediately did as much as was in her power to provide Ocasio with a diagnosis and relief from his intermittent hand pain. Additionally, from the time that Ocasio requested the x-ray until it was performed, approximately one month passed. This does not constitute an inordinate amount of time for an injury that was not an apparent emergency as Ocasio testified he was still able to write and eat with his hand despite the pain he was feeling.

Accordingly, in the alternative, defendants' motion as to these claims should be granted on this ground.

### 2. Excessive Force

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U .S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s] [an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 2010 WL 596513 (2010) ("The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de *minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

conscience of mankind." *Hudson, 503 U.S. at 9-10* (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims, 230 F.3d at 22* (citation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id. at 21* (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson, 503 U.S. at 7).* In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir.2003)* (internal quotation marks and citations omitted).

While a broken metacarpal was not categorized as a serious injury above, a serious injury need not be established in order for an excessive force claim to survive summary judgment. Construing the facts in the light most favorable to Ocasio and that he was compliant with the officers' orders when his handcuffs were being removed, there was no reason to use any force during the removal. Thus crediting Ocasio's testimony, the actions of Deluke and Beebe in restraining Ocasio's shoulder, pulling the retention strap, and grasping his hands appear to have been solely for the purposes of harming Ocasio, which represents a malicious use of force constituting a *per se* Eighth Amendment violation. *Blyden, 186 F.3d at 263; see also Wilkins, 2010 WL 596513.* Therefore, construing the facts in the light most favorable to Ocasio, he has established an Eighth Amendment claim against Deluke and Beebe for their malicious and intentional use of force during the removal of his restraints solely for the purpose of causing Ocasio harm.

Accordingly, defendants' motion as to Deluke and Beebe on this claim should be denied.

### 3. Conditions of Confinement

The Eighth Amendment prohibition against cruel and unusual punishment extends to prison conditions. *Horne v. Coughlin, 155 F.3d 26, 31 (2d Cir.1998).* "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer, 511 U.S. at 832.* As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir.1996)* (citations omitted).

The objective prong can be satisfied by

conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

**\*16** *Davidson v. Murray, 371 F.Supp.2d 361, 370 (W.D.N.Y.2005)* (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)*). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer, 511 U.S. at 834* (citations omitted). As to restrictive diets, no constitutional violation will be found unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured [the inmate]...." *McEachin v. McGuinnis, 357 F.3d 197, 199-201 (2d Cir.2004)* (citations omitted).

In this case, even liberally construing the complaint and viewing the facts in the light most favorable to Ocasio, he has failed to establish that placement on the restricted diet was a violation of his Eighth Amendment. Nothing in the record supports that the diet was inadequate, posed a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

health risk, or injured Ocasio. Thus, Ocasio has failed to satisfy the objective prong of the analysis. Furthermore, Ocasio's claims that Hamel and Lespier were deliberately indifferent to his placement on the diet are also meritless. First, as previously stated, the objective prong has not been satisfied. Second, even if the objective prong was satisfied, the record belies Ocasio's claims of deliberate indifference. The health records provided are replete with medical entries of Ocasio continuing to see the medical staff throughout 2006, multiple times per week. Dkt. No. 129-6 at 34-71. Thus, Ocasio's access to medical staff was neither impeded nor delayed.

Accordingly, defendants' motion on this ground should be granted.

### F. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

**\*17** As Ocasio was never confined in SHU on the disciplinary charge here prior to the reversal on administrative appeal, (Ocasio Dep. 1 at 176-77), there are no questions of fact which exist as to the liberty interest

asserted by him. Therefore, Ocasio's liberally construed claim that his procedural due process was violated during his disciplinary hearing is meritless as there has been no established accompanying liberty interest. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

Accordingly, in the alternative, defendants' motion as to the due process claim should also be granted on this ground.[FN11]

> **FN11.** It is unclear from Ocasio's testimony whether or not he lost any good time credits as a result of his SHU disposition and subsequent reversal. Ocasio Dep. 1 at 178-80. It appears that the credit was restored. However, even if it was not, this is the incorrect vehicle in which to request relief. Any claims for the loss of "*already-earned* good time credit as a result of [the disciplinary disposition, should be addressed pursuant to a writ of habeas corpus as it i]s a prisoner's sole recourse in challenging the procedures used to deny him good-time credits." *Fifield v. Eaton,* 669 F.Supp.2d 294, 297 (W.D.N.Y.2009) (citations omitted) (emphasis in original).

### G. Eleventh Amendment

While Ocasio's response indicate that he is not suing GMCF in any capacity (Dkt. No. 148 at 3), the complaint names it as a defendant. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

(citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340-41 (1979).

Therefore, Ocasio's claims against GMCF, to the extent that any exist, are expressly barred by the Eleventh Amendment. *See Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422, 425 (S.D.N.Y.2001) ("State agencies, such as DOCS, serve as an arm of the state and are, similarly, entitled to Eleventh Amendment immunity.") (citations omitted). Thus, the Eleventh Amendment bar applies and serves to prohibit Ocasio's claims against the correctional facility.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted as to GMCF.

### H. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

**\*18** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged

violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to all defendants except Deluke and Beebe because, as discussed *supra,* accepting all of Ocasio's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

However, with respect to Ocasio's claims against Deluke and Beebe for their use or excessive force, the second prong of the analysis need be considered. There is no question that it was well settled on January 7, 2008 that the Eighth Amendment required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting Ocasio's allegations as true, qualified immunity should be granted to Deluke and Beebe for their allege use of excessive force.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be denied as to Deluke and Beebe and granted as to all other defendants in all other respects.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 129) be **GRANTED** as to all claims and all defendants. Pursuant to 28 U.S .C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S .C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2010.

Ocasio v. Deluke

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)

(Cite as: 2010 WL 6001595 (N.D.N.Y.))

Slip Copy, 2010 WL 6001595 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 864898 (N.D.N.Y.)

(Cite as: 2011 WL 864898 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Omar OCASIO, Plaintiff,
v.
F. DELUKE, C.O., Great Meadow Correctional
Facility; P. Vanguilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy, Inspector
General; D. Beebe, C.O; S. Hamel, C.O.; T. Lespier,
Sgt.; C. Murry, Sgt.; R. Armstrong, Lt.; S. Rowe,
Captain; Julie Daniels, Inmate Grievance Coordinator;
M. Harris, Nurse; Richard A. Dunning, as Administrator
of the Estate of Elaine Dunning; Great Meadow
Correctional Facility, Medical Grievance Department;
Lucien Leclaire, Jr.; Edward McSweeney; and Donald
Selsky, Defendants.
No. 9:08-cv-51 (GLS/DRH).

March 8, 2011.
Omar Ocasio, New York, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, James Seaman, Adam Silverman, Assistant
Attorneys General, of Counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, District Judge.

*1 Pro se plaintiff Omar Ocasio, a former inmate at
Great Meadow Correctional Facility, brings this action
under 42 U.S.C. § 1983, alleging violations of his First,
Eighth, and Fourteenth Amendment rights. (See Compl.,
Dkt. No. 1.) On September 1, 2009, defendants moved for
summary judgment on Ocasio's claims. (Dkt. No. 129.) In
a Report-Recommendation and Order (R & R) filed
September 3, 2010, Magistrate Judge David R. Homer
recommended that defendants' motion be granted and that
Ocasio's claims be dismissed.[FN1] (Dkt. No. 158.) Pending
are Ocasio's objections to the R & R. (Dkt. No. 162.) For

the reasons that follow, the R & R is adopted in its
entirety.

> FN1. The Clerk is directed to append the R & R
> to this decision, and familiarity therewith is
> presumed.

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. See Almonte v. N.Y. State Div.
of Parole, No. 04-cv-484, 2006 WL 149049, at *6-7
(N.D.N.Y. Jan. 18, 2006). In those cases where no party
has filed an objection, or only a vague or general objection
has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. See
id.

Without specifying the legal or factual basis for his
objections, Ocasio generally objects to Judge Homer's R
& R. (See Objections at 2-4, Dkt. No. 162.) In light of
Ocasio's nonspecific and vague objections, the court has
reviewed the R & R for clear error and finds none. Ac-
cordingly, the court adopts Judge Homer's findings and
recommendations and grants defendants' motion for
summary judgment on Ocasio's claims.

**WHEREFORE,** for the foregoing reasons, it is
hereby

**ORDERED** that Magistrate Judge David R. Homer's
Report-Recommendation and Order (Dkt. No. 158) is
**ADOPTED** and defendants' summary judgment motion
(Dkt. No. 129) is **GRANTED;** and it is further

**ORDERED** that Ocasio's complaint is **DISMISSED**
in its entirety; and it is further

**ORDERED** that the Clerk close this case and provide
a copy of this Memorandum-Decision and Order to the
parties by regular and certified mail.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 864898 (N.D.N.Y.)

(Cite as: 2011 WL 864898 (N.D.N.Y.))

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Ocasio v. Deluke
Slip Copy, 2011 WL 864898 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald PHIPPS, Plaintiff,
v.
Dr. Sohail A. GILLANI [FN1] and the State of New York,
Defendants.

FN1. In plaintiff's complaint the individual defendant is named as Dr. Guilani. However, from the signature page of his affidavit as well as publicly available information, *see* http://www.vitals.com/doctors/Dr_Sohail_Gillani (screenshot attached), it appears that the correct name of that defendant is Dr. Sohail A. Gillani. The clerk is respectfully directed to adjust the court's records to reflect the correct spelling of Dr. Gillani's name.

Civil Action No. 9:10–CV–1588 (TJM/DEP).

Jan. 5, 2012.
Ronald Phipps, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney General, State of New York, Department of Law, Christina Roberts–Ryba, Esq., Assistant Attorney General, William J. Mccarthy, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*1 *Pro se* plaintiff Ronald Phipps, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[FN2] Interpreted in a light most favorable to him, plaintiff's complaint, which is exceedingly brief, alleges that Dr. Sohail Gillani, a psychiatrist at the prison facility in which he was housed at the relevant times, injected him on multiple occasions with Risperdal over his objection, in violation of his constitutional rights.

FN2. In addition to this matter plaintiff has filed six other suits in this court, four of which were commenced prior to this action. *See Phipps v. Senkowski,* No. 9:96–CV–0596 (RSP/RWS); *Phipps v. Cuomo,* No. 8:08–CV–1169 (GTS/RFT); *Phipps v. Attorney General's Office,* No. 9:07–CV–0132 (TJM/RWS); *Phipps v. The State of New York,* No. 9:07–CV–0372 (TJM/GJD); *Phipps v. Senkowski,* No. 9:96–CV–0596 (RSP/RWS); and *Phipps v. Superintendent,* No. 9:11–CV–0015 (DNH). From a review of the history of the earlier actions it appears that Phipps has at least two, and possibly three, strikes within the meaning of 28 U.S.C. § 1915(g). I have not set forth a complete analysis concerning this issue or incorporated it into my recommendation, however, in light of the fact that it appears likely plaintiff could qualify for the imminent danger exception to the three strikes provision of section 1915(g). *See Chavis v. Chappius,* 618 F.3d 162, 169–171 (2d Cir.2010).

Currently pending before the court in connection with this action are two dismissal motions. In the first, Dr. Gillani seeks dismissal of plaintiff's claims both for failure to state a cause of action upon which relief may be granted and on the basis of qualified immunity.[FN3] In a subsequently filed motion the State of New York, named as a co-defendant along with Dr. Gillani, requests dismissal of plaintiff's claims against it based upon the immunity afforded by the Eleventh Amendment. For the reasons set forth below I recommend that the State's motion be granted, but that Dr. Gillani's be denied.

FN3. Defendant Gillani's motion also requests that the court stay discovery pending a final disposition of the dismissal motion.

*I. BACKGROUND*[FN4]

FN4. In light of the procedural posture of this

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964).

From the scant allegations set forth in his complaint, which is comprised of one solitary paragraph, it appears that the plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and designated to the Clinton Correctional Facility, located in Dannemora, New York.[FN5] *See generally* Complaint (Dkt. No. 1). While at Clinton plaintiff claims to have been administered in excess of 200 bi-weekly medical injections of Risperdal, over his objection, despite the fact that a court order directing such involuntary injections expired in October 2007. Complaint (Dkt. No. 5). Plaintiff asserts that the injections "have caused [him] to feel weak and dizzy and sick." *Id.*

FN5. According to publicly available information, although not confirmed by any change of address notification received from the plaintiff in compliance with this court's local rules, *see* N.D.N .Y.L.R. 10.1(c)(2), Phipps was transferred from Clinton to the Central New York Psychiatric Center ("CNYPC"), a facility operated by the New York State Office of Mental Health, in or about May, 2011, and was later returned from that agency to DOCCS custody at Clinton on or about October 12, 2011. http:// n y s d o c c s l o o k u p . d o c c s . n y .gov/GCA00P00/WIQ3/WINQ130 (site lasted visited on January 4, 2012) (screenshot attached).

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 30, 2010, with the filing of a pleading styled as an order to

show cause for a temporary restraining order and seeking preliminary injunctive relief.[FN6] Dkt. No. 1. Plaintiff's initial pleading names Dr. Gillani and New York State as defendants and requests an order from the court directing that the DOCCS "cease and desist" from administering involuntary injections of Risperdal. *Id.*

FN6. That filing was followed by the submission of a virtually identical document on January 12, 2011. Dkt. No. 5.

On January 12, 2011, Senior District Judge Thomas J. McAvoy issued a decision and order directing the filing of plaintiff's original submission as a complaint, granting plaintiff's application for *in forma pauperis* status, denying plaintiff's motion for a temporary restraining order, and ordering a response by the named defendants to plaintiff's request for injunctive relief. Dkt. No. 4. Thereafter, on February 16, 2011, defendants responded to plaintiff's motion for injunctive relief. Dkt. Nos. 10, 11. Among the materials provided in opposition to the motion for injunctive relief was an affidavit from Dr. Gillani identifying himself as a board certified psychiatrist employed by the CNYPC and assigned to treat inmates with mental health needs at Clinton. Gillani Aff. (Dkt. No. 10–1) ¶¶ 1, 2. In his affidavit, Dr. Gillani asserts that he has never administered any medication to the plaintiff over his objection and states further, based upon his review of plaintiff's medical records, which were also supplied, that there is no indication that any other physician at Clinton has done so. *Id .* at ¶¶ 4–9, 11. Plaintiff's motion for a preliminary injunction as well as a subsequent submission, construed by the court as also seeking interim injunctive relief, *see* Dkt. No. 13, were denied by order issued by Senior District Judge McAvoy on May 3, 2011. Dkt. No. 19.

*2 In lieu of answering, each of the two named defendants has now moved seeking dismissal of plaintiff's complaint. The first of those motions was filed on March 28, 2011 by Dr. Gillani, requesting dismissal of plaintiff's claims against him for failure to state a cause of action and on the basis of qualified immunity. Dkt. No. 16. A second motion to dismiss was later filed on behalf of the State requesting dismissal of plaintiff's claims against that defendant on the basis of the Eleventh Amendment. Dkt. No. 23. Plaintiff has not responded to either of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

outstanding dismissal motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).FN7 *See* Fed.R.Civ.P. 72(b).

> **FN7.** Plaintiff's failure to respond to the pending motion does not preclude the court from recommending its disposition without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99–CV–8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan.18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322–23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall* ).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands

more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 129, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ––––, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

**\*3** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of *Twombly* and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

B. *New York State's Motion to Dismiss*

Although its basis is not altogether clear, plaintiff has asserted a claim in this action against the State of New York. In its motion, the State asserts that plaintiff's claims against it are precluded under the Eleventh Amendment.

As the State contends, the Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest . [FN8] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). That amendment bars suits in law or equity in a federal court against the state absent either the state's consent to be sued or a congressional abrogation of immunity. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54–55, 116 S.Ct. 1114, 1122–23, 134 L.Ed.2d 252 (1996). It is well established that neither the State nor the DOCCS has consented to be sued in federal court under circumstances such as those now presented. *See Dube v. State University of New York,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 222 S.Ct. 2814, 115 L.Ed.2d 986 (1991). In addition, it is equally clear that in enacting section 1983 Congress did not intend abrogate the Eleventh Amendment immunity afforded to states. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.); *see also Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

> FN8. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

**\*4** Based upon the foregoing, plaintiff's claims in this action against the State of New York are plainly barred, and its motion to dismiss should therefore be granted.

C. *Dr. Gillani's Motion to Dismiss*

1. *Failure to State a Claim*

In his motion, Dr. Gillani first argues that plaintiff has failed to state a cognizable claim against him. In his memorandum, Dr. Gillani has devoted considerable time and effort in an attempt to show that plaintiff's Eighth Amendment rights were not violated, characterizing his challenge to being injected with Risperdal against his will as a mere disagreement over a prescribed course of treatment. This argument, however, misses the mark. Plaintiff's claim in this case does not arise under the Eighth Amendment, but instead finds its roots in the due process clause of the Fourteen Amendment.

It is well-established that prison inmates possess "a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

*Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *see also Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (discussing generally the right of a patient to refuse treatment under both common law under the constitution); *Roland v. Smith,* No. 10 Civ. 9218(VM)(KMF), 2011 WL 3449545, at *1 (S.D.N.Y. July 26, 2011).[FN9] In *Harper,* notwithstanding an inmate's liberty interest in refusing psychotropic medication, the Supreme Court held that a state may treat an inmate against his will if (1) "the inmate is dangerous to himself or others" and (2) "the treatment is in the inmate's medical interest." 494 U.S. at 227, 110 S.Ct. 1039–40; *see also Roland,* 2011 WL 3449545, at * 1 (citing *Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178); *Project Release v. Prevost,* 722 F.2d 960, 971–81 (2d Cir.1983). In that case, the Court also upheld a prison policy that provided administrative procedures, including notice, a right to be present at an adversary hearing, and to present and cross examine witnesses, prior to a determination that inmate would be medicated over his or her objections as comporting with the requirements of procedural due process.[FN10] *Harper,* 494 U.S. at 235, 110 S.Ct. at 1044.

> FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> FN10. In doing so, the Court concluded that the policy at issue represented
>
> an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others. The Due Process Clause does require certain essential procedural protections, all of which are provided by the regulation before us.
>
> *Harper,* 494 U.S. at 236, 110 S.Ct. at 1044.

In *Project Release,* the Second Circuit held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

New York Correction Law § 402 provides procedures whereby, upon the certification of a correctional facility physician that an inmate is mentally ill and in need of care and treatment, the superintendent of the facility may apply to a judge of a New York county court or justice of the supreme court in the county for an order committing such inmate to a hospital for the mentally ill. *See generally* N.Y. Correct. Law § 402. The procedure outlined in section 402 expressly includes notice and opportunity to be heard to the mentally ill inmate. *See id.* at § 402(3). During the pendency of any section 402 proceeding, "the judge may forthwith commit such alleged mentally ill person to a hospital for the mentally ill upon petition and the affidavit of two examining physicians that the superintendent is not able to properly care for such person at the institution where he is confined and that such person is in immediate need of care and treatment." *Id.* at § 402(8). Additionally, section 402 provides that an inmate of a correctional facility may be admitted on an emergency basis to CNYPC upon certification of two examining physicians that he or she "suffers from a mental illness which is likely to result in serious harm to himself or others as defined in subdivision (a) of section 9 .39 of the mental hygiene law." *Id.* at 402(9). When an inmate is delivered to CNYPC under this emergency provision, a proceeding for an order of commitment as outlined in section 402 must be commenced immediately. *See id.* The procedural safeguards guaranteed under section 402 are similar to the provisions of New York Mental Health Law § 33.03, the general provision governing involuntary commitment and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release,* 722 F.2d at 971–981); *see also Johnson v. Myers,* No. 10–CV–1964, 2011 WL 6131003, at *4 (E.D.N.Y. Dec.6, 2011).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

**\*5** While a prisoner may, in some circumstances, refuse medical treatment, it appears that the right to do so has not been clearly defined. *Rose v. Goldman,* No. 02–CV–5370, 2011 WL 1130214, at \*8 (E.D.N.Y. Mar. 24, 2011) (citing cases). On the other hand, it seems clear that the procedural protections afforded by Correction Law § 402, if afforded plaintiff in this case, "exceeded what was required by the Due Process Clause." *Gonzales v. Carpenter,* No. 9:08–CV–629, 2011 WL 768990, at \*17 (Jan. 3, 2011) (Baxter, M.J.) (citing *Sheridan v. Dubow,* 92 Civ. 6024, 1993 WL 336946, at \*3 (S.D.N.Y. Sep.3, 1993)), *report and recommendation adopted,* 2011 WL 767546 (N.D.N.Y. Feb.25, 2011) (Kahn, J.).

From plaintiff's complaint, though scant, it appears that the section 402 procedures may well have been followed in the past, resulting in the issuance of a state court order in or about 2007, authorizing such involuntary injections—an order which, according to the plaintiff, is now expired. While Dr. Gillani's affidavit submitted in opposition to plaintiff's motion for injunctive relief suggests that the facts may not ultimately bear out plaintiff's claim, his complaint, when liberally construed, suggests that Dr. Gillani involuntarily administered Risperdal over plaintiff's objection without first having satisfied the requirements of due process, and thus states a plausible due process claim.[FN11] I therefore recommend that defendant Gillani's motion to dismiss for failure to state a cognizable claim be denied.

> FN11. It is true, as was previously noted, that Dr. Gillani has submitted an affidavit to the court in which he flatly denies having ever administered or authorized the administering of medication to the plaintiff over his objection. That affidavit, however, is not property considered on a motion to dismiss, and I have therefore not taken into account that denial in assessing the sufficiency of plaintiff's complaint. *Gadson v. Goord,* No. 96–CV–7544, 1997 WL 714878, at \*1 n. 2 ("Generally a court may not look outside the pleadings when review a Rule 12(b)(6) motion to dismiss.")

2. *Qualified Immunity*

In addition to requesting dismissal on the merits, defendant Gillani also seeks a finding that he is entitled to qualified immunity from suit, having acted reasonably in his belief that plaintiff's rights were not being violated.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed.'" *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 815–16. The first step requires the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

"should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN11] *Pearson, 555 U.S. at 236, 242, 129 S.Ct. at 818, 821.* In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey, 567 F.3d at 61* (citing *Pearson, 129 S.Ct. at 821*) (emphasis in original).

> FN12. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier, 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.*

> FN13. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin, 577 F.3d at 433, n. 11* (citation omitted).

> FN14. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985),* the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson, 555 U.S. at 231, 129 S.Ct. at 815* (quoting *Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, ———— (1991)* (per curiam)).

**\*6** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin, 577*

F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey, 567 F.3d at 61* (quoting *Pearson, 129 S.Ct. at 818*).

At this early procedural juncture, I am unable to recommend a finding that Dr. Gillani acted reasonably and is therefore entitled to qualified immunity. The principle that a prison inmate is entitled to due process before being forced to take medication over his objection was well-established at the relevant times. *See Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178.* Reading plaintiff's complaint in a light most favorable to him, as the court must, and assuming that Dr. Gillani injected plaintiff with Risperdal over his objection without first having satisfied the requirements of the Fourteenth Amendment, the court is unable to conclude that such conduct was objectively reasonable. I therefore recommend denial of defendant Gillani's motion for a finding of qualified immunity, without prejudice to renewal at a later stage in the proceedings based upon a more robust record.

D. *Stay of Discovery*

As was previously noted, defendant Gillani has also requested a stay of discovery pending resolution of his dismissal motion. The Federal Rules of Civil Procedure provide, in relevant part, that

[a] party or any person from who discovery is sought may move for a protective order in the court where the action is pending ... the Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1); *see also, Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd., 206 F.R.D. 367, 368 (S.D.N.Y.2002)* (granting stay of discovery pending determination of motion to dismiss

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. County of Nassau,* 188 F.R.D. 187, 188–89 (E.D.N.Y.1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency ... favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay.).

In this instance, I find good cause to grant a stay of discovery pending final resolution of defendants' dismissal motions.[FN15]

> FN15. I note that it appears unlikely the plaintiff will be prejudiced by such a stay of discovery. Under the rules of this court and its established practice, no discovery in the action can occur absent court permission until an answer is filed and the court has issued its standard pretrial order pursuant to Rule 16 of the Federal Rules of Civil Procedure.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action, when construed in a light most favorable to Phipps, appears to assert that defendant Dr. Gillani injected him, against his will, with Risperdal on multiple occasions while he was a prison inmate housed at Clinton. This allegation suffices, at this early juncture, to set forth a plausible due process claim. Plaintiff's claim against the State of New York based upon the same conduct, however, is precluded by the immunity afforded under the Eleventh Amendment. Accordingly, it is hereby respectfully

**\*7** RECOMMENDED that the motion of defendant State of New York to dismiss plaintiff's claims in this action against that defendant (Dkt. No. 23) be GRANTED, and that all claims against the State be DISMISSED; and it is further

RECOMMENDED that the motion of defendant Dr. Sohail Gillani to dismiss plaintiff's claims against him in this action (Dkt. No. 16) be DENIED, without prejudice to the defendant's right to raise a defense of qualified immunity at an appropriate juncture in the future; and it is

further

ORDERED, that pending final disposition of the pending dismissal motions, the filing of an answer in the case, and the issuance of the court's Rule 16 customary pretrial order, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))



© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))



Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

Find Doctors by Disorder | Find Leading Experts | International Doctors | Find Arthritis Doctors | Find Chronic Myeloid Leukemia Doctors

As more fully set forth in this website's terms and conditions, (1) nothing contained on or offered by or through this website should be construed as medical advice and should not be relied upon for medical diagnosis or treatment. MDX Medical, Inc. ("MDX"), the provider of this website, does not recommend or endorse any particular healthcare provider whose information or ratings appear on this website; and (2) MDX has granted you a limited license to access and use this website for your own noncommercial use. You are not permitted to copy, reproduce, distribute, transmit, mirror, frame, scrape, extract, wrap, create derivative works of, reverse engineer, decompile or disassemble any part or aspect of this website.

Copyright © 2006 - 2011 Vitals.com & MDx Medical, Inc. All Rights Reserved.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))



© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 265727 (N.D.N.Y.)

(Cite as: 2012 WL 265727 (N.D.N.Y.))

| ARSON 1ST | A1 |
|-----------|----|
|           |    |
|           |    |

| **Sentence Terms and Release Dates**<br>Under certain circumstances, an inmate may be released prior to serving his or her minimum term and before the earliest release date shown for the inmate.<br>As of 01/04/12 | |
|---|---|
| **Aggregate Minimum Sentence** | 0015 Years, 00 Months, 00 Days |
| **Aggregate Maximum Sentence** | LIFE Years, 99 Months, 99 Days |
| **Earliest Release Date** | 09/2013 |
| **Earliest Release Type** | PAROLE HEARING DATE |
| **Parole Hearing Date** | 09/2013 |
| **Parole Hearing Type** | REAPPEARANCE |
| **Parole Eligibility Date** | 02/03/2006 |
| **Conditional Release Date** | NONE |
| **Maximum Expiration Date** | LIFE |
| **Maximum Expiration Date for Parole Supervision** | |
| **Post Release Supervision Maximum Expiration Date** | |
| **Parole Board Discharge Date** | |

| Home | Privacy Policy | Accessibility Information | Contact DOCCS | Disclaimer |
|------|----------------|--------------------------|---------------|------------|

N.D.N.Y.,2012.

Phipps v. Gillani
Slip Copy, 2012 WL 265727 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 264414 (N.D.N.Y.)

(Cite as: 2012 WL 264414 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald PHIPPS, Plaintiff
v.
Dr. Sohail A. GILLANI and the State of New York,
Defendants.
No. 9:10–CV–1588 (TJM/DEP).

Jan. 30, 2012.

Ronald Phipps, Dannemora, NY, pro se.

William J. McCarthy, Jr., New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

*1 This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to Magistrate Judge Peebles's January 5, 2012 Report and Recommendation [FN1] have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice.

> FN1. The Report Recommendation is dated January 5, 2011 but was docketed on January 5, 2012. *See* dkt. # 28. The Court presumes that the year typed on the document was the result of a typographical error.

**II. CONCLUSION**

The Court **ADOPTS** the Report and Recommendation [dkt. # 28] for the reasons stated therein. Therefore, it is hereby

**ORDERED** that the motion of Defendant State of New York to dismiss Plaintiff's claims in this action against that defendant (Dkt. No. 23) is **GRANTED,** and all claims against the State of New York are **DISMISSED;** and it is further

**ORDERED** that the motion of Defendant Dr. Sohail Gillani to dismiss Plaintiff's claims against him in this action (Dkt. No. 16) is **DENIED** without prejudice to Defendant's right to raise a defense of qualified immunity in the future.

**IT IS SO ORDERED**

N.D.N.Y.,2012.

Phipps v. Gillani
Slip Copy, 2012 WL 264414 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mark W. GANTT, Plaintiff,
v.
William LAPE and Gary Mielenz, Defendants.
No. 9:10-CV-0083 (GTS/GHL).

Jan. 18, 2011.
Mark W. Gantt, Five Points Correctional Facility Romulus, NY.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Justin C. Levin, Esq., of Counsel, Albany, NY, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.
   **\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Mark W. Gantt alleges that he was wrongfully charged for commissary purchases and punished for lying. Currently pending before the Court is Defendant William Lape's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 12.) Also pending is Plaintiff's request to amend the complaint to add an additional defendant. (Dkt. No. 15.) For the reasons that follow, I recommend that Defendant's motion be granted and order that Plaintiff's request is denied without prejudice.

### I. BACKGROUND

   The complaint alleges that on September 8, 2009, Plaintiff filed a grievance because the commissary charged him $10.49 for an item he had not purchased. (Dkt. No. 1 at 4.<sup>FN1</sup>)

FN1. The page reference is to the page number assigned by the Court's electronic filing system.

   Thereafter, Defendant Gary Mielenz, a commissary clerk, came to Plaintiff's cell and screamed at Plaintiff that Plaintiff "did make [t]he purch[ase] and [t]hat [h]e was [g]oing [t]o [t]ake the $10.49 and [Plaintiff] would never [g]o [t]o [the] commissary" again. *Id.* at 4-5.

   Defendant Mielenz wrote a misbehavior report charging Plaintiff with lying. *Id.* at 5. A hearing was conducted on the misbehavior report. *Id.* The hearing officer "[r]ead [t]he [g]rievance at [t]he [t]ime of [t]he hear[ ]ing" and found Plaintiff guilty. *Id.* Plaintiff states that the grievance he filed was the only evidence the hearing officer considered. *Id.* The hearing officer imposed a penalty of thirty days' loss of commissary privileges and a $5.00 fine. *Id.*

   Plaintiff filed the complaint in this action on January 22, 2010. (Dkt. No. 1.) The complaint names William Lape (the superintendent of Coxsackie Correctional Facility) and Mielenz as defendants. *Id* . at 1-2. The complaint does not name the hearing officer as a defendant. Plaintiff requests $120,015.49. *Id.* at 7.

   Defendants answered on July 6, 2010. (Dkt. No. 11.) On that same date, Defendant Lape filed the pending motion for judgment on the pleadings. (Dkt. No. 12.) Plaintiff opposes the motion for judgment on the pleadings. (Dkt. No. 14.) In addition, Plaintiff requests leave to amend his complaint to add the hearing officer as a defendant. (Dkt. No. 15.) Defendants oppose that request. (Dkt. No. 16.)

### II. LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS

   "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). In order to state a claim upon which relief can

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*2** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### III. ANALYSIS

### A. Defendant Lape's Motion for Judgment on the Pleadings

Defendant Lape moves for judgment on the pleadings. (Dkt. No. 12 .) Defendant Lape argues that (1) the complaint does not sufficiently allege that he was personally involved in any constitutional violation; and (2) he is entitled to qualified immunity. (Dkt. No. 12-1.)

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN2]

> **FN2.** Although the Second Circuit has not yet addressed the issue, several district courts in this Circuit have found that the Supreme Court's decision in *Ashcroft v. Iqbal, ---* U.S. ----, 129 S.Ct. 1937, 1949 (2009) nullified some or all of the *Colon* categories of personal involvement. *See Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases).

Here, the complaint does not allege any facts about Defendant Lape at all. He is mentioned only in the list of parties. (Dkt. No. 1 at 1.) Therefore, on the face of the complaint does not plausibly suggest that Defendant Lape was personally involved in any constitutional violation. Accordingly, I recommend that the Court dismiss Plaintiff's claims against Defendant Lape.

**\*3** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

Here, the problem with Plaintiff's claim against Defendant Lape is substantive and could not be cured by better pleading. Plaintiff argues in opposition to the motion that Defendant Lape "did know of his [e]mployee's [a]ction[ ]s [because] he is or was [a]t [t]he [t]ime [t]he [s]uperintendent of Coxsackie C.F. and is [t]he one who [g]et[ ]s [ ][t]he Tier 2 appeal[ ]s." (Dkt. No. 14 at 1.) Attached to Plaintiff's opposition is a copy of Plaintiff's appeal of the disciplinary determination. (Dkt. No. 14 at 4.) This appeal form shows that on October 20, 2009, the "superintendent or designee" affirmed the results of Plaintiff's disciplinary hearing. *Id.* The signature of the "superintendent or designee" is not entirely legible, but the first name appears to begin with an "R" and the last name with a "W." *Id.*

There are two reasons that Plaintiff's allegation and exhibit are insufficient to plausibly suggest that Defendant Lape was personally involved in any alleged constitutional violation. First, as a factual matter, it does not appear that Defendant Lape was the individual who affirmed the results of Plaintiff's disciplinary hearing. Defendant Lape's first name begins with a "W" and his last name begins with an "L", which does not correspond to the signature of the "superintendent or designee" on the exhibit.

Second, as a legal matter, even if Defendant Lape had signed the form, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08-CV-463A, 2009 WL 4730309, at *2-3 (W .D.N.Y. Dec. 7, 2009).[FN3] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN4], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official

"proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2-3. Here, Plaintiff has not alleged, either in his complaint or in his opposition to the motion for judgment on the pleadings, that Defendant Lape was "proactively involved" in reviewing Plaintiff's administrative appeal.

FN3. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN4. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Further, the second *Colon* category-that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal-applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation. *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N .D.N.Y.2008) ("It has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.") (internal quotation marks and citations omitted); *Rahman v. Fisher,* 607 F.Supp.2d 580, 585 (S.D.N.Y.2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member.") (citation omitted). Here, Plaintiff does not allege that he was the victim of any ongoing constitutional violation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

**\*4** Accordingly, I find that Plaintiff will be unable to cure the defect in his complaint and I therefore recommend that the Court dismiss the claims against Defendant Lape without leave to amend. Because I find that Defendant Lape is entitled to judgment on this ground, I decline to address his argument that he is entitled to qualified immunity.

**B. Plaintiff's Request to Amend the Complaint to Add a Defendant**

Plaintiff has filed a request to amend his complaint to add the hearing officer as a defendant. (Dkt. No. 15.) In full, this request states that:

> I would like to put this motion before the court to add another de[ ]fendant to this [action]. The de[ ]fendant in question is the hearing [officer] Lt. McDermont who read the grievances into the hearing of the Tier II of the Plaintiff's gr[ie]vance that the Plaintiff filed that was all the evidence [ ] that the hearing L.T. relied on.

*Id.* Defendants oppose Plaintiff's request, arguing that (1) the request is defective because Plaintiff did not file a proposed amended complaint; and (2) "because Plaintiff has failed to submit a proposed amended complaint, he cannot demonstrate that any such pleading would be viable and not futile." (Dkt. No. 16 at 1.) Defendants' first argument is correct.[FN5]

> **FN5.** Regarding Defendants' second argument, I note that the burden of proving the futility of an amendment lies with the party opposing the amendment. *Garcia v. Pancho Villa's of Huntington Vill.,* 268 F.R.D. 160, 166 (E.D.N.Y.2010). Therefore, Plaintiff is not required to "demonstrate that any such pleading would be viable and not futile" unless and until Defendants present an argument that the amended pleading *would* be futile. (Dkt. No. 16 at 1.)

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. Proc. 15(a)(2); *Foman v. Davis,* 371 U .S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993).

Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should ... be 'freely given.'

*Foman,* 371 U.S. at 182, *accord, Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

Under Local Rule 7.1(a)(4), a "party moving to amend a pleading ... must attach an unsigned copy of the proposed amended pleading to its motion papers." Here, Plaintiff has not provided the Court with a proposed amended pleading. Although Plaintiff, as a *pro se* civil rights litigant, is entitled to special solicitude and leniency regarding the substance of his pleadings and papers, even *pro se* plaintiffs must obey the Court's procedural rules.[FN6] The requirement that a motion to amend be accompanied by a proposed amended complaint promotes clarity. Here, for instance, without such a document, it is not clear either to the Court or Defendants what claims Plaintiff intends to pursue against the hearing officer. Defendants thus cannot adequately oppose Plaintiff's attempt to amend and the Court cannot adequately weigh the parties' arguments. Therefore, I deny Plaintiff's request to amend without prejudice to Plaintiff filing a renewed motion to amend that complies with this Court's local rules.

> **FN6.** *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

comply with relevant rules of procedural and substantive law."); *Edwards v. I.N.S.,* 59 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") (citations omitted).

**\*5 ACCORDINGLY,** it is

**RECOMMENDED** that Defendant Lape's motion for judgment on the pleadings (Dkt. No. 12) be **GRANTED.** It is recommended that the Court dismiss the action as to Defendant Lape without leave to amend; and it is further

**ORDERED** that Plaintiff's request to amend the complaint (Dkt. No. 15) is **DENIED** without prejudice to the filing of a procedurally proper motion; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08-CV-463A, 2009 WL 4730309 (W.D.N.Y. Dec. 7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Gantt v. Lape
Slip Copy, 2011 WL 673783 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mark W. GANTT, Plaintiff,
v.
William LAPE, Superintendent, Coxsackie Correctional
Facility; and Gary Mielenz, Commissary Clerk IV,
Coxsackie Correctional Facility, Defendants.
No. 9:10-CV-0083 (GTS/GHL).

Feb. 17, 2011.
Mark W. Gantt, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Justin C. Levin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner
civil rights action filed by Mark W. Gantt ("Plaintiff")
against William Lape and Gary Mielenz ("Defendants")
are the following: (1) Defendant Lape's motion for a
judgment on the pleadings (Dkt. No. 12); (2) Plaintiff's
letter-motion requesting leave to amend his Complaint to
add a Defendant (Dkt. No. 15); and (3) United States
Magistrate Judge George H. Lowe's
Report-Recommendation recommending that Defendant
Lape's motion be granted, Defendant Lape be dismissed
from this action, and Plaintiff's motion be denied without
prejudice (Dkt. No. 25). Plaintiff has not filed an
Objection to the Report-Recommendation. For the reasons
set forth below, the Report-Recommendation is accepted
and adopted in its entirety; Defendant Lape's motion is
granted; Defendant Lape is dismissed from this action; and
Plaintiff's motion to amend is denied without prejudice.

**I. RELEVANT BACKGROUND**

Plaintiff filed his Complaint on January 22, 2010.

(Dkt. No. 1.) Construed with the utmost of liberality,
Plaintiff's Complaint alleges that, in September 2009,
while he was incarcerated at Coxsackie Correctional
Facility, Defendant Mielenz issued him a misbehavior
report in retaliation for him filing a grievance regarding
commissary purchases for which he was charged, but did
not make or receive. (*Id.*) Plaintiff further alleges that he
was found guilty at his Tier II disciplinary hearing of
making false statements, which resulted in the imposition
of a five dollar ($5.00) fine and the loss of commissary
privileges for 30 days. (*Id.* at 4-5.) For a more detailed
recitation of the factual allegations asserted in Plaintiff's
Complaint, the Court refers the reader to that Complaint in
its entirety. (*See generally* Dkt. No. 1.)

Construed with the utmost of special leniency,
Plaintiff's Complaint attempts to assert the following
claims against Defendants based on the above-described
factual allegations: (1) a claim of retaliation against
Defendant Mielenz, in violation of the First Amendment;
and (2) a claim of denial of due process against the
hearing officer who presided over his disciplinary hearing,
in violation of the Fourteenth Amendment. (*Id.*)

On July 6, 2010, Defendant Lape filed a motion for
judgment on the pleadings. (Dkt. No. 12.) In his motion,
Defendant Lape argues as follows: (1) Plaintiff has failed
to allege facts plausibly suggesting that Defendant Lape
was personally involved in the events alleged; (2) he is
shielded from liability as a matter of law by the doctrine of
qualified immunity; and (3) he is entitled to a protective
order barring discovery until this motion is resolved. (Dkt.
No. 12.)

On July 8, 2010, Plaintiff filed a response in
opposition to Defendant Lape's motion. (Dkt. No. 14.) In
his response, Plaintiff argues that Defendant Lape should
not be dismissed from this action because, as
Superintendent of Coxsackie Correctional Facility, he
receives Tier II appeals, and he was therefore aware of
Defendant Mielenz's actions. (Dkt. No. 14, at 1.) As an
attachment to that response, Plaintiff submitted, for the
first time, a copy of a disciplinary appeal determination
bearing a barely legible signature of the "superintendent or

Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

[his] designee." (*Id.* at 4.)

**\*2** On August 11, 2010, Plaintiff submitted a letter-motion requesting that the Court permit him leave to amend his Complaint to add a Defendant. (Dkt. No. 15.) Specifically, Plaintiff sought to add as a Defendant Lieutenant McDermont, the officer who presided over his Tier II disciplinary hearing. (*Id.*)

On January 18, 2011, Magistrate Judge Lowe issued a Report-Recommendation recommending that Defendant Lape's motion be granted, that Plaintiff's claims against Defendant Lape be dismissed, and that Plaintiff's letter-motion to amend his Complaint to add a Defendant be denied without prejudice. (Dkt. No. 25.) In support of his recommendation, Magistrate Judge Lowe found as follows, *inter alia*: (1) Plaintiff failed to allege any facts about Defendant Lape in his Compliant (let alone facts plausibly suggesting a claim upon which relief can be granted against him); (2) the disciplinary appeal determination, which Plaintiff provides for the first time in his opposition papers, does not clearly show it was signed by Defendant Lape, nor would any such signature even render Defendant Lape personally involved in the constitutional violations alleged; (3) because the problem with Plaintiff's claim against Defendant Lape is substantive, and could not be cured by better pleading, granting Plaintiff leave to amend would be futile; and (4) Plaintiff's failed to file a proposed amended complaint with his letter-motion seeking leave to amend, and therefore his motion is procedurally defective. (*See generally* Dkt. No. 25.) Familiarity with the grounds of Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order, which is intended primarily for review by the parties.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Review of a Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN1] When only general objections are made to a magistrate

judge's report-recommendation, or where the objecting party merely reiterates the same arguments taken in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

> FN1. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN2. *See also Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09-CV-0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07-CV-1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

**B. Legal Standard Governing a Motion to Dismiss**

**\*3** Magistrate Judge Lowe correctly recited the legal standard governing a motion for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c), as well as the legal standard governing a motion for leave to amend a complaint, pursuant to Fed.R.Civ.P. 15(a). (Dkt. No. 25.) As a result, these standards are incorporated by reference in this Decision and Order.

**III. ANALYSIS**

Plaintiff has not filed an Objection to the Report-Recommendation. As a result, the Court need review the Report-Recommendation only for clear error. After carefully reviewing all of the papers in this action, including Magistrate Judge Lowe's thorough Report-Recommendation, the Court concludes that the Report-Recommendation is well-reasoned and not clearly erroneous. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein.

The Court would add only two points. First, Magistrate Judge Lowe's thorough Report-Recommendation would survive even a *de novo* review. Second, Magistrate Judge Lowe's finding of futility (i.e., his finding that it would be futile to afford Plaintiff a further chance to amend his claim against Defendant Lape because better pleading could not cure the referenced defect in that claim) is further supported by the fact that Plaintiff's motion to amend his Complaint-which was filed after he had notice of Defendants' challenge to his claim against Defendant Lape-is conspicuously absent of a request for leave to add any factual allegations regarding Defendant Lape. (*See generally* Dkt. No. 15.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 25) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendant Lape's motion for judgment on the pleadings (Dkt. No. 12) is *GRANTED;* and it is further

**ORDERED** that Defendant Lape is *DISMISSED* from this action; and it is further

**ORDERED** that Plaintiff's letter-motion to amend his Complaint (Dkt. No. 15) is *DENIED* without prejudice.

N.D.N.Y.,2011.

Gantt v. Lape
Slip Copy, 2011 WL 673782 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.