IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

TYRONE WALKER,

                          Plaintiff,          Civil Action No.
                                         9:10-CV-1431(MAD/DEP)

     v.

DALE ARTUS, *Superintendent,*
*Clinton Correctional Facility*; *et al.*,

                        Defendants.

_____

<u>APPEARANCES</u>:                  <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

TYRONE WALKER, *Pro Se*
94-A-5258
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN     ADELE M. TAYLOR-SCOTT, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Tyrone Walker, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983, against a number of corrections employees, alleging deprivation of his civil rights.  In his complaint, plaintiff, who is a Muslim, alleges the defendants have failed to provide him with the opportunity to participate in Jumu'ah services during his confinement in the Special Housing Unit ("SHU") at Clinton Correctional Facility ("Clinton"), in violation of his rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1(a),and the free exercise clause of the First Amendment to the United States Constitution.

Currently pending before the court is a motion brought by defendants Fadle Assallami, Thomas LaValley, and Dale Artus, the remaining defendants in this action, seeking summary judgment dismissing plaintiff's claims pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  Complaint (Dkt. No. 1) at ¶ 1.  At all times relevant to this action, he was confined in a SHU cell at Clinton, which is located in Dannemora, New York.[2]  *Id.*

The plaintiff is one of approximately 300 Muslims at Clinton.  Plf. Aff. Exh. 1 – LaValley Admis. (Dkt. No. 63-2) at ¶ 31.  Jumu'ah is an hour-long Muslim congregate service held on Fridays, and includes aspects of sermon and prayer.  Plf. Aff. Exh. 4 – Assallami Admis. (Dkt. No. 63-2) at ¶¶ 11, 20, 21, 32.  Jumu'ah services are provided for Muslim inmates confined at Clinton on Fridays between 1:00 and 2:00 p.m.  *Id.* at ¶ 32.  According to Imam Assallami Fadle, the Muslim Chaplin assigned to Clinton, although

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin*, 26 F. Supp.2d 615,  618 (S.D.N.Y. 1998) (citing 7 NYCRR pts. 253, 254, and 301).  The conditions typically experienced by inmates confined in an SHU include two showers per week, one hour of outdoor exercise per day, unlimited legal visits, one non-legal visit per week, access to counselors, access to sick call, cell study programs, and access to library books. *Husbands v. McClellan*, 990 F. Supp. 214, 218 (W.D.N.Y. 1998) (citing 7 NYCRR pt. 304).

Muslim men are expected to attend Jumu'ah services if they are free and able to do so, "[i]t is not mandatory for women, or for men who are sick, or for men who are not free to attend service." *Id.* at ¶ 25; Plf. Aff. Exh. 4 – Assallami Resp. to Interog. (Dkt. No. 63-2) at ¶ 5.

Pursuant to DOCCS Directive 4933 § 304.9(d), inmates confined in a SHU cell are prohibited from participating in congregate religious services. 7 N.Y.C.R.R. § 304.9(d). Based on his twenty-eight years of experience working for the DOCCS, Joseph F. Bellnier, the DOCCS Deputy Commissioner for Correctional Facilities, states that "the possibility of disruption to the smooth operation of the facility is increased" any time inmates congregate.[3] Bellnier Decl. (Dkt. No. 57-4) at ¶ 6. For that reason, "SHU inmates do not attend congregate religious services. Instead, religious counseling by a member of the facility's ministerial services staff is provided upon the written request of an inmate, and the facility senior chaplain or a designated member of the ministerial services staff is required to make a minimum of one round per week in the SHU."[4] *Id.* at ¶ 12 (citing 7

_____

[3] Plaintiff does not challenge the constitutionality of section 304.9(d) in this action. Instead, he only challenges defendants' denial of his requests to view or listen to Jumu'ah services through video or audio feed into his SHU cell.

[4] Throughout this case, plaintiff has repeatedly alleged that defendant Assallami does not, in fact, visit Clinton's SHU at least weekly. *See, e.g.*, Plf.'s Local Rule 7.1 Statement (Dkt. No. 63-1) at ¶¶ 22-23; Scott-Taylor Decl. Exh. D (Dkt. No. 57-2) at 106. In support of this allegation, plaintiff submitted the SHU log book in opposition to

N.Y.C.R.R. § 304.9).   In addition, Muslim SHU inmates are allowed to retain

possession of a Quran, Kufi, and prayer rug; they are permitted to pray

demonstratively within their cells; they are permitted to order religious

periodicals unless they are prohibited for security purposes; and they are

provided an alternative diet in conformity with their religious dietary

restrictions, and with accommodations made during feast and fast days.

Bellnier Decl. (Dkt. No. 57-4) at ¶ 24; LaValley Decl. (Dkt. No. 57-5) at ¶¶ 9,

10.   Those religious accommodations are designed to provide an "alternative

means for Muslim inmates confined to SHU to practice their religion without

undue risk to the safety, security and the good working order of correctional

facilities[.]"  Bellnier Decl. (Dkt. No. 57-4) at ¶ 25.

---

defendants' motion for summary judgment.  Plf. Aff. Exh. 5 (Dkt. No. 63-2).  According to
defendant Assallami, the log book is the official record of all SHU visits.  Plf. Aff. Exh. 4 –
Assallami Admis. (Dkt. No. 63-2) at ¶ 46.  According to the portions of the SHU log book
provided by plaintiff, it appears defendant Assallami visited the SHU less than twenty
times between January 5, 2011, and December 2, 2011.  Plf. Aff. Exh. 5 (Dkt. No. 63-2).
It does not appear, however, that plaintiff provided a complete copy of the log in light of
the number of gaps in dates from the log.  Specifically, there are no entries for the
following dates: January 7-27, 2011; January 29-February 8, 2011; February 10-March 30,
2011; March 31-April 14, 2011; April 15-May 10, 2011; May 11-17, 2011; May 18-30,
2011; May 31-July 14, 2011; July 20-August 10, 2011; August 11-18, 2011; August 19-23,
2011; August 24-September 2, 2011; September 4-October 30, 2011; November 1-23,
2011; November 25-December 1, 2011.  *Id.*  In contrast to plaintiff's contentions on this
point, defendant Assallami has stated that, during February 2009 and approximately
September 2012, another Imam in the DOCCS would take over his responsibilities at
Clinton while he was on vacation.  Plf. Aff. Exh. 4 – Assallami Resp. to Interrog. (Dkt. No.
63-2) at ¶ 25.

Because of the prohibition against congregation for SHU inmates, plaintiff in this case requested permission to participate in Jumu'ah by way of closed circuit television from the secured area in the back of his SHU cell.[5] Complaint (Dkt. No. 1) at ¶¶ 35-39, 42; Taylor-Scott Decl. Exh. D (Dkt. No. 57-2) at 82. Notwithstanding the fact that SHU inmates currently do not have access to any television of any sort, plaintiff proposes that, monitors could be installed in each cell's Sally port because they are already equipped with wiring for camera/video surveillance. Taylor-Scott Decl. Exh. D (Dkt. No. 57-2) at 82-85. More specifically, plaintiff requests that Muslim inmates in the SHU who have not received a misbehavior report within the prior thirty days be allowed to go into the Sally port to participate in Jumu'ah via closed circuit television. *Id.* at 85.

In the alternative, plaintiff requests that Jumu'ah services be broadcast through the audio headphone jack in his SHU cell.[6] Complaint (Dkt. No. 1) at ¶¶ 40-41; Taylor-Scott Decl. Exh. 4 (Dkt. No. 57-2) at 87. The broadcast

---

[5]     The secured area in the back of the SHU cells is called the "Sally port" and is under video surveillance. Plf. Aff. Exh. 1 – LaValley Resp. to Interrog. (Dkt. No. 63-2) at ¶ 6; Plf. Aff. Exh. 1 – LaValley Admis. (Dkt. No. 63-2) at ¶ 8; Plf. Aff. Exh. 2 – Artus Resp. to Interrog. (Dkt. No. 63-2) at ¶ 5.

[6]     Nothing in the Quran prohibits either alternative method of participating in Jumu'ah as proposed by plaintiff. Plf. Aff. Exh. 4 – Assallami Resp. to Interrog. (Dkt. No. 63-2) at ¶ 6. According to defendant Assallami, if DOCCS were to authorize plaintiff's proposed accommodations, services conducted at Clinton's Masjid (Mosque) could be recorded. Plf. Aff. Exh. 4 – Assallami Admis. (Dkt. No. 63-2) at ¶ 23.

could either be a live feed or pre-recorded.  Taylor-Scott Decl. Exh. 4 (Dkt. No. 57-2) at 95.  According to plaintiff, by listening to Jumu'ah on headphones, he could actively participate in the services while still complying with the DOCCS' ban on congregating.  Plf. Aff. Exh. 4 – Assallami Admis. (Dkt. No. 63-2) at ¶ 22.

In an effort to gain the opportunity to participate in Jumu'ah by way of closed circuit television or audio feed, plaintiff filed grievances at Clinton on October 21, 2008, July 1, 2010, and September 21, 2010; sent a complaint letter on July 28, 2008 to defendant Dale Artus, the superintendent at Clinton at that time; forwarded a written complaint to DOCCS Commissioner Brian Fischer on August 25, 2008; sent three letters, dated February 10, 2009, February 23, 2009, and March 2, 2009, to defendant Assallami; and lodged a complaint, dated September 21, 2010, with defendant Thomas LaValley, the current superintendent at Clinton.[7]  Complaint (Dkt. No. 1) at ¶¶ 35-42; Complaint Exhs. 16-22 (Dkt. Nos. 1-2, 1-3).

Defendant Artus has no personal recollection of having addressed plaintiff's requests.  Artus Decl. (Dkt. No. 57-3) at ¶ 4.  The record nonetheless demonstrates that he delegated a number of plaintiff's

---

[7]     Defendant Artus was the Clinton Superintendent from July 28, 2003 until April 16, 2010.  Artus Decl. (Dkt. No. 57-3) at ¶ 3.  Defendant LaValley took over for defendant Artus in April 2010.  LaValley Decl. (Dkt. No. 57-5) at ¶ 2.

complaints to staff for investigation, and denied plaintiff's grievance dated

July 1, 2010, in light of the absence of a DOCCS Directive providing for

closed circuit television for religious services. *Id.* at ¶¶ 4, 6; Artus Decl. Exh.

B (Dkt. No. 57-3) at 111. On appeal from the superintendent's ruling, the

DOCCS Central Office Review Committee upheld the denial finding that

plaintiff had "not presented any compelling reasons to place CCTV in his cell

to watch Muslim services." Artus Decl. Exh. B (Dkt. No. 57-3) at 109. Insofar

as the other complaint letters were delegated to staff for review, defendant

Artus does "not have any further information that [leads him] to believe that

the issues addressed in those letters were not adequately resolved." Artus

Decl. (Dkt. No. 57-3) at ¶ 5. As it relates to defendant LaValley, he has no

personal recollection of receiving or responding to plaintiff's letter dated

September 21, 2010. LaValley Decl. (Dkt. No. 57-5) at ¶ 4. Defendant

Assallami acknowledges that he spoke with defendant Artus regarding

plaintiff's request to participate in Jumu'ah services by way of closed circuit

television, but was informed that it "was not a decision the Superintendent

was authorized to make." Plf. Aff. Exh. 4 – Assallami Admis. (Dkt. No. 63-2)

at ¶ 3; Plf. Aff. Exh. 4 – Assallami Resp. to Interrog. (Dkt. No. 63-2) at ¶ 3.

Defendants have submitted evidence explaining the necessary steps

the DOCCS would have to take to meet plaintiff's requests for

accommodations.  Thomas McQuade, a Facilities Planning Specialist

employed by the DOCCS, explains that each SHU cell is equipped with three

wall jacks, all of which are audio-only capable, and not currently capable of

carrying a video feed.  McQuade Decl. (Dkt. No. 57-6) at ¶¶ 5-6.  Therefore,

to accommodate plaintiff's request to allow Jumu'ah to be broadcast over

closed circuit television in SHU cells, the DOCCS would be required to install

the necessary video wiring, as well as televisions.  More specifically, as

McQuade explains in his declaration,

> [t]o do this properly, the existing wiring would need to
> be modified with a type of cable for in cell television.
> Conduit will need to be run to provide the extra jack as
> well as power to each cell.  SHU cells are not normally
> provided user connectable power outlets due to
> security concerns.  New control equipment would also
> be required, as well as the inmate would need to
> purchase an approved television from the facility.  To
> accomplish this, the [DOCCS] would need to issue a[
> New York State Office of General Services] project for
> each facility through its capital construction program
> to perform the necessary work.  Design fees and
> construction costs could be several hundred thousand
> dollars or greater at a facility depending on the size of
> the SHU.

*Id.* at ¶ 9.

Regarding plaintiff's request to permit Muslim SHU inmates to listen to

Jumu'ah through an audio feed, the existing wiring in the SHU does not allow

an independent signal to be sent to a particular cell.  McQuade Decl. (Dkt.

9

No. 57-6) at ¶ 6.  Accordingly, in the event the DOCCS satisfied this request,

the same religious programming that plaintiff, as a Muslim, would receive in

his cell, would also be provided to all of the other SHU inmates, regardless of

their religious beliefs.  *Id.*  Moreover, the audio option is not feasible because

the DOCCS would be forced to install the equipment in all of the SHUs

throughout its facilities, of which there are forty-eight, in an effort to maintain

consistency, which is important to maintaining the security and order of

facilities.  *Id.* at ¶¶ 7, 8; *see also* Bellnier Decl. (Dkt. No. 57-4) at ¶ 18

("Providing benefits to one group of inmates can lead to manipulative

behaviors which place a substantial strain on staffing and other resources.").

McQuade explains that "[e]ach [of the forty-eight] facilit[ies] would need to

provide wiring and equipment to extend from the place of worship an audio

signal to the existing radio distribution rack for the SHU.  Staff would be

required to set up the equipment for the service, as well as operate the

program selection to send the audio over one of the three channels."

McQuade Decl. (Dkt. No. 57-6) at ¶ 8.  According to McQuade, "[u]nder

current financial restraints, [where] there is reduced budget for new

infrastructure projects[,] . . . DOCCS does not currently have the means to

accommodate plaintiff's request, or the monetary resources to divert to the

type of investment it would take to do so." *Id.* at ¶¶ 4, 10; *see also* Bellnier Decl. (Dkt. No. 57-4) at ¶ 20.

In addition to the financial concerns, there are a number of safety concerns associated with re-wiring the SHU cells to make them capable of permitting SHU inmates to view Jumu'ah services through closed circuit television or listening through an audio feed. For example, because of the behavioral concerns that lead to the placement of inmates in SHU, any video displays or wiring would need to be secured and resistant to tampering to prevent any components from being fashioned into weapons or escape paraphernalia. Bellnier Decl. (Dkt. No. 57-4) at ¶ 15.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of his complaint on November 29, 2010. Complaint (Dkt. No. 1). Defendants responded by the filing of a motion to dismiss the complaint on April 4, 2011, Dkt. No. 28, resulting in an issuance of a report recommending that several of plaintiff's claims, as well as several defendants, be dismissed from the action, Dkt. No. 40. That report was adopted through a memorandum-decision and order issued by District Judge Mae A. D'Agostino on March 26, 2012. Dkt. No. 43. As a result of those decisions, only three defendants remain in this action, including Dale Artus, the former Superintendent at Clinton; Thomas LaValley,

a former Deputy Superintendent and presently the Superintendent at the facility; and Imam Assallami A. Fadle, the Islamic Chaplain at Clinton. The only claims that have survived defendants' motion to dismiss are plaintiff's RLUIPA and First Amendment causes of action arising from allegations that the defendants failed to permit him to observe Jumu'ah services. Report and Recommendation (Dkt. No. 40) at 47-48; Decision and Order (Dkt. No. 43) at 19.

Following the close of discovery, the remaining defendants in this action moved for summary judgment arguing that plaintiff's remaining claims should be dismissed because there is no record evidence to support a finding that defendants were personally involved in the deprivations alleged by plaintiff, and that the RLUIPA and/or First Amendment does not require DOCCS to provide Jumu'ah services to Muslim inmates. Defs.' Memo. of Law (Dkt. no. 57-8) at 12-21. In the alternative, defendants argue that they are entitled to qualified immunity from suit. *Id.* at 21-23. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III.    DISCUSSION

### A.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83.  In the event this initial burden is met, the

opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. <u>Plaintiff's Free Exercise Claims</u>

1. <u>Plaintiff's First Amendment Claim</u>

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context . . . a prison

inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). When determining whether a refusal by prison officials to permit an inmate's attendance at a religious service impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin*, 905 F.2d at 574 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988).

As a threshold matter, "[t]he prisoner must show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs."

*Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). In evaluating this factor, the court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

The court then inquires into whether a defendant's conduct, which allegedly deprives the plaintiff of his free exercise rights, is reasonably related to some penological interest. *Ford*, 352 F.3d at 594; *see also Washington v. Gonyea*, -- F. App'x ----, No. 11-0980, 2013 WL 4792413, at *3 (2d Cir. Sept. 10, 2013) ("Even if Defendants-Appellees substantially burdened [the

16

Plaintiff-Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)).[8]  To evaluate whether a challenged regulation or decision by prison officials is reasonable,[9] courts must evaluate the following four factors:

> [(1)] [W]hether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [(2)] whether prisoners have alternative means of exercising a burdened right; [(3)] the impact on the guards, inmates, and prison resources of accommodating the right; and [(4)] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (footnote omitted).

In this case, the first question is whether there is a dispute of material fact as to whether the decision to deny plaintiff's request for video or audio broadcasts of Jumu'ah places a substantial burden on his sincerely held religious beliefs.  After careful consideration, I conclude that, based on the record now before the court, a reasonable factfinder could conclude that denying plaintiff's request to view or listen to Jumu'ah services substantially

---

[8]     All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

[9]     Indeed, the Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise."  *Salahuddin*, 467 F.3d at 274 n.4.

burdens his beliefs. Although plaintiff conclusorily describes participation in Jumu'ah services as "mandatory," Plf. Aff. (Dkt. No. 63-2) at ¶ 9, defendant Assallami, an Imam and the Muslim Chaplain at Clinton, states that, "[i]f a man is free to [attend Jumu'ah], and able to do so, he should do so. It is not mandatory for women, or for men who are sick, or for men who are not free to attend services." Plf. Aff. Exh. 4 – Assallami Resp. to Interrog. (Dkt. No. 63-2) at ¶ 5. Accordingly, a dispute of fact exists in the record as to whether Jumu'ah is mandatory for Muslims, which implicates the question of whether plaintiff's beliefs are "sincerely held" and/or "substantially burdened," and the court is not in a position to determine this type of ecclesiastical question. *See Ford*, 352 F.3d at 590-91 (finding the district court erred in crediting the DOCCS religious authorities who all concluded that the meal the plaintiff was denied did not carry religious significance because the pertinent inquiry was not whether the meal carried religious meaning under Islamic law and tradition, but whether the plaintiff sincerely believed it did).[10]

Because plaintiff has satisfied his burden of demonstrating a dispute of fact regarding whether he holds a sincere belief that is substantially burdened

---

[10] It should be noted, moreover, in *Ford*, the Second Circuit said that, although "[w]hether a particular practice is religiously mandated is . . . relevant to resolving whether a particular burden is substantial, . . . the Supreme Court . . . ha[s] [n]ever held that a burdened practice must be mandated in order to sustain a prisoner's free exercise claim." 352 F.3d at 593.

by defendants' conduct, the court must next consider whether, based on the record evidence, there is a dispute of fact as to whether defendants' actions were "reasonably related to some legitimate penological interests." *Ford*, 352 F.3d at 594. As was explained above, the factors to consider in determining whether a decision is reasonably related to a legitimate penological interest are

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising a burdened right; the impact on the guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Salahuddin, 467 F.3d at 274.

There is substantial record evidence illustrating a connection between defendants' refusal to install the necessary equipment to permit plaintiff to view or listen to Jumu'ah services and a governmental objective, as well as the potential impact on DOCCS corrections officers, inmates, and resources. First, and most persuasively, defendants have set forth evidence demonstrating that installation of equipment necessary to provide closed circuit television in a cell's Sally port or audio feed into a cell would create safety concerns at a facility. For example, DOCCS Deputy Commissioner of

Facilities Joseph F. Bellnier has explained that any time a SHU inmate

moves in or out of his cell, special precautions must be taken because

inmates in the SHU are housed there primarily for disciplinary confinement

and after "an administrative determination that [their] presence in general

population is a threat to staff, other inmates and/or good order of the

correctional facility."  Bellnier Decl. (Dkt. No. 57-4) at ¶ 4, 8.  Bellnier explains

that, "absent special circumstances, inmates assigned to SHU are

handcuffed whenever they are escorted from their cells, and must be

escorted by at least two correction officers."  *Id.* at ¶ 9 (citation omitted).  It

follows that, because plaintiff's requests involve access to the Sally port

behind his SHU cell, DOCCS corrections officers will be forced to employ the

enhanced security measures that are required by DOCCS directives.  In

addition, plaintiff's proposal that congregate services that occur at DOCCS

facilities could be videotaped for the benefit of SHU inmates (and then

replayed using the newly installed technology in SHU cells) would be

disruptive to the general population inmates who attend those services.  *Id.* at

¶ 21.  Moreover, occasionally an inmate from general population facilitates a

congregate service.  *Id.* at ¶ 22.  If the service was to be videotaped for

viewing by SHU inmates, Bellnier explains that a safety concern arises where

the inmates "could use the video transmission . . . to convey covert

messages" to one another. *Id.* Finally, Bellnier has stated that the new equipment would have to be installed in a manner sophisticated enough that it is tamper-proof so that inmates cannot create weapons from it. *Id.* at ¶ 5.

In addition to these safety concerns, defendants have provided evidence that, if DOCCS was to accommodate plaintiff's requests regarding participation in Jumu'ah through video or audio feed, it would be required to accommodate similar requests from all SHU inmates in the custody of the DOCCS who seek to participate in congregate services, regardless of their religion. Bellnier Decl. (Dkt. No. 57-4) at ¶¶ 18-20; *see also* McQuade Decl. (Dkt. No. 57-6) at ¶ 8. There are forty-eight SHUs in the DOCCS system throughout New York State. Bellnier Decl. (Dkt. No. 57-4) at ¶ 19; McQuade Decl. (Dkt. No. 57-6) at ¶ 8. The volume of requests that DOCCS corrections officers may endure were DOCCS required to provide video or audio feed of congregate religious services would be "unduly burdensome [–] even if SHU cells were equipped with the necessary wiring and video displays, which they are not." Bellnier Decl. (Dkt. No. 57-4) at ¶ 20.

In opposition to this evidence, plaintiff argues that his requests "do not present issues of security or cost" and that "there are numerous alternative ways that the matter could be accomplished without being to[o] costly or a threat to security." Plf. Aff. (Dkt. No. 63-2) at ¶ 40. Plaintiff suggests, for

example, that the televisions and tape recorders that are confiscated from inmates in the custody of the DOCCS could offset the cost for implementing plaintiff's requests for listening to or viewing Jumu'ah. *Id.* at ¶¶ 17, 41. The televisions, however, are currently resold at the prison commissary, and the proceeds are put into the Inmate Benefit Fund. *Id.* at ¶ 17. There is no record evidence regarding the Inmate Benefit Fund, or whether the specific proceeds earned from the resale of confiscated televisions are put toward a specific inmate program that depends on that funding. Moreover, although plaintiff conclusorily states that "there are numerous alternative[s]" to his requests that a video or audio feed be installed in a SHU cell Sally port or inside the cell directly, he offers no specifics.[11]

Turning to the factor regarding whether prisoners have an alternative means of exercising the alleged burdened right in this case, there is record evidence that illustrates the several accommodations Muslim SHU inmates

_____

[11] In this regard, the court notes that, during his deposition, plaintiff suggested, an alternative, that he be permitted to access Jumu'ah services by way of listening to a prerecorded service on a tape recorder in his Sally port. Taylor-Scott Decl. Exh. A (Dkt. No. 57-2) at 45-55; Plf.'s Memo. of Law (Dkt. No. 63) at 12-15, 31. The court declines to address this alternative in this report, however, because (1) plaintiff did not allege that defendants' failure to provide a tape recorded and pre-recorded services violated his rights, and therefore defendants were not put on notice that they should defend against this proposed accommodation in this case; and (2) it appears doubtful from the record that plaintiff has exhausted his available administrative remedies as it relates to this alternative. Indeed, the record now before the court does not reveal that this alternative was ever suggested prior to plaintiff's deposition, or that any formal request to listen to Jumu'ah services by way of a tape recorder was ever made to and denied by defendants.

already receive for their religious beliefs.  Specifically, DOCCS Directive 4202 permits Muslim inmates confined to the SHU to (1) maintain a copy of the Quran, a prayer rug, and a Kufi in their cells, (2) engage in demonstrative prayer in their cells; (3) request alternative meals that satisfy Muslim dietary requirements; (4) eat special meals during Islamic feast days; (5) eat meals after sunset during Islamic feast days; and (6) order religious periodicals, provided they are not a prohibited list for security purposes.  LaValley Decl. (Dkt. No. 57-5) at ¶¶ 9-10.  Moreover, DOCCS Directive 4933 permits Muslim SHU inmates to meet, one-on-one, with an Imam or religious adviser of their registered religion.  *Id.* at ¶ 11.  Although none of these accommodations specifically permit SHU inmates to congregate for Jumu'ah, the record suggests that participation in congregate service is one of many Muslim traditions.  On balance, in light of the security and cost considerations highlighted by defendants, as well as the number of accommodations already provided to SHU inmates in the custody of the DOCCS, in my view no reasonable factfinder could conclude that defendants' decision to refuse plaintiff's requests regarding installation of new equipment so that SHU inmates can participate in Jumu'ah was unreasonable.  Accordingly, I recommend that this claim be dismissed.  *See O'Lone*, 482 U.S. at 351-52 (applying the reasonableness test, the Court held that a restriction prohibiting

23

Muslim prisoners from attending Jumu'ah did not violate the free exercise clause because, *inter alia*, those prisoners had alternative means of exercising their religious rights due to numerous other accomodations afforded to Muslims for other practices of their religion); *Vega v. Lantz*, No. 04-CV-1215, 2009 WL 3157586, at *6-7 (D. Conn. Sept. 25, 2009) (finding that the plaintiff's request for Halal meat to be served to him as a Muslim was properly denied by the defendants, where the defendants submitted evidence that granting the accommodation would create issues of favoritism in the facility and increase administrative costs in light of the fact Halal meat is more expensive, needs to be transported, stored, and prepared separately from other meat, and where the defendants demonstrated that the plaintiff had other opportunities to exercise his religious beliefs).[12]

### 2.    Plaintiff's RLUIPA Claim

As was previously noted, plaintiff has also asserted a claim under the RLUIPA, which provides, in pertinent part, that

---

[12]    Plaintiff relies heavily on *Hudson v. Dennehy*, 538 F. Supp. 2d 400 (D. Mass. 2008), *aff'd*, 578 F.3d 39 (1st Cir. 2009) (granting injunction requiring closed circuit television broadcasting of Jumu'ah services for Muslim plaintiffs housed in special management unit ("SMU")).  That case is materially distinguishable, however, for two reasons.  First, unlike the DOCCS in this case, the Massachusetts Department of Correction did not offer any technical reason that would prevent closed circuit television broadcasting of Jumu'ah services in the SMU.  *Hudson*, 538 F. Supp. 2d at 42, 44. Second, the standards of review for a motion for a preliminary injunction, *see id.* at 43, are distinct from those applicable here.

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling interest.

42 U.S.C. 2000cc-1(a). "As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009).

Similar to claims arising under the First Amendment free exercise clause, in considering claims arising under the RLUIPA courts apply a burden-shifting analysis. *Harnett v. Barr*, 538 F. Supp. 2d 511, 520 (N.D.N.Y. 2008) (Hurd, J.). Under the established protocol, the plaintiff bears the initial obligation of showing that his religious exercise has been burdened and that the burden is substantial. *Harnett*, 538 F. Supp. 2d at 520 (citing *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)). The focus then shifts to the government to show that the burden furthers a compelling governmental interest and that it represents the least restrictive means of achieving that interest. *Hartnett*, 538 F. Supp. 2d at 520. Under the RLUIPA,

25

"religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

Here, as was discussed above in the context of plaintiff's First Amendment free exercise claim, plaintiff has proffered sufficient evidence to establish that inhibiting him from participating in Jumu'ah places a substantial burden on the exercise of his religion. Accordingly, the court must now determine whether there a genuine dispute of fact as to whether the defendants' denial of plaintiff's request for Jumu'ah services to be provided by way of video or audio feed furthers a compelling governmental interest and represents the least restrictive means necessary. As was also discussed above, defendants have set forth evidence demonstrating that plaintiff's proposals give rise to several articulable security concerns. Moreover, in order to accommodate plaintiff's requests, new wiring and equipment would have to be installed in all SHUs within the DOCCS, of which there are forty-eight. Bellnier Decl. (Dkt. No. 57-4) at ¶¶ 18-19; McQuade Decl. (Dkt. No. 57-6) at ¶ 8. Defendants have estimated the cost for undertaking this project at "several hundred thousand dollars." McQuade Decl. (Dkt. No. 57-6) at ¶ 10. In light of all of this evidence provided by defendants that illustrates how plaintiff's requests in this case give rise to

safety and cost concerns, I find that they have demonstrated a compelling governmental interest.

Turning to the question of whether defendants' decision to deny the requests is the least restrictive means to satisfy the compelling interests, I find that it is. Plaintiff's requests are very specific – he requests that DOCCS install closed circuit television in each SHU cell or its Sally port or install additional wiring to permit an audio feed of Jumu'ah. The nature of this request mandated that defendants respond either by accommodating or denying the request. Defendants chose to deny the request, and the rationale offered to justify their denial adequately supports a finding that denial was the only means of furthering the interests identified. Accordingly, I recommend that plaintiff's RLUIPA claim be dismissed. *See Vega*, 2009 WL 3157586, at *8 ("[T]he defendants have demonstrated. . . that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs, and maintaining workable administrative procedures."); *Phipps v. Morgan*, No. 04-CV-5108, 2006 WL 543896, at *9 (E.D. Wash. Mar. 6, 2006) ("The Court further finds that Defendants have not only shown legitimate interests for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks, but they

have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA.").

## IV.    SUMMARY AND RECOMMENDATION

After a careful review of the record in this case, I find that defendants' decision to deny plaintiff's requests for access to Jumu'ah services through closed circuit television or an audio feed was reasonably related to articulable legitimate penological interests, including safety and the cost of installing the necessary equipment, and that their denial furthers those interests, as required under the RLUIPA.[13]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 57) be granted, and that this case be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v.*

---

[13]    Because I find that no reasonable factfinder could find that plaintiff's rights under the First Amendment free exercise clause or the RULIPA were violated when defendants denied plaintiff's requests to be provided access to Jumu'ah through closed circuit television or an audio feed in his SHU cell, I have not considered defendants' personal involvement or qualified immunity arguments.

*Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    September 27, 2013
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

**H**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE(WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals,

Second Circuit.
Anthony WASHINGTON, Plaintiff–Appellant,
v.
Paul GONYEA, Deputy Superintendent of Monterey Correctional Facility, Individually and in his Official Capacity, Tammi Chaboty, Sergeant at Woodbourne Correctional Facility, Individually and in her Official Capacity, Keith Granger, Sergeant at Livingston Correctional Facility, Individually and in his Official Capacity, Defendants–Appellees.
No. 11–980–CV.

Sept. 10, 2013.

Michael J. Balch, New York, New York, for Plaintiff–Appellant.

Brian A. Sutherland, Assistant Solicitor General of Counsel (Barbara D. Underwood, Solicitor General, Michael S. Belohlavek, Senior Counsel, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, New York, for Defendants–Appellees.

Present DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges, EDGARDO RAMOS, District Judge.<sup>FN*</sup>

> FN* The Honorable Edgardo Ramos, of the United States District Court for the Southern District of New York, sitting by designation.

SUMMARY ORDER

**\*1 UPON DUE CONSIDERATION,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the order of the District Court is **AFFIRMED IN PART and REVERSED IN PART,** and the case is **REMANDED.**

Plaintiff–Appellant Anthony Washington ("Washington") appeals from a judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*), entered January 31, 2011, granting Defendants–Appellees' motions to dismiss. In an accompanying opinion filed today, we affirm on alternative grounds the district court's dismissal of Washington's claim that Defendants–Appellees substantially burdened his right to free exercise of religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1. In this summary order, we affirm the district court's denial of Washington's due process claim and reverse dismissal of his First Amendment retaliation claims.<sup>FN1</sup> We assume the parties' familiarity with the underlying facts and procedural history of the case.

> FN1. Washington did not challenge the district court's dismissal of his conspiracy claim on appeal, and we therefore deem that claim abandoned. *See LoSacco v. City of Middletown, 71 F.3d 88, 92–93 (2d Cir.1995).*

We review the grant of a motion to dismiss *de novo,* accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *See Harris v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

*Mills,* 572 F .3d 66, 71 (2d Cir.2009). The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Since Washington filed his complaint *pro se,* "it must be construed liberally to raise the strongest arguments it suggests," *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013) (internal quotation marks and alterations omitted), although "a *pro se* complaint must state a plausible claim for relief," *id.*

**I. Due Process Claim**

"Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). When a prison disciplinary hearing may impose a punishment sufficient to trigger due process protections, "the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill,* 472 U.S. 445, 454 (1985). In addition, "due process requires 'that there be some evidence to support the findings made in the disciplinary hearing.' " *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992) (quoting *Hill,* 472 U.S. at 457); *see Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004) (explaining that this Court "look[s] to see whether there was 'reliable evidence' of the inmate's guilt" supporting the disciplinary decision).

*2 Washington fails to raise a due process claim upon which relief may be granted because his complaint does not plausibly allege that Defendant–Appellee Paul Gonyea's ("Gonyea") disciplinary decision that Washington had "communicat[ed] messages of a personal nature to an employee," thereby violating Rule 107.11, 7 N.Y.C.R.R. § 270.2(B)(8)(ii), lacked the support of at least some reliable evidence.[FN2] Washington's complaint alleges that during the disciplinary hearing Gonyea heard testimony from Defendant–Appellee Tammi Chaboty

("Chaboty"), corroborated by testimony from Defendant–Appellee Keith Granger ("Granger"), that Chaboty "was concerned" when Washington handed her the Quran, that he had an "eerie smile which was unnerving," and that his "conduct [on] the night of the incident seemed inappropriate." The transcript of the proceeding also indicates that Gonyea interviewed the accuser, Chaboty, and in issuing his decision, relied upon Chaboty's written incident report and her testimony.[FN3] Although New York's Third Department found that the disciplinary decision was not based on *substantial* evidence, *Washington v. Selsky,* 48 A.D.3d 864, 865 (3d Dep't 2008) (annulling Washington's disciplinary disposition), Chaboty's testimony and corroborating evidence constituted *some* evidence in support of the decision. Since the decision did not rest on "blatantly implausible" evidence, *Zavaro,* 970 F.2d at 1152, or on hearsay accusations not independently assessed to be credible, *see Pico,* 356 F.3d at 489–90, Washington's due process claim must fail.

> FN2. Rule 107.11 is part of Rule Series 107, which addresses an inmate's "Interference with an Employee or Other Person." 7 N.Y.C .R.R. § 270.2(B)(8). Rule 107.11 provides in full,
>
> > An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee or any other person including a person subject of an order of protection with the inmate or who is on the inmate's negative correspondence list.
>
> *Id.* § 270.2(B)(8)(ii).

> FN3. In considering a motion to dismiss, a court may consider both documents incorporated by reference into the complaint and unincorporated documents that are integral to the complaint and upon which the complaint heavily relies. *Chambers v. Time Warner Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). Here, incorporation of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

transcript is proper because the complaint relies heavily on the hearing transcript.

## II. First Amendment Retaliation Claims

Washington alleges that the Defendants–Appellees violated his First Amendment rights to free exercise of his religion and free speech when they retaliated against him for disseminating religious material to Chaboty. To prevail on a First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983, a prisoner must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that "the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). In determining whether a prisoner's conduct is motivated by a sincerely held religious belief, we do not "evaluate the objective reasonableness of the prisoner's belief;" *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003); rather, our "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature," *id.* (internal quotation marks omitted).

**\*3** The district court erred in dismissing Washington's retaliation claims on the basis that he failed to plead that his act of giving the Quran to Chaboty constituted an exercise of his sincerely held religious beliefs. Washington alleged that he wanted to give Chaboty the Quran "in response to her expressed interest to know about the religion of Islam" and, significantly, that "he felt that he would be remissed [*sic* ] not to give her the book as it is the primary source of Islam." In his affidavit opposing dismissal, Washington stated that he believes it to be his "religious duty to inform others about the religion of Islam, especially those who inquire about it." FN4 Therefore, read liberally and as a whole, the complaint alleges that Washington felt a sincere religious obligation to give the Quran to Chaboty, and while the contours of the burden standard are not precisely drawn, *see Salahuddin,* 467 F.3d at 275 n. 5, the conduct alleged

here—that Washington was severely punished for engaging in protected activity—rises to the level of a substantial burden on the free exercise of religion.

> FN4. Courts "deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013).

Even if Defendants–Appellees substantially burdened Washington's sincerely held religious beliefs, their actions do not constitute a constitutional deprivation if they were "reasonably related to legitimate penological interests." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)); *see Turner v. Safley,* 482 U.S. 78, 89–90 (1987) (articulating three-step analysis for determining reasonableness of a prison regulation). As the district court correctly recognized, assessing the reasonableness of penological interests is a factual and context-specific inquiry that in this case is inappropriate at this preliminary stage of the proceedings. *See Ford,* 352 F.3d at 596; *Salahuddin,* 467 F.3d at 277. Furthermore, Washington alleges that Defendants–Appellees were motivated by personal prejudice and did not act against him for legitimate penological reasons. *See Shakur v. Selsky,* 391 F.3d 106, 116 (2d Cir.2004) (reversing dismissal of prisoner's retaliation claim and noting that "a failure to abide by established procedures or standards can evince an improper objective"). Therefore, accepting the complaint's well-pled factual allegations as true, we conclude that Washington has plausibly alleged that the officers' actions were not reasonably related to legitimate penological interests.

Additionally, we note that Washington alleges that he was denied religious services while in Special Housing Unit ("S.H.U.") pursuant to the discipline imposed by Gonyea. Although assigned pro bono counsel did not argue on appeal that this alleged deprivation constituted a violation of Washington's free exercise rights, our waiver doctrine is prudential, *see In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 133 (2d Cir.2008) (per curiam), and we address that claim here. While the complaint does not specify which official denied him religious services in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))

(Cite as: 2013 WL 4792413 (C.A.2 (N.Y.)))

S.H.U., a liberal reading of the complaint gives rise to a plausible inference that Chaboty and Granger were involved either directly or indirectly, and Washington has therefore adequately pled a violation of his First Amendment rights on that basis. On remand, the district court should allow Washington leave to amend his pleadings to add additional defendants if requested.

**III. Qualified Immunity**

**\*4** Finally, Defendants–Appellees argue that they are entitled to qualified immunity because their conduct, as alleged, did not violate clearly established statutory or constitutional rights. However, "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir,* 264 F.3d 154, 169 (2d Cir.2001). Here, Washington has plausibly alleged that Defendants–Appellees acted with an improper retaliatory motive. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) ("In order to prevail on his retaliation claims, [plaintiff] bears the burden of showing ... that the [constitutionally protected] conduct was a substantial or motivating factor for the adverse actions taken by prison officials."); Compl. ¶¶ 18, 20, 22, 24, 39. Therefore, at this stage of the proceedings, Washington's allegations are sufficient to require deferral of the issue of qualified immunity.

We have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART,** and the case is **REMANDED** for further proceedings consistent with this order.

C.A.2 (N.Y.),2013.

Washington v. Gonyea
--- Fed.Appx. ----, 2013 WL 4792413 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))



Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Joe Burgos VEGA, Plaintiff,
v.
Theresa LANTZ, et al., Defendants.
No. 304CV1215DFM.

Sept. 25, 2009.
West KeySummary**Constitutional Law 92 ☞ 1427**

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1421 Prisons and Pretrial Detention
92k1427 k. Religious services and
ceremonies; study and prayer groups. Most Cited Cases
**Prisons 310 ☞ 155**

310 Prisons

310II Prisoners and Inmates
310II(B) Care, Custody, Confinement, and Control
310k151 Religious Practices and Materials
310k155 k. Services, ceremonies, texts,
study, and prayer. Most Cited Cases
Prisoner's First Amendment rights were not violated
by the Department of Corrections (DOC) prohibiting the
prisoner from congregate prayer five times daily since the
DOC provided evidence that allowing such activity would
endanger security. The prisoner alleged that his religion
required him to congregate with other Muslims five time
daily for prayer. The DOC contended that it could not
provide sufficient chaplains or custody staff to lead or
supervise such prayer. Furthermore, it would endanger
security by creating a perception of favoritism which
could create strife among the inmates, because Muslim
inmates would be out of their cells more frequently than
other inmates. U.S.C.A. Const.Amend. 1.

Matthew A. Weiner, McCarter & English, Hartford, CT,
for Plaintiff.

Steven R. Strom, Attorney General's Office, Hartford, CT,
for Defendants.

*RULING ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*

DONNA F. MARTINEZ, United States Magistrate Judge.
**\*1** The plaintiff, a prisoner, brings this action against
officials of the Connecticut Department of Corrections
("DOC") under the Free Exercise Clause of the First
Amendment, the Equal Protection clause and the Religious
Land Use and Institutionalized Persons Act ("RLUIPA"),
42 U.S.C. § 2000cc. He alleges that the defendant prison
officials restricted him from practicing his religion.
Pending before the court is the defendants' Motion for
Summary Judgment, doc. # 146.[FN1] For the reasons that
follow, the motion is granted in part and denied in part.

FN1. Also pending are four motions to preclude
certain evidence. Because the court finds that
none of this disputed evidence is required for a
ruling on the instant summary judgment motion,
the motions to preclude (docs.# 150, 154, 169,
171) are denied without prejudice to refiling at
the time of trial.

I. *Procedural Background*

The plaintiff commenced this action in July 2004,
representing himself *pro se.* He filed the operative
Amended Complaint, doc. # 62, on November 8, 2005.

The plaintiff, a practicing Muslim, is incarcerated at
MacDougall Walker Correctional Institution, in Suffield,
Connecticut. (Def's Local Rule 56(a)(1) Statement of
Material Facts, doc. # 149, ¶ 1.) The remaining defendants
are: Theresa Lantz, the Commissioner of the DOC [FN2];
Reverend Anthony Bruno, the DOC's Director of
Religious Services; Robert DeVeau, the DOC's Director
of Food Services; and Imam Abdul–Majid Karim Hasan,
a contract chaplain for the DOC.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

FN2. Since the filing of the lawsuit, Theresa Lantz has retired. Brian K. Murphy is now the acting Commissioner of the Department of Correction.

In September 2006, the court partially granted the defendants' Motion for Judgment on the Pleadings, dismissing claims as to several defendants and reducing the scope of claims as to the remaining defendants. (Doc. # 95.) Among other things, the court dismissed all of plaintiff's official capacity damages claims. (Doc. # 95 at 22–23, 34–35.) Plaintiff's claims for injunctive or declaratory relief against the defendants in their official capacity survived the Motion for Judgment on the Pleadings, as did his individual capacity damages claims.

In November 2006, the court appointed counsel for the plaintiff. The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73. (See doc. # 27.)

II. *Plaintiff's Claims*

The plaintiff brings a series of religious exercise claims under the First Amendment, RLUIPA and the Equal Protection clause. He alleges that all of the defendants refused to provide him with Halal FN3 meat as part of his diet (Am. Compl., Seventh Count). He alleges that defendants Lantz, Bruno and Hasan also (1) failed to provide or permit congregational prayer five times daily and did not allow him to lead other inmates in prayer (*id.,* Second Count and Eighth Count); (2) regularly cancelled weekly Muslim congregate prayer service (known as Jumah FN4)(*id.,* Third Count); (3) denied his religiously-motivated request to be circumcised (*id.,* Ninth Count); (4) permitted correctional officers to mishandle inmates' copies of the Quran FN5 (*id.,* Tenth Count); (5) deprived him of timely Eid-ulFitr congregational prayer during Ramadan FN6 in 2002 (*id.,* Fourth Count); (6) failed to provide sufficient calories in Ramadan meals (*id.,* Fifth Count); and (7) effectively denied the purchase or possession of certain religious items conforming to Islamic requirements, such as a toothstick, prayer oils, a prayer clock, leather socks and a silver Islamic ring. (*Id.,* Sixth Count).FN7

FN3. Halal is a "Quranic term used to indicate what is lawful or permitted." The Oxford Dictionary of Islam, 105 (John L. Esposito ed., 2004). When used in the context of dietary restrictions, the word often refers to "the meat of permitted animals that have been ritually slaughtered, hunted game over which the name and praise of God have been recited, and fish and marine life." *(Id.)* Halal food is contrasted with prohibited, or "haram," foods, which include "pork, blood, alcoholic beverages, scavenger animals, carrion and improperly sacrificed permitted animals." (*Id.*)

FN4. "Salat al-Jumah" is the "Friday congregational prayer." It "is held in the mosque and performed in straight lines." The Oxford Dictionary of Islam, 276 (John L. Esposito ed., 2004).

FN5. The Quran is "the book composed of writings accepted by Muslims as revelations made to Muhammad by Allah and as the divinely authorized basis for the religious, social, civil, commercial, military and legal regulations of the Islamic world." Webster's Third New International Dictionary (Unabridged) 1255, 1868 (1993).

FN6. Ramadan is "the 9th month of the Muhammadan year observed as a sacred month on each day of which strict fasting is practiced from dawn to sunset." Webster's Third New International Dictionary (Unabridged) 1878 (1993). The Eid–ul–Fitr, also spelled Id-ulFitr, is "[t]he Feast of breaking the Ramadan Fast, or Lesser Bairam, celebrated on the 1st of the month of Shawwl: one of the two major festivals in Islam." Oxford English Dictionary (2d Ed.1989), *available at* http://dictionary.oed.com.

FN7. The complaint also alleges that the defendants "intentionally, systematically and discriminately physically and psychologically abused the Plaintiff because of his faith and his Islamic religion." *(Id.,* Eleventh Count.) The plaintiff's memorandum does not list this as one

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

of his claims or point to evidence in support of it. This claim is dismissed in light of the plaintiff's *in forma pauperis* status. *See Barr v. Abrams, 810 F.2d 358, 363 (2d Cir.1987)*("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights"); *Clark v. Levesque,* 2006 U.S. Dist. LEXIS 25917 (D.Conn. Mar. 17, 2006)(28 U.S.C. § 1915(e)(2)(B)(ii) requires the court to dismiss at any time allegations that fail to state a claim upon which relief may be granted), *aff'd Clark v. Levesque,* No. 06–2046–pr, 2009 U.S.App. LEXIS 14981 (2d Cir. July 8, 2009); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (internal citations omitted).

### III. *Factual Background*

**\*2** The following facts are undisputed. Prison policy requires that collective religious activity be "conducted and supervised by a Department authorized Chaplain or religious volunteer who professes the same religion as the group gathering together." (Administrative Directive 10.8 ("A.D. 10.8" ¶ 6(B), attached as ex. F to doc. # 149.) Inmates are not permitted to lead collective religious activities and "can never exercise any authority over any other inmate." (*Id.,* ¶¶ 6(B), 6(D).) Inmates may not engage in "demonstrative public individual prayer that would disrupt the orderly operation of the institution, such as in the work or school area, recreation area, day room, etc." (*Id.,* ¶ 6(E).) Instead, "[a]ll such prayer must be done privately in one's cell or by one's bed." (*Id.*)

Congregate prayer is permitted once a week. Prison policy provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations." (*Id.,* ¶ 6(A).) There is a weekly chaplain-led Jumah prayer for Muslim inmates, but it has frequently been cancelled due to the unavailability of a chaplain or volunteer to oversee it.

The DOC offers various opportunities to Muslim inmates to practice and study their religion. They may attend Islamic study classes and Arabic language classes, and they have access to books and other study materials. Muslim inmates who choose to fast during the month of Ramadan are accommodated with meals served after sunset. Muslim inmates are able to attend two annual feasts known as the Eids. Inmates may purchase certain religious items such as prayer rugs in the commissary, which also offers more than forty Halal food items, including Halal meat sausage.

The plaintiff receives what is known as the "Common Fare" diet, an alternative to the regular prisoner diet. Common Fare includes no meat, meets the nutritional requirements of prisoners and does not contain items that are forbidden by Islam. It is available to members of other religions with dietary restrictions. It includes fish, cheese and other non-meat sources of protein, and DOC staff follow special preparation, storage and cleaning procedures to ensure that there is no cross-contamination with non-Common Fare foods. The DOC does not offer Halal or Kosher meat as part of any menu.

### IV. *Standard of Review*

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A party opposing a ... motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (quoting *Celotex,* 477 U.S. at 324).

**\*3** The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See* Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000). Moreover, because the plaintiff's Amended Complaint was filed while he represented himself *pro se,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

the court reads its allegations liberally. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers")(internal citations and quotation marks omitted).

## V. *Discussion*

### A. *General Defenses to Plaintiff's Claims*

As an initial matter, the defendants raise several general defenses that they say preclude some of the plaintiff's claims as a matter of law. The court will address these before turning to plaintiff's substantive claims.

### 1. *Exhaustion*

The defendants move for summary judgment as to certain claims on the ground that the plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). (Defs' Mem., doc. # 148 at 33–34.)

Section 1997e(a) "mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions." *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2008 U.S. Dist. LEXIS 59098 (S.D.N.Y. Aug. 5, 2008) (citing *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001)).

The plaintiff does not dispute that he failed to exhaust his remedies as to certain of his claims prior to filing suit. Instead, he contends that the defendants waived this defense because the special defense set forth in their answer did not specify which claims were unexhausted.

Plaintiff is correct that failure to exhaust is an affirmative defense that may be waived if not raised. *See Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). However, the defendants did plead the defense in their Answer. (*See* Doc. # 30.) The plaintiff offers no authority in support of his argument that the defendants were required to specify which claims were unexhausted in order to preserve the defense.

The defendants' motion for summary judgment is granted as to the following unexhausted claims: untimely prayer at the end of Ramadan in 2002, lack of adequate nutrition in the Ramadan meals, and lack of access to leather socks, a prayer clock, hygiene items and an Islamic silver ring.

### 2. *Physical Injury Requirement*

The defendants move for summary judgment as to all of plaintiff's damages claims on the grounds that he has not alleged a physical injury. They rely on 42 U.S.C. § 1997e(e), which provides that

[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

**\*4** This provision bars prisoner claims for compensatory damages "for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002). However, the provision "does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages." *Id.* at 418. Therefore, the defendants are not entitled to summary judgment as to plaintiff's damages claims on these grounds.[FN8]

> **FN8.** The plaintiff argues that Section 1997e(e) does not apply to compensatory damages in First Amendment cases. Having found that the plaintiff is entitled to seek at least nominal damages, the court need not decide at this time whether he may also seek compensatory damages.

### 3. *Money Damages Under RLUIPA*

The defendants next argue that RLUIPA does not allow the plaintiff to seek money damages against a state official in his or her individual capacity.[FN9]

> **FN9.** The court previously dismissed plaintiff's claims for damages against defendants in their official capacities. (Doc. # 95 at 22–23 .) The plaintiff's claims for injunctive and declaratory

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

relief against defendants in their official capacities survived that ruling.

The statutory text permits a plaintiff to "obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The term "government" is defined as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law." 42 U.S.C. § 2000cc–5(4). The Second Circuit has not considered whether this language permits for money damages against defendants in their individual capacities. However, other circuit courts that have considered this issue have held that it does not. *Smith v. Allen,* 502 F.3d 1255 (11th Cir.2007); *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316 (5th Cir.2009). *See also El Badrawi v. Dep't of Homeland Sec.,* 579 F.Supp.2d 249, 261 (D.Conn.2008); *Pugh v. Goord,* No. 00 Civ. 7279(RJS), 2008 WL 2967904 at *22 (S.D.N.Y. July 31, 2008); *Sweeper v. Taylor,* No. 9:06–CV–379(NAM/GJD), 2009 U.S. Dist. LEXIS 27318 at *27 (N.D.N.Y. March 27, 2009). The Fifth Circuit recently relied on a Spending Clause analysis in holding that RLUIPA does not create a cause of action for damages against defendants in their individual capacities:

RLUIPA was enacted pursuant to Congress's Spending Clause power, not pursuant to the Section 5 power of the Fourteenth Amendment. Accordingly, only the grant recipient—the state—may be liable for its violation. Spending Clause legislation is not legislation in its operation; instead, it operates like a contract, and individual RLUIPA defendants are not parties to the contract in their individual capacities.

*Sossamon,* 560 F.3d at 328.[FN10] This court is persuaded by the logic of Sossamon and Smith and concludes that RLUIPA provides no cause of action for damages against state officials in their individual capacities. Therefore, the court grants the defendants' motion for summary judgment as to plaintiff's RLUIPA claims insofar as the plaintiff seeks money damages.

FN10. Sossamon also held that official-capacity damages claims are barred by the doctrine of

sovereign immunity, because RLUIPA did not unambiguously put states on notice that their acceptance of federal funds was conditioned on a waiver of immunity. *Id.* at 329–31. *See also Van Wyhe v. Reisch,* No. 08–1409, 2009 U.S.App. LEXIS 20235, *27–28 (8th Cir. Sept. 10, 2009); *Nelson v. Miller,* 570 F.3d 868, 884–85 (7th Cir.2009); *Cardinal v. Metrish,* 564 F.3d 794, 801 (6th Cir.2009). Because the plaintiff's official-capacity damages claims were previously dismissed, the court need not consider this issue.

### 4. *Lack of Personal Involvement*

Defendant Hasan moves for summary judgment based on his lack of personal involvement.[FN11] It is settled law in this circuit that in a civil rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Where a defendant did not personally commit a wrong, courts have recognized that personal involvement can also be shown through evidence that the defendant failed to remedy a known wrong, that the defendant created a policy or custom under which unconstitutional practices occurred or continued, or that the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN12]

FN11. Defendant DeVeau also moves for summary judgment as to all claims based on lack of personal involvement. However, because the court grants the defendants' motion for summary judgment as to plaintiff's Halal meat claim, *see infra,* the only claim directed to DeVeau, it need not address his personal involvement argument.

FN12. The *Colon* factors have recently been thrown into some doubt by the Supreme Court's ruling in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009), which discussed issues of supervisory liability. *See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

1801(SAS), 2009 U.S. Dist. LEXIS 54141 (S.D.N.Y. June 26, 2009)(under *Iqbal,* "a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate"); *Estate of Young v. N.Y. Office of Mental Retardation & Developmental Disabilities,* No. 07Civ. 6241(LAK), 2009 U.S. Dist. LEXIS 78049 (S.D.N.Y. Aug. 27, 2009). The court need not reach this unbriefed issue in this matter.

**\*5** Imam Hasan was formerly employed as a chaplain with the DOC, and, since his retirement in 2001, he has served as a contract chaplain. (Hasan Dep. Vol I, Pl's Opp., doc. # 162 ex. M at 74.) He has no authority to make DOC policy. (Hasan Dep. Vol. II, Defs' Mem., doc. # 149 ex. L at 95.) The DOC's Director of Religious Services, Reverend Bruno, described Imam Hasan as "our Islamic religious expert who is my right hand man" and "the go-to person for Islamic issues." (Bruno Dep., Pl's Opp., doc. # 162 ex. F at 32.) The plaintiff's complaint does not allege that Imam Hasan personally acted to limit the plaintiff's rights; rather, it alleges that he acted as an advisor to the other defendants. In opposition to the motion for summary judgment, the plaintiff argues that "[a]s the lead Islamic voice in the DOC, Imam Hasan has created the customs and supported the policies under which the constitutional violations occurred in this case. Moreover, Imam Hasan has failed to remedy, or even advocate a remedy, to the constitution[al] violations alleged by Mr. Vega." (Pl's Mem., doc. # 161 at 65–66.)

In response to the summary judgment motion, the plaintiff has pointed to no evidence indicating that Hasan personally deprived the plaintiff of any rights, or that he personally had the power or authority either to deprive the plaintiff of any rights or to remedy any violation by others. The court concludes that the reliance on his advice by the other defendants or other DOC employees is insufficient to constitute personal involvement for purposes of

constitutional liability. *See, e.g., Tafari v. Annetts,* 06 Civ. 11360(GBD)(AJP), 2008 U.S. Dist. LEXIS 45901, \*35–42 (S.D.N.Y. June 12, 2008) (granting summary judgment for lack of personal involvement by a prison rabbi who was alleged to have influenced the denial of plaintiff's transfer request). The summary judgment motion is granted as to all claims against Imam Hasan.

That completes the discussion of the general defenses. The court now turns to the merits of the plaintiff's religious exercise claims under RLUIPA, the First Amendment and the Equal Protection clause. The remaining legal claims are those involving Halal meat, congregate prayer, cancellation of Jumah, circumcision, mishandling of Qurans, availability of toothsticks, and nonconforming prayer oils.

B. *Claims Regarding Halal Meat*

The plaintiff alleges that the defendants' failure to include Halal meat in the Common Fare diet deprives him of a diet consistent with his religious beliefs.[FN13] The Common Fare diet is vegetarian. The plaintiff claims that his religion does not permit vegetarianism and requires him to eat Halal meat occasionally.[FN14] Plaintiff alleges that the lack of Halal meat is violative of the First Amendment, RLUIPA, and the Equal Protection Clause.

> FN13. The plaintiff's complaint alleges that the defendants permit cross-contamination between regular prison meals and the Common Fare meals. However, the plaintiff has abandoned this claim. In response to the summary judgment motion, plaintiff makes no argument about, and does not point the court to evidence of, such cross-contamination.

> FN14. The plaintiff adds that vegetarian meals have caused him gastrointestinal problems. He cites *Shakur v. Schriro,* 514 F.3d 878, 888 (9th Cir.2008) and suggests that his medical condition should be a part of the religious analysis. *Shakur* is distinguishable because it involved a prisoner's claims that the severe medical effects of the vegetarian diet impacted his ability to achieve the ritual purity required for Muslim prayer. There are no such allegations in this case.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

## 1. First Amendment

The court begins with the plaintiff's First Amendment claim. "[A]lthough prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).[FN15] "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner,* the Supreme Court identified the four factors to be considered in determining the reasonableness of a prison regulation: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmate has alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)(citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

> FN15. A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). The defendants' motion does not challenge the sincerity of plaintiff's belief. Their argument that the plaintiff has a flawed understanding of the requirements of Islam is irrelevant to the question of his sincerity. See *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). For purposes of this motion the court will assume, without deciding, that the plaintiff's sincere religious belief has been substantially burdened.

**\*6** The defendants bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin v. Goord,* 467 F.3d 263, 274–275 (2d Cir.2006)(internal citations and quotation marks omitted). In this analysis, courts must give deference to the defendants because "prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations in situations such as this." *Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). *See also Beard v. Banks,* 548 U.S. 521, 530, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006)(while court must draw inferences in favor of non-moving party at summary judgment stage as to disputed facts, the court's "inferences must accord deference to the views of prison authorities" as to "disputed matters of professional judgment.") "The burden [ ] is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Defendants need not show evidence of actual past disruptions. *See, e.g., Dixon v. Woodruff–Fibley,* No. 1:04–cv1374–DFH–VSS, 2006 U.S. Dist. LEXIS 65911 (S.D.Ind. Sept. 14, 2006) (rejecting plaintiff's argument that there was no evidence that his prayer outside his cell had caused disturbances in the past).

The defendants argue that they are entitled to summary judgment because the DOC's policy of not including Halal meat in the Common Fare diet is reasonably related to legitimate penological interests of security, cost and administrative burden.

First, the defendants argue that their policy serves the interest of prison security. Brian Murphy, Deputy Commissioner of the DOC, explains in his expert disclosure that perceptions of favoritism are a sensitive issue in a prison, and the dining hall is a particularly volatile environment due to inmates' relative freedom of movement and relatively low staff to inmate ratios. (Murphy expert report, doc. # 149, Ex. S at 7.)

Tensions brewing in the housing unit are often released in the group atmosphere of the dining hall, and there is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

greater potential for inmate violence. Such simmering inmate tensions can be ignited by feelings that the inmate is being deprived of food items he/she sees other inmates eating ... So long as some inmates were receiving cuts of meat that others were not, there is the strong potential for inmate unrest.

(*Id. See also* Robert E. Frank Deposition ("Frank Dep."), doc. # 149, Ex. O at 231–32 (opining as to tensions that might arise if Halal meat precisely equivalent to regular menu items could not be supplied) and Brian Murphy expert report, doc. # 149, Ex. S at 7–8 (stating that increasing the complexity of the Common Fare diet could lead to delays in serving meals, which could spark inmate unrest.)

The defendants also offer evidence that Halal meat would be more expensive than equivalent food items on the regular or Common Fare menus. (*See* Robert E. Frank Expert Report ("Frank Report"), doc. # 149, Ex. C.) Because Halal meat would have to be offered to all Muslim inmates systemwide[FN16], the extra cost would not be limited to the facility in which the plaintiff is incarcerated but would be incurred statewide.[FN17] (*See* Frank Report at 7.) In addition, because not all facilities have sufficient storage space (including freezers) to devote exclusively to Halal food, DOC would require expensive facility improvements in order to separately handle, store and prepare Halal meat in the quantities required. (*Id.,* Frank Dep., doc. # 149 Ex. P at 93; Frank Report, doc. # 149, Ex. C at 2.) The defendants contend that the only way to guarantee that Halal meat is consistently kept separate from other foods would be to use-and in some cases construct-separate kitchens. (*Id.* at 230–31.) Because Halal meat looks the same as regular meat, and the prison kitchen staffs are made up primarily of inmates with limited training, having both Halal meat and regular meat in the same kitchen could lead to improper substitution of food items.[FN18] (*Id.* at 88–90.)

FN16. DOC strives to ensure that all inmates in all facilities receive comparable foods in order to avoid resentment among inmates or the appearance of favoritism. (Frank Report at 7.) Therefore, if Halal meat were offered to Muslim inmates at one institution, it would have to be

offered to all Muslim inmates systemwide. The defendants report that as of March 15, 2007, there were 1541 Muslim inmates within the DOC. (Bruno Expert Report, Doc. # 149 Ex. D at 1.)

FN17. Although the plaintiff indicates that he would be satisfied with meat only once or twice a week, even that additional cost would be significant when considered in the context of more than 1500 Muslim prisoners statewide. This is particularly true in light of evidence that DOC's low food costs are a result of volume pricing. (Frank 4/4/07 Dep., doc. # 149, Ex. P at 26.)

FN18. In addition to accidental substitutions, Mr. Frank notes that intentional sabotage is always a concern with inmate workers. (*Id* . at 90.)

**\*7** The defendants also identify additional administrative burdens. Halal meat would have to be ordered separately, brought in on different trucks, unloaded, handled and stored separately in the kitchens, and served separately. (*Id.* at 32–33, 91, 102, 120; Frank expert report, doc. # 149, Ex. C at 2.)

Applying the first *Turner* factor, the defendants have demonstrated that there is a rational relationship between the policy of not providing Halal meat and the asserted penological interests of security, cost and reducing administrative burden. As to the second factor, alternative means of exercising the right, the record reflects that Halal meat sausage is available in the commissary, so the plaintiff has the ability to supplement his otherwise vegetarian diet with some Halal meat. *See Majid v. Fischer,* 07Civ.4584(NRB), 2009 U.S. Dist. LEXIS 71616 at \*19 (S.D.N.Y. July 31, 2009)(second *Turner* factor supports defendant prison officials' position where plaintiffs had option to, and did, supplement their diet with Halal commissary items). In addition, the plaintiff has other opportunities to exercise his religious beliefs, such as Jumah services, accommodations for Ramadan, Arabic class and religion classes. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (where prisoners on outside work details were

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

not able to attend Jumah services, Supreme Court found it significant for the second *Turner* factor that they were given other means of expression such as dietary accommodations and arrangements for Ramadan fasts). As to the third factor, the impact that accommodation of the right will have on the prison system, the defendants have demonstrated that accommodation of the right would have significant impact on the prison in terms of cost, administration and security. Finally, there are no ready alternatives to accomodate both the prisoner's religious needs and the prison's legitimate penological interests.[FN19]

> FN19. The plaintiff argues that the defendants could accept donations of Halal food, but he has not borne his burden of demonstrating that this would be a workable alternative. The defendants present evidence that accepting donated food is not feasible because of the DOC's strict guidelines for food storage and temperature and the risk of serious illness if food has not been properly stored. (Bruno Report, doc. # 149, Ex. D at 6–7; Frank Dep., doc. # 149 Ex. O at 196–99; Ex. P at 49–52.) In fact, Reverend Bruno indicates in his expert report that DOC would accept donations of food in some limited circumstances; "[t]here must, however, be enough donated Halal meat for every Muslim inmate, and the meat must comply with all state health and safety codes." (Bruno Expert Report, doc. # 149, Ex. D at 9.)

The defendants have discharged their burden of demonstrating that the policy is reasonably related to legitimate penological interests. The plaintiff has not made a showing that the defendants' proffered reasons are irrational or that the policy is not reasonably related to legitimate penological interests. Therefore, summary judgment is granted as to the plaintiff's free exercise claim relating to Halal meat.[FN20]

> FN20. This ruling is consistent with decisions by many other courts nationwide that have considered similar prisoner claims. *See, e.g .,* *Williams v. Morton,* 343 F.3d 212 (3d Cir.2003); *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807 (8th Cir.2008); *Phipps v. Morgan,* CV–04–5108, 2006 WL 543896 (E.D.Wash. Mar.6, 2006); *Spruel v. Clarke,* No. C06–5021RJB, 2007 WL 1577729 (W.D.Wash. May 31, 2007). *But see* *Hudson v. Dennehy,* 538 F.Supp.2d 400 (D.Mass.2008)(policy of providing non-Halal vegetarian meals violated plaintiffs' religious rights).

### 2. *RLUIPA*

The analysis under RLUIPA is slightly different. RLUIPA provides in relevant part that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). RLUIPA "imposes a more exacting standard on prison officials" than does the First Amendment analysis, "requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Rahman v. Goord,* No. 04–CV–6368 CJS, 2007 U.S. Dist. LEXIS 32680, *15 (W.D.N.Y. May 3, 2007)(internal quotation marks omitted). However, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter,* 544 U.S. at 722. Moreover, courts should accord "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.*

**\*8** Even assuming that the plaintiff can show a substantial burden on his religious belief, the defendants have demonstrated, as discussed in Section V(B)(1) *supra,*

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs and maintaining workable administrative procedures. *See also Spruel v. Clarke,* No. C06–5021RJB, 2007 WL 1577729 (W.D.Wash. May 31, 2007); *Phipps v. Morgan,* CV–04–5108, 2006 WL 543896 (E.D.Wash. Mar.6, 2006). The court is persuaded that the defendants' policies represent the least restrictive means of furthering those compelling governmental interests. The plaintiff receives nutritious vegetarian meals that include fish, cheese and other non-meat protein sources, and it is undisputed that these meals do not include items forbidden by his religion. Moreover, he is able to supplement his meals with many Halal items from the commissary, including Halal sausage. Therefore, summary judgment is granted as to the plaintiff's RLUIPA claim relating to Halal meat.

### 3. *Equal Protection*

Construing plaintiff's Amended Complaint liberally, he also alleges that the denial of Halal meat is an Equal Protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To prove an equal protection violation, a plaintiff "must demonstrate that he was treated differently than others similarly situated as a result of the intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). However, it is not the case that "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Graham v. Mahmood,* No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *14 (S.D.N.Y. Apr.22, 2008), citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The Second Circuit has determined that the *Turner* standard applies to equal protection claims involving prisoner religious exercise. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, even if a plaintiff can demonstrate that two groups are similarly

situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 574.

The plaintiff has not presented any evidence that members of other religions are treated differently with regard to diet. All inmates receive either the regular diet or the Common Fare diet. The plaintiff argues that Common Fare accomodates the religious scruples of inmates whose religions do not require meat, while failing to accomodate the plaintiff's religious need for Halal meat. Even if this could be viewed as evidence of different treatment of similarly situated groups, the defendants have demonstrated that their decision to offer a vegetarian Common Fare diet but not to offer Halal meat is reasonably related to legitimate penological interests. The defendants are therefore entitled to summary judgment as to this equal protection claim.

### C. *Daily Congregate Prayer*

**\*9** The plaintiff alleges that the defendants impermissibly bar him from engaging in daily congregate prayer. He believes that his religion requires him to congregate with other Muslims five times daily for prayer.[FN21] Relatedly, he also contends that the defendants should permit inmates to lead prayer when a chaplain is not available, which would make it possible for congregate prayer to occur more often. Once again, he claims violations of the First Amendment, RLUIPA and the Equal Protection Clause.

> FN21. The defendants dispute plaintiff's understanding of Islam, arguing that it permits individual prayer as a substitute for congregate prayer when a Muslim is prevented by certain circumstances (such as incarceration) from attending congregate prayer. The defendants do not challenge the sincerity of the plaintiff's belief. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003)(plaintiff bringing a free exercise claim need not show that the practice is required by a particular religion, but only that the beliefs professed are sincerely held and, in the individual's own scheme of things, religious.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

1. *First Amendment*

The defendants argue that they are entitled to summary judgment as to plaintiff's First Amendment claim on this issue because the DOC's policy supports the penological interests of prison security and administration.

As for chaplain-led prayer, the defendants contend that DOC can provide sufficient chaplains to lead prayer five times daily in every housing unit. (Murphy Expert Report, Doc. # 149, Ex. S at 1–2.) In addition, DOC cannot provide sufficient custody staff to supervise such prayer. (*Id.* at 1.) Permitting daily congregate prayer would also endanger security by creating a perception of favoritism, which can create strife among inmates, because Muslim inmates would be out of their cells more frequently than other inmates. (*Id.* at 3.) In addition, the defendants present evidence that congregate prayer "would critically interfere with daily operations, denying others use of common rooms and other areas ." (*Id.*) It would burden prison administration because programs such as meals, work, school, recreation and visits all would have to be scheduled around congregate prayer. (*Id.*)

As to plaintiff's claim that more frequent congregate prayer would be possible if inmates were permitted to lead it in the absence of a chaplain, the defendants submit evidence that the policy of forbidding inmates from leading group prayer is necessary for prison security, because inmate leadership of any sort tends to create "an alternate authority structure within the prison system." (Murphy Expert Report, Doc. # 149, Ex. # S at 2–3.) The DOC cites its experience of inmate religious groups being overtaken by gangs and being used as covers for gangs. (*Id.* at 3–4.) In addition, they point to evidence of violent incidents among DOC inmates belonging to different Muslim sects. (*Id.; see also* DOC incident reports, Doc. # 149, ex. T.) [FN22] The DOC's decision to combine all Muslim collective activity in one Jumah instead of permitting collective activities by various different sects has led to "significantly improved security conditions and enormous reductions in violence amongst Muslim groups." (*Id.* at 5.)

FN22. As an example, defendants cite an incident at Osborn Correctional Institute. A Muslim inmate was trying to enter the dining hall during Ramadan, and other Muslim inmates claiming to be "gatekeepers" attempted to keep him out. In the ensuing violence, a correctional officer was seriously injured. (*Id.*)

Applying the first *Turner* factor-whether there is a rational relationship between the regulation and the legitimate government interests asserted-the defendants have pointed to serious and legitimate penological concerns associated with unsupervised inmate religious activities and daily congregational prayer. Their policies are logically related to those penological concerns of security and administration. In this vein, the Second Circuit has broadly upheld a so-called "free-world sponsor" requirement requiring that a chaplain or volunteer be present for congregate religious activities "to ensure that the meeting is convened for religious purposes and not to hold kangaroo courts, foster extortion, or provide a venue for the dissemination of conspiratorial information." *Benjamin v. Coughlin, 905 F.2d 571, 577–578 (2d Cir.1990).*

**\*10** The second *Turner* factor-whether the inmate has alternative means to exercise the right-also supports the defendants' position. The plaintiff is free to pray individually in his cell, and, as discussed above, he has many other opportunities to practice his religion. Applying the third factor, the impact that accommodation would have on the prison, the defendants have submitted adequate evidence that daily congregate prayer would have a substantial effect on the administration and management of the prison and on security arrangements.

The fourth factor is the existence of ready alternatives which accommodate the right and satisfy the governmental interest. The plaintiff offers several alternatives. For example, he argues that he would be satisfied with just one congregate prayer per day. Plaintiff also argues that if an Islamic chaplain is at the prison during a time when Muslim inmates are out of their cells, and it is time to pray, then the chaplain should go to the common room to lead prayers.[FN23] Both of these proposals would necessitate the presence of security guards and/or chaplains, as well as the administrative burdens associated with scheduling and the use of prison facilities, and they do not address the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

defendants' security concerns about other inmates' perception of favoritism.[FN24] The defendants' governmental interest is not satisfied by these alternatives. The defendants' motion for summary judgment is therefore granted as to this First Amendment claim.

> FN23. Plaintiff's other suggestion, that inmates who happen to be out of their cells at the same time could simply gather to pray together, does not address the security concerns backing the prison's policy that prisoners cannot gather to pray unless a chaplain is present.

> FN24. Moreover, despite plaintiff's willingness to accept congregate prayer only once per day or whenever a chaplain happens to be present, the availability of congregate prayer necessarily impacts other Muslim prisoners, who might have stricter views.

## 2. *RLUIPA*

The court next considers the plaintiff's demand for daily congregate prayer under RLUIPA. Assuming for purposes of this motion that the plaintiff's religious exercise is substantially burdened, *see supra* section V(B)(2), the court concludes that the regulation is in furtherance of compelling government interests of prison security and order and is the least restrictive means of furthering that compelling government interest. The defendants permit the plaintiff to pray in his cell, and their policy provides that weekly congregate prayer be held for each religion. RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security concerns that the defendants identify. The defendants' motion for summary judgment is granted as to this RLUIPA claim.

## 3. *Equal Protection*

Construed liberally, the plaintiff's complaint alleges that the defendants' refusal to permit congregate prayer is an Equal Protection violation. In particular, his complaint alleges that "[t]he Plaintiff has witnessed inmates of other Religions leading their Religious congregations in prayers all throughout the Connecticut Department of Corrections"

and that the policy against inmate leadership of prayer is applied only to Muslims. (Am.Compl., doc. # 62–2, ¶ 130.) The defendants move for summary judgment as to this claim.

In response to the motion, the burden is on the plaintiff to present evidence of different treatment of similarly situated religious groups with regard to daily congregate prayer. This he has not done. Despite the allegations made in his complaint, the plaintiff has submitted no evidence that the defendants permit inmates of other religions to lead prayer or that any religious group has daily congregate prayer.[FN25] Therefore, the defendants are entitled to summary judgment as to plaintiff's equal protection claim.

> FN25. The only example plaintiff identifies is the DOC's accommodation of the daily Native American "smudging" ceremony. The record demonstrates that this is not an example of congregate prayer but an example of individual prayer. Participating Native American inmates are taken outdoors as a group because the ceremony involves fire that would be dangerous to use in a cell, but they pray individually.

## D. *Cancellation of Jumah*

**\*11** The plaintiff's complaint alleges that Friday Jumah services are frequently cancelled due to the unavailability of a chaplain to lead the services. He believes that participating in a weekly Jumah is a requirement of his religion. He points to evidence that lack of staffing for Jumah has been a regular problem for more than four years. (Pl's Opp., Doc. # 161 at 54.) The plaintiff alleges that this practice violates the First Amendment, RLUIPA and the Equal Protection Clause.

The defendants seem to concede that Jumah is frequently cancelled but say that cancellation is necessary when there is no chaplain available or in case of a security lockdown.[FN26] In opposing the plaintiff's request for daily prayer, the defendants argue that every religion is provided with a weekly congregate prayer, and that the plaintiff's need for congregate prayer is satisfied by the offering of Jumah. DOC policy expressly provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

to the various religious denominations." [FN27] (A.D. 10.8 ¶ 6(B), ¶ 6(A).) The defendants also present evidence touting the involvement and attentiveness of their Islamic chaplains. Yet they provide no explanation for the alleged frequent cancellation of Jumah, or for the insufficient and unequal staffing that allegedly underlies it.

> FN26. The defendants argue that Jumah must sometimes be cancelled due to a lockdown or other security issue, but there is no evidence that this security concern explains all cancellations. The parties have not directed the court's attention to any evidence in the record regarding cancellation on any particular dates.

> FN27. The plaintiff argues there is a disparity in staffing. "Protestants have over 300 approved volunteers while Muslim[s] have 12 approved volunteers." (Pl's Mem., doc. # 161 at 61.)

The defendants have failed to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest (under the First Amendment and Equal Protection Clause) or in furtherance of a compelling governmental interest (under RLUIPA). Therefore, the defendants' motion for summary judgment is denied as to these claims.

E. *Other Religious Exercise Claims*

1. *Mishandling of Quran*

The plaintiff alleges that DOC employees regularly mishandle the Quran. He gives evidence of Qurans being thrown on the floor and handled roughly, and says his own Quran was damaged due to mishandling. (Pl's Opp., doc. # 161 at 59; Pl's Aff., doc. # 163, ¶ 110–11.) The plaintiff concedes that Qurans must sometimes be searched but alleges that the disrespectful handling is a violation of the First Amendment and RLUIPA. Plaintiff also claims that it is an Equal Protection violation, because other inmates' religious items are more respectfully handled. [FN28]

> FN28. The plaintiff points to evidence that the medicine bags of Native American inmates are searched in a more respectful manner. (Pl's Opp.,

doc. # 161 at 29.) DOC officials are not permitted to touch the bags or the contents and instead have the inmates empty the bags themselves. (*Id.*)

The defendants have failed to address this claim in any way in their motion for summary judgment or to direct the court's attention to evidence about DOC policies for handling of inmates' religious materials. The defendants have not borne their burden of demonstrating that they are entitled to summary judgment on this claim.

2. *Circumcision*

The plaintiff alleges that the defendants' denial of his request to be circumcised for religious reasons violates the First Amendment and RLUIPA. He believes that Islam requires male converts to be circumcised. [FN29] The defendants' motion does not explain why they denied plaintiff's request, nor does it provide any analysis of the plaintiff's First Amendment and RLUIPA claims. The defendants have failed to provide the court with any explanation of their decision. The defendants have not borne their burden of demonstrating that they are entitled to summary judgment on this claim.

> FN29. The complaint alleges that, in response to plaintiff's grievance on this issue, defendant Bruno wrote that it was being denied based on advice from Imam Hasan "that circumcision is optional for adult male Islamic converts" and because circumcision "is not done by an Imam." (Am.Compl., doc. # 62, ¶ 87.)

3. *Purchase of Toothstick*

**\*12** The plaintiff claims that the DOC restricts him from purchasing a miswak, or toothstick. The plaintiff claims to have a sincere belief that miswaks are required for the practice of Islam and alleges that this restriction violates the First Amendment and RLUIPA. The defendants' motion fails to address this issue in any way and is therefore denied as to this claim.

4. *Commissary Prayer Oils*

Although it is undisputed that the DOC's commissary offers certain prayer oils, the plaintiff points to evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)

(Cite as: 2009 WL 3157586 (D.Conn.))

that the prayer oils sold in the DOC commissary contain chemicals that are prohibited by Islam. (Pl's Opp, doc. # 161 at 31.) He alleges that the failure to offer prayer oils conforming with Islamic requirements is a violation of the First Amendment and RLUIPA.

Reverend Bruno's expert report represents that "the DOC has obtained affidavits of purity and acceptance with regards to the oils sold in commissary." (Bruno Report, doc. # 149, Ex. D at 10.) A copy of such a certificate has been submitted. (Doc. # 149, Ex. I .) However, the defendants' motion does not otherwise address the plaintiff's claim that the oils contain improper chemicals. There appears to be a dispute of material fact as to the contents of these oils, and the defendants' motion is therefore denied as to this claim.

VI. *Conclusion*

For all the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part.

The motion is granted as to all claims against defendants DeVeau and Hasan. The motion is granted as to any claim under RLUIPA for money damages against the remaining defendants, Bruno and Lantz.

Summary judgment is also granted as to plaintiff's claims regarding Halal meat and daily congregate prayer. In addition, the defendants' motion is granted as to plaintiff's claims of untimely prayer at the end of Ramadan in 2002, lack of adequate nutrition in the Ramadan meals, lack of access to leather socks, lack of access to a prayer clock, lack of access to hygiene items and the confiscation of a silver ring. The plaintiff's claim that he was physically and psychologically abused because of his faith in violation of the Equal Protection Clause is dismissed. *See supra,* n. 7.

The motion is denied as to the following claims, all of which are directed to defendants Bruno and Lantz in their official capacities for injunctive and declaratory relief under RLUIPA, the First Amendment and the Equal Protection clause and in their individual capacities for damages and injunctive and declaratory relief under the First Amendment and the Equal Protection clause:

(1) claims regarding cancellation of Jumah;

(2) claims regarding denial of circumcision request;

(3) claims regarding mishandling of Qurans;

(4) claims regarding availability of toothsticks; and

(5) claims regarding nonconforming prayer oils.

The four pending Motions *in limine* (docs.# 150, 154, 169, 171) are denied without prejudice to refiling at the time of trial. As to those motions that seek to preclude only certain statements or opinions rather than an entire witness or report, if the motions are refiled they should specify in detail (and with pinpoint citations) the statements or opinions that the moving party seeks to preclude.

**\*13** SO ORDERED at Hartford, Connecticut this 25th day of September, 2009.

D.Conn.,2009.

Vega v. Lantz
Not Reported in F.Supp.2d, 2009 WL 3157586 (D.Conn.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. Washington.
Liniell PHIPPS, Plaintiff,
v.
Richard MORGAN, et al., Defendants.
No. CV-04-5108-MWL.

March 6, 2006.
Liniell Phipps, Monroe, WA, pro se.

Brian G. Maxey, Attorney General of Washington, Olympia, WA, for Defendants.

ORDER ADOPTING REPORT AND
RECOMMENDATION

SUKO, J.

**\*1** Magistrate Judge Leavitt filed a report and recommendation on January 13, 2006, recommending that Defendants' motion for Summary Judgment be granted, Defendants be awarded summary judgment on all claims set forth in Plaintiff's amended complaint, and Plaintiff's case be dismissed with prejudice. (Ct.Rec.89).

The report and recommendation permitted Plaintiff ten (10) days, following service thereof, to file written objections to the report and recommendation. (Ct.Rec.89). However, on January 26, 2006, the Court was informed that the report and recommendation was returned as not deliverable to Plaintiff. (Ct.Rec.90). On January 30, 2006, Plaintiff informed the Court that his address had been changed. (Ct.Rec.91). Therefore, on January 30, 2006, the Court ordered that the previously set date for the filing of objections to the report and recommendation be vacated and that the parties be allowed additional time, through, February 17, 2006, to file written objections to the report and recommendation. (Ct.Rec.92).

On February 17, 2006, Plaintiff filed an objection to the report and recommendation. (Ct.Rec.96). On February 28, 2006, Defendants filed a response to Plaintiff's objections. (Ct.Rec.100).

A. *First Amendment Claim*

In a claim arising under the First Amendment's Free Exercise Clause, an inmate must first satisfy two criteria: 1) the religious belief is sincerely held and 2) the claim must be rooted in religious belief. *Malik v. Brown,* 16 F.3d 330 (9th Cir.1994). If these prerequisites are established, then the reasonableness of a prison policy is determined pursuant to the four factors articulated in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[FN1]

> FN1. The *Turner* case sets forth the following four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests: 1) There must be a valid, rational connection between the prison regulation and the asserted legitimate governmental interest; 2) whether there are alternative means of exercising the right available to prison inmates; 3) the impact the accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and 4) exploration of the absence of ready alternatives to the regulation. 482 U.S. at 89-91.

The Magistrate Judge properly concluded that Defendants failed to provide the Court with any reason to doubt that Plaintiff sincerely believed that his religion required him to eat Halal meat, a tenet he believed was central to his religious beliefs. (Ct.Rec.89, p. 8). Therefore, the Magistrate Judge then discussed the *Turner* factors finding that the Defendants' failure to provide Halal meat to Plaintiff was reasonable.

Despite Plaintiff's objections, the Magistrate Judge appropriately analyzed the *Turner* factors in this case. The Department of Corrections ("DOC") has a legitimate interest in reducing its costs, streamlining its food production, limiting the number of required staff, maintaining consolidation of its vendors, and preventing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

security risks. Islamic law does not require the eating of meat as a condition of being a Muslim, and the ovo-lacto vegetarian meals adequately accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC. Although Plaintiff has directed the Court to passages from the Quran, none of the quotations actually mandate the eating of meat.

As determined by the Magistrate Judge, the current program of providing Muslim inmates with ovo-lacto vegetarian meals is an adequate alternative to providing Halal meals. By providing ovo-lacto vegetarian meals, the DOC is able to meet Muslim religious requirements and not incur the burdens of a complicated food service, demands for additional staffing, potential increased security threats and increased costs.

**2** The undersigned finds that the Magistrate Judge properly concluded that Defendants' failure to provide Halal meals to Muslim inmates is reasonably related to legitimate penological interests and, accordingly, Plaintiff's right to the free exercise of his religion was not violated by Defendants.

B. *RLUIPA*

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1.

The Magistrate Judge appropriately found that Defendants established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA, i.e., reducing costs, streamlining food production, limiting the

number of required staff, maintaining consolidation of vendors, and limiting security risks. (Ct.Rec.89, pp. 14-15). The Magistrate Judge also properly concluded that providing ovo-lacto vegetarian meals, the dietary program currently available to Plaintiff, was the least restrictive means of furthering that compelling interest. (*Id.*) The undersigned thus finds, in accord with the report and recommendation, that Defendants are entitled to summary judgment on Plaintiff's RLUIPA claim.

C. *Equal Protection Claim*

Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 67, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972). In order to state a § 1983 claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with intentional discrimination against plaintiff or against a class of inmates which included plaintiff. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir.2000). To prevail on this equal protection claim, Plaintiff must prove that a discriminatory intent was a motivating factor in the decision not to provide Halal meat to Plaintiff and that Defendants also failed to satisfy the *Turner* reasonable relationship test. *Salaam v. Collins,* 830 F.Supp. 853, 859 (D.Md.1993); *Abdullah v. Fard,* 974 F.Supp. 1112, 1119 (N.D.Ohio 1997).

The Magistrate Judge correctly found that Plaintiff failed to allege a discriminatory purpose behind DOC's policy of providing ovo-lacto vegetarian meals to Muslim inmates to accommodate their religious beliefs. (Ct.Rec.89, p. 16). As determined by the Magistrate Judge, even if a discriminatory purpose was shown, Defendants' dietary program pertaining to Muslim inmates still met the *Turner* reasonable relationship test. Accordingly, the undersigned finds, in accord with the report and recommendation, that Defendants are entitled to summary judgment with respect to Plaintiff's equal protection claim as well.

D. *Conclusion*

**3** Having reviewed the report and recommendation

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

(Ct.Rec.89), Plaintiff's objections to the report and recommendation (Ct.Rec.96), and Defendants' response (Ct.Rec.100), said report and recommendation is ADOPTED in its entirety.

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (Ct.Rec.48) is GRANTED, Defendants are awarded summary judgment on all of the claims set forth in Plaintiff's amended complaint (Ct.Rec.33), and Plaintiff's case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED. The District Court Executive shall enter this order, enter JUDGMENT in favor of the Defendants, forward a copies to Plaintiff and counsel, and CLOSE THE FILE.

REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LEAVITT, Magistrate J.

I. *Procedural History*

Plaintiff Linniell Phipps ("Plaintiff") is currently incarcerated at the Monroe Correctional Complex ("MCC") in Monroe, Washington. (Ct.Rec.50-1, Exh. 1, Att.A). Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims Defendants have violated his constitutional rights by failing to accommodate his religious needs by not providing him with a Halal religious diet,[FN1] for Muslim prisoners, during his incarceration. (Ct.Rec.33).

> FN1. Muslims are only allowed to eat Halal meat. Halal meat is prepared as follows: The animal should be slaughtered in such a way as to allow its blood to flow out freely and completely (i.e., with a sharp tool cutting the main veins and throat). The name of Allah should be invoked over the animal at the time of the slaughter. The meat should be inspected to ensure that it is wholesome and does not contain any matter injurious to human health. The person who slaughters the animal may be a Muslim, Jew or Christian, but not an atheist, pagan, or polytheist. (Ct.Rec.50-2, pp. 32-33).

The parties did not consent to the jurisdiction of the Magistrate Judge in this case. On November 17, 2005, Defendants filed a timely motion for summary judgment. (Ct.Rec.48). Pursuant to Local Rule 7.1(h), the hearing on Defendants' motion for summary judgment was set for January 9, 2006. (Ct.Rec.51). On November 30, 2005, the Court held a telephonic hearing on four non-dispositive motions filed by Plaintiff. (Ct.Rec.72). At the hearing on the motions, the Court orally issued Plaintiff a *Klingele/Rand* notice to ensure Plaintiff understood the implications of a grant of summary judgment and to permit him the opportunity to file his opposition accordingly. *Rand v. Rowland,* 154 F.3d 952 (9th Cir.1998); *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir.1988). The Court thereafter granted Plaintiff additional time, through December 29, 2005, to respond to Defendants' motion for summary judgment. (Ct.Rec.73). Plaintiff filed a response in opposition to Defendants' motion for summary judgment on December 21, 2005. (Ct.Rec.85). On December 28, 2005, Plaintiff filed a supplement to his response. (Ct.Rec.87). On January 6, 2006, Defendants filed a reply in support of their motion for summary judgment. (Ct.Rec.88).

After considering the arguments presented and the relevant authorities, the Court recommends that Defendants' motion for summary judgment be granted. (Ct.Rec.48).

II. *Legal Standard*

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under summary judgment practice, the moving party

**\*4** [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' ' *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 586 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings

and to assess the proof in order to see whether there is a genuine need for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments).

**\*5** In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed.R.Civ.P. 56(c). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Matsushita,* 475 U.S. at 587 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), aff'd, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (citation omitted).

### III. *Plaintiff's Claims*

Plaintiff's amended complaint (Ct.Rec.33) sets forth the following four allegations:

1. Plaintiff's First Amendment right to free exercise of his religion was violated by Defendants' refusal to provide him Halal meat.

2. Defendants' refusal to provide him Halal meat is a violation of RLUIPA.

3. Plaintiff was denied his Fourteenth Amendment right to the equal protection of the law because other inmates receive food pursuant to their religious principles, while Muslims do not receive Halal meals.

4. Defendants violated Plaintiff's rights under not only

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

the United States Constitution, but also the Washington State Constitution.

IV. *Discussion*

A. *First Amendment Claim*

The First Amendment to the United States Constitution provides that Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I. The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). A human being does not cease to be human because the human being is a prisoner of the state. *Ward v. Walsh,* 1 F.3d 873, 877 (9th Cir.1993). The Court has also recognized that limitations on a prisoner's free exercise rights arise from both the fact of incarceration and from valid penological objectives. *O'Lone,* 482 U.S. at 348; *McElyea v. Babbit,* 833 F.2d 196, 197 (9th Cir.1987). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone,* 482 U.S. at 348. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), provides the test for balancing those interests: "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

**\*6** The *Turner* case sets forth four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89. Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. *Id.* Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. *Id.* Fourth, "the absence of ready alternatives" to the regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not

reasonable." *Id.*

However, before analyzing a prison regulation under *Turner,* in a claim arising under the First Amendment's Free Exercise Clause, an inmate must first satisfy two criteria: 1) the religious belief is sincerely held and 2) the claim must be rooted in religious belief. *Malik v. Brown,* 16 F.3d 330 (9th Cir.1994). If these prerequisites are established, then the reasonableness of a prison policy is determined pursuant to the factors articulated in *Turner.* "In order to establish a free exercise violation, [plaintiff] must show the defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith." *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). The burden imposed must be substantial, and not merely an inconvenience. *Id.* at 737.

Defendants provide adequate support for their argument that there is no requirement that Muslims consume meat prepared in accordance with Halal requirements and that Plaintiff thus fails to demonstrate that eating meat is a central tenet of Islam. (Ct. Rec. 49, p. 4; Ct. Rec. 50-3, Exh. 4, pp. 15-16; *see infra* ). Even accepting that the consumption of Halal meat is a tenet of Plaintiff's religious practice, the materials provided by Plaintiff himself establish that Kosher meat is also considered Halal and that a Kosher diet is considered Halal. (Ct.Rec.87). It is undisputed that Kosher meals are also available to Plaintiff. The unpublished Colorado district court case provided by Plaintiff in his supplemental response recognized that providing Kosher meals satisfied a Muslim's religious exercise to consume Halal meat.[FN2] (Ct.Rec.87).

> FN2. The case provided by Plaintiff in his supplemental response states as follows: "Kosher meat is also considered halal as the strictures governing the processing of Kosher meats are at least as rigorous as the strictures governing the processing of halal meat. Thus, a Kosher diet, to the extent it does not contain alcohol, is considered halal." (Ct.Rec.87).

Nevertheless, as was the case in the unpublished Colorado district court case provided in Plaintiff's supplemental response (Ct.Rec.87), Defendants fail to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

provide the Court with any reason to doubt that Plaintiff sincerely believes that Islam requires him to eat Halal meat. *See, also, Williams v. Morton,* 343 F.3d 212, 217 (3rd Cir.2003). Having determined that Defendants have imposed a substantial burden on Plaintiff's sincerely held religious belief, the Court must next determine whether the Defendants' failure to provide Halal meat to Plaintiff is reasonable under *Turner.*

1. *Legitimate Penological Interests*

**\*7** Defendants assert that the Department of Corrections ("DOC") has a legitimate interest in reducing its costs, streamlining its food production, limiting the number of required staff, and maintaining consolidation of its vendors. (Ct.Rec.49, p. 6). They contend that the current ovo-lacto vegetarian meals accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC, and that these costs are not just financial, but include simplified food services, lower numbers of staff, and efficiency of consolidating food service vendors. (Ct. Rec. 49, p. 6; Ct. Rec. 50-3, Exh. 5, p. 2). In addition, Defendants assert that the use of an alternate vendor to provide the meals would create a security risk, as those vendors have not been screened by the DOC.

Simplified food service, security, and budget constraints are legitimate penological interests. *Williams,* 343 F.3d at 217; *see also, Al-Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir.1991) (Both security and economic concerns are legitimate penological concerns); *DeHart v. Horn,* 227 F.3d 47, 53 (3rd Cir.2000) (simplified food service is a legitimate penological interest).

Cheryl Johnson, Food Program Manager for the DOC, provides persuasive evidence to support Defendants' claim of legitimate penological interests. (Ct.Rec.50-3, Exh. 5). Ms. Johnson declared that all special meals create increased demands on staff, the provision of Halal meals to Muslim inmates would create additional costs, decrease efficiency of the food preparation and necessitate hiring additional staff members, and there would be increased security risks associated with special delivery services if Halal meals were not available through the primary vendor. (Ct.Rec.50-3, Exh. 5, p. 2).

Ms. Johnson's statements are logical and are not adequately refuted by Plaintiff's remarks to the contrary (Ct.Rec.85, pp. 19-25). Plaintiff simply makes assertions, without support, to refute Ms. Johnson's declaration. (Ct.Rec.85, pp. 23-25). Plaintiff's unsupported, conclusory statements do not create an issue of fact necessary to defeat summary judgment. See *Celotex Corp.,* 477 U.S. at 322. Moreover, federal case law supports the fact that introducing Halal meals would increase costs and lead to additional security concerns. *Williams,* 343 F.3d at 218 ($1.80 more per meal for a Halal meal with meat than the cost of a regular meal in addition to evidence of security concerns associated with providing Halal diet); *Salaam v. Collins,* 830 F.Supp. 853 (D.Md.1993) (recognized cost advantage of providing Muslim inmates with a lacto-ovo-vegetarian diet instead of a Halal diet).

Defendants submit the declarations of Daniel L. Williams, Religious Program Manager for the DOC (Ct.Rec.50-2, Exh. 2) and Brannon Wheeler, Distinguished Professor of History and Politics, and Director of the Center for Middle East and Islamic Studies at the United States Naval Academy (Ct.Rec.50-3, Exh. 4), as support for their assertion that the ovo-lacto vegetarian diet adequately accommodates Plaintiff's religious dietary requirements.

**\*8** Mr. Williams stated that inmates at the DOC are provided with ovo-lacto vegetarian meals which are nutritionally adequate and which meet the religious requirements for Muslims. (Ct.Rec.50-2, Exh. 2, p. 4). He indicated that he inquired directly to the Islam advisor about the sufficiency of ovo-lacto vegetarian meals to meet Islam requirements, and that individual advised Mr. Williams that the consumption of Halal, Kosher, or vegetarian diets would be sufficient under Islam. (*Id.*)

Mr. Wheeler declared that Islamic law does not require the eating of meat as a condition of being a Muslim, and that the consumption of a vegetarian diet is actually considered more pious than the eating of a meat diet. (Ct.Rec.50-3, Exh. 4, p. 16). He additionally stated that animals slaughtered according to Kosher (Orthodox Jewish) laws are considered Halal (lawful) for Muslims to consume. (Ct.Rec.50-3, Exh. 4, p. 17).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

Federal case law, including the Colorado district court case provided by Plaintiff in his supplemental response (Ct. Rec. 87; Kosher meals accommodate religious needs of Muslim inmates), has consistently held that vegetarian, ovo-lacto vegetarian or Kosher meals all meet the religious requirements for Muslims. *Williams,* 343 F.3d at 218 (vegetarian meals); *Salaam,* 830 F.Supp. at 861 (lacto-ovo-vegetarian meals); *Abdullah v. Fard,* 974 F.Supp. 1112, 1118 (N.D.Ohio 1997) (vegetarian meals); *Cochran v. Schotten,* 172 F.3d 47 (6th Cir.1998) (ovo-lacto-vegetarian diet).

The declarations of Ms. Johnson, Mr. Williams and Mr. Wheeler, in addition to federal case law, support a conclusion that ovo-lacto vegetarian meals adequately accommodate Plaintiff's religious dietary requirements at the lowest cost to the DOC.[FN3] Moreover, it is undisputed that Kosher meals are also available to Plaintiff, and the materials provided by Plaintiff, as well as Mr. Williams' declaration, indicate that Kosher meals also satisfy a Muslim's religious exercise to consume Halal meat.

> FN3. While Plaintiff argues that the ovo-lacto vegetarian diet does not accommodate his religion because the diet contains eggs (Ct.Rec.85, p. 16), the Court finds nothing in the record to support this assertion. There is simply no evidence, other than argument by way of Plaintiff's memorandum, to contradict the fact that the currently provided ovo-lacto vegetarian meals accommodate Plaintiff's religious dietary requirements. *See, Celotex Corp.,* 477 U.S. at 322.

2. *Alternative Means of Expressing Religious Belief*

Defendants met the second factor by providing alternate means for Plaintiff to exercise his religion. Muslims are given time off of work to celebrate the two major holidays, are allowed to meet together to celebrate Eidul-Fitr and Eidul-Adha, and receive special meals, their fasting requirements are met during Ramadan, accommodations are made for the five daily required prayers, and Muslims are permitted to congregate every Friday for the Jum'ah service. (Ct.Rec.50-2, Exh. 2). Education classes or other activities are often held for Muslims on other days, and a number of DOC facilities have hired a Muslim contract chaplain to assist in the religious practice and instruction of the Muslim inmates. (*Id.*) Plaintiff does not dispute these assertions. (Ct.Rec.85).

3. *Impact on Guards and Other Inmates*

While it is true that Defendants have not submitted any analysis regarding the impact that supplying Halal meat will have on guards, other inmates and the allocation of prison resources, such a showing is not required. *Abdullah,* 974 F.Supp. at 1118. The burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it. *Overton V. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Defendants have, however, shown by way of declaration from Ms. Johnson that all special meals create increased demands on staff, the provision of Halal meals to Muslim inmates would decrease efficiency of the food preparation and necessitate hiring additional staff members, and there would be increased security risks associated with special delivery services if Halal meals were not available through the primary vendor. (Ct.Rec.50-3, Exh. 5, p. 2).

4. *The Absence of Ready Alternatives*

**\*9** Finally, Defendants have demonstrated that the current program of providing ovo-lacto vegetarian meals for Plaintiff is an adequate alternative to providing Halal meals. By providing ovo-lacto vegetarian meals, the DOC is able to meet Muslim religious requirements and not incur the burdens of a complicated food service, demands for additional staffing, potential increased security threats and increased costs. The Court is convinced that there is no reasonable alternative that would accommodate Plaintiff's request with a diminimus impact on the DOC.

Defendants have satisfied the four factors set forth in *Turner* thus demonstrating that Defendants' failure to provide Halal meals to Muslim inmates is reasonably related to legitimate penological interests. As a matter of law, Plaintiff's constitutional right to free exercise of his religion was not violated by Defendants. Accordingly, Defendants are awarded summary judgment on this claim.

B. *RLUIPA*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1.

Plaintiff alleges that eating Halal meat is compelled by and central to his religion and that Defendants' refusal to provide him the benefit of eating Halal meat pressures him to either violate the covenants of his belief or to simply no longer be a Muslim. (Ct.Rec.85, pp. 26-27). Plaintiff thus asserts that the Defendants' refusal to provide him with Halal meat is in violation of RLUIPA.

As determined in Section A, above, the Court finds that Plaintiff has adequately alleged that the Defendants' refusal to provide him with Halal meat burdens the exercise of his religion. The Court thus finds that Plaintiff has made a prima facie showing, and the burden shifts to Defendants to demonstrate that the regulation furthers a compelling government interest and is the least restrictive means of furthering that compelling interest. *San Jose Christian College v. Morgan Hill*, 360 F.3d 1024 (9th Cir.2004).

The Court further finds that Defendants have not only shown legitimate interests for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks, but they have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA. Additionally, Defendants have demonstrated that the least restrictive means of furthering that compelling interest is providing ovo-lacto vegetarian meals, the dietary program currently available to Plaintiff.[FN4] Therefore, Defendants are entitled

to summary judgment on Plaintiff's RLUIPA claim as well.

FN4. Kosher meals, which are considered Halal according to the supplemental materials provided by Plaintiff and the declaration of Mr. Williams, are also available to Plaintiff.

C. *Equal Protection Claim*

**\*10** Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972). In order to state a § 1983 claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with intentional discrimination against plaintiff or against a class of inmates which included plaintiff. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (equal protection claims may be brought by a "class of one"); *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir.2000); *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998); *Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 471 (9th Cir.1991); *Lowe v. City of Monrovia,* 775 F.2d 998, 1010 (9th Cir.1985). "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren,* 152 F.3d at 1194.

Plaintiff contends that he was denied equal protection of the law because other inmates receive food pursuant to their religious principles, while Muslims do not receive Halal meat. (Ct.Rec.33). To prevail on this claim, Plaintiff must prove that a discriminatory purpose was a motivating factor in the decision not to provide Halal meat to Plaintiff and that Defendants failed to satisfy the *Turner* reasonable relationship test. *Salaam,* 830 F.Supp. at 859; *Abdullah,* 974 F.Supp. at 1119.

Plaintiff fails to even allege that the practice at DOC to give ovo-lacto vegetarian meals to Muslim inmates is done with discriminatory intent. (Ct.Rec.33). Defendants contend that the DOC provides all religions diets that accommodate their central tenets and requirements.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

(Ct.Rec.49, pp. 13-14). They indicate that the DOC treats all religions similarly by meeting their nutritional and religious needs, while still maintaining an efficiently run food service program. (*Id.*) Plaintiff does not dispute these assertions in his response. (Ct.Rec.85). Furthermore, even if a discriminatory purpose were established, Defendants meet the *Turner* reasonable relationship test. *Supra.* Accordingly, Plaintiff cannot prevail on his equal protection claim. The Court finds that there is no genuine issue for trial with regard to Plaintiff's equal protection claim and Defendants have thus met their burden as the parties moving for summary judgment. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's equal protection claim.

D. *State Law Claims*

Plaintiff alleges that Defendants violated his rights under not only the United States Constitution, but also the Washington State Constitution. (Ct.Rec.33). A court is not, however, required to undertake an independent state constitutional analysis without the plaintiff first raising a convincing argument. *State v. Gunwall,* 106 Wash.2d 54, 63, 720 P.2d 808 (1986). "Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articuable, reasonable, and reasoned." *Id.* "If a party does not provide constitutional analysis based upon the facts set out in *Gunwall,* the court will not analyze the state constitutional grounds in a case." *First Covenant Church of Seattle v. City of Seattle,* 120 Wash.2d 203, 224, 840 P.2d 174 (1992).

**\*11** The six nonexclusive criteria established in *Gunwall* to determine whether the Washington State Constitution should be considered as extending broader rights to its citizens than does the United States Constitution are as follows: 1) the textual language of the state constitution; 2) significant differences in the texts of parallel provisions of the federal and state constitutions; 3) state constitutional and common law history; 4) preexisting state law; 5) differences in structure between federal and state constitutions; and 6) matters of particular state interest and local concern. *Gunwall,* 106 Wash.2d at 59-61, 720 P.2d 808.

As indicated by Defendants (Ct.Rec.49, 11-13), Plaintiff has failed to consider or brief the *Gunwall* factors. In addition, Plaintiff has failed to plead with particularity his state constitutional claims in his amended complaint. (Ct.Rec.33). Plaintiff offers no response to Defendants' motion for summary judgment on Plaintiff's state law claims. (Ct.Rec.85). Based on the foregoing, the court also awards Defendants summary judgment on Plaintiff's state law claims.

Due to the conclusions determined above, the Court finds that it need not reach Defendants' affirmative defense arguments of qualified immunity and Eleventh Amendment immunity. (Ct.Rec.49, pp. 15-20). Nevertheless, it appears that Plaintiff's claims would be defeated by these defenses as well.[FN5]

> FN5. The State has not waived its immunity to suit in this case; therefore, pursuant to the Eleventh Amendment, it appears that the named Defendants are immune from suit in their official capacities. In addition, there is no clear-cut rule or established right regarding Muslim inmates and their right to Halal meals. *See, Hudson v. Maloney,* 326 F.Supp.2d 206, 211-214 (D.Mass.2004). Therefore, pursuant to *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the uncertain applicability of the law to the facts of record in this case with respect to the religious diet issues entitles the named Defendants to qualified immunity.

V. *Conclusion*

For the reasons discussed above, the Court recommends that Defendants' motion for summary judgment (Ct.Rec.48) be GRANTED, Defendants be awarded summary judgment on all of the claims set forth in Plaintiff's amended complaint (Ct.Rec.33), and Plaintiff's case be DISMISSED WITH PREJUDICE.

In light of the foregoing recommendation, it is ORDERED that all dates and obligations set forth in the June 30, 2005 amended scheduling order (Ct.Rec.47) are STRICKEN pending a final determination by the district court.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)

(Cite as: 2006 WL 543896 (E.D.Wash.))

### OBJECTIONS

Any party may object to a magistrate judge's proposed findings, recommendations or report within ten (10) days following service with a copy thereof. Such party shall file with the District Court Executive all written objections, specifically identifying the portions to which objection is being made, and the basis therefor. Attention is directed to Fed.R.Civ.P. 6(e), which adds another three (3) days from the date of mailing if service is by mail.

A district judge will make a *de novo* determination of those portions to which objection is made and may accept, reject, or modify the magistrate judge's determination. The district judge need not conduct a new hearing or hear arguments and may consider the magistrate judge's record and make an independent determination thereon. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. See 28 U.S.C. § 636(b)(1)(B) and (C), Fed.R.Civ.P. 73, and LMR 4, Local Rules for the Eastern District of Washington. A magistrate judge's recommendation cannot be appealed to a court of appeals; only the district judge's order or judgment can be appealed.

**\*12** The District Court Executive is directed to enter this Report and Recommendation and to forward copies to Plaintiff, to counsel for Defendants and to the referring judge.

DATED this *13th* day of January, 2006.

E.D.Wash.,2006.

Phipps v. Morgan
Not Reported in F.Supp.2d, 2006 WL 543896 (E.D.Wash.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.