**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

**TYRONE WALKER,**

                               **Plaintiff,**

    vs.                                      9:10-CV-1431
                                                        (MAD/DEP)

**DALE ARTUS,** *Superintendent,*
*Clinton Correctional Facility; et al.,*

                               **Defendants.**

---

**APPEARANCES:**                           **OF COUNSEL:**

**TYRONE WALKER**
**94-A-5258**
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929
Plaintiff *pro se*

**OFFICE OF THE NEW YORK**        **ADELE M. TAYLOR-SCOTT, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff *pro se* Tyrone Walker, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that Defendants deprived him of his civil rights in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), and the Free Exercise Clause of the First Amendment to the United Stated

Constitution. *See* Dkt. No. 1. On January 18, 2013, Defendants filed a motion for summary judgment. *See* Dkt. No. 57-8.

Currently before the Court are Plaintiff's objections to Magistrate Judge Peebles' Report and Recommendation, in which he recommended that Defendants' motion for summary judgment be granted and that this case be dismissed. *See* Dkt. No. 64 at 2.

## II. BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State DOCCS. *See* Dkt. No. 1 at ¶ 1. At all times relevant to this action, he was confined in a Special Housing Unit ("SHU") at Clinton Correctional Facility ("Clinton C.F."), which is located in Dannemora, New York.[2] *See id*.

Plaintiff is one of over 300 Muslim inmates at Clinton C.F. *See* Dkt. No. 63-2 at 31. Jumu'ah is an hour-long Muslim congregate service held on Fridays, and includes aspects of sermon and prayer. *See id.* at 65, 67. Jumu'ah services are provided for Muslim inmates confined at Clinton C.F. on Fridays between 1:00 and 2:00 p.m. *See id.* at 67. According to Imam Assallami Fadle, the Muslim Chaplin assigned to Clinton C.F., although Muslim men are expected to attend Jumu'ah services if they are able to do so, "[i]t is not mandatory for women, or for men who are sick, or for men who are not free to attend service." *See id.* at 54, 66.

---

[1] The Court has adopted Magistrate Judge Peebles' recitation of the relevant factual background, to the extent that it is supported by the record and not objected to by the parties.

[2] In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin*, 26 F. Supp. 2d 615, 618 (S.D.N.Y. 1998) (citing 7 N.Y.C.R.R. pts. 253, 254, and 301).

Pursuant to DOCCS Directive 4933, inmates confined in a SHU cell are prohibited from participating in congregate religious services. 7 N.Y.C.R.R. § 304.9(d). Joseph F. Bellnier, the DOCCS Deputy Commissioner for Correctional Facilities, states that "the possibility of disruption to the smooth operation of the facility is increased" any time inmates congregate.[3] *See* Dkt. No. 57-4 at ¶ 6. For that reason, "SHU inmates do not attend congregate religious services. Instead, religious counseling by a member of the facility's ministerial services staff [is] provided upon the written request of an inmate, and the facility senior chaplain or a designated member of the ministerial services staff is required to make a minimum of one round per week in the SHU."[4] *Id.* at ¶ 12 (citing 7 N.Y.C.R.R. § 304.9). Muslim SHU inmates are also allowed to retain possession of a Quran, Kufi, and a prayer rug; they are permitted to pray demonstratively within their cells; they are permitted to order religious periodicals unless they are prohibited for security purposes; and they are provided an alternative diet in conformity with their religious dietary restrictions, and with accommodations made during feast and fast days. *See* Dkt. No. 57-4 at ¶ 24; *see also* Dkt. No. 57-5 at ¶¶ 9-11. Those religious accommodations are designed to provide an "alternative means for Muslim inmates confined to SHU to practice their religion without undue risk to the safety, security and the good working order of correctional facilities[.]" *See* Dkt. No. 57-4 at ¶ 25.

Because of the prohibition against congregation for SHU inmates, Plaintiff requested permission to participate in Jumu'ah by way of closed circuit television from the secured area in

---

[3] Plaintiff does not challenge the constitutionality of section 304.9(d) in this action. Instead, he only challenges Defendants' denial of his requests to view or listen to Jumu'ah services through video or audio feed into his SHU cell.

[4] Plaintiff alleges that Defendant Assallami does not, in fact, visit Clinton C.F.'s SHU on a weekly basis, nor does a substitute Imam visit when Defendant Assallami is unavailable. *See* Dkt. No. 71 at 11.

the back of his SHU cell. *See* Dkt. No. 1 at 9–10; *see also* Dkt. No. 57-2 at 82. Notwithstanding the fact that SHU inmates currently do not have access to any television of any sort, Plaintiff proposes that monitors could be installed in each cell's Sally port because they are already equipped with wiring for camera/video surveillance. *See* Dkt. No. 57-2 at 82–85. More specifically, Plaintiff requests that Muslim inmates in the SHU who have not received a misbehavior report within the prior thirty days be allowed to go into the Sally port to participate in Jumu'ah via closed circuit television. *Id.* at 85.

In the alternative, Plaintiff requests that Jumu'ah services be broadcast through the audio headphone jack in his SHU cell. *See* Dkt. No. 1 at 10; *see* Dkt. No. 57-2 at 87. The broadcast could either be a live feed or pre-recorded. *See* Dkt. No. 57-2 at 95. According to Plaintiff, by listening to Jumu'ah services on headphones, he could actively participate in the services while still complying with DOCCS' ban on congregating. *See* Dkt. No. 63-2 at 65.

In an effort to gain the opportunity to participate in Jumu'ah services by way of closed circuit television or audio feed, Plaintiff filed grievances at Clinton C.F. on October 21, 2008, July 1, 2010, and September 21, 2010; sent a complaint letter on July 28, 2008 to Defendant Dale Artus, the superintendent at Clinton C.F. at that time; forwarded a written complaint to DOCCS Commissioner Brian Fischer on August 24, 2008; sent three letters, dated February 10, 2009, February 23, 2009, and March 2, 2009, to Defendant Assallami; and lodged a complaint, dated September 21, 2010, with Defendant Thomas LaValley, the current superintendent at Clinton C.F. *See* Dkt. No. 1 at 9–10; Complaint Exhs. 16–22 (Dkt. Nos. 1-2, 1-3). Defendant Artus has no personal recollection of having addressed Plaintiff's requests. *See* Dkt. No. 57-3 at 2. The record nonetheless demonstrates that he delegated a number of Plaintiff's complaints to staff for investigation, and denied Plaintiff's grievance dated July 1, 2010, in light of the absence

4

of a DOCCS Directive providing for closed circuit television for religious services. *See id.* at 2,
111. On appeal from the superintendent's ruling, DOCCS Central Office Review Committee
upheld the denial, finding that Plaintiff had "not presented any compelling reasons to place
CCTV in his cell to watch Muslim services." As it relates to Defendant LaValley, he has no
personal recollection of receiving or responding to Plaintiff's letter dated September 21, 2010.
*See* Dkt. No. 57-5 at ¶ 4. Defendant Assallami acknowledges that he spoke with Defendant
Artus regarding Plaintiff's request to participate in Jumu'ah services by way of closed circuit
television, but was informed that it "was not a decision the Superintendent was authorized to
make." *See* Dkt. No. 63-2 at 61; *see also* Dkt. No. 63-2 at 54.

Defendants have submitted evidence explaining the necessary steps DOCCS would have
to take to meet Plaintiff's requests for accommodations. Thomas McQuade, a Facilities Planning
Specialist employed by DOCCS, explains that each SHU cell is equipped with three wall jacks,
all of which are audio-only capable, and not currently capable of carrying a video feed. *See* Dkt.
No. 57-6 at ¶ 6. Therefore, to accommodate Plaintiff's request that all Jumu'ah services be
broadcast over closed circuit television in SHU cells, DOCCS would be required to install the
necessary video wiring, as well as televisions. More specifically, as McQuade explains in his
declaration,

> [t]o do this properly, the existing wiring would need to be
> modified with a type of cable for in-cell television. Conduit will
> need to be run to provide the extra jack as well as power to each
> cell. SHU cells are not normally provided user connectable
> power outlets due to security concerns. New control equipment
> would also be required, as well as the inmate would need to
> purchase an approved television from the facility. To accomplish
> this, the [DOCCS] would need to issue a [New York State Office
> of General Services] project for each facility through its capital
> construction program to perform the necessary work. Design fees

> and construction costs could be several hundred thousand dollars
> or greater at a facility depending on the size of the SHU.

*Id.* at ¶ 9.

Regarding Plaintiff's request to permit Muslim SHU inmates to listen to Jumu'ah services through an audio feed, the existing wiring in the SHU does not allow an independent signal to be sent to a particular cell. *See id.* at ¶ 6. Accordingly, in the event DOCCS satisfied this request, the same religious programming that Plaintiff, as a Muslim, would receive in his cell, would also be provided to all of the other SHU inmates, regardless of their religious beliefs. *See id.* Moreover, according to McQuade, the audio option is not feasible because DOCCS would be forced to install the equipment in all of the SHUs throughout its facilities, of which there are forty-eight, in an effort to maintain consistency, which is important to maintaining the security and order of facilities. *See id.* at ¶¶ 7-8; *see also* Dkt. No. 57-4 at ¶ 18 ("Providing benefits to one group of inmates can lead to manipulative behaviors which place a substantial strain on staffing and other resources"). McQuade explains that "[e]ach [of the forty-eight] facilit[ies] would need to provide wiring equipment to extend from the place of worship an audio signal to the existing radio distribution rack for the SHU. Staff would be required to set up the equipment for the service, as well as operate the program selection to send the audio over one of the three channels." *See* Dkt. No. 57-6 at ¶ 8. According to McQuade, "[u]nder current financial restraints, [where] there is reduced budget for new infrastructure projects[,] . . . DOCCS does not currently have the means to accommodate Plaintiff's request, or the monetary resources to divert to the type of investment it would take to do so." *Id.* at ¶¶ 4, 10; *see also* Dkt. No. 57-4 at ¶¶ 18-20, 25.

In addition to the financial concerns, there are a number of safety concerns associated with re-wiring the SHU cells to make them capable of permitting SHU inmates to view Jumu'ah services through closed circuit television or listening through an audio feed. For example, because of the behavioral concerns that lead to the placement of inmates in SHU, any video displays or wiring would need to be secured and resistant to tampering to prevent any components from being fashioned into weapons or escape paraphernalia. *See* Dkt. No. 57-4 at ¶ 15.

### A.     Magistrate Judge Peebles' Report and Recommendation

In their motion for summary judgment, Defendants presented the following arguments: (1) Defendants did not have sufficient authority or personal involvement to support a claim for damages; (2) there are compelling penological justifications for denying Plaintiff access to congregate religious services; (3) the current policy is the least restrictive means of achieving the State's compelling interests; and (4) Defendants are entitled to qualified immunity. *See* Dkt. No. 57-8 at 10–21. In a September 27, 2013 Report and Recommendation, Magistrate Judge Peebles recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint. *See* Dkt. No. 64 at 28.

### B.     Plaintiff's Objections

In his objections to Magistrate Judge Peebles' recommendations, Plaintiff first argues that Magistrate Judge Peebles erred in finding that Defendants' current policy is the least restrictive means of meeting the State's compelling penological goals. *See* Dkt. No. 71 at 8–9. Specifically, Plaintiff argues that using the least restrictive means require allowing him to

participate in Jumu'ah services by listening to the services on a portable audio device (such as a walkman) while in the Sally port behind his cell. *See id.* at 8. Plaintiff claims that Magistrate Judge Peebles failed to properly address this alternative possibility that would allow Plaintiff to participate in Jumu'ah services. *See id.* at 9.

Next, Plaintiff argues that Magistrate Judge Peebles erred in finding Plaintiff had an alternative means of exercising his allegedly burdened right. *See id.* at 10–11. Magistrate Judge Peebles found that there was record evidence demonstrating the numerous accommodations that Muslim inmates at Clinton C.F. receive in order to practice their religion. This includes Muslim inmates being permitted to "(1) maintain a copy of the Quran, a prayer rug, and a Kufi in their cells; (2) engage in demonstrative prayer in their cells; (3) request alternative meals that satisfy Muslim dietary requirements; (4) eat special meals during Islamic feast days; (5) eat meals after sunset during Islamic feast days; and (6) order religious periodicals, provided they are not [on] a prohibited list for security purposes" under DOCCS Directive 4202. *See* Dkt. No. 64 at 23. The Magistrate Judge also noted that "DOCCS Directive 4933 permits Muslim SHU inmates to meet, one-on-one, with an Imam or religious adviser of their registered religion." *Id.* Plaintiff does not dispute that any of these accommodations have been available to him with the exception of a weekly, one-on-one meeting with an Imam or religious adviser. *See* Dkt. No. 71 at 10–12. Plaintiff claims that Defendant Assallami does not make weekly visits to the SHU, and in contrast to Defendant Assallami's statements, another Imam does not make visits when Defendant Assallami is unavailable. *See id.* at 11. To support this allegation, Plaintiff submitted the SHU log book as Exhibit # 5 in opposition to Defendants' motion for summary judgment. *See* Dkt. No. 63-2 at 73–89. While the log book shows Defendant Assallami entering the SHU less than twenty times between January 5, 2011 and December 2, 2011, Magistrate Judge

8

Peebles noted that Plaintiff did not provide a full copy of the log as there were a number of large gaps in dates in the exhibit provided. *See* Dkt. No. 64 at 4–5. Magistrate Judge Peebles also cited Defendant Assallami's statement that another Imam would visit the SHU in place of Defendant Assallami when he was on vacation. *See id.* at 5. Plaintiff claims that there are gaps in the copy of the log book that he provided because he left out over 300 pages that did not show Defendant Assallami entering the SHU for the reasons of cost and convenience. *See* Dkt. No. 71 at 14. Plaintiff also claims that, contrary to Defendant Assallami's contentions, another Imam has not visited the SHU when Defendant Assallami is unavailable. *See id.*

### III. DISCUSSION

**A.     Standard of Review**

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same argument [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citation and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d

29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513–14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of

summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, at *81 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F. 2d 18, 21 (2d Cir. 1991)).

**B.     First Amendment Claim**

Plaintiff claims that Magistrate Judge Peebles erred in finding that Defendants' decision to deny Plaintiff access to congregate religious services was reasonable. *See* Dkt. No. 71 at 11. Specifically, Plaintiff argues that Magistrate Judge Peebles erred in finding that Defendants have a legitimate penological interest and that Plaintiff has an alternative means of practicing his religion. *See id.* at 24. Plaintiff's main contentions are that Magistrate Judge Peebles failed to properly address (1) evidence that Defendant Assallami or a substitute Imam does not visit the SHU weekly; and (2) Plaintiff's request to listen to tape recordings of Jumu'ah services in the Sally port behind his cell. *See id.* at 8–12.

The United State Supreme Court has held "that a prison inmate retains those First Amendment Rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Included in this First Amendment protection is the right to participate in congregate religious services. *See Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). However, this right to participate in congregate religious services is not absolute. *Id.* Alleged infringements of an inmate's free exercise rights are judged by whether the restriction on the inmate's rights is "reasonable." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Ford v. McGinnis*, 352

11

F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). This reasonableness test is "'less restrictive than that ordinarily applied.'" *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone*, 482 U.S. at 348).

A prisoner bringing a free exercise claim has the initial burden of establishing "that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 275–75. The burden then shifts to the defendants to identify legitimate penological interests which justify the restriction of the plaintiff's free exercise rights. *Salahuddin*, 467 F.3d at 275. The burden on the defendants in this situation is "relatively limited" and the burden remains on the plaintiff to establish that the identified penological interests are irrational or illegitimate. *Id.*; *Ford*, 352 F.3d at 595.

The court must then determine if the challenged regulation or decision is reasonable based on four factors laid out by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 90–91 (1987). *See Salahuddin*, 467 F.3d at 274 (citation omitted). The four factors are:

> [W]hether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (citation and footnote omitted).

As Defendants are not challenging the sincerity of Plaintiff's beliefs, the Court will begin its analysis by considering whether Defendants have satisfied their burden of identifying legitimate penological interests in denying Plaintiff's requests to participate in Jumu'ah services by video or audio means. *See* Dkt. No. 57-8 at 15. In his report and recommendation, Magistrate Judge Peebles found that the record supported Defendants' arguments that allowing

12

Plaintiff and others in the SHU to participate in Jumu'ah services by audio or video feed would require enhanced security measures required by DOCCS directives, would raise concerns that inmates participating in the congregate service could "convey covert messages" to SHU inmates, and would require that the equipment be installed to be tamper-proof so that the inmates would be unable to create weapons from it. *See* Dkt. No. 64 at 20–21; *see also* Dkt. No. 57-4 at ¶¶ 8-11, 15, 18-23. Magistrate Judge Peebles also found there would be substantial costs involved in granting Plaintiff's requests as DOCCS would be required to accommodate similar requests from inmates housed in all forty-eight SHUs across New York State. *See* Dkt. No. 64 at 21; *see also* Dkt. No. 57-4 at ¶¶ 18-20; Dkt. No. 57-6 at ¶¶ 6-10. The evidence also demonstrated that, because the cells would need to be rewired and new equipment would be needed, "[f]ees and construction costs could be several hundred thousand dollars or greater . . ." *See* Dkt. No. 57-6 at ¶ 9.

In Plaintiff's objection to the Report and Recommendation, Plaintiff appears to abandon his argument to participate in Jumu'ah services by closed circuit television or by radio transmission through the wall jacks in his cell. *See* Dkt. No. 71 at 16. Plaintiff instead objects to Magistrate Judge Peebles' decision not to address the alternative suggested during Plaintiff's deposition, that Plaintiff be allowed to participate in Jumu'ah services by listening to the service on a tape recorder in the Sally port behind his cell, asserting that this will alleviate all legitimate penological concerns. *See* Dkt. No. 71 at 8–10. Contrary to Plaintiff's argument, Magistrate Judge Peebles correctly declined to address this proposed alternative. Plaintiff never alleged that Defendants' failure to allow him to participate in Jumu'ah services by way of a tape recorder with pre-recorded services was in violation of his rights. Plaintiff specifically stated in his complaint that Defendants violated the his free exercise rights as well as RLUIPA by "depriving Plaintiff

13

the opportunity to listen to Jumuah Services on the headphone jack or view it on a closed circuit TV. . . ." *See* Dkt. No. 1 at 20. There is no mention of the possibility of the alternative Plaintiff is now suggesting. It is well established that "a plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint." *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007) (citing cases).

Plaintiff's claim that the alternative was suggested by the attorney for Defendants is of no consequence, as he is bringing it before the Court for the first time in his objections to the Report and Recommendation. Furthermore, as Magistrate Judge Peebles correctly states, there is no evidence to suggest that Plaintiff has exhausted his administrative remedies as there is nothing showing that Plaintiff ever formally requested to participate in Jumu'ah services by listening to pre-recorded tapes or that Defendants ever denied such requests. *See* Dkt. No. 64 at 22 n.11.

Further, Magistrate Judge Peebles correctly determined that Plaintiff has an adequate means to exercise his burdened right as DOCCS Directive 4202 establishes several accommodations Muslim SHU inmates receive for their religious beliefs and that the denial of participation in congregate religious services is only one of many traditions that is denied while an inmate is confined in the SHU. *See* Dkt. No. 64 at 22-23; *see also O'Lone*, 482 U.S. at 351–52; *Vega v. Lantz*, No. 04–CV–1215, 2009 WL 3157586, *6–*7 (D. Conn. Sept. 25, 2009).

Plaintiff argues in his objections to the Report and Recommendation that this determination was error because Defendant Assallami has not visited the SHU a minimum of once a week as required by 7 N.Y.C.R.R. § 304.9. *See* Dkt. No. 71 at 10–11. In support of this allegation, Plaintiff provided a copy of portions of the SHU log book, which, according to Defendant Assallami, is the official record of SHU visits. *See* Dkt. No. 63-2 at 70. While the log

14

book entries provided show that Defendant Assallami visited the SHU less than 20 times during 2011, Magistrate Judge Peebles correctly points out that there are large gaps in the dates of the log book provided by Plaintiff. *See id.* at 73–89; *see also* Dkt. No. 64 at 4–5. Due to the missing dates in the log book, there is insufficient evidence in the record to show that Defendant Assallami, or a substitute Imam, did not visit the SHU on a weekly basis as Defendant Assallami has stated. *See* Dkt. No. 63-2 at 62, 65. Furthermore, even assuming that Plaintiff is correct in his assertion that a religious adviser visited the SHU less than twenty times during the year of 2011, that would not change the fact that Plaintiff received numerous other accommodations to practice his religion as stated above. Even without weekly visits from Defendant Assallami or a substitute Imam, the "alternative means" factor is satisfied in this case. *See O'Lone* 482 U.S. at 352 (holding that the "alternative means" factor was satisfied because the "respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' motion for summary judgment should be granted on Plaintiff's First Amendment claim.

## C.    **RLUIPA Claim**

Plaintiff also objects to Magistrate Judge Peebles' finding that Plaintiff's RLUIPA claim should be dismissed and relies on the same arguments as discussed above under the First Amendment analysis.

RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as

> defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> **(1)** is in furtherance of a compelling governmental interest; and
>
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). As Magistrate Judge Peebles noted, "'RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment.'" *See* Dkt. No. 64 at 25 (quoting *Jova v. Smith*, 582 F. 3d 410, 415 (2d Cir. 2009)).

The Court finds that Magistrate Judge Peebles was correct in finding that Defendants' actions in this case have met those heightened duties. After determining that Plaintiff's right was substantially burdened, the Magistrate Judge was required to determine whether Defendants had shown that the burden on Plaintiff furthered a compelling governmental interest and whether the means used were the least restrictive way of achieving that interest. *Hartnett v. Barr*, 538 F. Supp. 2d 511, 520 (N.D.N.Y. 2008).

Here, as discussed above in the context of Plaintiff's First Amendment claim, Defendants have set forth a great deal of evidence in regard to the security and cost concerns involved with granting Plaintiff's request. *See* Dkt. No. 64 at 20–21; *see also* Dkt. No. 57-4 at ¶¶ 8-23; Dkt. No. 57-6 at ¶¶ 4-10. These substantial safety and cost concerns lead the Court to conclude that Defendants have demonstrated a compelling governmental interest.

As to whether the burden placed on Plaintiff is the least restrictive means necessary to serve this compelling interest, it is important to note that Plaintiff's requests were very specific. Plaintiff requested that either a closed circuit television or additional wiring for an audio feed be installed in his cell to allow him to watch and/or listen to Jumu'ah services. Both of these

requests gave rise to the compelling security and cost concerns discussed above and Defendants therefore chose to deny the request.[5]

Also as discussed above, while Plaintiff has now abandoned his initial requests and now wishes to listen to pre-recorded services on a tape player, the Magistrate Judge correctly refused to consider this alternative request for relief because it was first placed before the Court in Plaintiff's opposition to Defendants' motion for summary judgment. *See Murray v. Palmer*, No. 9:03-cv-1010, 2008 WL 2522324, *22 (N.D.N.Y. June 20, 2008) (holding that "a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment") (citing *Auguste v. Dept. of Corr.*, 424 F. Supp. 2d 363, 368 (D. Conn. 2006)); *see also Alster v. Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) (quotation omitted).

Therefore, the Court finds that Magistrate Judge Peebles was correct in determining that Defendants' denial of Plaintiff's requests further a compelling governmental interest and represent the least restrictive means necessary, and that the Court should grant Defendants' motion as to Plaintiff's RLUIPA claim.

---

[5] Plaintiff relies on *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 412 (D. Mass. 2008), *aff'd*, 578 F.3d 39 (1st Cir. 2009) (holding that a "ban on participation [special management unit] inmates by closed-circuit television is not the least restrictive means of vindicating the compelling interest at issue"). However, Magistrate Judge Peebles is correct that *Hudson* is distinguishable as "the Massachusetts Department of Correction did not offer any technical reason that would prevent closed circuit television broadcasting of Jumu'ah services in the [special management unit]." *See* Dkt. No. 64 at 24 (footnote omitted).

## IV. CONCLUSION

After careful review of Magistrate Judge Peebles' Report and Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' September 27, 2013 Report and Recommendation is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 57) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 21, 2014
       Albany, New York

Mae A. D'Agostino
U.S. District Judge